**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:**<br><br>**ANIMO BANCORP, INC.,**<br><br>**DEBTOR.** | §<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 24-50359-alt**<br><br>**Chapter 7** |
| **JOHN PATRICK LOWE, TRUSTEE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TOBY NEUGEBAUER AND MELISSA NEUGEBAUER,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 26-05011-alt** |

**TRUSTEE'S TRADITIONAL MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS TOBY NEUGEBAUER AND MELISSA NEUGEBAUER**

Plaintiff John Patrick Lowe (the "Trustee") as the duly-appointed Chapter 7 Trustee for the estate of Animo Bancorp, Inc. (the "Debtor" or "Bancorp"), files this Traditional Motion for Summary Judgment (the "Motion") against Defendants Toby Neugebauer ("Toby") and Melissa Neugebauer ("Melissa," and collectively with Toby, the "Neugebauers" or "Defendants"), and shows the following:

## I. SUMMARY OF MOTION

1. This Adversary Proceeding stems from Defendants' decision to take $7,000,000 of the Debtor's funds in exchange for zero value. Defendants' theft of the $7,000,000 left multiple creditors unpaid and rendered the Debtor insolvent as a result.

2. Defendants admit: (1) they each received $3,500,000 from the Debtor's bank

account on November 30, 2022 (collectively, the "Transfers"); (2) they have not returned the Transfers to the Debtor; (3) they provided no services or work that could possibly justify the Transfers; and, as a result, (4) the Debtor was rendered insolvent. Defendants simply took back the capital contributions they made into Bancorp just over a year prior. Notwithstanding these admissions, and after the Trustee filing suit six months ago, Defendants still refuse to return any amount of the Transfers to the Debtor.

3. The Trustee therefore brought this Adversary Proceeding to avoid the Transfers (which were fraudulent) and recover the full $7,000,000 for the benefit of the Estate's creditors. For the reasons set forth herein, the Trustee is entitled to summary judgment on his constructive fraudulent transfer claims (*i.e.*, Counts III,[1] IV, and V[2]) because there is no genuine issue of material fact[3] that Bancorp received no reasonably equivalent value in exchange for the Transfers and was, as a result, left insolvent, with unreasonably small capital, and unable to pay its debts as they matured. The Trustee is therefore entitled – as a matter of law – to recover the full amount of the Transfers.[4]

## II. MATERIAL FACTS

### *A. Bancorp's Formation*

4. Bancorp was formed on May 27, 2021, for the primary purpose of acquiring Ganado Bancshares, Inc. and its wholly owned subsidiary The Citizens State Bank of Ganado

---

1 In Count III, the Trustee brings a claim to avoid the Transfers as constructively fraudulent under the Bankruptcy Code (*i.e.*, 11 U.S.C. § 548(a)(1)(B)).

2 In Counts IV and V, the Trustee brings claims to avoid the Transfers as constructively fraudulent under TEX. BUS. & COM. CODE ("TUFTA") §§ 24.005(a)(2) and 24.006(a).

3 The "open and shut" nature of this Motion is further proven by Defendants filing a "Hail Mary" Motion to Convert [Dkt. 39] to avoid its consequences (i.e., paying back the $7,000,000).

4 This Motion is supported by the summary judgment evidence attached hereto, referenced by exhibit number.

(collectively, "Ganado").[5] Bancorp operated under the broader "GloriFi" umbrella, which was an enterprise designed to develop and launch an integrated financial services platform offering banking, insurance, and mortgage products through a mobile application and website.

5. From inception through the time it filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on March 5, 2024 (the "Petition Date"), Toby and Melissa owned Bancorp in equal 50 percent interests and shared common control.[6,7] In order to successfully charter a bank, Bancorp needed approval from the Federal Reserve Board (the "FRB")[8] and therefore needed to file an application with the FRB to obtain same.

### *B. The Defendants' $7,000,000 Equity Contribution*

6. Ahead of filing the FRB application, Bancorp sought equity funding and issued capital call notices to Toby and Melissa on October 5, 2021.[9] The capital call requested a "Capital Contribution" in the amount of $7,000,000; $3,500,000 from Toby and $3,500,000 from Melissa.[10]

7. On October 7, 2021, Toby and Melissa each contributed $3,500,000 in equity to Bancorp.[11] Defendants' capital contribution was, at all times, structured and recorded in Bancorp's books as equity.[12] The Neugebauers do not dispute that their respective $3,500,000 contributions

---

5 *See* **Exhibit 1-A**, which is a true and correct copy of the Texas Secretary of State's Certificate of Filing approving the Debtor's Certificate of Formation (along with the Certificate of Formation). The Declaration of John Patrick Lowe is attached hereto as **Exhibit 1**.

6 Toby and Melissa each served Objections and Responses to the Trustee's Sets of Discovery. Toby's Responses to the Trustee's First, Second, Third, and Fourth Sets of Discovery are attached hereto as **Exhibit 2**, and Melissa's Responses to the Trustee's First, Second, and Third Sets of Discovery are attached hereto as **Exhibit 3**. *See* Ex. 2, RFA Nos. 1–2; Ex. 3, RFA Nos. 1–2.

7 The Trustee took Toby's deposition on September 11, 2026. Transcript excerpts from Toby's deposition are attached hereto as **Exhibit 4**. *See* Ex. 4, at 33:15–17.

8 *See* 12 U.S.C. § 1842.

9 A true and correct copy of the Capital Call Notice to Toby is attached hereto as **Exhibit 5**. A true and correct copy of the Capital Call Notice to Melissa is attached hereto as **Exhibit 6**.

10 *See* Ex. 5, at Neug-Animo0000247; Ex. 6, at Neug-Animo0000246.

11 *See* Ex. 2, RFA Nos. 4–5; Ex. 3, RFA Nos. 4–5; Ex. 4, at 38:1–21, 39:4–20.

12 *See* **Exhibit 10-A**, at CROWE-ANIMO-000005; CROWE-ANIMO-000007, which includes true and correct

were, indeed, equity.[13]

### *C. Bancorp's Unpaid Obligations to Capco and Other Unsecured Creditors*

8. As part of its role in the larger "GloriFi" initiative, Bancorp retained various third-party vendors to build out GloriFi's banking infrastructure and to lease office space for its operations.[14,15] One such vendor was Capco, a business and technology consulting firm.[16]

9. On August 25, 2021, Bancorp entered into an engagement agreement to retain Capco.[17] This engagement provided that Capco would submit monthly invoices for services rendered, which Bancorp was obligated to pay.[18] Beginning on June 9, 2022, Bancorp ceased paying the Capco invoices.[19] Between June 9, 2022, and November 9, 2022, Capco submitted invoices to Bancorp totaling $396,904.38.[20] On November 14, 2022, Capco sent the Capco

---

copies of the Debtor's Audited Annual Financial Statements for the period May 27, 2021, to December 31, 2021 (prepared by Crowe LLP) along with **Exhibit 10**, the Business Records Declaration of Lindsay Cutler, and reflects that the Neugebauers' $7,000,000 capital contribution was, indeed, equity.

[13] While it initially appeared that the Neugebauers would argue that the Transfers were repayment for a loan, they have since abandoned that position. In his deposition, Toby confirmed that the $7,000,000 contributions were not loans. *See* Ex. 4, at 48:7–15. When asked in written discovery to state any facts supporting the classification of the $7,000,000 provided to Bancorp by Toby and Melissa as a loan, debt, or other repayment obligation (as opposed to equity), Toby and Melissa each responded "[n]one," confirming their admission that the $7,000,000 was an equity infusion rather than a loan. *See* Ex. 2, ROG No. 6; Ex. 3, ROG No. 2. Defendants additionally admit that the $7,000,000 provided by Defendants was not accompanied by a promissory note, did not bear interest, did not include a maturity date, and was not accompanied by any repayment obligation or security interest. *See* Ex. 2, ROG No. 6, RFA Nos. 6–9; Ex. 3, ROG No. 2, RFA Nos. 6–9.

[14] *See In re Animo Bancorp, Inc.,* Case No. 24-50359-alt, Claims Register ("Claims Register"). *See also* **Exhibit 7-A**, which is a true and correct copy of the Capco Markets Company, LLC ("Capco") Engagement Letter, at CAPCO 000301; **Exhibit 7-B**, which is a true and correct copy of the November 14, 2022, Capco Demand Letter (the "Capco Demand"), at CAPCO 000336–000337; and **Exhibit 7**, the Business Records Declaration of Adam Engleman.

[15] *See also* **Exhibit 8-A**, which is a true and correct copy of the lease signed by Bancorp with Birmingham Financial Center, LLC ("Birmingham Financial"), at BFC 000096–000142, along with **Exhibit 8**, the Business Records Declaration of W. Carter Bryars, III.

[16] *See* Ex. 7-A, at CAPCO 000301.

[17] *Id.*

[18] *Id.*

[19] *See* Ex. 7-B, at CAPCO 000336–000337.

[20] *See* Ex. 7-B, at CAPCO 000336–000337.

Demand to Bancorp requesting payment of these invoices, which all remained unpaid.[21]

### *D. The November 30, 2022, Fraudulent Transfers*

10. On November 23, 2022, Bancorp board member Bill Conroy resigned from his position, citing Bancorp's decision to withdraw its application to the Federal Reserve, a decision that ended any hope of Bancorp generating revenue.[22] Fellow board member Miles Everson replied requesting a board meeting, but rather than agree to one, Toby responded that he "[n]eed[ed] capital reinvested" and was dissolving Bancorp.[23]

11. On November 30, 2022, Toby directed and authorized Bancorp to transfer $3,500,000 to himself (the "Toby Transfer") and $3,500,000 to Melissa (the "Melissa Transfer") (*i.e.*, collectively, the "Transfers").[24]

12. The Neugebauers admit that the Transfers were nothing more than a return of the capital they put in just over a year prior.[25] Indeed, in Toby's own words[26]:

> The Toby Transfer was a dollar-for-dollar return of his own October 7, 2021 equity contribution to Bancorp, made after the Federal Reserve denied the company's bank license and shareholders wound the company down — a return of capital that requires no separate asset, property, or service in exchange, which is the basis for the denial.

---

[21] *Id.* Other unsecured creditors, such as Predictive Analytics Group, Inc. ("Predictive"), sent demands for unpaid invoices or other amounts. *See, e.g.*, **Exhibit 9-A**, which is a true and correct copy of a January 11, 2023, demand letter from Predictive, along with **Exhibit 9**, the Business Records Declaration of Stephen R. Hoops.

[22] *See* **Exhibit 1-B**, which is a true and correct copy of the November 23, 2022, email chain involving Bill Conroy, Miles Everson, and Toby, at ABI_Neug_024979–024981. *See also* Ex. 2, RFA No 14.

[23] *See* Ex. 1-B, at ABI_Neug_024979–024981.

[24] Ex. 2, ROG No. 5, RFA Nos. 16–17, 24; Ex. 4, at 40:23–41:11.

[25] *See* Ex. 4, at 35:15–36:7; 40:9–11 (Q. "So November 2022, $3.5 million equity distributions were made to both you and your wife, yes?" A. "Correct."). Additionally, in the Debtor's recently filed Motion to Convert Bankruptcy Case to Chapter 11, the Debtor (which is represented by the Neugebauers' counsel in this Adversary Proceeding) maintains the Transfers were "distributions . . . representing a return of [Toby and Melissa's] October 7, 2021 equity contribution to [Bancorp]." *See* Bankr. Dkt. No. 39 at 4 ¶ 13.

[26] Ex. 2, ROG No. 22 (emphasis added).

13. Immediately preceding the Transfers, the Debtor held $7,135,825.46 in cash.[27] The Transfers drained Bancorp's cash amount to just $135,309.72, less than the $396,904.38 in unpaid invoices specified in the Capco Demand.[28]

### *E. Defendants Did Not Provide Any Services in Exchange for the Transfers*

14. Defendants admit that the Transfers were not made in exchange for any services or work they performed.[29] Indeed, Toby testified that neither he nor Melissa provided any services in exchange for the Transfers.[30] Melissa further admitted that the Melissa Transfer was not made in exchange for any asset, property, or other contemporaneous value.[31]

### *F. Crawford's Expert Analysis of Bancorp's Financial Condition*

15. For the reasons set forth herein, Bancorp's vulnerable financial condition is conclusively established by the Debtor's own bank records (which Defendants also produced) reflecting the funds in Bancorp's account both before and after the Transfers. Nonetheless, the Trustee took the additional step of retaining Rodney L. Crawford ("Crawford"), a Senior Managing Director at GlassRatner Advisory & Capital Group, LLC ("GlassRatner"), as an expert in financial and accounting matters to opine on Bancorp's solvency, capital adequacy, and ability to pay debts as they became due.[32] Based on Crawford's review of Bancorp's financial statements and other accounting records, he concluded the following:

16. As of October 31, 2022, Bancorp's internal consolidated balance sheet evidences

---

27 *See* **Exhibit 1-E**, which includes true and correct copies of Frost Bank Checking Account Statements for the Debtor, at Neug-Animo0001633.

28 *See* Ex. 7-B, at CAPCO 000336–000337; Ex. 1-E, at Neug-Animo0001633.

29 *See* Ex. 2, RFA Nos. 21, 26; Ex. 3, RFA No. 21.

30 *See* Ex. 4, at 48:7–12.

31 Ex. 3, RFA No. 22.

32 *See* **Exhibit 11**, the Declaration of Rodney L. Crawford.

that Bancorp was solvent on a balance sheet basis: Bancorp held $7,237,000 in liquid assets, comprised of $2,750,000 in cash and $4,487,000 in United States Treasury securities, against total liabilities of $1,049,000.[33,34] The internal consolidated balance sheet appears as follows:[35]

**Animo Bancorp, Inc.**
**Consolidated Balance Sheet**
**October 31, 2022**
**(In Thousands)**

| | Oct-22 | Sep-22 | $ Change | | Dec-21 |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash | $ 2,750 | $ 1,608 | $ 1,142 | A | $ 5,523 |
| US Treasury securities | 4,487 | - | 4,487 | B | - |
| Software In-Process | 133 | 133 | - | | - |
| Investment in Citizens State Bank of Ganado | 750 | 750 | - | | 750 |
| Due from related parties | 497 | 497 | - | | - |
| Prepaid expenses | 297 | 331 | (34) | | - |
| Note receivable | - | 5,841 | (5,841) | C | - |
| Operating lease ROU asset | 92 | 98 | (6) | | - |
| **Total assets** | **$ 9,006** | **$ 9,258** | **$ (252)** | | **$ 6,273** |
| LIABILITIES | | | | | |
| Due to Animo Services | $ - | $ - | $ - | | $ 528 |
| Accounts payable and accrued expenses | 956 | 1,006 | (50) | | 46 |
| Operating lease liability | 93 | 99 | (6) | | - |
| **Total liabilities** | 1,049 | 1,105 | (56) | | 574 |
| SHAREHOLDERS' EQUITY | | | | | |
| Additional paid in capital | 12,843 | 12,841 | 2 | | 7,000 |
| Retained deficit | (4,886) | (4,688) | (198) | | (1,301) |
| **Total shareholders' equity** | 7,957 | 8,153 | (196) | | 5,699 |
| **Total liabilities and shareholders' equity** | **$ 9,006** | **$ 9,258** | **$ (252)** | | **$ 6,273** |

17. On November 28, 2022, Bancorp's cash balance totaled $7,135,825.46.[36] The Transfers rendered Bancorp insolvent, as it left Bancorp's cash balance at $135,309.72.[37] This cash balance was insufficient to pay the $396,904.38 in unpaid Capco invoices, let alone the liabilities listed on the October 21, 2022, consolidated balance sheet.[38]

18. Bancorp's only assets other than cash as of October 31, 2022, were a $750,000

---

33 *See* **Exhibit 1-D**, which contains a true and correct copy of Bancorp's October 31, 2022, Monthly Financial Package, at ABI_Neug_024932. *See also* Ex. 11 at p. 9, ¶ 25. *See also* **Exhibit 1-C**, which contains true and correct copies of the Debtor's November 2021 financial statements.

34 As discussed below, the remaining items listed as assets on Bancorp's internal October 31, 2022, consolidated balance sheet had a fair market value of $0. *See* Ex. 11 at pp. 10–12, ¶¶ 27–31.

35 Ex. 1-D, at ABI_Neug_024932.

36 Ex. 1-E, at Neug-Animo0001633.

37 *See* Ex. 1-E, at Neug-Animo0001633; Ex. 11 at p. 10, ¶ 26.

38 *See* Ex. 1-E, at Neug-Animo0001633; Ex. 11 at p. 10, ¶ 26.

forfeitable deposit on the failed Ganado acquisition (which was mischaracterized as an "Investment in Citizens State Bank of Ganado" on Bancorp's October 31, 2022, consolidated balance sheet), software in process, receivables from Animo Services, LLC ("ASL") and With Purpose, Inc. ("WPI") (both of which also operated under the "GloriFi" umbrella), a right of use lease asset, and prepaid expenses comprised of prepaid insurance premiums and IT software.[39] Per Crawford's expert opinion, because Bancorp was winding down operations in late October 2022, it could not be considered a going concern, and therefore the fair value of Bancorp's remaining assets must be analyzed on a liquidation basis.[40] To that end, Crawford concluded that each of Bancorp's non-cash assets had a fair value of $0:

a. The $750,000 forfeitable deposit on the proposed Ganado acquisition was forfeited upon Bancorp's failure to acquire Ganado. Therefore, the value of the deposit may properly be considered fully impaired with a valuation of $0.[41]

b. The software in process had a book value of $133,000 and a fair value of $0 as it had no known cash value or other market value.[42]

c. The prepaid expenses had a book value of $297,000 and a fair value of $0.[43]

d. The receivables from ASL and WPI had a book value of $497,000 and a fair value of $0.[44]

---

[39] *See* Ex. 1-D, at ABI_Neug_024932; Ex. 11 at pp. 10–11, ¶ 27.

[40] Ex. 11 at p. 11, ¶ 29; Ex. 2, ROG No. 22.

[41] Ex. 11 at pp. 10–12, ¶¶ 27–31.

[42] This is further evidenced by the fact that the incomplete software asset could not be monetized. *See* Ex. 11 at p. 11, ¶ 29(a).

[43] *See* Ex. 11 at p. 11, ¶ 29(b). Prepaid expenses for insurance premiums and IT software are generally non-transferable and are without standalone economic value. *Id.* Furthermore, software license fees paid in advance are generally non-refundable. *Id.*

[44] *See* Ex. 11 at pp. 11–12, ¶¶ 29(c). The Court may take judicial notice of the fact that WPI filed a voluntary petition for relief under chapter 7 on February 8, 2023, and ASL filed a voluntary petition for relief under chapter 7 on January 4, 2023. *See In re With Purpose, Inc.*, Case No. 23-30246-mvl7, Dkt. No. 1; *In re Animo Services, LLC*,

e. The right of use lease asset had a book value of $92,000 and a fair value of $0.[45]

19. In total, the fair value of all non-cash Bancorp assets listed on the October 31, 2022, consolidated balance sheet was $0.[46] Bancorp's outstanding liabilities, exclusive of the operating lease liability, totaled $956,000.[47]

20. Crawford concluded that, after the Transfers, Bancorp was insolvent on a balance sheet basis, unable to pay its obligations as they became due, and was left with unreasonably small capital.[48] Crawford further opined that Bancorp was insolvent on a cash flow basis since Bancorp generated no revenue, had no other sources of funding, and owed at least $1,000,000 in liabilities.[49]

21. Crawford additionally concluded that Bancorp remained insolvent at all times following the Transfers and through the Petition Date.[50] Total deposits after the Transfers were less than $1,000.[51] The $135,309.72 remaining in Bancorp's account after the Transfers was reduced to $203.09 by March 1, 2024, largely through three wire transfers totaling $98,100 made that same day.[52]

---

Case No. 23-30035-mvl7, Dkt. No. 1. Per Crawford, the receivables from WPI and ASL had no known cash or other market value based on the financial conditions of these companies as of October 31, 2022. *See* Ex. 11 at pp. 11–12, ¶¶ 29(c).

[45] As Crawford explains, this is a book accounting entry related to GAAP (Generally Accepted Accounting Principles) operating lease accounting and fully offset by a corresponding operating lease liability. Ex. 11 at p. 12, ¶ 29(d).

[46] Ex. 11 at p. 12, ¶ 30.

[47] *Id.*

[48] Ex. 11 at p. 12, ¶ 32.

[49] *Id.*

[50] Ex. 11 at p. 12–13, ¶ 33.

[51] *Id.*

[52] *Id.*; *see also* Ex. 1-E, at Neug-Animo0001649.

## III. ARGUMENTS AND AUTHORITIES

### *I. The Summary Judgment Standard*

22. Summary judgment is appropriate when the record, including the pleadings, depositions, written discovery responses, and any affidavits or declarations, demonstrates that no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(1); *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 418 (Bankr. N.D. Tex. 2021). To prevail at summary judgment on a claim on which the moving party has the burden of proof, the party must establish all of the essential elements "beyond peradventure." *In re Essential Fin. Educ., Inc.*, 629 B.R. at 419 (quoting *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995)). If the Rule 56 standards are met, summary judgment is not to be regarded as a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

23. If the movant meets its burden, the nonmovant must go beyond mere allegations or denials in its pleadings and must designate specific facts showing that a genuine issue of material fact exists for trial. *See In re Aurora Nat. Gas, LLC*, 316 B.R. 481, 482 (Bankr. N.D. Tex. 2004); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A factual dispute is genuine when the evidence is such that a reasonable factfinder could return a verdict in favor of the non-movant. *In re Essential Fin. Educ., Inc.*, 629 B.R. at 419.

### *II. Overview of the Elements of the Trustee's Constructive Fraudulent Transfer Claims and Organization of the Argument*

24. The Trustee asserts three related causes of action arising from the Transfers: (1) constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code; (2) constructive fraudulent transfer under section 24.005(a)(2) of TUFTA; and (3) constructive fraudulent transfer under section 24.006(a) of TUFTA. Although each cause of action arises under

a distinct statutory provision, all three share a common analytical framework: each requires the Trustee to establish (1) a transfer of Bancorp's interest in property; (2) satisfaction of the statute's particular creditor or timing requirement; (3) that Bancorp did not receive reasonably equivalent value in exchange for the Transfers; and (4) that Bancorp's financial condition satisfies one of the relevant statute's alternative financial conditions. 11 U.S.C. § 548(a)(1)(B); TEX. BUS. & COM. CODE § 24.005(a); TEX. BUS. & COM. CODE § 24.006(a).

### *A. Elements of the Trustee's Constructive Fraudulent Transfer Cause of Action Under Section 548(a)(1)(B) of the Bankruptcy Code*

25. A constructive fraudulent transfer claim under the Bankruptcy Code requires "(1) the transfer was of an interest of the debtor in property; (2) the transfer was made or incurred on or within two years before the date of the filing of the petition; (3) the debtor voluntarily or involuntarily received less than reasonably equivalent value in exchange for such transfer or obligation;" and (4) one of the four alternative financial conditions. *In re Essential Fin. Educ., Inc.*, 629 B.R. at 442; *accord In re Wolf*, No. 15-31477-HCM, 2016 WL 4940198, at *28 (Bankr. W.D. Tex. Sept. 15, 2016), *subsequently aff'd*, 697 F. App'x 317 (5th Cir. 2017); 11 U.S.C. § 548(a)(1)(B).

26. As to the fourth element, and of relevance to the Transfers in this case, the debtor (1) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;" (2) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;" or (3) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . ." 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III).

### *B. Elements of the Trustee's Constructive Fraudulent Transfer Cause of Action Under Section 24.006(a) of TUFTA*

27. A trustee is entitled to step into the shoes of an eligible unsecured creditor and avoid transfers under applicable state law such as TUFTA through section 544(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 544(b)(1)*; see also In re Arete Healthcare LLC*, No. 19-52578-CAG, 2022 WL 362924, at *14 (Bankr. W.D. Tex. Feb. 7, 2022). Section 24.006(a) of TUFTA requires the creditor's claim to have arisen before the transfer in question. *See In re Pace*, 456 B.R. 253, 270 (Bankr. W.D. Tex. 2011).

28. Under section 24.006(a) of TUFTA, a transfer is constructively fraudulent if "(1) the debtor transferred an interest in property; (2) without receiving reasonably equivalent value in exchange for the transfer; and (3) while the debtor was insolvent, or became insolvent as a result of the transfer." *In re Essential Fin. Educ., Inc.*, 629 B.R. at 442.

### *C. Elements of the Trustee's Constructive Fraudulent Transfer Cause of Action Under Section 24.005(a)(2) of TUFTA*

29. As with a constructive fraudulent transfer under section 24.006(a) under TUFTA, a trustee is entitled to avoid a transfer that is avoidable under section 24.005(a)(2) of TUFTA through section 544(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 544(b)(1)*; see also In re Arete Healthcare LLC*, 2022 WL 362924, at *14. An eligible creditor under section 24.005(a)(2) must have a claim that "arose before or within a reasonable time after the transfer was made or the obligation was incurred." TEX. BUS. & COM. CODE § 24.005(a); *In re Giant Gray, Inc.*, 629 B.R. 814, 851 (Bankr. S.D. Tex. 2020).

30. A transfer is constructively fraudulent under section 24.005(a)(2) of TUFTA if "(1) the debtor transferred an interest in property; (2) without receiving reasonably equivalent value in exchange for the transfer . . . ." and (3) by showing the debtor: "(A) was engaged or was about to

engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *In re Essential Fin. Educ., Inc.*, 629 B.R. at 442; TEX. BUS. & COM. CODE § 24.005(a)(2).

### *III. The Transfers Constitute a Transfer of the Debtor's Interest in Property Made Within the Applicable Statutory Periods*

31. It is without question that the funds comprising the Transfers – *i.e.*, money that was in the Debtor's bank account – constitute "an interest of the [D]ebtor in property." *See* 11 U.S.C. § 548(a)(1); TUFTA § 24.002(12). Indeed, the Neugebauers admit that they provided $7,000,000 to Bancorp as equity on October 7, 2021, and without any repayment obligation, confirming Bancorp held legal and equitable title to those funds, unencumbered by any trust, lien, or security interest.[53] This is the same money the Neugebauers admit they took back via the Transfers.[54] Had the Transfers not been made, the $7,000,000 now in the Neugebauers' pockets would have been property of the Debtor's estate. *See, e.g., In re Jenkins*, 617 B.R. 91, 104-05 (Bankr. N.D. Tex. 2020).

32. Further, it is undisputed that the Transfers occurred within the two-year look-back period from Bancorp's March 5, 2024, Petition Date.[55]

33. Consequently, there is no genuine issue of material fact that the Transfers constitute a transfer of an interest of the Debtor in property within two years preceding the Petition Date.

---

[53] *See* Ex. 2, ROG No. 6, RFA Nos. 4–5; Ex. 3, RFA Nos. 4–5.

[54] *See* Ex. 2, ROG No. 5, RFA Nos. 16–17, 24; Ex. 4, at 40:23–41:11.

[55] *See* Ex. 2, RFA Nos. 16–17; Ex. 3, RFA No. 16.

### IV. *Several Actual Unsecured Creditors Whose Claims Arose Before or Within a Reasonable Time After the Transfers Exist, Establishing the Trustee's Derivative Standing Under § 544(b)(1)*

34. Section 544(b)(1) of the Bankruptcy Code allows a Trustee to invoke sections 24.005(a)(2) and 24.006(a) of TUFTA to avoid constructively fraudulent transfers under Texas state law. *See* 11 U.S.C. § 544(b)(1)*; see also In re Arete Healthcare LLC*, 2022 WL 362924, at *14. To do so, a Trustee must show that an unsecured creditor[56] existed at the time of the date of the petition. *In re Fresh Acquisitions, LLC*, 671 B.R. 171, 191 (Bankr. N.D. Tex. 2025).

35. Section 24.006(a) of TUFTA requires the golden creditor's claim to have arisen before the transfers in question, while an eligible creditor under section 24.005(a) may be before or within a reasonable time after such transfers. TEX. BUS. & COM. CODE § 24.006(a); TEX. BUS. & COM. CODE § 24.005(a). Courts take judicial notice of unsecured creditors listed on the claims register and the associated proofs of claim in determining the sufficiency of summary judgment evidence. *See In re Fresh Acquisitions, LLC*, 671 B.R. at 191.

36. Several unsecured creditors are listed on the Claims Register in the Debtor's bankruptcy case, including but not limited to Capco, Personetics Technologies, Inc., Birmingham Financial, and Predictive.[57] The Capco Demand establishes that Bancorp owed Capco $396,904.38 in unpaid invoices by November 14, 2022, at the latest.[58] The Transfers occurred on November 30, 2022.[59] Accordingly, Capco's unsecured claim arose before the Transfers.

37. Therefore, as a matter of law, no genuine issue of material fact exists as to the existence of a golden creditor, allowing the Trustee to invoke sections 24.006(a) and 24.005(a)(2)

---

[56] Commonly referred to as a "golden creditor." *See, e.g.*, *In re Essential Fin. Educ., Inc.*, 629 B.R. at 420.

[57] *See* Claims Register, Claim Nos. 3, 5, 6, and 7.

[58] *See* Ex. 7-B, at CAPCO 000336–000337.

[59] *See* Ex. 2, RFA Nos. 16–17.

of TUFTA.

### *V. The Transfers Were Not Made in Exchange for Reasonably Equivalent Value*

38. The absence of reasonably equivalent value is an element common to each of the Trustee's constructive fraudulent transfer causes of action. *See* 11 U.S.C. § 548(a)(1)(B)(i); TEX. BUS. & COM. CODE §§ 24.005(a)(2), 24.006(a). The Bankruptcy Code does not define reasonably equivalent value. *In re Triplett*, 651 B.R. 196, 203 (Bankr. E.D. Tex. 2023). However, Fifth Circuit precedent provides that reasonably equivalent value means "'the debtor has received value that is substantially comparable to the worth of the transferred property.'" *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994)). Under TUFTA, "reasonably equivalent value" is defined as "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COM. CODE § 24.004(d). Courts measure reasonably equivalent value from the standpoint of the creditors. *In re TransTexas Gas Corp.*, 597 F.3d at 306. When determining whether transfers were made for reasonably equivalent value, the court's focus is on the "net effect of the transfers on the debtor's estate, and the funds available to unsecured creditors." *In re Essential Fin. Educ., Inc.*, 629 B.R. at 442-43.

39. Multiple courts applying a reasonably equivalent value analysis under section 548 of the Bankruptcy Code and applicable derivative state constructive fraudulent transfer causes of action have held that equity distributions and returns of prior capital contributions are not transfers made for reasonably equivalent value.[60] Indeed, under similar circumstances, courts have concluded as follows:

---

[60] *See In re BK RACING, LLC*, No. 18-30241, 2024 WL 1060972, at *17 (Bankr. W.D.N.C. Mar. 11, 2024) (quoting *5 Collier on Bankruptcy*, ¶ 548.05[2][c]) ("Dividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value.'"); *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003) (noting that distributions made on account of

> A recipient of a fraudulent transfer may not defend against such claim by asserting that a company was merely returning a prior capital contribution to her. . . . The whole point of a capital contribution is that it provides resources to which creditors (not equity holders) have first rights. Once a capital contribution is made, that contribution has inured to the benefit of the entity's creditors, and as equity capital it cannot be reclaimed . . . if by doing so would be in violation of creditors' rights under fraudulent transfer laws. If the Defendants were right, then any dividend payment recipient could assert, in defense to a fraudulent transfer claim, that the recipient was merely reclaiming some of the capital contributions that it had previously made. I know of no authority for the proposition that such a defense can be asserted, and the whole notion defies common sense.

*In re Fun Bowl Vacations, Inc.*, 666 B.R. 867, 879 (Bankr. S.D.N.Y. 2025) (quoting *In re GBG USA Inc.*, 666 B.R. 115, 139-40 (Bankr. S.D.N.Y. 2024)) (internal brackets, parentheses, and quotations omitted).

40. Here, as set forth above, it is undisputed that the $7,000,000 provided by the Defendants on October 7, 2021, was an equity infusion.[61] It is further undisputed that the Transfers were simply a return of the capital they put into Bancorp in October 2021.[62] If that was not enough, the Neugebauers admit that the Transfers were not made in exchange for any work or services they performed for the Debtor.[63,64]

41. Accordingly, as a matter of law, the Transfers – whether classified as an equity distribution or return of capital – were not made in exchange for *any* value (let alone reasonably equivalent value). *See, e.g.*, *In re Brentwood Lexford Partners*, 292 B.R. at 267. No genuine issue of material fact exists, and the Trustee is entitled to summary judgment.

---

equity ownership are not made for reasonably equivalent value); *In re Coley*, 608 B.R. 625, 646 (Bankr. E.D.N.C. 2019) (holding the transfers were a return of capital which "as a matter of law is not value to the transferor").

[61] *See* Ex. 2, ROG Nos. 6, 22, RFAs Nos. 6–9; Ex. 3, ROG No. 2, RFA Nos. 6–9.

[62] *See* Ex. 2, ROG No. 22; Ex. 4, at 35:15–36:7, 40:9–11.

[63] *See* Ex. 2, RFA Nos. 21, 26; Ex. 3, RFA No. 21.

[64] In response to the Trustee's interrogatories, Toby even went as far as saying that the only value Bancorp received in exchange for the Toby Transfer was the value of Toby's own October 7, 2021, "equity contribution to Bancorp," and that the Toby Transfer was a "return of capital that requires no separate asset, property, or service in exchange . . . ." *See* Ex. 2, ROG No. 22.

## *VI. Bancorp's Financial Condition Satisfies the Financial Element of Each Cause of Action*

42. The financial condition element may be satisfied by showing any one of three alternative conditions: insolvency, unreasonably small capital/assets, or an inability to pay debts as they mature. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III); TEX. BUS. & COM. CODE §§ 24.005(a)(2)(A)-(B), 24.006(a). As shown below, Bancorp satisfies all three.

### *A. Bancorp Became Insolvent as a Result of the Transfers*

43. "Under the Bankruptcy Code, an entity is insolvent where its financial condition is 'such that the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation* . . . .'" *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 891 (Bankr. W.D. Tex. 1992) (quoting 11 U.S.C. § 101(32)(A)). Likewise, TUFTA states that "'a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation.'" *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 737 (Bankr. S.D. Tex. 2020) (quoting TEX. BUS. & COM. CODE § 24.003(a)). Courts employ a balance sheet test when analyzing insolvency, while assigning assets their market value at the time of the disputed transfers. *In re Pioneer Home Builders*, 147 B.R. at 891-92. Under Texas law, a debtor that is generally not paying its debts as they become due is presumed insolvent. TEX. BUS. & COM. CODE § 24.003(b).

44. As a direct result of the Transfers, Bancorp became insolvent as a matter of law under both the Bankruptcy Code and TUFTA. As set forth above, Bancorp was solvent as of October 31, 2022, where the fair value of its assets equaled $7,237,000 against total liabilities of $956,000,[65] and its assets other than cash and U.S. Treasury securities had a fair value of $0.[66] On

---

[65] Liabilities totaled $1,049,000 but were $956,000 exclusive of the operating lease liability. *See* Ex. 11 at p. 9, ¶ 25; Ex. 11 at p. 12, ¶ 30.

[66] Ex. 1-D, at ABI_Neug_024932; *see also* Ex. 11 at pp. 11–12, ¶¶ 29–30.

November 28, 2022, Bancorp held $7,135,825.46 in cash.[67] Following the Transfers, Bancorp retained only $135,309.72 in cash, an amount less than its approximately $956,000 in total liabilities, and insufficient to even satisfy the $396,904.38 demanded by Capco alone, let alone Bancorp's other creditors.[68,69] Because Bancorp's liabilities exceeded its assets immediately following the Transfers, Bancorp was insolvent as a matter of law.

### *B. Bancorp Was Engaged in a Business or Transaction for Which Its Remaining Property Constituted Unreasonably Small Capital/Assets*

45. Neither the Bankruptcy Code nor TUFTA define "unreasonably small" capital. *In re Pioneer Home Builders*, 147 B.R. at 894. Courts have recognized that unreasonably small capital reflects a lesser degree of financial distress than insolvency. *See id.* Unreasonably small capital reflects a debtor's general inability to generate sufficient cash flow on the date of the transfer to sustain ongoing operations and pay its debts. *See In re WCC Holding Corp.*, 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994); *see also In re Houston Drywall, Inc.*, No. 05-95161-H4-7, 2008 WL 2754526, at *28 (Bankr. S.D. Tex. July 10, 2008). Both the Bankruptcy Code and TUFTA require that the disputed transfer cause the unreasonably small capital condition. *See In re Pioneer Home Builders*, 147 B.R. at 894.

46. Before the Transfers, Bancorp held $7,237,000 in liquid assets, which was more than enough capital to pay its obligations.[70] By the time of the Transfers, the FRB had denied Bancorp's application to acquire Ganado, blocking its only prospective avenue to revenue.[71] With

---

[67] Ex. 1-E, at Neug-Animo0001633.

[68] Bancorp was not generally paying its debts as they became due both before and after the Transfers. *See* Ex. 7-B, at CAPCO 000336–000337; *see also* Ex. 9-A, at PAG000070–000071. As such, insolvency is presumed under Texas law. *See* TEX. BUS. & COM. CODE § 24.003(b).

[69] *See* Claims Register. *See also* Ex. 11 at p. 10, ¶ 26; Ex. 11 at p. 12, ¶ 30.

[70] For example, the total amount of claims in the Claims Register was $1,280,248.16. *See* Claims Register. The $7,237,000 in liquid assets was more than enough to pay those claims. *See* Ex. 11 at p. 9, ¶ 25.

[71] *See* Ex. 2, ROG No. 22.

no operations, no revenue, and no remaining path to generate cash flow, the Transfers rendered Bancorp's capital unreasonably small, leaving it with only $135,309.72 in cash and unable to satisfy its existing creditors, including the $396,904.38 demanded by Capco just sixteen days prior to the Transfers.[72] Thus, as a matter of law, the Transfers left Bancorp with an unreasonably small amount of capital.

### *C. Bancorp Reasonably Should Have Believed It Would Incur Debts Beyond Its Ability to Pay as They Became Due*

47. Section 548 of the Bankruptcy Code and section 24.005(a)(2) of TUFTA offer an additional avenue for satisfying the financial condition element: a showing that the debtor intended to incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they matured. 11 U.S.C. § 548(a)(1)(B)(ii)(III); TEX. BUS. & COM. CODE § 24.005(a)(2)(B).[73]

48. Bancorp's post-Transfer cash balance of $135,309.72 was significantly lower than Capco's demand of $396,904.38 for already past-due invoices, let alone Bancorp's $956,000 in liabilities.[74,75] On the date of the Transfers, Bancorp, which became insolvent as a result of the Transfers, reasonably should have believed that it would incur debts beyond its ability to pay as they became due. *See In re Triplett,* 651 B.R. at 204-05; *see also In re Houston Drywall, Inc.*, 2008 WL 2754526, at *28 (holding that the debtor reasonably should have believed it could not pay its debts as they became due because it was insolvent at the time of the transfer). Furthermore,

---

[72] *See* Ex. 1-E, at Neug-Animo0001633; *see also* Ex. 7-B, at CAPCO 000336–000337.

[73] While the text of section 548 of the Bankruptcy Code suggests a subjective intent, bankruptcy courts hold that the intent requirement can be inferred where the facts establish that the debtor could not have reasonably believed that it would be able to pay its debts as they matured. *See In re Triplett*, 651 B.R. at 204. Section 24.005(a)(2)(B)'s text explicitly allows either a subjective or objective standard. *See* TEX. BUS. & COM. CODE § 24.005(a)(2)(B); *see also In re Pace*, 456 B.R. at 274.

[74] As stated above, liabilities totaled $1,049,000, but totaled $956,000 exclusive of the operating lease liability. *See* Ex. 11 at p. 10, ¶ 26; Ex. 11 at p. 12, ¶ 30.

[75] *See* Ex. 1-E, at Neug-Animo0001633; *see also* Ex. 7-B, at CAPCO 000336–000337.

Defendants have admitted that the Transfers left Bancorp with an insufficient amount to satisfy the outstanding Capco invoices.[76]

49. Accordingly, as a matter of law, Bancorp intended to incur, or believed or reasonably should have believed that Bancorp would incur, debts beyond Bancorp's ability to pay as they became due.

### *VII. The Trustee is Entitled to Recover the Full Amount of the Transfers Under Section 550*

50. Under section 550 of the Bankruptcy Code, the Trustee is entitled to recover, from an immediate transferee, the full amount of any transfer that is avoided under sections 544 and 548. *See* 11 U.S.C. § 550(a). The Neugebauers have admitted that they are the transferees of the Transfers, and it is undisputed that the Neugebauers have not returned any amount of the Transfers to the estate.[77] For all of the reasons set forth herein, the Transfers are avoidable as constructive fraudulent transfers. Accordingly, the Trustee is entitled – as a matter of law – to recover the full amount of the Transfers from the Neugebauers. The Trustee seeks such relief from this Court.

## IV. CONCLUSION

51. For the foregoing reasons, there is no genuine issue of material fact that Defendants Toby and Melissa Neugebauer received $7,000,000 in transfers from Bancorp that are constructively fraudulent under 11 U.S.C. § 548(a)(1)(B) and TUFTA §§ 24.005(a)(2) and 24.006(a). Accordingly, the Trustee is entitled to judgment as a matter of law against Defendants. The Trustee respectfully requests that this Court grant this Motion, enter judgment in the Trustee's favor in the amount of $7,000,000, and award such further relief as the Court deems just and proper.

---

[76] *See* Ex. 2, RFA No. 40.

[77] *See* Ex. 2, RFA No. 23; Ex. 3, RFA No. 23.

Respectfully submitted,

*/s/ Joshua J. Iacuone*
**CHASE J. POTTER**
Texas State Bar No. 24088245
potter@imcplaw.com
**Greg McAllister**
Texas State Bar No. 24071191
greg@imcplaw.com
**JOSHUA J. IACUONE**
Texas State Bar No. 24036818
josh@imcplaw.com
**JOSHUA L. SHEPHERD**
Texas State Bar No. 24058104
shepherd@imcplaw.com
**JESSE A. OKIROR**
Texas State Bar No. 24065843
jesse@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Avenue, Suite 1112
Dallas, Texas 75206
(214) 432-1536 - Telephone

**SPECIAL COUNSEL FOR THE TRUSTEE**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system on this 21st day of September, 2026.

*/s/ Joshua J. Iacuone*
**JOSHUA J. IACUONE**