# EXHIBIT 8

**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 24-50359-alt** |
| **ANIMO BANCORP, INC.,** | § | **Chapter 7** |
| **DEBTOR.** | § | |
| **JOHN PATRICK LOWE, TRUSTEE,** | § | |
| **Plaintiff,** | § | **Adversary No. 26-05011-alt** |
| **v.** | § | |
| **TOBY NEUGEBAUER AND MELISSA NEUGEBAUER** | § | |
| **Defendants.** | § | |

## BUSINESS RECORDS DECLARATION

1. My name is W. Carter Bryars, III I am over twenty-one (21) years of age, have never been convicted of a felony, and am competent to make this Declaration. The matters set forth herein are within my personal knowledge and are true and correct.

2. I am the custodian of records for Birmingham Financial Center, LLC ("Birmingham Financial") with respect to the documents requested and produced in response to the subpoena issued in the above-referenced adversary proceeding by the Trustee's counsel to Birmingham Financial (the "Subpoena").

3. By virtue of my duties and responsibilities as the custodian of records for Birmingham Financial, I am familiar with the manner in which Birmingham Financial's records are created and maintained.

4. Attached are 142 pages of records being produced in response to the Subpoena (the "Records") and "Bates" labeled "BFC 000001" through "BFC 000142."

5. The Records are kept under my care, supervision, custody, and control.

6. The Records are original records or exact duplicates of the original records.

7. The Records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth therein.

8. The Records were made by, or from information transmitted by, persons with knowledge of the matters set forth in the records, and it is the regular practice of Birmingham Financial for these types of records to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.

9. The Records were kept in the course of regularly conducted business activity, and it is the regular practice of Birmingham Financial to make these Records.

My name is W. Carter Bryars, III. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Jefferson County, State of Alabama on September 09, 2026.

DECLARANT
CARTER W. BRYARS, III

EXHIBIT
8-A

*Execution Version*

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (the "**Lease**"), dated 2/26/2022, 2022, is made and entered into by and between **BIRMINGHAM FINANCIAL CENTER, LLC**, a Delaware limited liability company ("**Landlord**"), and **ANIMO BANCORP, INC.**, a Texas corporation ("**Tenant**").

**1.** Basic Lease Information.

| | | | |
|---|---|---|---|
| Base Rental: | Base Rental shall be the following amounts for the following periods of time: | | |
| | Lease Month | **Annual Base Rental Rate Per Rentable Square Foot** | **Monthly Base Rental** |
| | 1 – 12 | $19.00 | $5,603.42 |
| | 13 - 24 | $20.00 | $5,898.33 |
| | | | |
| Base Year: | The calendar year 2022. | | |
| Building: | The Premises are contained in the Financial Center located at 505 20th Street North, Birmingham, Alabama, which Building contains 311,201 net rentable square feet of space. | | |
| Commencement Date: | March 1, 2022 | | |
| Estimated Delivery Date: | N/A | | |
| Landlord's Address: | Birmingham Financial Center, LLC<br>c/o Daniel Corporation<br>505 20th Street North, Suite 1000<br>Birmingham, Alabama 35203 | | |
| Parking Spaces: | See **Paragraph 51** below. | | |
| Permitted Use: | General office use consistent with the character of a first class office building. | | |

| | | |
|---|---|---|
| Premises: | Suite No. 1450, containing approximately 3,539 net rentable square feet, located on the 14th floor. | |
| Rental: | Base Rental, Additional Rental, and all Other Charges. | |
| Security Deposit: | N/A | |
| Tenant Improvement Allowance: | N/A | |
| Tenant's Proportionate Share: | 1.14%, determined by dividing the net rentable square footage contained in the Premises by the net rentable square footage contained in the Building. | |
| Tenant's Address: | Prior to Commencement Date:<br>________________________<br>________________________<br>________________________<br>Attn: ____________________ | After Commencement Date:<br><br>AT THE PREMISES |
| Term: | 24 full calendar months, plus any partial month from the Commencement Date to the end of the month in which the Commencement Date falls, starting on the Commencement Date and ending at 5:00 p.m. local time on the last day of the 24th full calendar month following the Commencement Date, subject to adjustment and earlier termination as provided in the Lease. The Term shall mean the initial Term of this Lease and any renewals or extensions thereafter, provided that Tenant shall not have any right to renew or extend the Term except as expressly set forth herein. | |
| Landlord's Broker: | Daniel Realty Services, L.L.C. | |
| Tenant's Broker: | N/A | |
| Special Provisions: | See **Exhibit H** below. | |

The foregoing Basic Lease Information is incorporated into and made a part of the Lease identified above. If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control. Terms used above in the left column are defined terms for purposes of this Lease and shall have the meanings set forth in the right column above.

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

**2. Premises.** In consideration of the rents, terms, provisions and covenants of this Lease, Landlord hereby leases unto Tenant and Tenant hereby rents and accepts from Landlord the Premises. The Premises are outlined on the floor plan attached hereto as **Exhibit A** and incorporated herein by reference. The land on which the Building is situated, together with all improvements located thereon (collectively, the "**Property**"), is more particularly described on **Exhibit B** attached hereto and incorporated herein by reference.

**3. Tender of Possession.** Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in its current "as is" condition on or about the Commencement Date. If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Commencement Date, then (i) the validity of this Lease shall not be affected or impaired thereby, (ii) Landlord shall not be in default hereunder or be liable for damages therefore, (iii) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant, and (iv) the March 1, 2022 date set forth in the definition of the "Commencement Date" in Section 1 above shall be extended on a day for day basis for every day of delay in delivery of possession of the Premises to Tenant. Any occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Base Rental and Additional Rental (each as defined herein). Upon the occurrence of the Commencement Date, Tenant shall execute and deliver to Landlord a Commencement Date Agreement substantially in the form of **Exhibit C** hereto (the "**Commencement Date Agreement**") confirming, among other things, (i) the Commencement Date and the expiration date of the initial Term, (ii) that Tenant has accepted the Premises, and (iii) that Landlord has performed all of its obligations with respect to the Premises; however, the failure of the parties to execute such letter shall not defer the Commencement Date or otherwise invalidate this Lease.

Taking of possession by Tenant shall be deemed conclusively to establish Tenant has accepted the Premises as suitable for Tenant's intended use and that Landlord's construction obligations with respect to the Premises have been completed and the Premises, to the extent of Landlord's construction obligations with respect thereto, are in good and satisfactory condition (subject to completion of any incomplete or corrective items specified in a punch list approved by Landlord and Tenant).

**4. Rent.**

(a) **Base Rental**. Tenant shall timely pay to Landlord the Base Rental, without notice, demand, deduction or set off (except as otherwise expressly provided herein), by good and sufficient check drawn at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes. The obligations of Tenant to pay Base Rental and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Base Rental, adjusted as herein provided, shall be payable monthly in advance. The first monthly installment of Base Rental shall be payable contemporaneously with the execution of this Lease; thereafter, Base Rental shall be payable on the first day of each month beginning on the first day of the second full calendar month of the Term. The monthly Base Rental for any partial month at the beginning of the Term shall equal the product of 1/365 of the annual Base Rental in effect during the partial month and the number of days in the partial month and shall be due on the

Commencement Date. Payments of Base Rental for any fractional calendar month at the end of the Term shall be similarly prorated. Tenant shall pay Additional Rental at the same time and in the same manner as Base Rental.

(b) **Additional Rental.** If Operating Expenses (as hereinafter defined) in any calendar year exceed the actual Operating Expenses for the Base Year (such excess amount shall hereinafter be referred to as the "**Operating Expense Pass-through Amount**"), Tenant shall pay to Landlord, as additional rental ("**Additional Rental**"), Tenant's Proportionate Share of the Operating Expense Pass-through Amount as set forth below. If this Lease commences or terminates on a date other than January 1, the annual Operating Expenses and the Operating Expenses for the Base Year shall be prorated by multiplying one-twelfth (1/12) of the annual Operating Expenses and one-twelfth (1/12) of the Operating Expenses for the Base Year each by the number of full or partial months between the Commencement Date and December 31 of the year of commencement or between January 1 of the year of termination and the termination date, as the case may be.

(i) **Operating Expenses.** "**Operating Expenses**" are all the expenses paid by or on behalf of Landlord in connection with the management, ownership, operation, service and maintenance of the Property (including the Premises), including, without limitation, the following: (A) Real Estate Taxes (as hereinafter defined); (B) premium costs for liability, boiler, extended coverage, casualty and other insurance covering the Property maintained by Landlord; (C) electricity, gas, water and other utility charges for the Property; (D) repair and maintenance of HVAC systems, elevators, irrigation systems and other mechanical systems; (E) repair and maintenance of the Common Areas (as hereinafter defined) and the Building structure and roof; (F) trash removal and snow removal; (G) janitorial service; (H) reasonable wages, salaries and fees of operating, auditing, accounting, maintenance and management personnel in connection with the Property; (I) all payroll charges for such personnel, such as unemployment and social security taxes, workers' compensation, health, accident and group insurance, and other so-called fringe benefits; (J) rental charges for office space chargeable to the operation and management of the Property; (K) licenses, permits and inspection fees; (L) supplies and materials used in the operation and management of the Property; (M) furnishings and equipment not treated by Landlord as capital expenditures of the Property; (N) depreciation and the cost of any labor saving devices that may, from time to time, be placed in operation as a part of Landlord's maintenance program; (O) personal property taxes on property used in the operation, maintenance, service and management of the Property; (P) the costs, as reasonably amortized by Landlord, with interest at the rate of ten percent (10%) per annum on the unamortized amount, of any capital improvement made after completion of initial construction of the Building which reduces Operating Expenses, but in an amount not to exceed such reduction for the relevant year; (Q) management fees relating to the Property; (R) the reasonable cost of any installation or improvement required by reason of any law, ordinance or regulation, which requirement did not exist on the date of the Lease and is generally applicable to similar office buildings; and (S) any association or other fees due under any covenants, conditions and restrictions or the like. In no event shall Tenant's Additional Rental for any calendar year relating to controllable Operating Expenses (excluding government

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

regulations, utilities, taxes and insurance) increase by more than a cumulative five percent (5%) over that for the previous calendar year.

Notwithstanding anything to the contrary set forth herein, if ninety-five percent (95%) or less of the net rentable area leased or held for lease for general office purposes in the Building is occupied and fully provided with Building-standard services during any partial year or any full calendar year, an adjustment shall be made in computing each component of Operating Expenses for such year so that Operating Expenses shall be computed for such year as though ninety-five percent (95%) of the net rentable area leased or held for lease for general office purposes in the Building had been occupied and fully provided with Building-standard services during such partial or full year.

(ii) **Real Estate Taxes**. "**Real Estate Taxes**" shall include all taxes, and assessments, special or otherwise, exclusive of penalties or discounts levied upon or with respect to the Property, including the Premises, imposed by any federal, state or local governmental agency, and including any use, occupancy, excise, sales or other like taxes (other than general income taxes on rent or other income for the Building computed in the case of a graduated tax, as if Landlord's rent and other income from the Building was Landlord's sole taxable income). Real Estate Taxes also shall include the expense of contesting the amount or validity of any such taxes, charges or assessments, such expense to be applicable to the period of the item contested. Real Estate Taxes shall not, however, include income, franchise, capital stock, estate or inheritance taxes unless Landlord reasonably determines that such taxes are in lieu of real estate taxes, assessments, rental, occupancy and other like excise taxes. For purposes of this Lease, Real Estate Taxes for any calendar year shall be those taxes the last timely payment date for which occurs within such calendar year. In case of special taxes or assessments payable in installments, only the amount of the installment(s) the last timely payment date for which occurs on or after the first day and on or before the last day of such year shall be included in Real Estate Taxes for that year. Landlord shall retain the sole right to participate in any proceedings to establish or contest the amount of Real Estate Taxes. If a complaint against valuation, protest of tax rates or other action increases or decreases the Real Estate Taxes for any calendar year, resulting in an increase or decrease in rent hereunder, the Real Estate Taxes for the affected calendar year shall be recalculated accordingly and the resulting increased rent plus the expenses incurred in connection with such contest, or decreased rent, less the expenses incurred in connection with such contest, shall be paid simultaneously with or applied as a credit against, as the case may be, the rent next becoming due.

(c) **Payment of Proportionate Share.** To provide for current payments of Operating Expenses, Tenant shall pay Tenant's Proportionate Share of the Operating Expense Pass-through Amount, as estimated by Landlord from time to time, in twelve (12) monthly installments, commencing on the first day of the month following the month in which Landlord notifies Tenant of the amount of its estimated Proportionate Share. Landlord and Tenant intend to estimate the amount of Operating Expenses for each year and then to reconcile such estimated expenses in the following year based on actual Operating Expenses for such year paid by Landlord. If Tenant's Proportionate Share of the actual Operating Expense Pass-through Amount shall be greater than or less than the aggregate of all installments so paid on account to

Landlord for such twelve (12) month period, then within ten (10) days of Tenant's receipt of Landlord's statement of reconciled Operating Expenses, Tenant shall pay to Landlord the amount of such underpayment, or Landlord shall credit Tenant for the amount of such overpayment against the next maturing installment(s) of rent, as the case may be. The obligation of Tenant with respect to the payment of Tenant's Proportionate Share of the Operating Expense Pass-through Amount shall survive the termination of this Lease. Any payment, refund, or credit made pursuant to this **subparagraph 4(c)** shall be made without prejudice to any right of Tenant to dispute the statement as hereinafter provided, or of Landlord to correct any item(s) as billed pursuant to the provisions hereof. Landlord's failure to give such statement shall not constitute a waiver by Landlord of its right to recover Rental that is due and payable hereunder.

(d) **Dispute of Operating Expenses.** If Tenant questions in writing any such notice of reconciled Operating Expenses (or revised notice thereof), and if the question is not amicably settled between Landlord and Tenant within thirty (30) days after said notice of reconciled Operating Expenses (or revised adjusted) has been given, Landlord shall, during the sixty (60) days next following the expiration of such thirty (30) day period, employ an independent certified public accountant, to be reasonably approved by Tenant, to audit Operating Expenses. The determination of such accountant shall be final, conclusive and binding upon Landlord and Tenant. Tenant understands that the actual itemization of, and the amount of individual items constituting, Operating Expenses is confidential; and while Landlord shall keep and make available to such accountant all records in reasonable detail, and shall permit such accountant to examine and audit such of Landlord's records as may reasonably be required to verify such reconciled Operating Expenses, at reasonable times during business hours, Landlord shall not be required to (and the accountant shall not be permitted to) disclose to any person, firm or corporation, including to Tenant, any such details (it being the intent of the parties that such accountant shall merely certify to Landlord and to Tenant the correct amount of adjusted additional Operating Expenses for the calendar year). Any change in the reconciled Operating Expenses required by such accountant's determination shall be made within thirty (30) days after such determination has been rendered. The expenses involved in such determination shall be borne by Tenant and deemed to be Additional Rental under this Lease, unless the results of such audit determine that the difference between the Operating Expenses as determined by the audit and the Operating Expenses as determined by Landlord is greater than ten percent (10%) of the Operating Expenses as determined by Landlord, in which case such expenses shall be borne by Landlord. If Tenant does not, in writing, question the reconciled Operating Expenses within thirty (30) days after such notice has been given, Tenant shall be deemed to have approved and accepted such reconciled Operating Expenses.

(e) **Adjustments to Operating Expenses.** If a clerical error occurs or Landlord or Landlord's accountants discover new facts, which error or discovery causes Operating Expenses for any period to increase or decrease, upon notice by Landlord to Tenant of the adjusted Operating Expenses for such calendar year, the adjusted Operating Expenses shall apply and any deficiency or overpayment of Tenant's Proportionate Share of the Operating Expense Pass-through Amount, as the case may be, shall be paid by Tenant or taken as a credit by Tenant according to the provisions set forth in **subparagraph 4(c)**. Additionally, Landlord shall have the right, from time to time, to remeasure the Building and to readjust Tenant's Proportionate Share as applicable. This provision shall survive the termination of the Lease.

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

(f) **No Decrease in Base Rental**. If the actual Operating Expenses are less than the Operating Expenses for the Base Year, the annual Base Rental as set forth in the Basic Lease Information shall not be reduced.

(g) **Other Charges**. All costs, expenses and other sums that Tenant assumes or agrees to pay to Landlord pursuant to this Lease ("**Other Charges**") shall be deemed rental and, in the event of nonpayment thereof, Landlord shall have all the rights and remedies herein provided for in case of nonpayment of Base Rental. If any Rental is not received on or before the fifth (5th) day of the month in which it is due, other remedies for nonpayment of Rental notwithstanding, Tenant shall pay to Landlord a late charge of five percent (5%) of such installment of Rental for the purpose of defraying Landlord's administrative expenses incident to the handling of such overdue payment, and such past due Rental shall bear interest at the greater of: (i) a rate of interest equal to fifteen percent (15%) per annum; or (ii) a rate of interest equal to the prime rate as announced from time to time by Bank of America, N.A. (or its successor-in-interest) plus three percent (3%) per annum (the "**Default Rate**"), for each day from the first day of the month through the date such installment of Rental is received by Landlord.

(h) **Place of Payment**. Tenant shall pay all rent and other charges due under this Lease without demand, deduction or set off to Landlord in accordance with the instructions set forth in **Exhibit G** attached hereto, or at such other place as Landlord may designate from time to time hereafter by written notice to Tenant.

(i) **No Partial Payment**. No payment by Tenant or acceptance by Landlord of an amount less than the Rent herein stipulated or otherwise becoming due shall be deemed a waiver of any other Rent due. No partial payment or endorsement on any check or any letter accompanying such payment of Rent shall be deemed an accord and satisfaction, but Landlord may accept such payment without prejudice to Landlord's right to collect the balance of any Rent due under the terms of this Lease or any late charge assessed against Tenant hereunder. All payments received by Landlord shall be applied by Landlord as Landlord shall determine, regardless of any notation that may be made on any check or any letter accompanying such payment.

**5. Construction.**

(a) **Intentionally Deleted.**

(b) **Condition of Premises.** Landlord shall deliver the Premises to Tenant in its "As Is" condition and shall have no obligation to improve the Premises. Landlord has made no representation respecting the condition of the Premises, the Building or the Property. Tenant is leasing the Premises on an "as is, where is" basis and Landlord shall have no obligation to install any leasehold improvements within the Premises. At the termination of this Lease, by lapse of time or otherwise, Tenant shall remove all Tenant's property, including, but not limited to, trade fixtures, from the Premises, and shall return the Premises broom-clean and in as good a condition as when Tenant took possession or as same may thereafter have been put by Landlord, except for ordinary wear, loss by fire or other casualty, and repairs that Landlord is required to make under this Lease. If Tenant fails to remove any or all of its property upon termination of

this Lease, such property shall be deemed to be abandoned and shall become the property of Landlord.

(c) **Overload**. To coordinate orderly move-ins and move-outs, no furniture, freight or equipment of any kind exceeding three hundred (300) pounds shall be brought into the Building without prior notice to Landlord and Landlord shall designate the time and manner of moving the same. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property from any cause, and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at Tenant's expense.

**6. Use of the Premises.**

(a) **Permitted Use**. Tenant shall only use the Premises for the Permitted Use. Tenant shall not, without the prior written consent of Landlord, exhibit, sell or offer for sale on the Premises or in the Building any article or thing.

(b) **Advertisement.** Tenant shall not advertise the business, profession or activities of Tenant conducted in the Building in any manner that violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business of Tenant, and shall never use any picture or likeness of the Building in any circulars, notices, advertisements or correspondence without Landlord's prior written consent.

(c) **Solicitation**. Tenant shall not disturb, solicit, or canvass any occupant of the Building and shall cooperate with Landlord to prevent same.

(d) **Care**. Tenant shall use and occupy the Premises so that no other occupant of any adjoining premises will be unreasonably disturbed and shall create no nuisance in, upon or about the Premises. Subject to the provisions of **Paragraph 9(b)**, Tenant shall take good care of the Premises, the fixtures and appurtenances thereto, and all alterations, additions and improvements thereto. Tenant will not make or permit to be made any use of the Premises or any part thereof, and will not bring into or keep anything in the Premises or any part thereof, that (i) violates any of the covenants, agreements, terms, provisions and conditions of this Lease; (ii) directly or indirectly is forbidden by public law, ordinance or regulation of any governmental or public authority (including zoning ordinances); (iii) is dangerous to life, limb or property; (iv) increases the risk to Landlord or any other tenant or invalidates or increases the premium cost of any policy of insurance carried on the Building or covering its operation; or (v) in the sole judgment of Landlord, in any way impairs or tends to impair the character, reputation or appearance of the Property as a first-class office building, or impairs or interferes with any of the services performed by Landlord for the Property.

(e) **Noise; Odors**. Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises; permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

reason of noise, odors and/or vibrations; interfere in any way with other tenants or those having business therein; or bring in or keep any animals or birds in the Premises. Tenant shall not use the Premises for housing accommodations or lodging or sleeping purposes, or do any cooking therein, excepting coffee makers and microwave ovens, or use any illumination other than electric light.

**7. Alterations.**

(a) **Prohibition**. Tenant shall not make any alterations, additions or improvements (collectively, the "**Alterations**") in or to the Premises, or in or to the Building without the express prior written consent of Landlord; provided, however, that Landlord's consent shall not be required for any cosmetic, nonstructural Alterations that do not affect the mechanical, electrical or plumbing systems of the Building that cost less than $5,000.00. Before commencing any work in connection with the Alterations, Tenant shall furnish to Landlord for its approval the following: (i) detailed plans and specifications therefore, (ii) names and addresses of each of the contractors and subcontractors, (iii) copies of all contracts, subcontracts and necessary permits, (iv) a payment and performance bond, or other indemnification, in form and amount satisfactory to Landlord, protecting Landlord against any and all claims, costs, damages, liabilities and expenses that may arise in connection with the Alterations, (v) such documentation as is necessary to comply fully with the mechanics' lien law of the state in which the Premises is located, and (vi) certificates of insurance, in form and amount satisfactory to Landlord, from all contractors and subcontractors who will perform labor or furnish materials, insuring Landlord against any and all liability for personal injury, including workers' compensation claims and for property damage that may arise out of or be in any manner connected with the Alterations. Tenant shall ensure that all Alterations shall at all times comply with all applicable laws.

(b) **Indemnification.** In addition to the indemnity set forth in **Paragraph 13** of this Lease, Tenant hereby specifically agrees to indemnify and hold harmless Landlord from and against any and all liabilities, costs and expenses of every kind and description, including attorneys' fees, that may arise out of or in any manner be connected with any Alterations made by Tenant. Tenant shall pay the cost of all such Alterations and all costs associated with decorating the Premises that may be occasioned thereby. Upon completion of any such Alterations, Tenant shall furnish Landlord with: (i) receipted bills covering all labor and materials used, together with such documentation as is necessary to comply fully with the mechanics' lien law of the state in which the Premises is located; (ii) a true and correct copy of the certificate of occupancy, if one is issued; and (iii) a certificate of Tenant's architect or engineer stating that such Alterations were made in accordance with the plans and specifications.

Notice is hereby given that Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for such labor or material shall attach to or affect the reversion or other estate or interest of Landlord in and to the Premises.

(c) **Compliance and Supervision of Alterations.** All Alterations made by Tenant hereunder shall be installed in a good and workmanlike manner, using only materials of the same or higher quality as those installed in the Building. All Alterations shall comply with

all requirements of Landlord's insurance carriers and with all laws, rules, ordinances and regulations of any lawful authority. Tenant shall permit Landlord to employ a contractor to complete Tenant's Alterations or to supervise construction operations in connection with any such Alterations, if Landlord requests the right to do so (but Landlord shall have no obligation to make such requests, or having done so, to supervise construction) and Tenant shall pay for all costs associated with such Alterations, including, but not limited to, overhead, general conditions, fees and other costs of the Alterations. Landlord's employment of a contractor to complete Alterations and/or supervision of construction shall be done solely for the benefit of Landlord and shall not alter Tenant's liability and responsibility under this **Paragraph 7**.

(d) **Landlord's Property.** All Alterations, whether temporary or permanent, including hardware, non-trade fixtures and wall and floor coverings, whether placed in or upon the Premises by Landlord or Tenant, shall become Landlord's property and shall remain with the Premises at the termination of this Lease, whether by lapse of time or otherwise, without compensation, allowance or credit to Tenant; provided, however, that notwithstanding the foregoing, Landlord may request that any or all of said Alterations in or upon the Premises made by Tenant be removed by Tenant at the termination of this Lease. If Landlord requests such removal or if Tenant removes its trade fixtures, Tenant shall remove the same prior to the end of the Term and shall repair all damage to the Premises, the Building or the Property caused by such removal. Tenant shall not, however, be required to remove pipes and wires concealed in floors, walls or ceilings, provided that Tenant properly cuts and caps the same, and seals them off in a safe, lawful and workmanlike manner, in accordance with Landlord's reasonable requirements and all applicable building codes. If Tenant does not remove any Alterations when requested by Landlord to do so, Landlord may remove the same and repair all damage caused thereby, and Tenant shall pay to Landlord the cost of such removal and repair immediately upon demand therefore by Landlord, plus ten percent (10%) of the cost of such removal to reimburse Landlord for its administrative expense. Tenant's obligation to observe or perform this covenant shall survive the expiration or termination of this Lease.

(e) **Wiring.** Landlord will direct electricians as to where and how telephone and computer wires are to be introduced. No boring or cutting for wires will be allowed without Landlord's consent. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to Landlord's approval.

**8. Mechanics' Liens.**

(a) If, because of any act or omission of Tenant, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against any portion of the Premises, Tenant, at its own cost and expense, shall cause the same to be discharged of record or bonded against within ten (10) days of the filing thereof unless Tenant shall contest the validity of such lien by appropriate legal proceedings diligently conducted in good faith and without expense to Landlord; and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including attorneys' fees, on account thereof.

(b) If Tenant shall fail to cause such liens to be discharged of record or bonded against with the aforesaid ten (10) day period or shall fail to satisfy such liens within ten (10) days after any judgment in favor of such lien-holders from which no further appeal might be

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

taken, then Landlord shall have the right to cause the same to be discharged. All amounts paid by Landlord to cause such liens to be discharged, plus interest on such amounts at the Default Rate, shall constitute Other Charges payable by Tenant to Landlord.

**9. Maintenance and Repair.**

(a) **Tenant's Maintenance.** Tenant, at its sole cost and expense, shall maintain and repair during the Term of this Lease the Premises and every part thereof and any and all appurtenances thereto, including, but not limited to, the doors and interior walls of the Premises; special light fixtures; kitchen fixtures; auxiliary heating, ventilation, or air-conditioning equipment serving the Premises (i.e. as opposed to serving the Building in general); private bathroom fixtures and any other type of special equipment, together with related plumbing or electrical services; and rugs, carpeting, wall coverings and drapes within the Premises, whether installed by Tenant or by Landlord on behalf of Tenant, and whether or not such items will become Landlord's property upon expiration or termination of this Lease. Notwithstanding the provisions hereof, in the event that repairs required to be made by Tenant become immediately necessary to avoid possible injury or damage to persons or property, Landlord may, but shall not be obligated to, make repairs to such items at Tenant's expense, which shall constitute Other Charges payable by Tenant to Landlord. Within ten (10) days after Landlord renders a bill for the cost of said repairs, Tenant shall reimburse Landlord. Tenant shall at once report, in writing, to Landlord any defective or dangerous condition known to Tenant. To the fullest extent permitted by law, Tenant hereby waives all rights to make repairs at the expense of Landlord or in lieu thereof to vacate the Premises as may be provided by any law, statute or ordinance now or hereafter in effect. Landlord has no obligation and has made no promise to alter, remodel, improve, repair, decorate or paint the Premises or any part thereof, except as specifically and expressly herein set forth.

(b) **Landlord's Maintenance**. Subject to **subparagraph 9(a)** above, Landlord shall keep, repair and maintain the Building (including the roof and structural members, the Common Areas, mechanical and electrical equipment (except to the extent such mechanical and electrical equipment is Tenant's responsibility pursuant to **subparagraph 9(a)** above), the exterior and architectural finish, and all items except those excepted elsewhere in this Lease), and the lawn, shrubs and other landscaping on the Property, all in good and tenantable condition during the Term of this Lease. Landlord shall, in addition, supply reasonable snow removal for the walkways and parking areas of the Property during Normal Business Hours (as hereinafter defined). Tenant shall notify Landlord immediately when any repair to be made by Landlord is necessary. If any portion of the Building or the Premises is damaged through the fault or negligence of Tenant, its agents, employees, invitees or customers, then Tenant shall promptly and properly repair the same at no cost to Landlord; provided, however, that Landlord may, at its option, make such repairs and Tenant shall, on demand, pay the cost thereof, together with interest at the Default Rate to Landlord as Other Charges. Tenant shall immediately give Landlord written notice of any defect or need for repairs, after which notice Landlord shall have reasonable opportunity to repair same or cure such defect. For the purposes of making any repairs or performing any maintenance, with advance notice to Tenant when reasonable, Landlord may block, close or change any entrances, doors, corridors, elevators or other facilities in the Building or in the Premises, and may close, block or change sidewalks, driveways or parking areas of the Property provided that Landlord shall use commercially reasonable efforts to

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

minimize interference with Tenant's business operations. Landlord shall not be liable to Tenant, except as expressly provided in this Lease, for any damage or inconvenience and Tenant shall not be entitled to any abatement of rent by reason of any repairs, alterations or additions made by Landlord under this Lease.

(c) **Inspection**. Tenant shall permit Landlord, its agents, employees and contractors, at any time in the event of an emergency, and otherwise with twenty-four (24) hours advance notice, to take any and all measures, including inspections, repairs, alterations, additions and improvements to the Premises or to the Building, as may be necessary or desirable to safeguard, protect or preserve the Premises, the Building or Landlord's interests; to operate or improve the Building; to comply on behalf of Tenant with all laws, orders and requirements of governmental or other authority (if Tenant fails to do so); to examine the Premises to verify Tenant's compliance with all of the terms, covenants, obligations and conditions of this Lease; or to exercise any rights with respect to the Premises that Landlord may exercise in the event of default by Tenant.

**10. Common Areas.**

(a) **Grant.** During the Term of this Lease, Landlord grants to Tenant, its employees, customers and invitees, a nonexclusive license to use, in common with all others to whom Landlord has granted or may hereafter grant a license to use, the common areas of the Property, including, but not limited to, the sidewalks, lobbies, halls, passages, exits, entrances, elevators, stairways, restrooms, parking areas (except as provided for in **subparagraph (b)** below), driveways and landscaped areas (collectively, the "**Common Areas**") subject to reasonable rules and regulations respecting the Common Areas as Landlord may from time to time promulgate. The Common Areas shall not be obstructed by Tenant or used for any purpose other than for ingress to and egress from the Premises. The Common Areas are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence, in the judgment of Landlord, shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing herein contained shall be construed to prevent such access to persons with whom Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. Neither Tenant, nor its employees, customers or invitees, shall go upon the roof or mechanical floors or into mechanical areas of the Building.

(b) **Right to Change Common Areas**. Landlord may do and perform such acts in and to the Common Areas as Landlord, in its good business judgment, shall determine to be advisable. Landlord hereby reserves the right to make alterations, additions, deletions or changes to the Common Areas, including, but not limited to, changes in its size and configuration.

**11. Building Services.**

(a) **Electric**. Landlord shall provide electricity for all normal business operations from the regular Building supply through fixtures installed by Landlord (or by Tenant with Landlord's prior written consent); provided that Tenant shall reimburse Landlord, at rates fixed by Landlord, for electricity used by Tenant for any special equipment, supplementary air-

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

conditioning or refrigerating installed by or for Tenant, such equipment to be designed, installed and separately metered at Tenant's expense. Tenant shall not exceed Tenant's Proportionate Share of the maximum electrical load available to the Building.

(b) **Water.** Landlord shall provide water for drinking, lavatory and toilet purposes from the regular Building supply (at the prevailing temperature) through fixtures installed by Landlord (or by Tenant with Landlord's prior written consent); provided that Tenant shall reimburse Landlord, at rates fixed by Landlord, for water used by Tenant for supplementary air-conditioning or refrigerating installed by or for Tenant and for any other water used by Tenant (except for public drinking water and public lavatory use).

(c) **Air-Conditioning and Heat**. Landlord shall provide air-conditioning and heat to the Premises for comfortable occupancy during Normal Business Hours assuming an occupancy density not greater than one person per 200 rentable square feet, for any given room or area within the Premises, and subject at all times, however, to restrictions placed upon Landlord by any duly constituted governmental agency and/or by any utility supplier. Tenant shall cooperate reasonably with Landlord to assure the effective operation of the Building's air-conditioning and heating systems, and if windows are operable, to keep them closed when the air-conditioning or heating system is in use. Tenant shall not use any apparatus or device in, upon or about the Premises that in any way may materially increase the amount of such services usually furnished or supplied to tenants, and Tenant shall not connect any apparatus or device with the conduits or pipes, or other means by which such services are supplied for the purpose of using additional or unusual amounts of such services, without the prior written consent of Landlord. If Tenant uses such services under this provision to excess, Landlord reserves the right to charge Tenant for such services as an Other Charge at the rate then in effect at the Property. In the event Tenant desires HVAC usage outside of the Normal Business Hours, Tenant shall request such additional HVAC usage not less than twelve (12) hours in advance of such usage, and shall pay for such additional usage at the then prevailing rate at the Building (which is currently $50.00 per hour). If Tenant refuses to make payment upon demand of Landlord, such excess charge shall constitute a breach of the obligation to pay Rental under this Lease and shall entitle Landlord to the rights granted in this Lease for such breach.

(d) **Janitor Service.** Landlord shall provide janitor service in and about the Premises and the Building at the end of each Monday, Tuesday, Wednesday and Thursday, and at Landlord's option, at the end of either Sunday or Friday, except for Holidays (as hereinafter defined). Tenant shall not provide any janitor service without Landlord's prior written consent. If Landlord consents to janitor service provided by Tenant, the same shall be subject to Landlord's rules and regulations and to Landlord's supervision, but at Tenant's sole cost and expense (without reduction in Rental). Landlord shall further provide carpet cleaning in the Common Areas and window cleaning at such times as Landlord, in its sole opinion, considers that such cleaning is necessary. Tenant shall cooperate with any janitor service in keeping the Premises neat and clean. Landlord shall be in no way responsible to Tenant, its agents, employees or invitees, for any loss of property from the Premises or for any damage to property thereon, from any cause.

(e) **Elevator Service.** If the Building contains elevators, Landlord shall provide passenger elevator service at all times.

(f) **Interruption of Services.** Tenant hereby acknowledges that any one or more of the utilities or building services specified in this **Paragraph 11** may be interrupted or diminished temporarily by Landlord or other person until certain repairs, alterations or other improvements to the Premises or other parts of the Property can be made or by any event or cause which is beyond Landlord's reasonable control, including, without limitation, any ration or curtailment of utility services; that Landlord does not represent, warrant or guarantee to Tenant the continuous availability of such utilities or building services; and that any such interruption shall not be deemed or construed to be an interference with Tenant right of possession, occupancy and use of the Premises, shall not render Landlord liable to Tenant for damages or entitle Tenant to any reduction of Rental, and shall not relieve Tenant from its obligation to pay Rental and to perform its other obligations under this Lease.

(g) **Normal Business Hours**. For purposes of this Lease, "**Normal Business Hours**" shall mean 7:00 a.m. to 6:00 p.m., Monday through Friday, not including Holidays and 7:00 a.m. to 12:00 p.m. on Saturday.

(h) **Holidays.** For purposes of this Lease, Holidays shall include New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving and Christmas.

**12. Estoppel Certificates.** Within ten (10) days after written request by Landlord, Tenant shall execute acknowledge and deliver to Landlord or to Landlord's mortgagee, prospective mortgagee, land lessor or prospective purchaser of the Property or any part thereof, an estoppel certificate, in form and substance substantially similar to that attached hereto as **Exhibit E** and incorporated herein by reference. Tenant shall make such modifications to such estoppel certificate as may be necessary to make such certificate true and accurate, it being intended that any such statement delivered pursuant to this **Paragraph 12** may be relied upon by any such mortgagee, prospective mortgagee, prospective purchaser, or land lessor of the Property. If Tenant fails to provide such estoppel certificate within ten (10) days after Landlord's request the same shall be a default hereunder (without the need for any further notice or cure), Tenant shall be deemed to have approved the contents of any such certificate submitted to Tenant by Landlord and Landlord is hereby authorized to so certify.

**13. Indemnification; Waiver of Claims.**

(a) Tenant shall protect, indemnify and hold harmless Landlord, its agents, servants, employees, officers, directors and partners forever against and from (i) any penalty, damages, charges or costs imposed or resulting from any violation of any law, order or ordinance of any governmental agency, or by the use and occupancy of the Premises by Tenant, whether occasioned by the neglect of Tenant or those holding under Tenant; (ii) all claims, losses, costs, damages and expenses, including attorneys' fees, arising out of or from any accident or other occurrence on or about the Premises or the Property causing injury to any person or property, except caused by the grossly negligent or intentional act or omission of Landlord or its servants, agents or employees; and (iii) all claims, losses, costs, damages and expenses, including attorneys' fees, arising out of any failure of Tenant in any respect to comply with or perform all the requirements and provisions of this Lease or arising out of any use of the Premises or the Property by Tenant or any one claiming by, through or under Tenant except to the extent caused by the gross negligence or willful misconduct of Landlord.

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

(b) Landlord shall not be liable for, and Tenant hereby waives all claims against Landlord, (i) for any and all damage or loss to fixtures, equipment or other property of Tenant and its servants, agents, employees, contractors, suppliers, invitees, patrons and guests, in, upon or about the Premises or the Property (except caused by the negligent or intentional act or omission of Landlord or its servants, agents or employees), or (ii) for injury or death to any person, occurring in, upon or about the Premises or the Property, resulting from any cause whatever (except caused by the negligent or intentional act or omission of Landlord or its servants, agents or employees), including, but not limited to, water, snow, frost, ice, explosion, falling plaster, fire or gas, smoke or other fumes, nor by reason of the leaking, breaking, backing up or other malfunction of any lines, wires, pipes, tanks, boilers, lifts or any other appurtenances, regardless by whom installed or maintained (Tenant hereby expressly assuming all responsibility for the safety and security of the person and property of Tenant, and its servants, agents, employees, contractors, suppliers, invitees, patrons and guests, while in, upon or about the Premises). The occurrence of any event described in this **Paragraph 13** shall not constitute a breach of Landlord's covenant of quiet enjoyment set forth in **Paragraph 18**.

**14. Insurance.**

(a) **Tenant's Insurance**. Tenant, at its sole costs and expense, shall carry during the entire Term of this Lease, the following types of insurance:

(i) Commercial general liability insurance against injuries to persons occurring in, upon or about the Premises, with minimum coverage of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate coverage per one (1) accident or disaster, and One Million ($1,000,000) for property damage.

(ii) Fire, extended coverage, vandalism and malicious mischief, and sprinkler damage and all-risk insurance coverage on all personal property, trade fixtures, floor coverings, wall coverings, furnishings, furniture and contents for their full insurable value on a replacement cost basis.

(iii) Workers' Compensation or similar insurance, if and to the extent, required by law and in form and amounts required by law.

(iv) Rental loss insurance in an amount equal to all unpaid Rental which would be due for a period of twelve (12) months under the Lease. The amount of such rental loss insurance shall be increased from time to time during the Term as and when the Base Rental increases (including estimated increases in Additional Rental as reasonably determined by Landlord).

(v) Tenant shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all peril commonly insured against by prudent lessees in the business of Tenant or attributable to prevention of access to the Premises as a result of such perils.

(vi) Any other form or forms of insurance as Tenant or Landlord or any mortgagees of Landlord may reasonably require from time to time in form, in amounts and for insurance risks against which a prudent tenant would protect itself.

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

(b) **Landlord as Additional Insured.** Except for the insurance described in **subparagraph 14(a)(iii)** above, all such insurance required to be maintained by Tenant shall name Landlord as an additional insured and shall be written with a company or companies reasonably satisfactory to Landlord, having a policyholder rating of at least "A" and be assigned a financial size category of at least "Class XIV" as rated in the most recent edition of "Best's Key Rating Guide" for insurance companies, and authorized to engage in the business of insurance in the state in which the Premises are located. Tenant shall deliver to Landlord copies of such policies and customary insurance certificates evidencing such paid-up insurance. Such insurance shall further provide that the same may not be canceled, terminated or modified unless the insurer gives Landlord and Landlord's mortgagee(s) at least thirty (30) days' prior written notice thereof.

(c) **Landlord's Insurance**. Landlord shall maintain in force, at all times during the Term of this Lease, a policy or policies of fire insurance to the extent of at least eighty percent (80%) of the insurable value of the Building.

(d) **Increase in Premiums.** If insurance premiums payable by Landlord or any other tenant are increased as a result of any breach of Tenant's obligations under this Lease or as a result of Tenant's use and occupancy of the Premises, Tenant shall pay to Landlord an amount equal to any increase in such insurance premiums.

**15. Waiver of Subrogation.** Notwithstanding any contrary provision contained herein, Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under a policy that (with respect to Landlord) covers the Building and the Premises or rents payable hereunder, and (with respect to Tenant) that covers Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against by the waiving party under the terms hereof, regardless of whether the negligence or fault of the other party caused such loss. Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.

**16. Holding Over.** If Tenant retains possession of the Premises or any part thereof after the termination of this Lease, Tenant shall, from that day forward, be a tenant from month to month and Tenant shall pay Landlord Rental at 150% of the monthly rate in effect immediately prior to the termination of this Lease for the time Tenant remains in possession. No acceptance of rent by, or other act or statement whatsoever on the part of Landlord or its agent or employee, in the absence of a writing signed by Landlord, shall be construed as an extension of or as a consent for further occupancy. Tenant shall indemnify Landlord for all damages, consequential as well as direct, sustained by reason of Tenant's retention of possession. The provisions of this **Paragraph 16** do not exclude pursuit of Landlord's right of re-entry or any other right hereunder. If Tenant retains possession of the Premises, or any part of the Premises, for thirty (30) days or more after the expiration or termination of this Lease, then at the sole option of Landlord expressed by written notice to Tenant, but not otherwise, such holding over shall constitute a renewal of this Lease for a period of one (1) year on the same terms and conditions and at 150% of the monthly rate of Base Rental in effect immediately prior to the

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

termination or expiration of this Lease, together with Additional Rental. Tenant waives any right to notice of the expiration or termination of its tenancy.

17. **Assignment and Sublease.**

(a) **Prohibition.** Tenant shall not assign, convey, mortgage, pledge, encumber or otherwise transfer this Lease or any interest therein, sublet the Premises or any part thereof, or permit the use or occupancy of the Premises or any part thereof by anyone other than Tenant, without receiving Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. A transfer by operation of law, merger or consolidation, or a change of any partnership interest in Tenant or in the ownership of the voting stock of Tenant or any direct or indirect parent of Tenant shall be deemed an assignment for purposes of this **Paragraph 17**. Any purported transfer, encumbrance, pledge, mortgage, assignment or subletting not in compliance herewith shall be void and of no force or effect. In the event of any assignment, subletting, transfer or occupancy by someone other than Tenant, whether or not expressly or implied approved by Landlord, Tenant shall, nevertheless, at all times, remain fully responsible and jointly and severally liable for the payment of the rent and for compliance with all other obligations imposed upon Tenant under the terms, provisions and covenants of this Lease. Any assignment or sublease shall contain a provision whereby the assignee or subtenant agrees to comply with and be bound by all of the terms, covenants, conditions, provisions and agreements of this Lease to the extent applicable, and Tenant shall deliver to Landlord, promptly after execution, an executed copy of each assignment or sublease and an agreement of compliance by each assignee or subtenant. Any sublease shall also contain a provision that in the event of default by Tenant hereunder and a termination of this Lease by Landlord, such subtenant shall, at Landlord's option, attorn to Landlord as if Landlord were the lessor under the sublease. Tenant shall reimburse Landlord for all third party costs and expenses incurred by Landlord in considering each such sublease or assignment, regardless of whether or not Landlord consents; provided, however, such amount shall not to exceed Two Thousand Five Hundred and No/100 Dollars ($2,500).

Notwithstanding anything to the contrary herein, Tenant shall have the right to assign this Lease, without Landlord's consent, to a bona fide merged, consolidated, parent or successor corporation, or to a bona-fide wholly-owned subsidiary or to an affiliate of Tenant, provided that the following conditions are met:

(a) The assignee's net worth is at least equal to Tenant's net worth as of the date of this Lease;

(b) Tenant gives Landlord due written notice of the proposed assignment and identifies the proposed assignee;

(c) The proposed assignee shall assume all of the obligations of this Lease in writing, including the obligation to operate its business in the Premises in accordance with the Permitted Use;

(d) The proposed assignee's character and reputation are satisfactory in Landlord's judgment; and

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

(v) Tenant shall remain fully liable for all obligations of Tenant hereunder.

(b) **Right to Collect Rents Directly.** Upon the occurrence of an event of default as described in **Paragraph 22** hereof, if all or any part of the Premises is then assigned, sublet, transferred or occupied by someone other than Tenant, then, in addition to any other remedies provided in this Lease or provided by law, Landlord, at its option, may collect directly from the assignee, subtenant, transferee or occupant all rent becoming due to Tenant by reason of the assignment, sublease, transfer or occupancy. Any collection directly by Landlord from the assignee or subtenant shall not be construed to constitute a novation or a release of Tenant from the further performance of its obligations under this Lease.

(c) **Excess Rent.** If Tenant assigns this Lease or sublets all or a portion of Premises for an amount in excess of the Base Rental (or the pro rata share of Base Rental in the case of a sublease of a portion of the Premises), then Tenant shall pay to Landlord, as rent, one hundred percent (100%) of such excess received by Tenant.

**18. Quiet Enjoyment.** If Tenant shall pay the rents and other sums due to be paid by Tenant hereunder as and when the same become due and payable, and if Tenant shall keep, observe and perform all of the other terms, covenants and agreements of this Lease on Tenant's part to be kept, observed and performed, Tenant shall, at all times during the Term herein granted, peacefully and quietly have and enjoy possession of the Premises without any encumbrance or hindrance by, or from or through Landlord, except for regulations imposed by any governmental or quasi-governmental agency on the occupancy of Tenant or the conduct of Tenant's business operations.

**19. Compliance with Laws and with Rules and Regulations.**

(a) **Laws.** Tenant, at its sole cost and expense, shall procure any permits and licenses required for the transaction of Tenant's business in the Premises and for Tenant's use and occupancy of the Premises. Tenant, at its sole cost and expense, shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of all state, federal, municipal and other agencies or bodies having jurisdiction relating to the use, condition and occupancy of the Premises, the Building and the Property at any time in force, applicable to the Premises or to Tenant's use thereof, except that Tenant shall not be under any obligation to comply with any law, ordinance, rule or regulation requiring any structural alteration of the Premises, unless such alteration is required because of a condition that has been created by, or at the instance of, Tenant, or is required by reason of a breach of any of Tenant's covenants and agreements under this Lease. Landlord shall not be required to repair any injury or damage by fire or other cause, or to make any repairs or replacements of any panels, decoration, office fixtures, railing, ceiling, floor covering, partitions, or any other property installed in the Premises by Tenant.

(b) **Rules and Regulations.** Tenant shall comply with all rules and regulations for the Building, which current rules and regulations are attached hereto as Exhibit F, and with such reasonable modifications thereof and additions thereto as Landlord may make hereafter, from time to time. Landlord shall not be responsible nor liable to Tenant, its agents,

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

representatives, employees, invitees or licensees, for the non-observance by any other tenant of any rules and regulations, except that Landlord will expend its reasonable efforts to achieve compliance with the rules and regulations by other tenants and their agents, representatives, employees, invitees or licensees.

**20. <u>Fire and Casualty</u>.**

(a) If the Premises or the Building or any substantial part of either is damaged or destroyed by fire or other casualty, cause or condition whatsoever, and such damage or destruction cannot be repaired within one hundred twenty (120) days, Landlord may terminate this Lease, by written notice to Tenant given within thirty (30) days after such damage. If the Premises are damaged or destroyed or access thereto or use thereof is affected by the damage, then Landlord's termination shall be effective as of the date of such damage; otherwise said termination shall be effective thirty (30) days after such notice.

(b) If the Common Areas in the Building are damaged or destroyed by fire or other casualty, cause or condition whatsoever, to such an extent as to substantially interfere with Tenant's use of the Premises or if the Premises or a substantial part thereof are made unrentable, and such damage or destruction cannot be repaired within nine (9) months, then Tenant may terminate this Lease by giving written notice to Landlord within thirty (30) days after such damage, said termination to be effective as of the date of such damage.

(c) Unless this Lease is terminated as herein above provided, Landlord shall proceed with due diligence to restore, repair and replace the Premises and the Building to the same condition as they were in as of the Commencement Date provided such damage or destruction was not caused or contributed to by an intentional act or negligence of Tenant, its agents, employees, invitees or those for whom Tenant is responsible. From and after the date of such damage to date of completion of said repairs, replacements and restorations a just proportion of the rent shall abate according to the extent the full use and enjoyment of the Premises are rendered impossible by reason of such damage. Landlord shall be under no duty to restore any alterations, improvements or additions made by Tenant. In all cases, due allowance shall be given to Landlord for any reasonable delays caused by adjustment of insurance loss, strikes, labor difficulties or any cause beyond Landlord's control.

**21. <u>Eminent Domain</u>.**

(a) If all the Premises or a substantial part thereof shall be taken for any public or quasi-public use under any statute or by rights of eminent domain or by private purchase in lieu thereof, this Lease shall terminate as of the date of vesting of title. Landlord shall be entitled to receive the entire award paid for such taking or condemnation, Tenant hereby assigning to Landlord all Tenant's right, title and interest therein, if any. Nothing contained herein shall be deemed to give Landlord any interest in or to require Tenant to assign to Landlord any award to Tenant for the taking of personal property or fixtures belonging to Tenant, for the interruption of or damage to Tenant's business or for Tenant's moving expenses. Tenant may seek, at its own cost and expense, an award from the condemning authority for the taking of personal property or fixtures belonging to Tenant, for the interruption of or damage to Tenant's

business or for Tenant's moving expenses, provided that the award for such claim or claims shall not reduce or minimize any award made to Landlord.

(b) If fifty percent (50%) or more of the Building shall be condemned, taken or purchased in lieu thereof, then Landlord may terminate this Lease by notifying Tenant of such termination within sixty (60) days after the date of vesting of title. This Lease shall expire on the date specified in such notice of termination, which date shall be not less than sixty (60) days after the giving of such notice. The rent hereunder shall be apportioned as of such termination date.

(c) If more than thirty percent (30%) of the surface parking area of the Property is condemned, taken or purchased in lieu thereof, either party shall have the right to terminate this Lease upon giving written notice to the other party within thirty (30) days of such taking and this Lease shall terminate thirty (30) days after the date of such notice.

(d) Any such taking, condemnation or temporary requisition which does not result in a termination of this Lease, as hereinbefore provided in this **Paragraph 21**, shall not be cause for any reduction or diminution of rent hereunder.

**22. Default.**

(a) If (i) Tenant fails to pay within 5 days of the date when due any rent, or any other sums required to be paid hereunder by Tenant ; or (ii) Tenant defaults in the performance or observance of any other material agreement or condition on its part to be performed or observed, and Tenant shall fail to cure said default within thirty (30) days after receipt of written notice thereof by Landlord; provided, however, if such default is of a type which cannot reasonably be cured within such thirty (30) day period, Tenant shall have a reasonable time thereafter to cure such default (not to exceed sixty (60) days) so long as Tenant has commenced such cure within such thirty (30) days and is diligently prosecuting such cure to completion; or (iii) Tenant files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any arrangement, composition, liquidation or dissolution under any present or future federal, state or other statute, law or regulation, relating to bankruptcy, insolvency or other relief for debtors or seeks or consents to or acquiesces in the appointment of any trustee, receiver or liquidator of Tenant or of all or any substantial part of its properties, or of the Premises, or makes any general assignment for the benefit of creditors, or admits in writing its inability to pay its debts generally as they become due; or (iv) a court enters an order, judgment or decree approving a petition filed against Tenant seeking any arrangement, composition, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree shall remain unvacated or unstayed for an aggregate of sixty (60) days (whether or not consecutive); or (v) Tenant fails to operate or closes its business upon the Premises, for reasons other than fire or other casualty or condemnation, for a period of fifteen (15) consecutive days without the payment of Rent; or (vi) Tenant abandons or vacates the Premises; then in any such event and at any time thereafter, Landlord may, without further notice to Tenant, and in addition to and not in lieu of any other rights or remedies available to landlord at law or in equity, exercise any one or more of the following rights:

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

(i) Landlord may (A) terminate this Lease and the tenancy created hereby by giving notice of such election to Tenant, and (B) reenter the Premises, by summary proceedings or otherwise, remove Tenant and all other persons and property from the Premises and store such property in a public warehouse or elsewhere at the sole cost and expense of and for the account of Tenant without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby.

(ii) Landlord may reenter and take possession of the Premises, without terminating this Lease and without relieving Tenant of its obligations under this Lease, and divide or subdivide the Premises in any manner Landlord may desire and lease or let the Premises or portions thereof, alone or together with other premises, for such term or terms (which may be greater or less than the balance of the remaining portion of the Term of this Lease) and on such terms and conditions (which may include concessions or free rent and alterations of the Premises) as Landlord, in its discretion, may determine.

(b) If this Lease is terminated by Landlord pursuant to this **Paragraph 22**, Tenant nevertheless shall remain liable for any Base Rental, Additional Rental and Other Charges required to be paid hereunder, the damages that may be due or sustained prior to such termination, and for all reasonable costs, fees and expenses incurred by Landlord in pursuit of its remedies hereunder, including attorneys', brokers' and other professional fees (all such rents, damages, costs, fees and expenses being referred to herein collectively as "**Termination Damages**") plus additional damages which are hereby stipulated to be equal to the present value of Base Rental, Additional Rental and Other Charges required to be paid hereunder that, but for termination of this Lease, would have become due during the remainder of the Term, plus the unamortized portion of tenant improvements and leasing commissions paid by or incurred by Landlord in connection with this Lease, less the fair market rental rate of the Premises for the remainder of the Term of this Lease discounted at the current five (5) year treasury bill rate (the "**Liquidated Damages**"). Termination Damages and Liquidated Damages shall be due and payable immediately upon demand by Landlord following any termination of this Lease pursuant to this **Paragraph 22**.

(c) Intentionally Deleted.

(d) If Landlord reenters and takes possession of the Premises pursuant to this **Paragraph 22**, without terminating this Lease, and relets the Premises or any part thereof (which Landlord shall have no obligation to do), the net rentals from such letting shall be applied first to the cost, fees and expenses incurred by Landlord in pursuit of its remedies hereunder, including attorneys', brokers' and other professional fees, in renting the Premises or part thereof to others from time to time (including the cost and expense of making such improvements to the Premises as may be necessary, in Landlord's sole discretion, to enable Landlord to relet same). The balance, if any, shall be applied by Landlord from time to time on account of the rent and other payments due from Tenant hereunder, with the right reserved to Landlord to bring such actions or proceedings for the recovery of any deficits remaining unpaid as Landlord may deem favorable from time to time without being obligated to await the end of the Term for the final determination of Tenant's account. Any balance remaining, however, after full payment and liquidation of Tenant's account as aforesaid shall be paid to Tenant with the right reserved to Landlord at any time to give notice in writing to Tenant of Landlord's election to cancel and

terminate this Lease and the giving of such notice and the simultaneous payment by Landlord to Tenant of any credit balance in Tenant's favor that may at the time be owing to Tenant shall constitute a final and effective cancellation and termination of this Lease and the obligations hereunder on the part of either party to the other. Landlord shall not be liable for, nor shall Tenant's obligations be diminished by reason of, any failure by Landlord to relet the Premises or any failure of Landlord to collect any rent due upon such reletting; provided, however, Landlord shall use commercially reasonable efforts to mitigate any damages resulting from a default by Tenant. Tenant acknowledges that in order to reasonably mitigate damages Landlord shall not be obligated (i) to lease the Premises prior to any other space available for lease in the Building at such time; or (ii) to lease the Premises for a use, which in Landlord's sole discretion, is incompatible with the then tenant mix of the Building or for below market rents.

(e) Upon the termination of this Lease or of Tenant's right to possession of the Premises by lapse of time or earlier termination as herein provided, Tenant shall remove its property from the Premises. Any such property of Tenant not removed from the Premises by Tenant within thirty (30) days after the end of the Term shall be conclusively deemed to have been forever abandoned by Tenant and may be retained by Landlord as its property or may be disposed of in such manner as Landlord may see fit.

(f) Notwithstanding anything contained herein, if Landlord shall have given written notice of three (3) defaults in any twelve (12) month period, no further prior notice by Landlord shall be required for Landlord to declare this Lease to be in default.

(g) If Tenant at any time fails to make any payment or perform any other act on its part to be made or performed under this Lease, Landlord may, but shall not be obligated to, and after reasonable notice or demand and without waiving or releasing Tenant from any obligation under this Lease, make such payment or perform such other act to the extent Landlord may deem desirable, and in connection therewith to pay expenses and employ counsel. Tenant shall pay upon demand all of Landlord's reasonable costs, charges and expenses, including the fees of counsel, agents and others retained by Landlord, incurred in enforcing Tenant's obligations hereunder or incurred by Landlord in any litigation, negotiations or transactions in which Tenant causes Landlord, without Landlord's fault, to become involved or concerned, which amount shall be deemed to be rent due and payable by Tenant, upon demand by Landlord, and Landlord shall have the same rights and remedies for the nonpayment thereof, as in the case of default in the payment of rent.

(h) All rights and remedies of Landlord herein enumerated shall be cumulative, and none shall exclude any other right or remedy allowed by law. In addition to the other remedies in this Lease provided, Landlord shall be entitled to the restraint by injunction of the violation or attempted violation of any of the material covenants, agreements or conditions of this Lease.

**23. <u>Waiver of Default or Remedy</u>.** No waiver of any covenant or condition or of the breach of any covenant or condition of this Lease shall be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance on any other occasion of the same or of any other covenant or condition hereof, nor shall the acceptance of rent by Landlord at any time when Tenant is in default under any covenant or

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

condition hereof be construed as a waiver of such default or of Landlord's right to terminate this Lease on account of such default, nor shall any waiver or indulgence granted by Landlord to Tenant be taken as an estoppel against Landlord, it being expressly understood that if at any time Tenant shall be in default in any of its covenants or conditions hereunder an acceptance by Landlord of rental during the continuance of such default or the failure on the part of Landlord promptly to avail itself of such rights or remedies as Landlord may have, shall not be construed as a waiver of such default, but Landlord may at any time thereafter, if such default continues, terminate this Lease or assert any other rights or remedies available to it on account of such default in the manner hereinbefore provided.

**24. Force Majeure.** If Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder (other than the payment of rent and other charges payable by Tenant) by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, riots, insurrection, the act, failure to act or default of the other party, war or any other reason beyond the reasonable control of the party who is seeking additional time for the performance of such act, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a reasonable period, in no event to exceed a period equivalent to the period of such delay. No such interruption of any service to be provided by Landlord shall ever be deemed to be an eviction, actual or constructive, or disturbance of Tenant's use and possession of the Premises, the Building or the Property.

**25. Subordination of Lease.**

(a) This Lease shall be subject and subordinate to all ground leases, master leases and the lien of all mortgages and deeds of trust which now or hereafter affect the Premises or the Property or Landlord's interest therein, any covenants, conditions and restrictions and all amendments thereto, all without the necessity of Tenant's executing further instruments to effect such subordination. If requested, Tenant shall execute and deliver to Landlord within ten (10) business days after Landlord's request whatever documentation that may reasonably be required to further effect the provisions of this section including, without limitation, a Subordination, Nondisturbance and Attornment Agreement in such form as may be required by Landlord's lender. Should any holder of a mortgage or deed of trust request that this Lease and Tenant's rights hereunder be made superior, rather than subordinate, to the mortgage or deed of trust, then Tenant will, within ten (10) business days after written request, execute and deliver such agreement as may be required by such holder in order to effectuate and evidence such superiority of the Lease to the mortgage or deed of trust.

(b) If the interest of Landlord under this Lease shall be transferred by reason of foreclosure, deed in lieu of foreclosure, or other proceedings for enforcement of any first mortgage or deed of trust on the Premises, Tenant shall be bound to the transferee (the "**Purchaser**") under the terms, covenants and conditions of this Lease for the balance of the Term remaining, and any extensions or renewals, with the same force and effect as if the Purchaser were the landlord under this Lease, and at the option of Purchaser, Tenant shall attorn to the Purchaser (including the mortgagee under any such mortgage, if it be the Purchaser), as its landlord, the attornment to be effective and self-operative without the execution of any further instruments upon the Purchaser succeeding to the interest of Landlord under this Lease. The

respective rights and obligations of Tenant and the Purchaser upon the attornment, to the extent of the then remaining balance of the Term of this Lease, and any extensions and renewals, shall be and are the same as those set forth in this Lease.

**26. Notices and Consents.** All notices, demands, requests, consents and approvals that may or are required to be given by either party to the other shall be in writing and shall be deemed given when sent by United States certified or registered mail, postage prepaid, or by overnight courier (a) if for Tenant, addressed to Tenant at the Premises or addressed to Tenant at the address set forth in the Basic Lease Information (if different than the Premises) or at such other place as Tenant may from time to time designate by notice to Landlord or (b) if for Landlord, addressed to Landlord at the address set forth in the Basic Lease Information, or at such other place as Landlord may from time to time designate by notice to Tenant. All consents and approvals provided for herein must be in writing to be valid. Notice shall be deemed to have been given if addressed and mailed as above provided on the date two (2) days after deposit in the United States mail or one (1) day after deposit with an overnight courier.

**27. Security Deposit.** Tenant shall, as a condition precedent to Landlord's obligations hereunder, deliver to Landlord, concurrently with its signatures to this Lease, the Security Deposit, for the performance of all obligations in this Lease. In the event of any type of default by Tenant during or at the termination or expiration of the Lease, Landlord may apply all or any part of the deposit to cure the default, and thereupon Tenant shall immediately redeposit with Landlord this amount in order that there will always be the full deposit on hand during the Term of this Lease or any extension or renewal thereof. At the expiration or earlier termination of this Lease and provided Tenant is not in default of any terms this Lease and has specifically complied with the surrender clauses of this Lease, Landlord will refund all or any of the remaining portion of the deposit to Tenant. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit.

**28. Miscellaneous Taxes.** Tenant shall pay, prior to delinquency, all taxes directly or indirectly imposed, assessed against or levied upon its occupancy of the Premises, gross sales, business operations or upon the fixtures, furnishings, equipment and all other personal property or assets of Tenant located in the Premises whether assessed against Tenant, Landlord or the Building, if nonpayment thereof shall give rise to a lien on the Premises, and when possible Tenant shall cause said fixtures, furnishings, equipment and other personal property to be assessed and billed separately from the property of Landlord. In the event any or all of Tenant's fixtures, furnishings, equipment and other personal property, or upon Tenant's occupancy of the Premises, shall be assessed and taxed with the property of Landlord, Tenant shall pay to Landlord its share of such taxes within ten (10) days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to Tenant's fixtures, furnishings, equipment or personal property. Tenant shall be responsible for any and all rent taxes charged to Landlord on the rent payable by Tenant under this Lease.

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

**29. Intentionally Deleted.**

**30. Hazardous Devices and Contaminants.**

(a) **Prohibition**. Except with the prior written consent of Landlord, Tenant shall not install or operate any steam or internal combustion engine, boiler, machinery, refrigerating or heating device or air-conditioning apparatus in or about the Premises, or carry on any mechanical business therein. Except as provided below, Tenant and its agents, employees, contractors and invitees shall not use, store, release, generate or depose of or permit to be used, stored, released, generated or disposed of any Contaminants (as hereinafter defined) on or in the Premises.

The foregoing restriction will not be deemed to prevent Tenant from using ordinary office and cleaning supplies commonly found in a first class office premises so long as Tenant complies with all Requirements of Law (as hereinafter defined), and does not dispose of or release such Hazardous Materials on or in the Building.

(b) **Indemnification**. Tenant shall indemnify and hold harmless Landlord, its agents, servants, employees, officers and directors forever from and against any and all liability, claims, demands and causes of action, including, but not limited to, any and all liability, claims, demands and causes of action by any governmental authority, property owner or any other third person and any and all expenses, including attorneys' fees (including, but not limited to, attorneys' fees to enforce Tenant's obligation of indemnification under this **Paragraph 30(b)**), relating to any environmental liability resulting from (i) any Release (as hereafter defined) of any Contaminant at the Premises or emanating from the Premises to adjacent properties or the surrounding environment during the Term of this Lease; (ii) during the Term of this Lease, any generation, transport, storage, disposal, treatment or other handling of any Contaminant at the Premises, including, but not limited to, any and all off-site transport, storage, disposal, treatment or other handling of any Contaminant generated, produced, used and/or originating in whole or in part from the Premises; and (iii) any activities at the Premises during the Term of this Lease that in any way might be alleged to fail to comply with any Requirement of Law.

(c) **Landlord Obligations.** Landlord shall be responsible for any generation, transport, storage, disposal, treatment or other handling of any Contaminant used by Landlord in the Common Areas, including, but not limited to, any and all off-site transport, storage, disposal, treatment or other handling of any such Contaminant.

(d) **Definitions.**

(i) "**Contaminant**" shall mean any substance or waste containing hazardous substances, pollutants, and contaminants as those terms are defined in the federal Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. and any substance similarly defined or identified in any other federal, state or local laws, rules or regulations governing the manufacture, import, use, handling, storage, processing, release or disposal of substances or wastes deemed hazardous, toxic, dangerous or injurious to public health or to the environment. This definition includes friable asbestos, petroleum or petroleum-based products.

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

(ii) "**Requirements of Law**" shall mean any federal, state or local law, rule, regulation, permit, agreement, order or other binding determination of any governmental authority relating to the environment, health or safety.

(iii) "**Release**" shall have the same meaning as in the federal Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. Section 9601, et seq.

**31. Exculpation.** This Lease is executed by certain general partners of Landlord, not individually, but solely on behalf of, and as the authorized nominee and agent for Landlord, and in consideration for entering into this Lease, Tenant hereby waives any rights to bring a cause of action against the individuals executing this Lease on behalf of Landlord (except for any cause of action based upon lack of authority or fraud), and all persons dealing with Landlord must look solely to the equity of Landlord in and to the Building for the enforcement of any claim against Landlord or and satisfaction of any of Tenant's remedies, if any, and the obligations hereunder are not binding upon, nor shall resort be had to the private property of any of, the trustees, members, managers, officers, directors, employees or agents of Landlord.

**32. Signs.** Tenant shall not display, inscribe, print, paint, maintain or affix on any place in or about the Building any sign, notice, legend, direction, figure or advertisement, except on the doors of the Premises, and then only such name(s) and matter, and in such color, size, place and materials, as shall first have been approved by Landlord in writing. Landlord reserves the right to install and maintain a sign or signs on the exterior or interior of the Building. If Tenant desires, Landlord shall list Tenant on the two directory signs located in the elevator lobby of the 14th floor of the Building and on the digital directory located in the Building's main lobby, at Landlord's sole cost and expense.

**33. Locks.** No additional locks or similar devices shall be attached to any door or window without Landlord's prior written consent. Except for those keys provided by Landlord, no keys for any door shall be made. If more than two keys for one lock are desired, Landlord will provide the same upon payment at reasonable and customary cost by Tenant. All keys must be returned to Landlord at the expiration or termination of this Lease. Tenant shall see that the doors and windows, if operable, of the Premises are closed and securely locked before leaving the Building. Notwithstanding anything to the contrary in this Lease, Landlord reserves the right to re-key or otherwise secure the Building to reasonable commercial standards. Landlord shall maintain Tenant's right of access at all times. Tenant may install, at its own cost and expense, its own card access system for its Premises.

**34. Employment.** Tenant shall not contract for any work or service that might involve the employment of labor incompatible with the Building employees or employees of contractors doing work or performing services by or on behalf of Landlord. This section shall not apply to work or service performed in connection with the installation, maintenance, repair or other services related to office equipment owned, rented or leased by Tenant including, without limitation, copiers, computers and communications equipment.

**35. Plumbing.** Tenant must observe strict care and caution that all water faucets and water apparatus are shut off before Tenant or its employees leave the Building to prevent waste

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

or damage. Plumbing fixtures and appliances shall be used only for purposes for which constructed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed therein. Damage resulting to any such fixtures or appliances from misuse by Tenant shall be paid by Tenant and Landlord shall not in any case be responsible therefore.

**36. Certain Rights Reserved to Landlord.** Landlord reserves the following rights:

(a) To name the Building and to change the name or street address of the Building; Landlord will pay reasonable costs to reprint Tenant's business stationery should such change occur.

(b) To designate all sources furnishing sign painting and lettering, ice, towels, toilet supplies, shoe shining, vending machines and mobile vending services used on the Premises or in the Building.

(c) On reasonable prior notice to Tenant, to exhibit the Premises to prospective tenants during the last one hundred twenty (120) days of the Term, and to exhibit the Premises to any prospective purchaser, mortgagee, or assignee of any mortgagee on the Property and to others having a legitimate interest at any time during the Term.

(d) To install vending machines of all kinds in the Property, including, without limitation, the Premises, and to provide mobile vending service therefore, and to receive all of the revenue derived therefrom; provided, however, that no vending machines shall be installed by Landlord in the Premises nor shall any mobile vending service be provided therefore, unless Tenant so requests.

**37. Miscellaneous.**

(a) No receipt of money by Landlord from Tenant after the termination of this Lease or after the service of any notice or after the commencement of any suit, or after final judgment for possession of the Premises, shall reinstate, continue or extend the Term of this Lease or affect any such notice, demand or suit or imply consent for any action for which Landlord's consent is required.

(b) The term "**Landlord**" as used in this Lease, so far as covenants or agreements on the part of Landlord are concerned, shall be limited to mean and include only the owner (or ground lessor, as the case may be) for the time being of the Premises. If the Premises or the underlying lease, if any, be sold or transferred, the seller thereof shall be automatically and entirely released of all covenants and obligations under this Lease from and after the date of conveyance or transfer, provided the purchaser on such sale has assumed and agreed to carry out all covenants and obligations contained in this Lease to be performed on the part of Landlord hereunder, it being hereby agreed that the covenants and obligations, contained in this Lease to be performed on the part of Landlord, shall be binding on Landlord, its successors and assigns, only during their respective successive period of ownership.

(c) It is understood that Landlord may occupy portions of the Building in the conduct of Landlord's business. In such event, all references herein to other tenants of the Building shall be deemed to include Landlord as occupant.

(d) All of the covenants of Tenant hereunder shall be deemed and construed to be "conditions" as well as "covenants" as though the words specifically expressing or implying covenants and conditions were used in each separate instance.

(e) Intentionally Deleted.

(f) This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that this provision shall in no manner enlarge Tenant's rights of assignment, which right of assignment has been restricted under the foregoing provisions of this Lease.

(g) This Lease shall create the relationship of landlord and tenant between the parties hereto; no estate shall pass out of Landlord. Tenant has only a usufruct, not subject to levy and sale, and not assignable by Tenant except by Landlord's consent as may be specifically provided herein.

**38. Relationship of Parties.** Any intention to create a joint venture, partnership or principal and agent relationship between the parties hereto is hereby expressly disclaimed. This Lease shall create the relationship of landlord and tenant between Landlord and Tenant.

**39. Gender and Number.** Whenever words are used herein in any gender, they shall be construed as though they were used in the gender appropriate to the context and the circumstances, and whenever words are used herein in the singular or plural form, they shall be construed as though they were used in the form appropriate to the context and the circumstances.

**40. Topic Headings.** Headings and captions in this Lease are inserted for convenience and reference only and in no way define, limit or describe the scope or intent of this Lease nor constitute any part of this Lease and are not to be considered in the construction of this Lease.

**41. Intentionally Deleted.**

**42. Counterparts.** Several copies of this Lease may be executed by all of the parties. All executed copies constitute one and the same Lease, binding upon all parties.

**43. Entire Agreement.** This Lease contains the entire understanding between the parties and supersedes any prior understanding or agreements between them respecting the subject matter. No representations, arrangements or understandings except those fully expressed herein, are or shall be binding upon the parties. No changes, alterations, modifications, additions or qualifications to the terms of this Lease shall be made or be binding unless made in writing and signed by each of the parties.

**44. Recording.** Neither Landlord nor Tenant shall record this Lease nor a short form memorandum thereof without the consent of the other.

**45. Governing Law; Invalidity of any Provisions.** This Lease shall be subject to and governed by the laws of the state in which the Premises is located. If any term or provision of this Lease or the application thereof to any person or circumstance shall to any extent be

invalid or unenforceable, the other terms of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**46. Financial Statements.** Prior to the date hereof, Tenant has delivered certain Financial Information (as hereinafter defined) to Landlord and Landlord has relied to a material extent on such financial information in agreeing to lease the Premises to Tenant. Tenant represents, warrants, certifies and covenants to Landlord that: (i) all of the financial information (other than future projections, if any) (collectively, "**Financial Information**") delivered by Tenant to Landlord prior to the date hereof is true, correct and complete in all material respects as of the date of such Financial Information; (ii) the Financial Information accurately represents the financial condition of the Tenant as of the date of such Financial Information; (iii) if Tenant delivered unaudited Financial Information to Landlord, then Tenant does not have any audited financial statements for the three (3) calendar and/or fiscal years preceding the date hereof; (iv) the Financial Information was prepared using generally accepted accounting principles consistently applied; and (v) Tenant has delivered to Landlord all material information in Tenant's possession and/or control concerning the financial condition of Tenant. Tenant shall at its own cost and expense, upon any written request by Landlord (not to exceed one (1) request every calendar quarter), deliver to Landlord true, correct and complete copies of Tenant's then most recent Financial Information, and if available, such Financial Information delivered to Landlord shall have been audited. Any failure by Tenant to deliver its then most recent financial Information within ten (10) business days (which shall be in lieu of any grace period set forth herein, if any) after a written request by Landlord to Tenant or if any Financial Information delivered by Tenant to Landlord is not true, correct and complete as of the date of such Financial Information shall in either case be a default by Tenant hereunder. Additionally, an amount equal to five percent (5%) of the monthly Base Rental shall be charged as an Other Charge for each month in which Tenant fails to deliver to Landlord the Financial Information required herein. Tenant agrees and acknowledges that notwithstanding anything to the contrary set forth in this Lease, under no circumstances shall Tenant be afforded any notice and/or cure rights with regards to any Financial Information that is not true, correct and complete in all material respects as of the date of the Financial Information. The foregoing provisions of this **Paragraph 46** shall also apply to any guarantor of this Lease.

**47. WAIVER OF RIGHT TO TRIAL BY JURY.** EACH PARTY TO THIS LEASE HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS LEASE MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

**48.** **Time**. Time is of the essence with respect to the performance of every provision of this Lease in which time or performance is a factor.

**49.** **Attorney's Fees and Homestead.** If Landlord should bring suit for possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provisions of this Lease, or for any other relief against Tenant hereunder, or in the event of any other litigation between the parties with respect to this Lease, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment. If Landlord is named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy hereunder, Tenant shall pay to Landlord its costs and expenses incurred in such suit, including reasonable attorneys' fees. Tenant waives all homestead rights and exemptions which it may have under any law as against any obligation owing under this Lease, and assigns to Landlord its homestead and exemptions to the extent necessary to secure payment and performance of its covenants and agreements hereunder.

**50.** **Brokers.** Tenant warrants that it has had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, except Landlord's Broker and Tenant's Broker. Landlord shall be responsible for paying a commission to Landlord's Broker. Landlord's Broker and Tenant's Broker may have entered into a separate agreement for the payment of a commission by Landlord's Broker to Tenant's Broker. Tenant warrants that it knows of no other real estate broker or agent who is or might be entitled to a commission in connection with the Lease. If Tenant has dealt with any other person or real estate broker with respect to leasing or renting space in the Building, Tenant shall be solely responsible for the payment of any fee due said person or firm and Tenant shall hold Landlord free and harmless against any liability in respect thereto, including attorneys' fees and costs.

**51.** **Off-Site Parking**. Landlord shall make available to Tenant's employees three (3) parking spaces on an unassigned basis in the parking structure adjacent to the Building ("**Parking Structure**"). The cost of each parking space is determined by The Birmingham Parking Authority ("**Authority**") and shall be billed directly by the Authority to the Tenant employee. The cost of each space will be paid by the Tenant employee to the Authority under agreement separate from this Agreement, at the beginning of each month, and shall be subject to rate increases as set by the Authority. As of the date of this Lease, the current monthly cost of each space is $100.00. At the end of the Term or earlier termination of the Lease, Tenant agrees to deliver to Landlord all parking cards assigned to Tenant by or through Landlord and not previously returned. For additional parking spaces in the Parking Structure, Tenant may contact the Authority directly or may request additional parking spaces from Landlord and, if Landlord has any additional parking spaces available, Landlord will provide Tenant addional parking spaces on a temporary month-to-month basis to be returned promptly to Landlord upon Landlord's request.

**52.** **Intentionally Deleted.**

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

**53.** **Tenant's Waiver of Redemption and with Regard to Billings.** Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Landlord obtaining possession of the Premises by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise. The rights given to Landlord herein are in addition to any rights that may be given to Landlord by any statute or otherwise. Except as provided in Section 4(d), Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of thirty (30) days after receipt thereof shall constitute Tenant's acquiescence with respect thereto and shall render such statement, invoice or billing an account stated between Landlord and Tenant.

**54.** **Damage or Theft of Personal Property.** All personal property in the Premises, including, but not limited to, any personal property brought into the Premises by Tenant or Tenant's employees, patients or invitees, shall be at the risk of Tenant only, and Landlord shall not be liable for theft thereof or any damage thereto occasioned by any act of co-tenants, occupants, invitees or other users of the Building or any other person. Landlord shall not at any time be liable for damage to any property in or upon the Premises which results from power surges or other deviations from the constancy of electrical service or from gas, smoke, water, rain, ice or snow which issues or leaks from or forms upon any part of the Building or from the pipes or plumbing work of the same, or from any other place whatsoever.

**55.** **Liability of Tenant.** Tenant hereby indemnifies Landlord from and agrees to hold Landlord harmless against, any and all liability, loss, cost, damage or expense, including, without limitation, court costs and reasonable attorney fees actually incurred (without regard to statutory definitions or constraints upon the charge or collection thereof), through all appeals, imposed on Landlord by any person whomsoever, caused in whole or in part by any act or omission of Tenant, or any of its employees, contractors, servants, agents, subtenants, assignees, representatives or invitees, or otherwise occurring in connection with any default of Tenant hereunder. The provisions of this Section 55 shall survive any termination of this Lease.

**56.** **Submission of Lease.** The submission of this Lease for examination does not constitute an offer to lease and this Lease shall be effective only upon execution hereof by Landlord and Tenant.

**57.** **Authority.** If Tenant executes this Lease as a corporation, each of the persons executing this Lease on behalf of Tenant does hereby personally represent and warrant that Tenant is a duly incorporated or a duly qualified (if a foreign corporation) corporation and is fully authorized and qualified to do business in the State in which the Premises are located, that the corporation has full right and authority to enter into this Lease, and that each person signing on behalf of the corporation is an officer of the corporation and is authorized to sign on behalf of the corporation. If Tenant signs as a partnership, joint venture, limited liability company, limited liability partnership, or sole proprietorship or other business entity (each being herein called "Entity"), each of the persons executing on behalf of Tenant does hereby covenant and warrant that Tenant is a duly authorized and existing Entity, that Tenant has full right and authority to enter into this Lease, that all persons executing this Lease on behalf of the Entity are authorized to do so on behalf of the Entity, and that such execution is fully binding upon the Entity and its partners, joint venturers, or principal, as the case may be. Upon the request of Landlord, Tenant

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

shall deliver to Landlord documentation satisfactory to Landlord evidencing Tenant's compliance with this Article, and Tenant agrees to promptly execute all necessary and reasonable applications or documents as reasonably requested by Landlord, required by the jurisdiction in which the Premises is located, to permit the issuance of necessary permits and certificates for Tenant's use and occupancy of the Premises.

**58. ERISA Compliance.** Tenant represents to Landlord that Tenant is not an "employee benefit plan", a "plan" or a "governmental plan" as defined below or an entity whose assets constitute "plan assets" as defined below. The term "employee benefit plan" means an "employee benefit plan" as defined in Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), which is subject to Title I of ERISA. The term "plan" means a "plan" as defined in Section 4975(e)(i) of the Internal Revenue Code of 1986, as amended. The term "governmental plan" means a "governmental plan" within the meaning of Section 3(32) of ERISA. The term "plan assets" means "plan assets" of one or more plans within the meaning of 2a C.F.R. 2510.3-101.

**59. Delivery of Documents.** If Tenant fails to execute, acknowledge or deliver any of the documents or instruments required under Section 12 or Section 25, same shall be deemed a material default of Tenant. In addition to any other rights or remedies Landlord may have with respect to such failure, Landlord may also charge and collect from Tenant, as Additional Rental, an administrative fee of $50 per day with respect to each day the same remain delinquent.

**60. Use of Name of Tenant.** Tenant hereby authorizes Landlord to identify Tenant as a tenant of the Building and to state the amount of space leased by Tenant in advertisements and promotional materials relating to the Building.

**61. Patriot Act**. Tenant represents and warrants to Landlord that Tenant is not, and is not acting, directly or indirectly, for or on behalf of, any person or entity named as a "specially designated national and blocked person" (as defined in Presidential Executive Order 13224) on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control, and that Tenant is not engaged in this transaction, directly or indirectly, on behalf of, and is not facilitating this transaction, directly or indirectly, on behalf of, any such person or entity. Tenant also represents and warrants to Landlord that neither Tenant nor its constituents or affiliates are in violation of any laws relating to terrorism or money laundering, including the aforesaid Executive Order and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended. Tenant hereby agrees to defend, indemnify and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorney fees and costs) arising from or related to any breach of the foregoing representations and warranties by Tenant.

**62. Intentionally Deleted.**

----------- SIGNATURE PAGE FOLLOWS ----------

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

**LANDLORD:**

**Birmingham Financial Center, LLC,**
a Delaware limited liability company

**By: Daniel Management Corporation,**
an Alabama corporation,
Its Manager

By:____________________
Its: COO

WITNESS:

____________________
Printed Name: JIM ADAMS

**TENANT:**

**Animo Bancorp, Inc.,**
a Texas corporation

By: DocuSigned by:
Name: Jonathan Pennington
Title: Chief Financial Officer, Animo Bancorp

WITNESS:
DocuSigned by:
Printed Name: Gardner Bell

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

# EXHIBIT A

## FLOOR PLAN



DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

# EXHIBIT B

## LEGAL DESCRIPTION OF THE PROPERTY

Lot 13-A, according to a Resurvey of Lots 13, 14, 15, 16, 17, 18, 19 and 20, Block 48, Birmingham Survey, recorded in Map Book 134, page 31, in the Probate Office of Jefferson County, Alabama, together with parking rights granted in adjacent parking deck as set forth in that certain instrument recorded in Real 3062, page 001, in the Probate Office of Jefferson County, Alabama.

# EXHIBIT C

## FORM OF COMMENCEMENT DATE AGREEMENT

## COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT ("**Agreement**") is between **Birmingham Financial Center, LLC** ("**Landlord**") and **Animo Bancorp, Inc.** ("**Tenant**").

W I T N E S S E T H:

A. Landlord and Tenant executed a certain Lease Agreement dated ___________________, 2022 (the "**Lease**").

B. Landlord and Tenant desire to set forth in writing certain matters concerning the Lease.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and other valuable consideration, the parties agree as follows:

1. The Commencement Date occurred on ___________________, 2022;

2. The Term of the Lease expires on ____________________, 2024;

3. Tenant has accepted possession of the Premises pursuant to the Lease. Furthermore, Tenant acknowledges that the Premises are suitable for the Permitted Use.

[Signatures appear on next page]

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on the day and year first above written.

**LANDLORD:**

**Birmingham Financial Center, LLC**,
a Delaware limited liability company

**By: Daniel Management Corporation**,
an Alabama corporation,
Its Manager

By:______________________________
Its:______________________________

WITNESS:

______________________________
Printed Name:______________________________

**TENANT:**

**Animo Bancorp, Inc.**,
a Texas corporation

By:______________________________
Name: ______________________________
Title: ______________________________

WITNESS:

______________________________
Printed Name:______________________________

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

# EXHIBIT D

## INTENTIONALLY DELETED

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

# EXHIBIT E

## FORM OF TENANT ESTOPPEL CERTIFICATE

## TENANT ESTOPPEL CERTIFICATE

RE: Premises: Financial Center ____________________

Lease Dated: ____________________

Amendment(s) Dated: ____________________

Between: Birmingham Financial Center, LLC ____________________ (Landlord)

And: Animo Bancorp, Inc. ____________________ (Tenant)

Square Footage Leased: 3,539 ____________________

Floor(s)/Suite #(s): 14th Floor / Suite #1450 ____________________

The undersigned, Tenant under the above-referenced lease ("**Lease**"), certifies to the following:

1. We have taken possession of and accepted the Premises described above, except as follows:

____________________

____________________

____________________

____________________

2. The Lease terms as described below are true and accurate, and the Lease is in full force and effect:

Base Rent: ____________________

Expense Stop: ____________________

Escalations: ____________________

Free Rent: ____________________

Commencement Date: ____________________

Expiration Date: ____________________

Renewals: ____________________

3. No part of the Premises has been subleased or assigned except as follows:

____________________

4. The rent has been paid through: ____________________

5. The security deposit is: ____________________

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

6. We are not in default of our obligations under the Lease. Landlord, to the best of our knowledge, is not in default of its obligations under the Lease. We are aware of no defense or counterclaim to rent or other sums required to be paid by us under or pursuant to the Lease.

If Tenant is a corporation, the undersigned is a duly appointed officer of the corporation signing this certificate and is the incumbent in the office indicated under his/her name. In any event, the undersigned individual is duly authorized to execute this certificate.

Date:_______________________, 20__ Signed:_______________________

_______________________

# EXHIBIT F

## RULES AND REGULATIONS

Wherever in these Rules and Regulations the word "**Tenant**" is used, it shall be taken to apply to and include Tenant and its agents, employees, invitees, licensees, subtenants and contractors, and is to be deemed of such number and gender as the circumstances require. The word "**Landlord**" shall be taken to include the employees and agents of Landlord. The Lease shall control any conflicts between the Lease and the Rules and Regulations.

1. **Moving:** Tenant shall be responsible for informing and requiring Tenant's moving company to protect with plywood sheeting all carpeted areas within Tenant's suite, as well as in the elevator, lobby, corridors and public areas of the Building. Any movement of material into or out of the Premises without such carpet protection shall be stopped immediately.

2. **Windows and Projections:** Nothing shall be affixed to or projected beyond the outside of the Building by Tenant without the prior written consent of Landlord. If Tenant desires, and Landlord permits, blinds, shades, awnings, or other forms of window covering, ventilating equipment or similar devices shall be furnished and installed at the expense of Tenant and must be of such shape, color, material and make as are approved by Landlord. Tenant shall not place or permit to be placed any article of any kind on the window ledges, and shall not throw or drop, or permit to be thrown or dropped, any article from any window of the Building.

3. **Advertising and Signs:** No sign, advertisement, notice or other lettering shall be inscribed, painted or affixed on any part of the outside or inside of the Building or otherwise exhibited so as to be visible from outside the Premises except on the doors of the Premises, and then only of subject matter and in such color, size, style and material as shall conform to the specifications of Landlord. Landlord reserves the right to remove all other signs and lettering, without notice to Tenant, at the expense of Tenant. Any newspaper, magazine or other advertising done from the Premises, or referring to the Premises or the Building, which in the opinion of Landlord, acting reasonably, is objectionable, shall be immediately discontinued upon notice from Landlord.

4. **Bicycles and Animals:** No bicycle or other vehicle and no fish, bird or animal shall be brought or permitted to be in the Building or any part thereof.

5. **Closing and Locking Doors and Windows:** Unless expressly permitted by Landlord, all doors to the Premises are to be kept closed at all times except when in actual use for entrance to or exit from the Premises. Tenant shall be responsible for the re-locking of doors to the Building that are unlocked by Tenant after business hours or on Saturday or Sunday. Tenant shall be responsible for any damage or loss resulting from violation of this rule.

6. **Machinery:** Unless Landlord gives prior written consent in each and every instance, Tenant shall not install or operate any steam or internal combustion engine, boiler or machinery apparatus in or about the Premises, or carry on any mechanical business therein. All equipment and machines of any electrical or mechanical nature shall be placed in settings which absorb and prevent vibration, noise, annoyance, or the spillage or leakage of fluids, oils or grease on the floors of the Building. Tenant shall not place or permit to be placed upon any floor of the

Building any item of any nature, or items in the aggregate, the weight of which shall exceed such floor's rated floor live load limit.

7. **Use:** Tenant shall not illegally sell or store therein any spirituous, malt or vinous liquors, or any narcotic drugs and shall not exhibit, sell or offer for sale in the Premises or in the Building anything whatsoever except as are essentially connected with the stated use of the Premises.

8. **Furniture or Equipment Removal:** Moving or delivery of furniture, trade fixtures and equipment, and freight by or for Tenant shall be done at such times and in such manner as may be required by Landlord. Tenant shall list with Landlord any and all furniture, trade fixtures and equipment and similar articles to be removed from the Building. The list must be approved at the office of the Building before Building employees will permit any articles to be moved in or out of the Building. Landlord shall not be liable to Tenant or to any other person for loss of, or damage to, any furniture, trade fixtures and equipment or other personal property from any cause.

9. **Unsightly Placement of Equipment:** Unless expressly permitted by Landlord, Tenant shall not place or allow anything to be against or near exterior windows, the glass or corridor partitions or doors of the Premises which may diminish the light in, or be unsightly from halls, corridors or the exterior of the Building.

10. **Locks:** Unless expressly permitted by Landlord, no additional locks or similar devices shall be attached to any door and no keys other than those provided by Landlord shall be made for any door. If more than two keys for one lock are desired by Tenant, Landlord shall provide the same upon payment therefore by Tenant. Tenant shall obtain keys from Landlord only and from no other source. Upon termination of this Lease or of Tenant's possession, Tenant shall surrender all keys to the Premises and shall provide Landlord with the then-current combinations for any combination locks on safes, cabinets and vaults.

11. **Noise and Other Nuisances:** Tenant shall not make or permit any noise or odor that is objectionable to Landlord or to other occupants of the Building to emanate from the Premises, and shall not create or maintain a nuisance therein, and shall not disturb, solicit or canvas any occupant of the Building and shall not do any act tending to injure the reputation of the Building. Tenant shall not install or operate any phonograph, musical instrument, radio or television receiver or similar device in the Building without prior approval of Landlord. The use thereof, if permitted, shall be subject to control by Landlord to the end that other tenants shall not be disturbed or annoyed.

12. **Safes or Heavy Articles:** Tenant shall not overload any floor or otherwise impair the structural integrity of the Building. Landlord may, but shall not be required to, direct the routing, time of movement and placement of safes and other heavy articles. Safes, furniture and all large articles shall be brought into the Premises or removed therefrom at Tenant's sole risk and responsibility. Any damage done to the Building by reason of a safe or other heavy article of Tenant being brought into, stored in or removed from the Premises shall be repaired at Tenant's sole expense.

**13.** **Telegraphs, Telephones, Antennae, Etc.:** No electrical wires, telegraphs, telegraph or telegraph call boxes, antennae, aerial wires or other electrical equipment or apparatus shall be installed on the outside of the Building without approval of Landlord.

**14.** **Solicitors:** Landlord reserves the right, but shall not be held obligated, to exclude or eject from the Building any or all solicitors, canvassers or peddlers, and any person conducting themselves in such manner as, in the sole judgment of Landlord, constitutes an annoyance to any of the tenants of the Building or an interference with Landlord's operation of the Building, or who are otherwise undesirable.

**15.** **Flammable Materials:** No article of an extra hazardous nature and no explosive shall be brought into the Premises or into the Building. The storage and use of all flammable and volatile materials and substances necessary in Tenant's business operations shall be in conformity with applicable laws, rules and regulations of all duly constituted public authorities.

**16.** **Lodging:** The Premises hereby leased shall not be used for lodging or sleeping purposes, and no cooking of food shall be done therein except for coffee makers and microwave ovens.

**17.** **Smoking:** By local ordinance smoking is not permitted in any public area of the Building. Tenant, and through Tenant, its employees and invitees shall abide by this ordinance.

**18.** **Parking:** Tenant shall not park or permit the parking of any vehicle by any of its guests, employees or invitees in any parking areas designated by Landlord as reserved parking or as handicapped parking (except with the appropriate handicapped placards). Tenant shall not park or permit the parking of any vehicle by any of its employees in any parking areas designated by Landlord as visitor parking. Tenant shall be responsible for advising its guests, employees and invitees of such parking restrictions and ensuring that such guests, employees and invitees comply with the terms hereof. Landlord reserves the right to tow such vehicles or charge for such unauthorized parking as Additional Rental.

**19.** **Additional Rules:** Landlord reserves the right to make such other and further reasonable Rules and Regulations and to rescind, alter or waiver such Rules and Regulations as in Landlord's reasonable judgment may from time to time be needful or desirable for the safety, care, cleanliness and efficient operation of the Building and for the preservation of good order therein. Without limiting the foregoing, Tenant shall comply, and cause its employees, agents, contractors and invitees to comply, with the "FINANCIAL CENTER BUILDING POLICIES AND PROCEDURES", a copy of which has been or will be provided to Tenant.

## EXHIBIT G

## RENT PAYMENT INFORMATION

All Rent, Additional Rent or other charges payable under this Lease shall either be hand-delivered to Landlord's office on the 10th Floor of the Building or shall be mailed via the U.S. Postal Service to:

Birmingham Financial Center, LLC
c/o Daniel Management Corporation
505 20th Street North
Suite 1000
Birmingham, AL 35203
Attn: Lisa Dodd

DocuSign Envelope ID: 70E707FC-859A-422B-AFDF-95EE8FFCE0AE

# EXHIBIT H

## SPECIAL PROVISIONS

1. **Furniture and Equipment**. The Premises shall be delivered to Tenant in "as is" condition including any furniture or other personal property left in the Premises by the prior tenant. The purchase and installation of any telephone, IT or other equipment for use within the Premises shall be at Tenant's sole cost and expense.

# COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT ("**Agreement**") is between **Birmingham Financial Center, LLC** ("**Landlord**") and **Animo Bancorp, Inc.** ("**Tenant**").

W I T N E S S E T H:

A. Landlord and Tenant executed a certain Lease Agreement dated February 26, 2022 (the "**Lease**").

B. Landlord and Tenant desire to set forth in writing certain matters concerning the Lease.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and other valuable consideration, the parties agree as follows:

1. The Commencement Date occurred on March 1, 2022;

2. The Term of the Lease expires on February 29, 2024;

3. Tenant has accepted possession of the Premises pursuant to the Lease. Furthermore, Tenant acknowledges that the Premises are suitable for the Permitted Use.

[Signatures appear on next page]

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on the day and year first above written.

**LANDLORD:**

**Birmingham Financial Center, LLC**,
a Delaware limited liability company

**By: Daniel Management Corporation**,
an Alabama corporation,
Its Manager

By: ______________________
Its: SVP

WITNESS:

______________________
Printed Name: Lisa Dodd

**TENANT:**

**Animo Bancorp, Inc.**,
a Texas corporation

By: DocuSigned by: ______________________
Name: Jonathan Pennington
Title: Chief Financial Officer, Animo Bancorp

WITNESS:

DocuSigned by: Gardner Bell
44059BA15B9F45B
Printed Name: Gardner Bell