**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:**<br>**ANIMO BANCORP, INC.,**<br>**DEBTOR.** | §<br>§<br>§<br>§ | **Case No. 24-50359-alt**<br>**Chapter 7** |
| **JOHN PATRICK LOWE, TRUSTEE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TOBY NEUGEBAUER AND MELISSA NEUGEBAUER,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 26-05011-alt** |

**DEFENDANTS' RESPONSE TO TRUSTEE'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendants Toby Neugebauer and Melissa Neugebauer (collectively, "Defendants") file this Response to the Motion for Summary Judgment (the "Motion") filed by Plaintiff John Patrick Lowe, Chapter 7 Trustee (the "Trustee"), and respectfully show the Court as follows:

## SUMMARY OF RESPONSE

The Motion treats a disputed, fact-intensive fraudulent-transfer case as cut-and-dried. It is not. The Trustee seeks to recover ~$7 million from two shareholders who contributed $7 million to Bancorp weeks after its formation, paid Bancorp $5,840,552 for a secured convertible note shortly before the challenged transfers, and received the transfers only after Bancorp's proposed bank acquisition had failed to close. This case has complex, competing narratives and disputed facts over every aspect of this adversary, including the value exchanged and Bancorp's financial condition.

At least four independent factual disputes preclude summary judgment: (1) whether the challenged transfers were for reasonably equivalent value; (2) whether Bancorp was insolvent when the transfers occurred or was rendered insolvent by them; (3) whether Bancorp was left with unreasonably small assets or capital in relation to any business or transaction; and (4) whether Bancorp reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Each issue depends on disputed evidence and competing inferences. Therefore, the Motion for Summary Judgment should be denied.

## SUMMARY JUDGMENT EVIDENCE[1]

Defendants rely on the following evidence:

| Exhibit | Description |
|---|---|
| A | Declaration of Toby Neugebauer. |
| B | Expert Rebuttal Report of Amir Mireskandari dated October 8, 2026, rebutting the September 9, 2026 report of Trustee's expert, Rodney L. Crawford (the "Mireskandari Report"). |
| C | Animo Bancorp's October 31, 2022 monthly financial and transaction package, (ABI_Neug_024930–024938). |
| D | Animo Bancorp's September 30, 2022 monthly financial package (ABI_Neug_024819). |

[1] Defendants object to the Trustee's attempt to expand the summary judgment record by email. On October 5, 2026, the Trustee's counsel served an email "notice" under Federal Rules of Evidence 803 and 902 stating that the Trustee "may use any" of the business records and declarations produced in this case—third-party productions from Capco, Personetics, PAG, and others—"as evidence at . . . the hearing on the motion for summary judgment." A notice of intent to authenticate records under Rule 902(11) does not designate summary judgment evidence. Rule 56 requires a party asserting that a fact cannot be genuinely disputed to support that assertion by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A). The movant bears the initial responsibility of informing the court of the basis for its motion and "identifying those portions" of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Rule 56 requires the parties to specifically cite and designate the evidence supporting their positions, the court is confined to the materials the parties actually offer and need not search the record for evidence that has not been specifically urged. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); FED. R. CIV. P. 56(c)(3) (court "need consider only the cited materials"); *see also Wedgeworth v. Dist. 2 Emergency Services, Inc.,* No. 5:21-CV-00976-JKP, 2023 WL 324514, at *2 (W.D. Tex. Jan. 18, 2023) (declining to consider evidence movant did not include in the original motion for summary judgment). The Trustee's Motion must stand or fall on the evidence it cites. Defendants object to any consideration of documents or declarations not cited in the Motion and, to the extent any such material is offered, object under Rule 56(c)(2) and request notice and a reasonable opportunity to respond under Rule 56(e)–(f).

| | |
|---|---|
| E | WPI Secured Convertible Promissory Note No. CN2-18 (ABI_Neug_025541–025560), the related assignment consent and October 3, 2022 Assignment (ABI_Neug_025563–025566; ABI_Neug_025571–025572), and Bancorp's October and November 2022 Frost Bank operating-account statements (ABI_Neug_025584–025585; Neug-Animo0001622 et seq.). |
| F | Bancorp's November 21, 2022 payables schedule (WPI_Trustee_9019_01704729). |
| G | Bancorp's Raymond James account-opening and investment correspondence (ABI_Neug_024753; ABI_Neug_024852). |
| H | Bancorp's August 31, 2022 balance sheet workpaper reflecting a projected "Note buy out" (ABI_Neug_024814). |
| I | Report of Ryan Downton on the value of Bancorp's potential litigation claims, including the Ayers Arbitration testimony cited therein. [2] |
| J | Final Judgment and Motion for New Trial in *The Capital Markets Co., LLC v. Animo Bancorp, Inc.,* Case No. DC-22-17307 (14th Dist. Ct., Dallas County, Tex.) (CAPCO 000161–000174). |
| K | Order Abating Case, No. 05-23-01195-CV (Tex. App.–Dallas Mar. 11, 2024). |
| L | Notice of Appeal, Case No. DC-22-17307. |
| M | Trustee's Original Complaint, *Seidel v. Winston & Strawn LLP*, Adv. No. 25-03105-mvl (Bankr. N.D. Tex.). |

## BACKGROUND

Bancorp was formed on May 27, 2021 as a Texas corporation and holding company whose purpose was to acquire Ganado Bancshares, Inc., the parent of Citizens State Bank of Ganado. Ex. A ¶ 3. Bancorp had no existing operating business apart from pursuing that proposed acquisition and related financial-services plans. *Id.* ¶ 4; Ex. C. On October 7, 2021, Toby Neugebauer and Melissa Neugebauer each contributed $3.5 million to Bancorp, for a total of $7 million. Ex. A ¶ 5. On September 8, 2022, With Purpose, Inc., doing business as GloriFi, issued Bancorp Secured Convertible Promissory Note No. CN2-18 in the principal

[2] Mr. Mireskandari and Mr. Downton are designated testifying experts, so this Response cites to their expert reports, the contents of which they will testify to at trial. *See, e.g.*, *JV v. Depositors Ins. Co.*, No. 3:22-cv-00784-L, 2024 U.S. Dist. LEXIS 130126, at *32 (N.D. Tex. June 17, 2024) ("Under Rule 56, opinions in an unsworn expert report need not be reduced to affidavit form to be competent summary judgment evidence if the expert is expected to testify at trial. … Teasdale's report is thus admissible summary judgment evidence." (citing *Lee v. Offshore Logistical and Transport, L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017))).

amount of $5,840,552 (the "Note"). Ex. E at ABI_Neug_025541–025560; Ex. D. The Note was secured and carried stated payment and maturity terms. Ex. E.

The Note was not a windfall to Bancorp. Bancorp's funds had been used to pay for development of the technology stack that was a GloriFi asset, and GloriFi issued the Note to repay Bancorp for that funding. Ex. E at ABI_Neug_025571; Ex. A ¶ 8. Bancorp's accounting staff recorded the Note as a receivable when it was issued. Ex. D; Ex. B. The bank Bancorp was acquiring was intended to "serve as the regulated entity for which With Purpose, dba, GloriFi would, in fact, execute banking transactions." Ex. I (quoting Arb. Tr. Day 5, 131:1-9). On October 3, 2022, Bancorp assigned the Note and the related subscription agreement to Toby and Melissa for $5,840,552—its full-face amount. Ex. E at ABI_Neug_025563–025566, 025571–025572; Ex. A ¶ 9. Frost Bank records show two transfers of $2,920,276 each into Bancorp on that date, matching the Note's principal. Ex. E at ABI_Neug_025584. The consideration was then used to fund a $4.5 million Raymond James fixed-income account, in which U.S. Treasury securities were purchased in October 2022. Ex. C; Ex. A ¶ 11.

The Note purchase was planned in advance. Bancorp's August 31, 2022 balance-sheet workpaper projected a "Note buy out." Ex. H. On September 12, 2022, Bancorp consented to assignment of the Note to Toby and Melissa. Ex. E at ABI_Neug_025563–025566; Ex. B, Op. 1. Between September 16 and 20, 2022, Bancorp's CFO opened a Raymond James account in anticipation of investing the Note proceeds once they were received. Ex. G at ABI_Neug_024753. Bancorp's own accountants recorded that the Raymond James fixed-income account was opened "to invest the cash received from the Series 2 convertible note purchase by Toby and Melissa Neugebauer." Ex. C.

The October 31, 2022 monthly financial package—the last accountant-prepared package before the November transfers—reported ~$9.006 million in assets, $1.049 million in liabilities, and $7.957 million in shareholders' equity. Ex. C at ABI_Neug_024930–024931.

It reported ~$2.75 million in cash, $4.487 million in U.S. Treasuries held through Raymond James, a $750,000 Ganado acquisition deposit, software in process, related-party amounts, and prepaid assets. *Id.* The Trustee's own expert agrees that Bancorp was solvent on a balance-sheet basis as of October 31, 2022. Mot. Ex. 11 ¶ 25. The same package's vendor detail did not list Capco, Personetics, or Predictive Analytics Group ("PAG") as Bancorp accounts payable. Ex. C at ABI_Neug_024937. Of the ~$970,000 in payables listed, ~$824,000 was owed to TTEC, which the package reported as deferred: "An agreement was reach[ed] to defer all other payments until the products were in full production." *Id.* Accounting records instead identified the Capco, Personetics, and PAG costs as obligations of Animo Services, LLC, the technology-stack entity that Bancorp had sold to With Purpose in November 2021, or otherwise associated with the With Purpose/GloriFi platform. Ex. A ¶¶ 14-15. The November 21, 2022 payables schedule likewise tagged the principal vendor amounts—Capco $396,904, Personetics $390,000, and PAG $103,500—to Animo Services. Ex. F.

Bancorp pursued the Ganado transaction for more than a year. Ex. A ¶ 7. The transaction required Federal Reserve approval, which was never obtained. *Id.*; *see* Mot. Ex. 2, RFA No. 36. The Trustee himself contends that by the time of the transfers the Federal Reserve had denied Bancorp's application, blocking its only prospective business. Mot. ¶ 46 & n.71. By late 2022, Bancorp's proposed operating purpose had failed and the entity was winding down rather than launching or expanding bank operations. Ex. A ¶ 17.

Bancorp's bank records trace the Note proceeds from receipt through the challenged transfers. On September 30, 2022, before the Note was paid, Bancorp's Frost account held about $1.6 million. Ex. D; Ex. B. On October 3, $2,920,276 arrived from Toby's account ending 0285 and $2,920,276 from Melissa's account ending 0293, raising the balance to ~$7.41 million. Ex. E at ABI_Neug_025584. On October 25, Bancorp debited $4,500,000 to Raymond James to buy Treasuries, and on November 3 it wired a further $1,000,000 to

Raymond James. *Id.*; Ex. E at ABI_Neug_025585; Ex. G. On November 28, Raymond James returned $5,512,246.69 to the operating account, bringing the balance to $7,135,825.46. Ex. E at ABI_Neug_025585. Two days later, Bancorp transferred $3,500,025 to Toby and $3,500,025 to Melissa—to the same two accounts that had funded the October 3 payment—leaving $135,309.72. *Id.*; Ex. A ¶ 19; Ex. B, Op. 1. As the wider GloriFi enterprise experienced financial difficulties, Bancorp filed a voluntary Chapter 7 petition on March 5, 2024. Mot. ¶ 5.

## ARGUMENT AND AUTHORITIES

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment is proper only if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The Court must view the evidence and draw reasonable inferences in the light most favorable to the nonmovant. A dispute is genuine when a reasonable factfinder could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). The movant bears the initial responsibility to identify the basis for its motion and the portions of the record it contends demonstrate the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant bears the burden of proof at trial, it must establish beyond peradventure all of the essential elements of its claim. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). The nonmovant need not prove its case at summary judgment; it must only identify evidence from which a reasonable factfinder could resolve a material issue in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The Court may not weigh competing evidence or make credibility determinations, *Anderson*, 477 U.S. at 249, and valuation, solvency, identity/amount of liabilities, and the economic substance of related transactions are fact-intensive inquiries that depend on the totality of the evidence.

**2. Trustee Bears the Burden as to His Constructive Fraudulent Transfer Claims.**

The Trustee seeks summary judgment on his constructive fraudulent transfer claims, which are Counts III, IV, and V in his complaint.

Count III asserts constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). The Trustee must prove that Bancorp transferred an interest in property within two years before the petition date; received less than reasonably equivalent value in exchange; and, at the relevant time, was insolvent or was rendered insolvent, had unreasonably small capital, intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they matured, or made the transfer to an insider under an employment contract and outside the ordinary course of business. *See* 11 U.S.C. § 548(a)(1)(B).

Count IV asserts constructive fraudulent transfer under Tex. Bus. & Com. Code § 24.005(a)(2), as made applicable through 11 U.S.C. § 544(b). The Trustee must prove a transfer without reasonably equivalent value and that Bancorp either was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

Count V asserts constructive fraudulent transfer under Tex. Bus. & Com. Code § 24.006(a). The Trustee must prove that the claimant's claim arose before the transfer, that Bancorp made the transfer without reasonably equivalent value, and that Bancorp was insolvent when the transfer was made or was rendered insolvent by it. TUFTA defines

insolvency in § 24.003(a): the sum of debts must exceed the sum of assets at a fair valuation.

Reasonably equivalent value is evaluated from the totality of the circumstances, including the value of what the debtor transferred and what it received, the relationship of the parties, and the economic substance of the transaction. *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010). Value must be assessed in the context of the transaction and the interest transferred, rather than by hindsight alone. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545–46 (1994). For the reasons set forth below, summary judgment should be denied.

**B. Trustee's Standing Largely Rests on a Single Disputed Creditor.**

Counts IV and V arise under TUFTA and are available to the Trustee only through 11 U.S.C. § 544(b)(1), which permits a trustee to avoid a transfer that is "voidable under applicable law by a creditor holding an unsecured claim." Section 544(b) "requires a trustee to identify an actual creditor capable of voiding the transfer at issue under 'applicable law.'" *United States v. Miller*, 604 U.S. 518, 531 (2025). The trustee steps into that creditor's shoes "subject to the same limitations and defenses that would apply to that creditor outside bankruptcy." *Id.* at 519.

The Trustee asserts that "several" unsecured creditors satisfy this requirement, listing Capco, Personetics Technologies, Inc., Birmingham Financial, and Predictive Analytics Group ("PAG") from the claims register. Mot. ¶ 36. But the Motion offers evidence about only one of them: Capco. It makes no showing of when the Personetics, Birmingham Financial, or PAG claims arose, whether any of them was a Bancorp obligation on November 30, 2022, or whether any remained unpaid on the petition date. *Id.* Defendants deny that Bancorp owed any of these creditors on November 30, 2022. Mot. Ex. 2, RFA Nos. 49–51, 56. Defendants recognize that a properly executed and filed proof of claim constitutes prima facie evidence of the claim's validity and amount. Fed. R. Bankr. P. 3001(f). But that presumption does not

carry the Trustee's burden here, for three reasons.

***First***, it is a rebuttable, claims-allowance presumption; once the objecting party produces evidence negating an essential element of the claim, the burden returns to the claimant to prove the claim by a preponderance. *See In re Fid. Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988). Defendants have produced that evidence: Bancorp's contemporaneous books did not carry these vendors as Bancorp payables and tagged them to Animo Services. Ex. C at ABI_Neug_024937; Ex. F; Ex. A ¶¶ 14–16. ***Second***, Rule 3001(f) speaks to a claim's validity and amount against the estate, not to *when* the claim arose or whether the claimant held an unsecured claim against Bancorp on November 30, 2022—facts the Trustee must separately prove under § 544(b) and that Count V under § 24.006(a). Proof of those facts is lacking in the Trustee's Motion while Defendants have presented evidence in this Response disputing them. ***Third***, a presumption that may be rebutted at trial cannot establish a fact "beyond peradventure" on the Trustee's own motion. *Fontenot*, 780 F.2d at 1194. The Trustee's reference to the claims register is thus insufficient and does not satisfy his summary judgment burden.

That leaves Capco and its $396,904.38 claim. Mot. ¶ 36. Whether Capco was a creditor of Bancorp—as opposed to Animo Services or With Purpose, Inc.—is also disputed. Bancorp's October 31, 2022 accounts-payable detail did not list Capco, and the November 21, 2022 payables schedule tagged the Capco amounts to Animo Services. Ex. C at ABI_Neug_024937; Ex. F; see Section D, *infra*. Nor is Capco's state-court judgment the last word. Capco obtained a judgment against Bancorp in Dallas County district court on August 28, 2023. Ex. J (CAPCO 000161–63). Bancorp disputed that it was the party that received Capco's services, moved for a new trial, and on November 22, 2023 timely noticed an appeal.

*Id.* (CAPCO 000165–174); Ex. L; Ex. A ¶ 24. When Bancorp filed its bankruptcy petition on March 5, 2024, the appeal was suspended under Texas Rule of Appellate Procedure 8.2 and abated on March 11, 2024—not dismissed—and "may be reinstated on motion by any party" if the stay is lifted. Ex. K (Order Abating Case, No. 05-23-01195-CV); Ex. A ¶ 25. Capco's judgment thus is not final and remains subject to appellate review as Bancorp's challenge to it was preserved. Because the Trustee's TUFTA standing rests on a single disputed creditor whose judgment remains on appeal, summary judgment on Counts IV and V must be denied. And even if Capco qualifies, the Trustee stands in Capco's shoes and takes Capco's claim—~$400,000 in principal—subject to every limitation that would apply to Capco outside bankruptcy. *Miller*, 604 U.S. at 519. Either way, summary judgment is improper here.

**C. Trustee Cannot Establish Lack of Reasonably Equivalent Value.**

The Trustee cannot establish lack of reasonably equivalent value as a matter of law because his analysis ignores the $5,840,552 the Neugebauers paid into Bancorp eight weeks before the transfers. The Note was issued by With Purpose, Inc. to Bancorp on September 8, 2022 because Bancorp had paid for certain technology services that were more properly to responsibility of With Purpose, Inc. *See*. Ex. A ¶ 8; Ex. E. On October 3, Bancorp assigned the Note to Toby and Melissa Neugebauer in exchange for them paying its full face amount, $5,840,552, as evidenced by the bank records. Ex. E at ABI_Neug_025571–025572, 025584.

That payment is directly linked to the $7 million transfers. By September 30, 2022, Bancorp held about $1.6 million in cash; the October 2021 equity contribution had largely been spent. Ex. D; Mot. at 6. The Neugebauers' $5,840,552 is what restored Bancorp's liquidity: it funded the $4.487 million in Treasuries and raised the cash holdings to $2.75 million as of October 31. Ex. C. The Trustee's own expert concedes that as of October 31,

2022 Bancorp "had sufficient capital to pay its outstanding debts." Mot. Ex. 11¶ 25. The $7 million that left Bancorp on November 30 was therefore drawn in large part from money the Neugebauers had put in weeks earlier.

The bank records confirm the point. Bancorp had $1.608 million of cash at September 30, 2022; of the $7.237 million of cash and Treasuries it held at October 31, $5.841 million came from the Neugebauers' October 3 payment. Ex. B; Ex. E. The Treasuries bought with that money were liquidated and returned to the operating account on November 28, and the November 30 transfers were paid out of that returned balance to the same accounts that had funded the Note purchase. Ex. E at ABI_Neug_025584–025585; Ex. G. Defendants' accounting expert concludes that $5.84 million of the $7.0 million transferred on November 30 was funded by the Neugebauers' October 3 payment and only about $1.16 million by cash Bancorp held before it. Ex. B. Over the 58 days between October 3 and November 30, the net cash that moved from Bancorp to the Neugebauers was $1,159,498—not $7 million. *Id.*

Even applying the Trustee's own method—every non-cash asset, including the Note, at zero—Bancorp was solvent before the Note transaction, with about $1.608 million of cash against $1.006 million of liabilities at September 30, 2022. Ex. B. Had neither the October 3 payment nor the November 30 transfers occurred, Bancorp would still have shown a surplus of about $338,000 on November 30. *Id.* The swing from that surplus to the $821,000 deficit the Trustee's expert reports equals the net $1.16 million that moved to the Neugebauers, not the $7 million gross transfer. *Id.*

The timing of the debits and credits reinforces the link. The bank records show no other source of funds large enough to pay the November 30 transfers: the operating account never exceeded about $2.67 million between May 31 and October 2, 2022, and it reached $7

million only through the Neugebauers' October 3 payment and the November 28 return of the Treasuries bought with it. Ex. E; Ex. G. Those same records reflect that Bancorp made no payment on Capco's outstanding invoices from June through November 2022, including after the Note proceeds arrived—consistent with Bancorp's records treating Capco as an Animo Services obligation, not with a scheme to divert money away from a known Bancorp creditor. Mot. Ex. 2, RFA No. 37; Ex. E; Ex. C at ABI_Neug_024937; Ex. F.

The Trustee characterizes the transfers in isolation as a return of 2021 equity. But viewed in the totality of the circumstances, the Neugebauers paid Bancorp a total of $12.84 million and received $7 million back. *TransTexas*, 597 F.3d at 306. They also hold the Note—an obligation of With Purpose, which was insolvent when the Note issued. Mot. Ex. 11 ¶ 29. The Trustee's expert relies on GloriFi's insolvency to value Bancorp's GloriFi receivable at zero, but does not apply the same premise to the Note. Ex. B. If GloriFi was insolvent when it issued the Note, then on October 3 the Neugebauers paid Bancorp $5.84 million in cash for an asset of little or no value—a transfer of substantial value into Bancorp eight weeks before the transfers at issue. *Id.* On the Trustee's own theory, Bancorp's creditors were better off by that amount. Therefore, the net value Bancorp received is a disputed fact question that cannot be resolved against Defendants on summary judgment.

At minimum, the $5,840,552 Note payment materially offsets the Trustee's assertion that Defendants provided no value to Bancorp. The Trustee may dispute the legal characterization of that payment, its timing, or its relationship to the later distributions. But, those disputes concern the economic substance of the transactions and the totality of the circumstances. They are not issues the Court can weigh conclusively on summary judgment.

## D. Whether the Debtor Is Insolvent Is a Disputed Issue of Material Fact.

The record also precludes summary judgment as to Bancorp's solvency. It is undisputable that Bancorp's October 31, 2022 financial package reported ~$9.006 million of assets against ~$1.049 million of liabilities and ~$7.957 million of equity. Ex. C, The Trustee's own expert agrees Bancorp was solvent on that date. Mot. Ex. 11 ¶ 25. That package was prepared by Bancorp's accounting organization from its general ledger and distributed to management. Ex. A ¶ 12. The question is therefore what Bancorp's actual liabilities and fairly valued assets were once the transfers were made—and on both sides of that ledger the evidence is disputed and precludes summary judgment.

Defendants' accounting expert concludes that the Trustee's expert does not reliably establish insolvency on the transfer date. Ex. B, Summary. On the books, after the $7.0 million of transfers and about $0.1 million of November disbursements, Bancorp still showed assets of about $1.9 million against liabilities of about $1.05 million. *Id.* The Trustee's insolvency conclusion comes entirely from writing Bancorp's $1.769 million of non-cash assets down to zero—without a November 30 balance sheet, without testing the recorded liabilities, and with one or two sentences of support per asset. *Id.*; Ex. B, Ops. 3–4.

***Liabilities.*** Bancorp's real liabilities were far smaller than the Trustee assumes. Of the roughly $970,000 in payables on the October package, ~$824,000 was owed to TTEC, which the package reported as deferred until the products were in full production, a milestone that, after the acquisition failed, would never occur. Ex. C at ABI_Neug_024937. The remaining payables were ordinary-course items of roughly $146,000. *Id.* Capco, Personetics, and PAG did not appear on Bancorp's payables at all; the accounting records booked those vendors to Animo Services, and the November 21, 2022 payables schedule tagged them there. *Id.*; Ex. F;

Ex. A ¶¶ 13-16. The Trustee's expert accepts the recorded liabilities without testing them while rejecting the recorded value of every non-cash asset, and carries the October 31 liabilities to November 30 unchanged even though the November bank statement shows about $108,000 of payments for rent, insurance premiums, and premium-finance installments, some of which appear on the October 31 payables schedule. Ex. B, Ops. 4–5. Given that, the question of whether those vendors were creditors of Bancorp at the time of the transfers, and what Bancorp actually owed on November 30, is a direct fact issue and summary judgment must be denied.

***Assets.*** After the transfers, Bancorp retained not only cash but also related-party receivables from With Purpose and Animo Services carried at ~$497,000, prepaid assets of ~ $297,000, software in process, and the $750,000 Ganado deposit. Ex. C; Mot. Ex. 11 ¶¶ 27–29. Bancorp also held potential litigation claims, including RICO claims, arising from the same course of conduct that derailed the Ganado acquisition, which have been valued in a range of $8.1 million to $40.5 million. Ex. I. Those claims rest on contractual covenants: the With Purpose investors who signed its Stockholders Agreement and related confidentiality and proprietary-technology agreements. Ex. A ¶ 22; Ex. I. The Trustee assigns every one of these assets a value of zero. Mot. at ¶ 18. But the fair value of each is a contested valuation question on which Defendants have offered competing evidence. Ex. B, Ops. 2–3, 6. The full facts must be weighed and tested as to these conflicting valuations.

***First***, the value of the litigation claims must be considered as part of Bancorp's assets on the date of the transfers. Ex. B. Mr. Downton valued these claims at $8.1 million to $40.5 million. Ex. I. That valuation makes Bancorp solvent, even assuming that $1.05 million of liabilities existed on the date of the transfers. The value of the claims is a fact issue for trial,

not for summary judgment. ***Second***, Mr. Downton's view of the claims' value finds support in filings in related matters. For instance, the trustee in the bankruptcy of With Purpose, Inc. alleges that GloriFi lost approximately $1.7 billion in "enterprise value" and seeks damages in that amount. Ex. M ¶ 95. Though that is a different bankruptcy, Bancorp was part of that value because it was intended to be the regulated banking arm of the business. *See* Ex. I (quoting Arb. Tr. Day 5, 131:1-9). These allegations support the conclusion that Bancorp's claims had substantial value. ***Third***, the Trustee's solvency analysis does not take these assets into account. In sum, there is a wide range of fact issues about the value of Bancorp's claims that cannot be decided on summary judgment.

***Lastly***, the Trustee's write-offs of Bancorp's assets are themselves disputed fact issues. The Trustee's expert describes no valuation approach, method, or calculation for the assets he writes off. Ex. B. He treats the Ganado deposit as "forfeited" without citing the merger agreement, identifying whether or when either party terminated it, or showing that Ganado retained the deposit; on November 30 the deposit was at most a contingent claim whose value had not been measured. *Id.* He values the related-party receivables at zero without separating the GloriFi and Animo Services balances or analyzing either obligor's condition, relying on bankruptcies that were not filed until the first quarter of 2023—classic hindsight. *Id.* He zeroes the prepaid insurance even though prepaid premiums commonly carry a pro rata or short-rate return on cancellation, and he zeroes the software because no one later monetized it. *Id.*; Ex. B. And his result is not robust: valuing the non-cash assets at book produces a surplus of about $856,000, and keeping only the Ganado deposit and prepaids at book produces a surplus of about $226,000. Ex. B.

Taken together, a reasonable factfinder could conclude that Bancorp's genuine, currently payable liabilities after the transfers were modest and were exceeded by its cash and fairly valued remaining assets. At minimum, the evidence requires a factfinder to determine which liabilities belonged to Bancorp, whether deferred obligations should be counted, what the remaining assets were worth at the transfer date, and whether the company was solvent.

Bancorp's failed acquisition and lack of ongoing operations further support competing inferences. Bancorp was formed to acquire Ganado; the required regulatory approval never arrived; and Bancorp did not operate the bank it had been created to acquire. Once that purpose failed, Bancorp had a rational basis to retain only enough assets to address its actual remaining obligations while winding down. Whether that rationale is credible, and whether the remaining assets were sufficient, are fact questions.

In light of the above, the post-transfer balance cannot be summarily reduced to the $135,309.72 cash figure without resolving the value of Bancorp's remaining assets and the identity of its actual creditors. And those determinations are fact-intensive questions that cannot be decided by summary judgment.

**E. Bancorp's Assets Were Not Unreasonably Small Compared to the Business it Intended to Pursue.**

The Trustee also cannot prove as a matter of law that Bancorp was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small. That inquiry is relational. The statute asks whether the debtor's remaining assets were "unreasonably small in relation to the business or transaction." Tex. Bus. & Com. Code § 24.005(a)(2)(A); *see* 11 U.S.C. § 548(a)(1)(B)(ii)(II). The authority the Trustee himself relies on confirms the point: unreasonably small capital reflects a debtor's inability "to generate sufficient cash flow . . . to sustain ongoing operations" and pay its debts. Mot. ¶ 45 (citing *In*

*re WCC Holding Corp.*, 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994), and *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992)). The test is measured against the operations the debtor actually had or planned. The Trustee's own Motion contradicts his position. He contends that "[b]y the time of the Transfers, the FRB had denied Bancorp's application to acquire Ganado, blocking its only prospective avenue to revenue," and that Bancorp had "no operations, no revenue, and no remaining path to generate cash flow." Mot. ¶ 46 & n.71. If that is true, Bancorp had no future revenue—but it also had no future business to conduct. Bancorp was not an operating bank with payroll, customers, loan originations, or a continuing expansion plan. It was a holding company formed for a proposed acquisition that regulators would not approve.

The Trustee cannot have it both ways. He cannot argue that the FRB's denial ended Bancorp's business and also argue that Bancorp was "engaged or about to engage" in a business for which it needed more capital. If, as the Trustee says, there were no "ongoing operations" left to sustain, his own authority supplies no benchmark against which Bancorp's capital could be found unreasonably small. *See WCC Holding*, 171 B.R. at 985. A purpose-spent holding company does not need the operating capital of an active bank when its only intended transaction has failed. *See* Ex. A ¶¶ 17-18. The relevant question is not whether Bancorp would have required millions of dollars had the Ganado acquisition closed; it is whether the assets retained were unreasonably small for the wind-down that was actually occurring. On this record, a reasonable factfinder could conclude that Bancorp's remaining assets, disputed liabilities, and potential litigation claims were sufficient for its limited post-acquisition-failure purpose. Summary judgment must therefore be denied.

## F. A Fact Issue Exists as to Whether Bancorp Intended or Reasonably Should Have Believed It Would Incur Debts Beyond Its Ability to Pay.

The Trustee must also prove that Bancorp intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III); TEX. BUS. & COM. CODE § 24.005(a)(2)(B). That inquiry turns on what Bancorp reasonably expected at the time of the transfers, not on hindsight from claims asserted after the acquisition failed. 11 U.S.C. § 548(a)(1)(B) (determination of insolvency or the intent to incur debts beyond the ability to pay must be established "on the date that such transfer was made or such obligation was incurred"); TEX. BUS. & COM. CODE § 24.005(a)(2)(B) (debtor's intent, belief, or reasonable expectation regarding the inability to pay debts is evaluated when "the debtor made the transfer or incurred the obligation"). Two factual issues preclude summary judgment.

***First,*** Bancorp had no business purpose requiring it to continue incurring the operating debts of an active bank after the Ganado transaction failed. Bancorp did not plan to launch operations, hire a workforce, or continue incurring the technology/vendor obligations the Trustee attributes to it. Ex. A ¶ 18. Instead, it was winding down and had no reason to anticipate new obligations. The Trustee's own evidence bears this out: after the transfers, Bancorp's account activity consisted of "minor recurring monthly expenses, such as monthly Spectrum internet charges." Mot. Ex. 11 ¶ 33. On these facts, a factfinder could conclude that Bancorp neither intended nor reasonably expected to incur debts beyond its ability to pay. Ex. A ¶ 20. Nor did the Trustee's expert perform the analysis this element requires. He did not analyze when Bancorp's liabilities were due, its expected expenses after November 30, any budget or forecast, or the capital needed for whatever activities remained. Ex. B. If $824,012 of the $956,000 in recorded payables was not payable until a production milestone that had

not occurred, the debt actually due on or shortly after November 30, 2022 was much smaller than the Trustee assumes. *Id.* And his reliance on claims filed from March through November 2024 is hindsight that is not tied to what was known or knowable on the transfer date. Ex. B.

***Second,*** the entity-classification evidence creates another independent dispute. If the Capco, Personetics, and PAG costs were obligations of Animo Services or With Purpose, then Bancorp's management and accountants had a reasonable basis to expect that Bancorp would not incur those debts. Bancorp's October 31, 2022 financial package—prepared by its accounting staff and distributed to management—did not list those vendors among Bancorp's payables, and the November 21, 2022 payables schedule assigned them to Animo Services. Ex. C at ABI_Neug_024937; Ex. F. Those were the records in front of Bancorp's decision-makers when the transfers were made. Ex. A ¶ 12. That means that, judged as of November 30, 2022, Bancorp reasonably believed its own obligations were limited to the modest, largely deferred payables on its books, which its remaining resources could cover. Whether that belief was reasonable is a fact issue that precludes summary judgment.

**G. Trustee Is Not Entitled to Recover the Full Amount of the Transfers.**

The Trustee asserts that once the transfers are avoided, he is entitled "as a matter of law" to recover the full $7 million under 11 U.S.C. § 550(a). Mot. ¶ 50. That is not accurate. Avoidance and recovery are two separate steps. Avoidance is the threshold determination that a transfer is legally voidable—here, that the Trustee has proved every element of a constructive fraudulent transfer under Section 548 or TUFTA. Recovery under Section 550 comes only afterward, and only "to the extent that a transfer is avoided" and "for the benefit of the estate." 11 U.S.C. § 550(a). The Trustee cannot establish avoidance on summary judgment because genuine disputes of material fact exist as to his standing under TUFTA, reasonably equivalent

value, and each of the financial-condition elements. Without avoidance, there is nothing to recover, and he is not entitled to judgment under Section 550 at all.

Even if avoidance were established, the amount of any recovery would remain disputed, and that dispute independently precludes summary judgment. ***First***, Section 550(a) authorizes recovery of the property transferred "or, if the court so orders, the value of such property," which leaves the measure of recovery to the Court on a developed record. *Id.* ***Second***, a transferee that takes for value and in good faith may retain the transfer or hold a lien "to the extent that such transferee . . . gave value to the debtor in exchange for such transfer." 11 U.S.C. § 548(c). Whether the $5,840,552 payment to Bancorp in October 2022 constitutes value given in exchange for the November transfers is a fact question. If it does, any recovery must be reduced by up to that amount. ***Third,*** as to the TUFTA counts, the Trustee stands in the shoes of the triggering creditor, and TUFTA limits a judgment to the lesser of the value of the asset transferred or "the amount necessary to satisfy the creditor's claim." TEX. BUS. & COM. CODE § 24.009(b); *Miller*, 604 U.S. at 519. Because the only creditor the Trustee has attempted to prove is Capco, that cap would limit any TUFTA judgment to the amount of Capco's claim, if Capco qualifies at all. ***Fourth***, the Trustee seeks $7 million when the filed claims total ~$1.28 million and the only creditor he has attempted to prove is owed about $400,000 in principal. Mot. ¶¶ 36, 46 n.70. Whether a $7 million recovery is required "for the benefit of the estate" in these circumstances is not appropriate at summary judgment.

## CONCLUSION AND PRAYER

For these reasons, genuine issues of material fact remain, and the Motion for Summary Judgment should be denied.

Dated: October 12, 2026

Respectfully submitted,

*/s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson
Texas Bar No. 20039200
jtillotson@tillotsonlaw.com
Austen Irrobali
State Bar No. 24092564
airrobali@tillotsonlaw.com
Sara K. Babineaux
State Bar No. 24125102
sbabineaux@tillotsonlaw.com
**TILLOTSON PATTON**
1201 Main Street, Suite 1300
Dallas, Texas 75202
(214) 382-3041 Telephone
(214) 292-6564 Facsimile

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2026, a true and correct copy of the foregoing document was served on all parties and counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson