Docusign Envelope ID: EDBC2C53-6DB8-8BDC-8279-69DFFF002F79

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:**<br>**ANIMO BANCORP, INC.,**<br>**DEBTOR.** | §<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 24-50359-alt** |
| **JOHN PATRICK LOWE, TRUSTEE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TOBY NEUGEBAUER AND MELISSA NEUGEBAUER,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 26-05011-alt** |

**DECLARATION OF TOBY NEUGEBAUER**

I, Toby Neugebauer, declare pursuant to 28 U.S.C. § 1746 as follows:

**Background**

1. My name is Toby Neugebauer. I am over the age of twenty-one, of sound mind, and fully competent to make this declaration. The facts stated in this declaration are within my personal knowledge, or are based on my review of Animo Bancorp, Inc.'s business records that I received in the ordinary course of my role with the company, and are true and correct.

2. I am a Defendant in this adversary proceeding. At all relevant times, my wife Melissa Neugebauer, and I each owned 50% of Animo Bancorp, Inc. ("Bancorp"). During 2022, I served on Bancorp's board of directors.

3. Bancorp was formed on May 27, 2021 as a Texas corporation. Bancorp was formed as a holding company for the purpose of acquiring Ganado Bancshares, Inc., the parent company of Citizens State Bank of Ganado, Texas (together, "Ganado").

4. Bancorp never operated a bank, never had bank customers or loan originations, and never generated revenue.

5. On October 7, 2021, Melissa and I each contributed $3.5 million to Bancorp, for a total of $7 million.

6. On October 21, 2021, Bancorp entered into an Agreement and Plan of Merger with Ganado Bancshares, Inc. to acquire all outstanding stock of Ganado. Bancorp paid a $930,000 deposit, $750,000 of which was to be credited against the purchase price, which Bancorp's records estimated at approximately $7 million, payable at closing.

7. The Ganado acquisition required approval from the Board of Governors of the Federal Reserve System (the "Federal Reserve"). Bancorp filed an application with the Federal Reserve on November 8, 2021, and Bancorp filed a new application dated December 24, 2021. Bancorp pursued the transaction for more than a year, including by responding to the Federal Reserve's requests for additional information. The Texas Department of Banking accepted the application for filing on August 23, 2022, but the Federal Reserve never approved it. In November 2022, the application was withdrawn.

**The Note and the October 2022 Payment to Bancorp**

8. On September 8, 2022, With Purpose, Inc., doing business as GloriFi ("With Purpose"), issued Bancorp Secured Convertible Promissory Note No. CN2-18 in the principal amount of $5,840,552 (the "Note"). With Purpose issued the note in favor of Bancorp because

Bancorp's funds had been used to pay for development of the technology stack that was a With Purpose asset. A true and correct copy of the Note is in **Exhibit E**.

9. On October 3, 2022, Bancorp assigned the Note and the related subscription agreement to Melissa and me in exchange for $5,840,552, the Note's full face amount. A true and correct copy of the assignment consent and the October 3, 2022 Assignment is included in Exhibit E.

10. On October 3, 2022, Melissa and I each transferred $2,920,276 to Bancorp's account at Frost Bank, for a total of $5,840,552. Bancorp's October 2022 Frost Bank statement, a true and correct copy of which is included in Exhibit E, reflects those two deposits.

11. The $5,840,552 that Melissa and I paid to Bancorp was used to fund a $4.5 million fixed-income account at Raymond James, through which Bancorp purchased U.S. Treasury securities in October 2022. Those transfers were made after the review of and in reliance on the thorough analysis of the allocation of assets and liabilities conducted by experienced third parties, including Crowe, Locke Lord, Winston & Strawn, and Wachtell, Lipton, Rosen & Katz.

**<u>Bancorp's Financial Records</u>**

12. Bancorp's monthly financial packages were prepared by the accounting team from Bancorp's general ledger. I received the October 31, 2022 package before November 30, 2022, and I relied on the packages to understand Bancorp's financial condition. True and correct copies of the financial packages for the months ending September 30, 2022 and October 31, 2022 are attached as **Exhibits D and C**, respectively.

13. The October 31, 2022 financial package was the last monthly package prepared before the November 30, 2022 transfers. It reported approximately $9.006 million in total assets, $1.049 million in total liabilities, and $7.957 million in shareholders' equity. Bancorp's assets included approximately $2.75 million in cash, $4.487 million in U.S. Treasury securities held through Raymond James, a $750,000 Ganado acquisition deposit, software in process, related-party receivables, and prepaid assets.

14. Page 6 of the October 31, 2022 financial package (ABI_Neug_024937) lists Bancorp's accounts payable by vendor, totaling approximately $970,000. Approximately $824,000 off that amount was owed to TTEC. The package notes that Animo Services paid TTEC $1 million in June 2022 for "all Animo entities" and that "an agreement was reach[ed] to defer all other payments until the products were in full production." The remaining listed payables, approximately $146,000, were ordinary-course items. The same page separately shows a $750,000 estimate for Wachtell, Lipton, Rosen & Katz for which no final invoice had been received. Capco, Personetics Technologies, Inc. ("Personetics"), and Predictive Analytics Group ("PAG") do not appear among the payables in that package as no final invoice was ever received from them and they did not perform work for Animo Bancorp directly that I am aware of.

15. My understanding at the time was that the work performed by Capco, Personetics, and PAG related to the consumer technology platform developed by Animo Services, LLC ("Animo Services") and With Purpose, and that those costs were obligations of Animo Services or With Purpose, not Bancorp. Bancorp sold Animo Services to With Purpose in November 2021.

16. A November 21, 2022 payables schedule prepared by the GloriFi accounting team—a true and correct copy of which is attached as **Exhibit F**—tagged the principal vendor amounts to Animo Services as the entity to expense, including Capco ($396,904), Personetics ($390,000), and PAG ($103,500).

**<u>The Wind-Down and the November 30, 2022 Transfers</u>**

17. By late November 2022, the Federal Reserve had not approved the application, the application was withdrawn, the Ganado acquisition could not close, and Bancorp was winding down. Bancorp was not launching or expanding bank operations.

18. As of November 30, 2022, Bancorp had no plans to launch operations, hire a bank workforce, or take on new technology or vendor obligations. After the acquisition failed, Bancorp had no business that would require it to incur the operating debts of an active bank.

19. On November 30, 2022, Bancorp transferred $3.5 million to me and $3.5 million to Melissa.

20. When those transfers were made, I relied on Bancorp's financial records described above. Based on those records, I believed that Bancorp's own obligations were limited to the payables reflected on its books, most of which the records showed as deferred. Based on those records and the payments made in November 2022, I also believed that Bancorp would retain sufficient resources to pay its actual obligations as they came due during the wind-down. I did not expect Bancorp to incur debts beyond its ability to pay.

21. After November 30, 2022, Bancorp's activities were limited to winding down its affairs, and its remaining expenses consisted of minor recurring costs and the cost of defending the lawsuit Capco filed against it.

22. Bancorp also held potential claims against third parties. The persons who invested in With Purpose and signed its Stockholders Agreement and related confidentiality and proprietary-technology agreements contractually agreed not to take or use GloriFi's ideas for their own purposes and not to make negative or disparaging statements about the company or its officers. As consideration for these agreements, these individuals received options to own their pro rata portion in Bancorp equal to their ownership intersts in WPI. I believe those persons breached those covenants and acted together in doing so. I understand that such concerted conduct supports conspiracy and RICO claims, which carry the potential for treble damages.

23. Bancorp filed a voluntary petition under Chapter 7 of the Bankruptcy Code on March 5, 2024.

24. In my understanding, Capco's engagement concerned the consumer technology platform being built for With Purpose and Animo Services, not services received by Bancorp. After Capco sued Bancorp in Dallas County District Court, Bancorp contested liability on that basis, and I signed an affidavit in support of Bancorp's response to Capco's motion for summary judgment. That court entered judgment for Capco on August 28, 2023. Bancorp moved for a new trial and, on November 22, 2023, filed a notice of appeal in the Fifth District Court of Appeals in Dallas (No. 05-23-01195-CV).

25. After Bancorp filed its bankruptcy petition, Bancorp's counsel filed a suggestion of bankruptcy in the Court of Appeals on March 8, 2024. On March 11, 2024, the Court of Appeals abated the appeal and ordered that it "may be reinstated on motion by any party showing . . . that the appeal is permitted by federal law or the bankruptcy court." A true and

Docusign Envelope ID: EDBC2C53-6DB8-8BDC-8279-69DFFF002F79

correct copy of that order is attached as **Exhibit K**. I continue to dispute the Capco claim and want Bancorp's appeal to proceed if the bankruptcy stay is lifted or I am otherwise permitted to do so. I believed at the time that the Chapter 7 Trustee would be able to gain documents that I was unable to obtain that would validate those claims. The Trustee did not do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2026.

Signed by:

Toby N.

50A84BED8F33450...

Toby Neugebauer

# EXHIBIT B

EATON HUDSON, INC

# Rebuttal Memo

# Critique of Plaintiff's Expert Report on Debtor Solvency

## In re Animo Bancorp, Inc.

*An independent review of the expert report of Rodney L. Crawford on the solvency of Animo Bancorp, Inc. at the time of the November 30, 2022 transfers, prepared in connection with Lowe, Chapter 7 Trustee v. Toby Neugebauer and Melissa Neugebauer, Adv. Proc. No. 26-05011, in Case No. 24-50359 (Bankr. W.D. Tex.).*

**October 8, 2026**

Prepared by Eaton Hudson Inc

*Prepared for*

**Tillotson Patton**

*Counsel for Toby Neugebauer and Melissa Neugebauer*

**PRIVILEGED & CONFIDENTIAL**

## Summary

This memo addresses the reliability and completeness of the solvency analysis in the expert report of Mr. Crawford (the "Report"). Our opinion is that the Report does not reliably establish that the Debtor was insolvent on the date of transfer, because its conclusion depends on values and liability figures it does not analyze and does not use a snapshot of the financial status of the business at the time of the business.

Mr. Crawford agrees that the Debtor was solvent on its books at October 31, 2022, when its internal financial package showed total assets of $9.006 million and total liabilities of $1.049 million (Report ¶37; ABI_Neug_024931). After the $7.0 million of transfers and about $0.1 million of November disbursements, the book figures still show assets of about $1.9 million against liabilities of about $1.05 million. On the most basic requirement to provide or create a proforma balance sheet as of end of November, the report fails. Instead it provides opinions for accounting entries that should have happened, yet does not justify the proper procedure to recreate the financials using such adjustments.

Not only are the conclusions not based on proper procedure, he depends on *hindsight.* Solvency is measured as of the transfer date, using what was known and knowable then, not what happened and then work backward from a transfer.

The Report's insolvency conclusion comes entirely from writing the Debtor's $1.769 million of non-cash assets down to zero. He does so without a November 30 balance sheet, without testing the recorded liabilities, and with one or two sentences of support per asset. His own ¶43 makes the conclusion depend on two assets, the $750,000 Ganado deposit and the $497,000 related-party receivable.

I have spoken to the founder of Bancorp, Mr. Neugebauer, who informed me that at or before the time of the transfer, Bancorp had valid claims against third parties that had intrinsic value which are not reflected in the schedules or the Crawford Report. The Report does not analyze any potential claims held by Bancorp against third parties, or any counterclaims or defenses which may mitigate the liabilities of Bancorp.

Our principal observations are:

- **Narrow margin.** On the Report's own figures, the balance sheet result moves from deficit to surplus with plausible changes to one or two values the Report does not analyze (Opinion 2).
- **No transfer-date measurement.** The Report does not present a balance sheet at November 30, 2022, relies on hindsight, and offers no separate analysis for its cash flow and capital adequacy conclusions (Opinions 4, 6 and 7).
- **GloriFi note.** On the Report's own premise that GloriFi was insolvent, the Neugebauers paid Bancorp $5.84 million in cash for a GloriFi note of little value 58 days before the

transfers. The Report describes the transaction but does not value the note or consider its effect (Opinion 1).

## Opinion 1 – GloriFi Transactions

The facts below come from Mr. Crawford's report (¶¶34–37), the September 30 and October 31, 2022 balance sheets he reproduces, and the Debtor's bank statements.

- September 8, 2022: With Purpose, Inc. (GloriFi) issued a $5,840,552 convertible note to Bancorp. Bancorp recorded a note receivable and increased additional paid-in capital by $5.841 million. At September 30, before any cash changed hands, Bancorp had $1.608 million of cash, total assets of $9.258 million, liabilities of $1.105 million, and equity of $8.153 million.
- September 12, 2022: Bancorp consented to assign the note to Toby and Melissa Neugebauer (ABI_Neug_025563–025566).
- October 3, 2022: The Neugebauers paid Bancorp $5,840,552 in cash for the note, $2,920,276 each (ABI_Neug_025571–025572; ABI_Neug_025584). The note left Bancorp's books. Paid-in capital stayed at $12.843 million, so the September contribution remained in equity, now backed by cash instead of the note
- October 25, 2022: Bancorp invested $4.5 million of the proceeds through a Raymond James account in U.S. Treasury securities, carried at $4.487 million. On October 31 it held $7.237 million of cash and Treasuries against $1.049 million of liabilities.
- November 30, 2022: Bancorp transferred $7.0 million to the Neugebauers, $3,500,025 to each of the same two accounts that funded the October 3 payment (ABI_Neug_025585).

| Cash between Bancorp and the Neugebauers | Date | Amount |
|---|---|---|
| Neugebauers' payment for the GloriFi note | Oct. 3, 2022 | 5,840,552 |
| Transfers to the Neugebauers | Nov. 30, 2022 | (7,000,050) |
| Net cash from Bancorp to the Neugebauers | 58 days | (1,159,498) |

Mr. Crawford relies on the finding that GloriFi was insolvent as of June 30, 2022 to value Bancorp's GloriFi receivable at zero. He does not apply the same premise to the GloriFi note. If GloriFi was insolvent when it issued the note, the note was worth far less than its $5.84 million face amount, and on October 3 the Neugebauers paid Bancorp $5.84 million in cash for an asset of little or no value. On the Report's own premise, that is a transfer of substantial value into Bancorp eight weeks before the transfers at issue. The Report describes the transaction but never values the note or addresses what the Neugebauers' payment represented.

Bancorp had $1.608 million of cash at September 30, 2022. Of the $7.237 million it held at October 31, $5.841 million came from the Neugebauers' October 3 payment. As a sources-and-uses matter, about $5.84 million of the $7.0 million transferred on November 30 was funded by that payment and about $1.16 million by cash Bancorp held before it.

The table below applies Mr. Crawford's method (all non-cash assets at zero, including the GloriFi note, consistent with his GloriFi insolvency premise; lease asset and liability excluded) at three points.

| Measurement point | Cash and Treasuries | Liabilities | Surplus (deficit) |
|---|---|---|---|
| September 30, 2022, before the note was sold | 1,608 | 1,006 | 602 |
| November 30, 2022, pro forma without the October 3 payment or the November 30 transfers | 1,294 | 956 | 338 |
| November 30, 2022, actual (Report) | 135 | 956 | (821) |

The pro forma line removes both cash movements and assumes the same October and November operating disbursements (about $212,000 and $102,000, derived from the Report's balance sheets and footnote 32). On these figures, Bancorp was solvent under the Report's own method before the GloriFi note transaction and would have remained solvent at November 30 had neither cash movement occurred. The change from a surplus of about $338,000 to a deficit of $821,000 equals the net $1.16 million that moved from Bancorp to the Neugebauers, not the $7.0 million gross transfer. The Report does not present the transfers in this context.

Whether the October 3 payment was the purchase of an asset, a capital contribution in substance, or part of a single transaction with the November 30 transfers is a legal question for counsel, and we offer no opinion on it. What we can address is the economic substance, which depends on the fair value of the GloriFi note on October 3, 2022. That requires the note's terms and an analysis of GloriFi's financial condition at that date, neither of which the Report provides.

## Opinion 2 – Sensitivity of the Conclusion

Using the Report's own figures, the table below shows the balance sheet result under alternative values for the non-cash assets. Cash is the $135,310 November 30 bank balance. Liabilities are held at the Report's $956,000, excluding the lease liability, consistent with ¶42. The right-of-use asset is excluded on the same basis. Amounts are in thousands.

| Scenario | Total assets | Liabilities | Surplus (deficit) |
|---|---|---|---|
| A. Report: all non-cash assets at $0 | 135 | 956 | (821) |

| Scenario | Total assets | Liabilities | Surplus (deficit) |
|---|---|---|---|
| B. All non-cash assets at book value (the Debtor's books) | 1,812 | 956 | 856 |
| C. Ganado deposit at book; all others at $0 | 885 | 956 | (71) |
| D. Ganado deposit and prepaids at book; others at $0 | 1,182 | 956 | 226 |
| E. Ganado deposit at $0; all others at book | 1,062 | 956 | 106 |
| F. Ganado deposit and receivables at $0; prepaids and software at book (Report ¶43) | 565 | 956 | (391) |

The Report presents no sensitivity analysis, and its conclusion is not robust to reasonable changes in values it does not analyze. This table tests the Report; it is not an opinion that any scenario other than A is correct. Scenario C shows that the Ganado deposit alone does not close the gap, so a solvency result on the asset side would require value in the deposit plus some value in the other assets, or substantial value in the receivables and prepaids if the deposit is zero.

The table holds liabilities constant. As Opinion 5 shows, the liability figure is at least as consequential to the result as any single asset value.

## Opinion 3 – Zero Values Without Valuation Analysis

Mr. Crawford holds the ABV credential but states that his work was performed under the AICPA Statement on Standards for Forensic Services (¶6). The Report does not describe any valuation approach, method, or calculation for the assets it writes off only that it should be viewed on a "liquidation basis." Each conclusion is stated in one or two sentences (¶41).

**Ganado deposit ($750,000).** In connection with the proposed acquisition of Ganado Bancshares, Inc., Bancorp paid Ganado $930,000. Its December 31, 2021 audited financial statements carried $750,000 as an other asset, to be applied to the purchase price at closing, and expensed the remaining $180,000 as bank acquisition expense. The audited footnote states that "[i]f the acquisition does not close, the amount of $750 thousand will be forfeited by the Company, representing a termination penalty" (Note 3, ABI_Neug_024346). The Report relies on that footnote and on Toby Neugebauer's interrogatory answer to conclude that the deposit was "forfeited as a transaction termination penalty upon the failure to complete the acquisition" and had no value on November 30, 2022. It does not take into account whether the deposit could have been transferred or whether another ownership group could have obtained value from the deposit.

The deposit is referred to a "Forfeitable" – The statement that was "forfeited" is an opinion not rooted in evidence. There is no analysis, documentation, or references to validate that it was in fact forfeited, and if so, when did that occur. On these facts, the deposit on November 30 was

potentially a contingent claim. Its value depended on the merger agreement's terms, on which termination right (if any) had been or would be exercised, and on the likelihood that the transaction would close or the deposit would be returned. That likelihood may well have been low by November 30. The Report, however, does not cite the merger agreement, identify whether or when either party terminated it, identify any forfeiture notice, or determine whether Ganado retained the deposit. Its zero value is a conclusion drawn from a footnote, not a measurement as of the transfer date. We do not at this time offer an alternative value for the deposit.

**Related-party receivables ($497,000).** The Report does not separate the balance between GloriFi (With Purpose, Inc.) and Animo Services, and it offers no analysis of Animo Services' financial condition. A receivable from a financially distressed obligor is ordinarily valued at its expected recovery, not automatically at zero. The Report does not consider whether Bancorp filed claims in either obligor's later bankruptcy case or what those estates have paid or are expected to pay. For GloriFi, the Report relies on the June 17, 2025 findings in the With Purpose case (Case No. 23-30246, Doc. 563). Mr. Crawford's testimony list indicates he testified on insolvency in that case. The extent to which those findings rest on his own work should be disclosed and considered.

This is a true example of "hindsight insolvency" - Those two debtors to Bancorp did not file for bankruptcy until the first quarter of 2023. That date is clearly after November of 2022. The reliance of events past the time of the transfer in this case, to conclude that receivables are of no value is faulty at best. There was not even an attempt to justify any indication of reserves for such receivables would be necessary in 2022 based on any evidence of potential nonpayment of such receivables.

**Prepaid expenses ($297,000).** The Report treats prepaid insurance premiums and software fees as having no value because they are "generally non-transferrable" and "generally non-refundable." Transferability is not the relevant question on a liquidation basis. Prepaid insurance premiums commonly carry a pro rata or short-rate return on cancellation. The bank statements show monthly payments to IPFS, a premium finance company, and to Summit Insurance (ABI_Neug_025584–025585), and the October 31 payables schedule lists a further IPFS installment (ABI_Neug_024936), which indicates that at least some premiums were financed. Where premiums are financed, a cancellation refund is applied first to the remaining financed balance, so the recoverable amount is the unearned premium less that balance. The Report reviews neither the policies, their cancellation terms, nor the financing.

**Software in process ($133,000).** The only support is that neither the Debtor nor the Trustee later monetized the software. That is a hindsight observation, addressed in Opinion 6, not a valuation as of November 30.

**Right-of-use asset ($92,000).** The Report zeroes the asset and also excludes the related lease liability (about $93,000). We do not take issue with the net result, but the treatment should be stated consistently.

## Opinion 4 – No Measurement at the Transfer Date

The Report states its scope as solvency in relation to the November 30, 2022 transfers (¶3), but its balance sheet is the Debtor's internal October 31, 2022 balance sheet (ABI_Neug_024930–024938). The only bridge to November 30 is footnote 32, which rolls forward cash: $7.237 million of cash and Treasuries, less the $7.0 million transfers, less about $0.1 million of other disbursements, equals the $135,310 ending bank balance.

The Report does not roll forward the other side of the balance sheet. It carries October 31 liabilities of $956,000 (excluding the lease liability) to November 30 without adjustment, even though the November bank statement shows about $108,000 of payments for rent, insurance premiums, and premium-finance installments, some of which appear in the October 31 payables schedule (ABI_Neug_024936; ABI_Neug_025585). It does not identify what was paid, what was accrued during November, or what the liability balance actually was on November 30.

## Opinion 5 – Recorded Liabilities Were Not Tested

The Report accepts the Debtor's recorded accounts payable and accrued expenses of $956,000 as the measure of its debts (¶¶4, 42) while rejecting the recorded value of every non-cash asset. The Debtor's October 31, 2022 accounts payable schedule (ABI_Neug_024936), part of the same package on which the Report relies, shows that the recorded figure involves matters that require analysis. The Report addresses neither.

## Opinion 6 – Reliance on Hindsight

Solvency is measured as of the transfer date, based on what was known or reasonably knowable then. The Report relies on later events in several places:

- The summary conclusion that non-cash assets were worth about zero is "further evidenced by the Debtor's inability to realize any monetary value for these assets" (¶15).
- The software is valued at zero because neither the Debtor nor the Trustee was later able to monetize it (¶41(a)). The bankruptcy case was not filed until March 5, 2024, more than fifteen months after the transfers, and the Trustee's efforts necessarily came later still.
- Claims filed from March through November 2024 are offered as evidence that the transfers left the Debtor with unreasonably small capital and unable to pay its debts (¶32).

Later events can corroborate conditions that were knowable on the transfer date, but the Report does not separate the two. Each of these points should have been tied to information available on or before November 30, 2022.

## Opinion 7 – Cash Flow and Capital Adequacy

The Report states that the Debtor was insolvent on a cash flow basis and left with unreasonably small capital (¶¶16, 44). The support is that the Debtor had $135,310 of cash, no revenue, and about $1.0 million of liabilities. The Report does not analyze when those liabilities were due, the

Debtor's expected expenses after November 30, any budget or forecast, or the capital needed for whatever activities remained. These are separate tests from balance sheet insolvency, and each requires its own analysis.

If $824,012 of the $956,000 was not payable until a production milestone that had not occurred, the debt actually due on or shortly after November 30, 2022 was much smaller than the Report assumes. Conversely, the payables schedule labels most of the TTEC balance past due, and the Ganado deposit estimate may have been payable. The Report does not resolve these questions.

# EXHIBIT C

# Animo Bancorp, Inc.
# Monthly Financial Package
# October 31, 2022

animo bancorp

CONFIDENTIAL

Animo Bancorp, Inc.
Monthly Accounting Financial Package
Table of Contents


| | |
|---|---|
| Monthly Balance Sheet Comparison | 1 |
| Monthly Balance Sheet | 2 |
| Monthly Income Statement Comparison | 3 |
| Monthly Income Statement | 4 |
| Significant Transactions | 5 |
| Accounts Payable Aging | 6 |
| Cash Position | 7 |

**Animo Bancorp, Inc.**
**Consolidated Balance Sheet**
**October 31, 2022**
**(In Thousands)**

| | Oct-22 | Sep-22 | $ Change | | Dec-21 |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash | $ 2,750 | $ 1,608 | $ 1,142 | **A** | $ 5,523 |
| US Treasury securities | 4,487 | - | 4,487 | **B** | - |
| Software In-Process | 133 | 133 | - | | - |
| Investment in Citizens State Bank of Ganado | 750 | 750 | - | | 750 |
| Due from related parties | 497 | 497 | - | | - |
| Prepaid expenses | 297 | 331 | (34) | | - |
| Note receivable | - | 5,841 | (5,841) | **C** | - |
| Operating lease ROU asset | 92 | 98 | (6) | | - |
| **Total assets** | **$ 9,006** | **$ 9,258** | **$ (252)** | | **$ 6,273** |
| LIABILITIES | | | | | |
| Due to Animo Services | $ - | $ - | $ - | | $ 528 |
| Accounts payable and accrued expenses | 956 | 1,006 | (50) | | 46 |
| Operating lease liability | 93 | 99 | (6) | | - |
| **Total liabilities** | 1,049 | 1,105 | (56) | | 574 |
| SHAREHOLDERS' EQUITY | | | | | |
| Additional paid in capital | 12,843 | 12,841 | 2 | | 7,000 |
| Retained deficit | (4,886) | (4,688) | (198) | | (1,301) |
| **Total shareholders' equity** | 7,957 | 8,153 | (196) | | 5,699 |
| **Total liabilities and shareholders' equity** | **$ 9,006** | **$ 9,258** | **$ (252)** | | **$ 6,273** |

**A:** The decrease in cash balance is due to the ongoing business expenses.
**B:** The increase is due to the $4.5 million investment at Raymond James in US treasury securities with the proceeds from the purchase of the convertible note by the Neugebauers.
**C:** The decrease is due to the $5.8 million convertible note being purchased by Toby and Melissa Neugebauer on Oct. 3.



CONFIDENTIAL

**Animo Bancorp, Inc.**
**Consolidated Balance Sheet**
**October 31, 2022**
**(In Thousands)**

| | Oct-22 | Sep-22 | Aug-22 | Jul-22 | Jun-22 | May-22 | Apr-22 | Mar-22 | Feb-22* | Jan-22* | Dec-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS | | | | | | | | | | | |
| Cash | $ 2,750 | $ 1,608 | $ 1,847 | $ 2,114 | $ 2,397 | $ 2,677 | $ 3,087 | $ 3,690 | $ - | $ - | $ 5,523 |
| US Treasury securities | 4,487 | - | | | | | | | | | |
| Software In-Process | 133 | 133 | 133 | 133 | 133 | 133 | 133 | 133 | - | - | - |
| Investment in Citizens State Bank of Ganado | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | - | - | 750 |
| Due from related parties | 497 | 497 | 497 | 497 | 497 | 497 | 497 | 497 | - | - | - |
| Prepaid expenses | 297 | 331 | 365 | 424 | 459 | 493 | 527 | 506 | - | - | - |
| Note receivable | - | 5,841 | - | - | - | - | - | - | - | - | - |
| Operating lease ROU asset | 92 | 98 | 104 | 109 | 115 | 121 | 127 | 132 | - | - | - |
| **Total assets** | **$ 9,006** | **$ 9,258** | **$ 3,696** | **$ 4,027** | **$ 4,351** | **$ 4,671** | **$ 5,121** | **$ 5,708** | **$ -** | **$ -** | **$ 6,273** |
| LIABILITIES | | | | | | | | | | | |
| Due to Animo Services | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 528 |
| Accounts payable and accrued expenses | 956 | 1,006 | 963 | 940 | 943 | 821 | 965 | 1,008 | - | - | 46 |
| Operating lease liability | 93 | 99 | 104 | 110 | 116 | 121 | 127 | 132 | - | - | - |
| **Total liabilities** | 1,049 | 1,105 | 1,067 | 1,050 | 1,059 | 942 | 1,092 | 1,140 | - | - | 574 |
| SHAREHOLDERS' EQUITY | | | | | | | | | | | |
| Additional paid in capital | 12,843 | 12,841 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | - | - | 7,000 |
| Retained deficit | (4,886) | (4,688) | (4,371) | (4,023) | (3,708) | (3,271) | (2,971) | (2,432) | - | - | (1,301) |
| **Total shareholders' equity** | 7,957 | 8,153 | 2,629 | 2,977 | 3,292 | 3,729 | 4,029 | 4,568 | - | - | 5,699 |
| **Total liabilities and shareholders' equity** | **$ 9,006** | **$ 9,258** | **$ 3,696** | **$ 4,027** | **$ 4,351** | **$ 4,671** | **$ 5,121** | **$ 5,708** | **$ -** | **$ -** | **$ 6,273** |

* - First quarter accounting was performed in Quickbooks, and opening balances booked in NetSuite as of 3/31. As a result no balances are reflected in NetSuite for the months of Jan/Feb.



CONFIDENTIAL

ABI_Neug_024933

**Animo Bancorp, Inc.**
**Consolidated Statement of Operations**
**October 31, 2022**
**(In Thousands)**

| Year-to-Date Sep-22 | | Month-to-Date Oct-22 | Month-to-Date Sep-22 | Change |
|---|---|---|---|---|
| | REVENUES | | | |
| $ - | Interchange income | $ - | $ - | $ - |
| - | **Total revenue** | - | - | - |
| | EXPENSES | | | |
| 2,779 | Professional services | 121 | 240 | (119) **A** |
| 255 | Occupancy expense | 26 | 25 | 1 |
| 48 | Operating lease amortization | 6 | 6 | - |
| 397 | General insurance expense | 41 | 42 | (1) |
| 106 | Other expense | 4 | 3 | 1 |
| **3,585** | **Total expense** | **198** | **316** | **(118)** |
| **(3,585)** | **Net income (loss) before income tax expense (benefit)** | **(198)** | **(316)** | **118** |
| - | Income tax expense (benefit) | - | - | - |
| **$ (3,585)** | **Net income (loss) attributable to common shareholder** | **$ (198)** | **$ (316)** | **$ 118** |

**A:** The decrease in professional services from September to October is due to TTEC services in September for $75K compared to $0 received for October and $50K of for consulting fees for Cathy Lemieux in September to get her paid up for the year compared to $8K in October.



CONFIDENTIAL

**Animo Bancorp, Inc.**
**Consolidated Statement of Operations**
**October 31, 2022**
**(In Thousands)**

| | Month-to-Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Oct-22** | **Sep-22** | **Aug-22** | **Jul-22** | **Jun-22** | **May-22** | **Apr-22** | **Mar-22** | **Feb-22*** | **Jan-22*** |
| REVENUES | | | | | | | | | | |
| Interchange income | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total revenue** | - | - | - | - | - | - | - | - | - | - |
| EXPENSES | | | | | | | | | | |
| Professional services | 121 | 240 | 273 | 212 | 293 | 232 | 481 | 927 | - | - |
| Occupancy expense | 26 | 25 | 27 | 27 | 31 | 44 | 22 | 53 | - | - |
| Operating lease amortization | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | - | - |
| General insurance expense | 41 | 42 | 41 | 41 | 105 | 19 | 19 | 89 | - | - |
| Other expense | 4 | 3 | 2 | 29 | 2 | (1) | 11 | 56 | - | - |
| **Total expense** | **198** | **316** | **349** | **315** | **437** | **300** | **539** | **1,131** | **-** | **-** |
| **Net income (loss) before income tax expense (benefit)** | **(198)** | **(316)** | **(349)** | **(315)** | **(437)** | **(300)** | **(539)** | **(1,131)** | **-** | **-** |
| Income tax expense (benefit) | | | | | - | - | - | - | - | - |
| **Net income (loss) attributable to common shareholder** | **$ (198)** | **$ (316)** | **$ (349)** | **$ (315)** | **$ (437)** | **$ (300)** | **$ (539)** | **$ (1,131)** | **$ -** | **$ -** |

*- First quarter accounting was performed in Quickbooks, and March YTD activity booked in NetSuite as of 3/31. As a result no amounts are reflected in NetSuite for the months of Jan/Feb.



CONFIDENTIAL

ABI_Neug_024935

# Animo Bancorp, Inc.
# Significant Transactions Summary
# as of October 31, 2022

## First Quarter 2022

02/26/2022: Animo Bancorp, Inc. executed a 24-month lease for office space in Birmingham, AL with a lease commencement date of March 1, 2022. Future minimum lease payments for base rent are $5,603 per month for lease months 1 through 12 and $5,898 for lease months 13 through 24.

03/15/2022: Animo Technology Services, LLC was created in TX to facilitate the transfer of technology to Animo Bancorp, Inc. from With Purpose, Inc.

03/15/2022: GFB Acquisition Corporation was established as a wholly owned subsidiary of Animo Bancorp, Inc. to transact the anticipated acquisition of Ganado Bancshares/Citizens State Bank.

03/18/2022: Animo Bancorp, Inc. completed the sale of all outstanding equity interests of Animo Mortgage Company to With Purpose Inc. (a related party) through a $10 thousand cash purchase. Animo Mortgage Company is now a wholly owned subsidiary of With Purpose.

## Second Quarter 2022

04/29/2022: Animo Bancorp, Inc. executed a 12-month lease for office space in Charlotte, NC with a lease commencement date of May 1, 2022. Future minimum lease payments for base rent are $7,864 per month.

06/30/2022: Crowe LLP issued an unqualified audit opinion for the 12/31/2021 Financial Statement Audit of Animo Bancorp, Inc. stating the financial statements were presented fairly in all material aspects.

## Third Quarter 2022

09/08/2022: Animo Bancorp, Inc. received a $5,840,552 Series 2 convertible note from GloriFi.
10/03/2022: Toby and Melissa Neugebauer purchased the $5,840,552 Series 2 convertible note from Animo Bancorp.
10/21/2022: A Raymond James fixed income account was opened with $4,500,000 to invest the cash received from the Series 2 convertible note purchase by Toby and Melissa Neugebauer. US Treasury securities were purchased in the account.

## Acquisition Update

On October 21, 2021 Animo entered into an Agreement and Plan of Merger with Ganado Bancshares, Inc. the parent company of Citizens State Bank of Ganado for the acquisition of all outstanding stock of Ganado for approximately $7 million, net of a deposit of $750K. There have been several conversations and written communications between Animo and the Agencies. The Texas Department of Banking accepted the application on 8/23. The application is still pending approval from the Federal Reserve.



CONFIDENTIAL

**Animo Bancorp, Inc.**
**Accounts Payable/Vendor Payments**
**As of October 31, 2022**

| | Due Week Ending | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vendor:** | **5/13/2022** | **5/27/2022** | **6/17/2022** | **7/22/2022** | **8/26/2022** | **9/23/2022** | **11/4/2022** | **11/18/2022** | **11/25/2022** | **12/2/2022** | **Total** |
| Network Computing Group | - | - | - | - | - | - | - | - | - | 9,905 | **9,905** |
| Lexis Nexis Risk Solutions | - | - | - | - | - | - | - | 23,966 | - | - | **23,966** |
| Summit First Insurance IPFS Corporation | - | - | - | - | - | - | - | 22,657 | - | - | **22,657** |
| Dallas Rent | - | - | - | - | - | - | 18,054 | - | - | - | **18,054** |
| Cathy Lemieux | - | - | - | - | - | - | - | - | - | 8,333 | **8,333** |
| Charlotte Rent | - | - | - | - | - | - | 7,864 | - | - | - | **7,864** |
| Birmingham Rent | - | - | - | - | - | - | 6,003 | - | - | - | **6,003** |
| Ganado Bancshares-Rent | - | - | - | - | - | - | 1,000 | - | - | - | **1,000** |
| Logix | - | - | - | - | - | - | - | 493 | - | - | **493** |
| Spectrum VoIP | - | - | - | - | - | - | - | - | - | 430 | **430** |
| Spectrum Business | - | - | - | - | - | - | - | - | - | 185 | **185** |
| Marqeta | - | - | - | - | - | - | - | - | - | 47,342 | **47,342** |
| **Total** | **-** | **-** | **-** | **-** | **-** | **-** | **32,922** | **47,116** | **-** | **66,195** | **146,232** |
| | | | | | | | | | | | |
| **Deferred:** | | | | | | | | | | | |
| TTEC Financial Services* | - | 236,952 | 170,214 | 142,295 | 111,335 | 88,477 | - | - | 74,739 | - | **824,012** |
| | | | | | | | | | | | |
| **Total of all outstanding invoices/payments:** | **-** | **236,952** | **170,214** | **142,295** | **111,335** | **88,477** | **32,922** | **47,116** | **74,739** | **66,195** | **970,244** |

*- A good faith payment was made to TTEC of $1 million on 6/14 by ASL for all Animo entities. An agreement was reach to defer all other payments until the products were in full production.

| | |
|---|---|
| **Total Past Due** | **749,273** |
| **Total Current** | **188,049** |

| **Estimate (Not Received Final Invoice):** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wachtell, Lipton, Rosen & Katz | 750,000 | - | - | - | - | | | - | - | | **750,000** |



CONFIDENTIAL

**Animo Bancorp, Inc.**
**Cash Position at Frost Bank**
**October 31, 2022**
**(In Thousands)**

| | October 2022 | September 2022 | August 2022 | July 2022 | June 2022 | May 2022 | April 2022 | March 2022 | February 2022 | January 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Animo Bancorp** | | | | | | | | | | |
| Beginning Balance | 1,603 | 1,842 | 2,109 | 2,392 | 2,672 | 3,082 | 3,690 | 3,917 | 4,185 | 5,523 |
| Ending Balance | 2,731 | 1,603 | 1,842 | 2,109 | 2,392 | 2,672 | 3,082 | 3,690 | 3,917 | 4,185 |
| Inc/(Dec) | 1,128 | (239) | (267) | (283) | (280) | (410) | (608) | (227) | (268) | (1,338) |
| $ Inc/(Dec) from Prior Month | 1,128 | (239) | (267) | (283) | (280) | (410) | (608) | (227) | (268) | (1,338) |
| % Inc/(Dec) from Prior Month | 70% | -13% | -13% | -12% | -10% | -13% | -16% | -6% | -6% | -24% |

Note: This only includes the cash at Frost Bank and does not include the reserve at Stearns Bank.



CONFIDENTIAL

# EXHIBIT D

# Animo Bancorp, Inc.
# Monthly Financial Package
# September 30, 2022

animo bancorp

# Animo Bancorp, Inc.
## Monthly Accounting Financial Package
## Table of Contents


| | |
|---|---|
| Quarterly Balance Sheet | 1 |
| Monthly Balance Sheet | 2 |
| Quarterly Income Statement | 3 |
| Monthly Income Statement | 4 |
| Significant Transactions | 5 |
| Accounts Payable Aging | 6 |
| Stearns/Transpecos Bank Summary | 7 |
| Cash Position | 8 |

**Animo Bancorp, Inc.**
**Consolidated Balance Sheet**
**September 30, 2022**
**(In Thousands)**

| | Sep-22 | Jun-22 | $ Change | | Dec-21 |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash | $ 1,608 | $ 2,397 | $ (789) | A | $ 5,523 |
| Software In-Process | 133 | 133 | - | | - |
| Investment in Citizens State Bank of Ganado | 750 | 750 | - | | 750 |
| Due from related parties | 497 | 497 | - | | - |
| Prepaid expenses | 331 | 459 | (128) | | - |
| Note receivable | 5,841 | - | 5,841 | B | - |
| Operating lease ROU asset | 98 | 115 | (17) | | - |
| **Total assets** | **$ 9,258** | **$ 4,351** | **$ 4,907** | | **$ 6,273** |
| LIABILITIES | | | | | |
| Due to Animo Services | $ - | $ - | $ - | | $ 528 |
| Accounts payable and accrued expenses | 1,006 | 943 | 63 | | 46 |
| Operating lease liability | 99 | 116 | (17) | | - |
| **Total liabilities** | 1,105 | 1,059 | 46 | | 574 |
| SHAREHOLDERS' EQUITY | | | | | |
| Additional paid in capital | 12,841 | 7,000 | 5,841 | C | 7,000 |
| Retained deficit | (4,688) | (3,708) | (980) | | (1,301) |
| **Total shareholders' equity** | 8,153 | 3,292 | 4,861 | | 5,699 |
| **Total liabilities and shareholders' equity** | **$ 9,258** | **$ 4,351** | **$ 4,907** | | **$ 6,273** |

**A:** The decrease in cash balance is due to the ongoing business expenses.
**B and C:** The increase is due to the $5.8 million convertible note with WPI executed on 9/8.

**Animo Bancorp, Inc.**
**Consolidated Balance Sheet**
**September 30, 2022**
**(In Thousands)**

| | Sep-22 | Aug-22 | Jul-22 | Jun-22 | May-22 | Apr-22 | Mar-22 | Feb-22* | Jan-22* | Dec-21 |
|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS | | | | | | | | | | |
| Cash | $ 1,608 | $ 1,847 | $ 2,114 | $ 2,397 | $ 2,677 | $ 3,087 | $ 3,690 | $ - | $ - | $ 5,523 |
| Software In-Process | 133 | 133 | 133 | 133 | 133 | 133 | 133 | - | - | - |
| Investment in Citizens State Bank of Ganado | 750 | 750 | 750 | 750 | 750 | 750 | 750 | - | - | 750 |
| Due from related parties | 497 | 497 | 497 | 497 | 497 | 497 | 497 | - | - | - |
| Prepaid expenses | 331 | 365 | 424 | 459 | 493 | 527 | 506 | - | - | - |
| Note receivable | 5,841 | - | - | - | - | - | - | - | - | - |
| Operating lease ROU asset | 98 | 104 | 109 | 115 | 121 | 127 | 132 | - | - | - |
| **Total assets** | **$ 9,258** | **$ 3,696** | **$ 4,027** | **$ 4,351** | **$ 4,671** | **$ 5,121** | **$ 5,708** | **$ -** | **$ -** | **$ 6,273** |
| LIABILITIES | | | | | | | | | | |
| Due to Animo Services | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 528 |
| Accounts payable and accrued expenses | 1,006 | 963 | 940 | 943 | 821 | 965 | 1,008 | - | - | 46 |
| Operating lease liability | 99 | 104 | 110 | 116 | 121 | 127 | 132 | - | - | - |
| **Total liabilities** | 1,105 | 1,067 | 1,050 | 1,059 | 942 | 1,092 | 1,140 | - | - | 574 |
| SHAREHOLDERS' EQUITY | | | | | | | | | | |
| Additional paid in capital | 12,841 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | - | - | 7,000 |
| Retained deficit | (4,688) | (4,371) | (4,023) | (3,708) | (3,271) | (2,971) | (2,432) | - | - | (1,301) |
| **Total shareholders' equity** | 8,153 | 2,629 | 2,977 | 3,292 | 3,729 | 4,029 | 4,568 | - | - | 5,699 |
| **Total liabilities and shareholders' equity** | **$ 9,258** | **$ 3,696** | **$ 4,027** | **$ 4,351** | **$ 4,671** | **$ 5,121** | **$ 5,708** | **$ -** | **$ -** | **$ 6,273** |

* First quarter accounting was performed in Quickbooks, and opening balances booked in NetSuite as of 3/31. As a result no balances are reflected in NetSuite for the months of Jan/Feb.

CONFIDENTIAL

**Animo Bancorp, Inc.**
**Consolidated Statement of Operations**
**September 30, 2022**
**(In Thousands)**

| Year-to-Date Sep-22 | | Quarter-to-Date Sep-22 | Quarter-to-Date Jun-22 | Quarter-to-Date Change | | Month-to-Date Sep-22 | Month-to-Date Aug-22 | Month-to-Date Change |
|---|---|---|---|---|---|---|---|---|
| | REVENUES | | | | | | | |
| $ - | Interchange income | $ - | $ - | $ - | | $ - | $ - | $ - |
| - | **Total revenue** | - | - | - | | - | - | - |
| | EXPENSES | | | | | | | |
| 2,658 | Professional services | 725 | 1,006 | (281) | A | 240 | 273 | (33) |
| 229 | Occupancy expense | 79 | 97 | (18) | B | 25 | 27 | (2) |
| 42 | Operating lease amortization | 18 | 18 | - | | 6 | 6 | - |
| 356 | General insurance expense | 124 | 143 | (19) | C | 42 | 41 | 1 |
| 102 | Other expense | 34 | 12 | 22 | D | 3 | 2 | 1 |
| **3,387** | **Total expense** | **980** | **1,276** | **(296)** | | **316** | **349** | **(33)** |
| **(3,387)** | **Net income (loss) before income tax expense (benefit)** | **(980)** | **(1,276)** | **296** | | **(316)** | **(349)** | **33** |
| - | Income tax expense (benefit) | - | - | - | | - | - | - |
| **$ (3,387)** | **Net income (loss) attributable to common shareholder** | **$ (980)** | **$ (1,276)** | **$ 296** | | **$ (316)** | **$ (349)** | **$ 33** |

**A:** The decrease in professional services from Q2 to Q3 is due to Animo Bancorp no longer utilizing consultants from Endava and the decrease in amounts of the TTEC invoices for Q3.
**B:** The decrease in occupancy expense is due to setup one time fees of $17K for the Charlotte office being paid in June.
**C:** The decrease in general insurance expense is due to $86K being paid in Q2 for D&O policy including a one time payment for the payment plan compared to $68K paid in Q3.
**D:** The increase in other expense is due to video equipment for the Dallas office invoiced for Q3.

**Animo Bancorp, Inc.**
**Consolidated Statement of Operations**
**September 30, 2022**
**(In Thousands)**

| | Quarter-to-Date | | | Month-to-Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep-22 | Jun-22 | Mar-22 | Sep-22 | Aug-22 | Jul-22 | Jun-22 | May-22 | Apr-22 | Mar-22 | Feb-22* | Jan-22* |
| REVENUES | | | | | | | | | | | | |
| Interchange income | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total revenue** | - | - | - | - | - | - | - | - | - | - | - | - |
| EXPENSES | | | | | | | | | | | | |
| Professional services | 725 | 1,006 | 927 | 240 | 273 | 212 | 293 | 232 | 481 | 927 | - | - |
| Occupancy expense | 79 | 97 | 53 | 25 | 27 | 27 | 31 | 44 | 22 | 53 | - | - |
| Operating lease amortization | 18 | 18 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | - | - |
| General insurance expense | 124 | 143 | 89 | 42 | 41 | 41 | 105 | 19 | 19 | 89 | - | - |
| Other expense | 34 | 12 | 56 | 3 | 2 | 29 | 2 | (1) | 11 | 56 | - | - |
| **Total expense** | 980 | 1,276 | 1,131 | 316 | 349 | 315 | 437 | 300 | 539 | 1,131 | - | - |
| **Net income (loss) before income tax expense (benefit)** | (980) | (1,276) | (1,131) | (316) | (349) | (315) | (437) | (300) | (539) | (1,131) | - | - |
| Income tax expense (benefit) | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net income (loss) attributable to common shareholder** | $ (980) | $ (1,276) | $ (1,131) | $ (316) | $ (349) | $ (315) | $ (437) | $ (300) | $ (539) | $ (1,131) | $ - | $ - |

*- First quarter accounting was performed in Quickbooks, and March YTD activity loaded in [illegible] as of 3/31. As a result no amounts are reflected in [illegible] for the months of Jan/Feb.

CONFIDENTIAL

ABI_Neug_024824

**Animo Bancorp, Inc.**
**Significant Transactions**
**as of September 30, 2022**

**Q1:**

02/26/2022: Animo Bancorp, Inc. executed a 24-month lease for office space in Birmingham, AL with a lease commencement date of March 1, 2022. Future minimum lease payments for base rent are $5,603 per month for lease months 1 through 12 and $5,898 for lease months 13 through 24.

03/15/2022: Animo Technology Services, LLC was created in TX to facilitate the transfer of technology to Animo Bancorp, Inc. from With Purpose, Inc.

03/15/2022: GFB Acquisition Corporation was established as a wholly owned subsidiary of Animo Bancorp, Inc. to transact the anticipated acquisition of Ganado Bancshares/Citizens State Bank.

03/18/2022: Animo Bancorp, Inc. completed the sale of all outstanding equity interests of Animo Mortgage Company to With Purpose Inc. (a related party) through a $10 thousand cash purchase. Animo Mortgage Company is now a wholly owned subsidiary of With Purpose.

**Q2:**

04/29/2022: Animo Bancorp, Inc. executed a 12-month lease for office space in Charlotte, NC with a lease commencement date of May 1, 2022. Future minimum lease payments for base rent are $7,864 per month.

06/30/2022: Crowe LLP issued an unqualified audit opinion for the 12/31/2021 Financial Statement Audit of Animo Bancorp, Inc. stating the financial statements were presented fairly in all material aspects.

**Q3:**

09/08/2022: Animo Bancorp received a $5,840,552 Series 2 convertible note from GloriFi.

Ongoing: On October 21, 2021 Animo entered into an Agreement and Plan of Merger with Ganado Bancshares, Inc. the parent company of Citizens State Bank of Ganado for the acquisition of all outstanding stock of Ganado for approximately $7 million, net of a deposit of $750K. There have been several conversations and written communications between Animo and the Agencies. The Texas Department of Banking accepted the application on 8/23. The application is still pending approval from the Federal Reserve.

**Animo Bancorp, Inc.**
**Accounts Payable/Vendor Payments**
**As of September 30, 2022**

| | Due Week Ending | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vendor:** | **5/13/2022** | **5/27/2022** | **6/17/2022** | **7/22/2022** | **8/12/2022** | **8/26/2022** | **9/23/2022** | **9/30/2022** | **10/21/2022** | **10/28/2022** | **11/4/2022** | **11/25/2022** | **Total** |
| Network Computing Group | - | - | - | - | - | - | - | - | - | - | 23,490 | - | **23,490** |
| Lexis Nexis Risk Solutions | - | - | - | - | - | - | - | - | 13,960 | - | - | - | **13,960** |
| Summit First Insurance IPFS Corporation | - | - | - | - | - | - | - | - | 22,657 | - | - | - | **22,657** |
| Kennedy Sutherland | - | - | - | - | - | - | - | 59 | - | - | - | - | **59** |
| Dallas Rent | - | - | - | - | - | - | - | 16,036 | - | - | - | - | **16,036** |
| Cathy Lemieux | - | - | - | - | - | - | - | - | 50,000 | - | - | - | **50,000** |
| Charlotte Rent | - | - | - | - | - | - | - | 7,864 | - | - | - | - | **7,864** |
| Birmingham Rent | - | - | - | - | - | - | - | 6,003 | - | - | - | - | **6,003** |
| Ganado Bancshares-Rent | - | - | - | - | - | - | - | 1,000 | - | - | - | - | **1,000** |
| Logix | - | - | - | - | - | - | - | - | 495 | - | - | - | **495** |
| Spectrum VoIP | - | - | - | - | - | - | - | 321 | - | - | - | - | **321** |
| Spectrum Business | - | - | - | - | - | - | - | 185 | - | - | - | - | **185** |
| Marqeta | - | - | - | - | - | - | - | - | - | 40,007 | - | - | **40,007** |
| **Total** | - | - | - | - | - | - | - | **31,469** | **87,112** | **40,007** | **23,490** | - | **182,078** |
| | | | | | | | | | | | | | |
| **Deferred:** | | | | | | | | | | | | | |
| TTEC Financial Services* | - | 236,952 | 170,214 | 142,295 | - | 111,335 | 88,477 | - | - | - | - | 74,739 | **824,012** |
| | | | | | | | | | | | | | |
| **Total of all outstanding invoices/payments:** | - | **236,952** | **170,214** | **142,295** | - | **111,335** | **88,477** | **31,469** | **87,112** | **40,007** | **23,490** | **74,739** | **1,006,090** |

*- A good faith payment was made to TTEC of $1 million on 6/14 by ASI for all Animo entities. An agreement was reach to defer all other payments until the products were in full production.

| | |
|---|---|
| **Total Past Due** | **749,273** |
| **Total Current** | **256,816** |

| **Estimate (Not Received Final Invoice):** | **5/13/2022** | **5/27/2022** | **6/17/2022** | **7/22/2022** | **8/12/2022** | **8/26/2022** | **9/23/2022** | **9/30/2022** | **10/21/2022** | **10/28/2022** | **11/4/2022** | **11/25/2022** | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wachtell, Lipton, Rosen & Katz | 750,000 | - | - | - | - | - | | - | - | | | | **750,000** |

CONFIDENTIAL

ABI_Neug_024826

**Animo Bancorp, Inc.**
**Transpecos Bank / Stearns Summary**
**as of September 30, 2022**

| | September 2022 | August 2022 | July 2022 | June 2022 | May 2022 | April 2022 | March 2022 | February 2022 | January 2022 |
|---|---|---|---|---|---|---|---|---|---|
| **Checking:** | | | | | | | | | |
| Balances | $228,443.26 | $216,580.13 | $58,777.35 | $28,214.48 | $12,293.62 | $8,722.60 | N/A | N/A | N/A |
| # of Accounts | 341 | 112 | 106 | 65 | 31 | 13 | N/A | N/A | N/A |
| Interest Expense | $71.99 | $91.38 | $47.19 | $16.31 | $9.85 | $0.81 | N/A | N/A | N/A |
| Interchange Income | $38.79 | $122.28 | $65.49 ** | $65.49 | $31.78 | $25.13 | N/A | N/A | N/A |
| **Savings:** | | | | | | | | | |
| Balances | $9,478.84 | $5,743.25 | $4,378.87 | $4,835.66 | $5,410.00 | $0.00 | N/A | N/A | N/A |
| # of Accounts | 63 | 36 | 32 | 27 | 15 | 0 | N/A | N/A | N/A |
| Interest Expense | $0.89 | $5.76 | $2.14 | $2.12 | $0.93 | $0.00 | N/A | N/A | N/A |
| Stearns Invoiced Amount* | 5,532.08 | $48,359.69 *** | $6,949.14 ** | $6,949.14 | $63,353.45 * | $20,848.79 | N/A | N/A | N/A |
| Transpecos Invoiced Amount* | 1,499.12 | | | | | | | | |

**Note:** Deposit balances above represent amounts on the balance sheet of Stearns Bank NA, not Animo Bancorp Inc. Animo receives revenue share on the interchange income, and is billed for related expenses on the transaction activities of the customer.

*Represents the total net amount invoiced to Animo Bancorp (expenses minus revenue share). The current month figure represents an accrual, based on the prior month's amount invoiced.

* Includes $50,000 one-time program fee
** Placeholder amount for July invoice - not received at the time of publication
*** Includes Mastercard pass thru fees currently under review

CONFIDENTIAL

**Animo Bancorp, Inc.**
**Cash Position at Frost Bank**
**September 30, 2022**
**(In Thousands)**

| | September 2022 | August 2022 | July 2022 | June 2022 | May 2022 | April 2022 | March 2022 | February 2022 | January 2022 |
|---|---|---|---|---|---|---|---|---|---|
| **Animo Bancorp** | | | | | | | | | |
| Beginning Balance | 1,842 | 2,109 | 2,392 | 2,672 | 3,082 | 3,690 | 3,917 | 4,185 | 5,523 |
| Ending Balance | 1,603 | 1,842 | 2,109 | 2,392 | 2,672 | 3,082 | 3,690 | 3,917 | 4,185 |
| Inc/(Dec) | (239) | (267) | (283) | (280) | (410) | (608) | (227) | (268) | (1,338) |
| $ Inc/(Dec) from Prior Month | (239) | (267) | (283) | (280) | (410) | (608) | (227) | (268) | (1,338) |
| % Inc/(Dec) from Prior Month | -13% | -13% | -12% | -10% | -13% | -16% | -6% | -6% | -24% |

Note: This only includes the cash at Frost Bank and does not include the reserve at Stearns Bank.

CONFIDENTIAL

# EXHIBIT E

EXECUTION VERSION

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION OR EXCHANGE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.

# SECURED CONVERTIBLE PROMISSORY NOTE

| | |
|---|---|
| **No. CN2-18** | **Date of Issuance** |
| **US$5,840,552.00** | **September 8, 2022** |

**FOR VALUE RECEIVED**, With Purpose, Inc., a Delaware corporation doing business as GloriFi, Inc. (the "***Company***"), hereby promises to pay to the order of Animo Bancorp, Inc. (the "***Holder***"), the principal sum of US$5,840,552.00 (the "***Principal Amount***"), together with interest thereon from the date of issuance of this convertible promissory note (this "***Note***"). Interest will accrue at a simple rate of 10.0% per annum and (a) from and after the date hereof until September 8, 2023 (the "***PIK Toggle Date***"), shall be paid in kind by capitalizing and adding such interest amount to the outstanding principal balance of this Note on the last day of each fiscal quarter ending on or prior to the PIK Toggle Date (such capitalized amount being the "***PIK Amount***"); provided, however, that the PIK Amount, together with the other outstanding principal amount of this Note, shall be paid in full, together with any interest accruing thereon, no later than the Maturity Date (b) after the PIK Toggle Date, shall be paid in cash on the Maturity Date. The PIK Amount shall itself bear interest hereunder in accordance with the terms hereof and shall be deemed to constitute outstanding principal for all purposes hereunder. Unless earlier converted into Conversion Shares (as defined below), the principal and accrued interest of this Note will be due and payable by the Company in cash at any time on or after September 8, 2024 (the "***Maturity Date***") at the Company's written election or upon written demand by the Holder.

This Note is one of a series of secured convertible promissory notes (collectively, the "***Series 2 Notes***") issued by the Company to investors with identical terms and on the same form as set forth herein (except that the holder, principal amount and date of issuance may differ in each Note). Capitalized terms not otherwise defined in this Note will have the meanings set forth in Section 4.1.

1. Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. Prepayment of principal, together with accrued interest, may not be made without the written consent of holders of at least 81% of the aggregate outstanding principal amount of the Series 2 Notes (the "***Requisite Noteholders***"). Upon receive of the written consent of the Requisite Noteholders, the Company shall give the Holder fourteen (14) business days advance written notice of the date of such prepayment of the Note (the

"***Prepayment Date***"). Except in connection with any repayment after September 8, 2024 at the written election of the Company or the written demand of the Holder, (i) any prepayment of the Series 2 Notes (whether principal, interest or otherwise, and regardless of the circumstances in which any such prepayment is made) shall be made pro rata among all holders of the Series 2 Notes based upon the aggregate unpaid principal amount of the Series 2 Notes held by each holder thereof and (ii) if Holder obtains any payment in excess of such holder's pro rata share of such prepayments made to all holders of the Series 2 Notes, by acceptance of this Note, such Holder agrees to distribute promptly to the other holders of Series 2 Notes cash in an amount as is necessary to cause such holders to share the excess payment ratably among them as provided in this Section 1 with respect to prepayments.

2. Security.

2.1 Secured. The obligations of the Company to Holder under this Note are secured pursuant to, and entitled to the benefits of, that certain Guarantee and Collateral Agreement, dated as of the date hereof, by and among the Company, OnPoint Companies, LLC, a Texas limited liability company, as Collateral Agent (herein, the "***Agent***"), and the other Grantors party thereto (the "***Guarantee and Collateral Agreement***" and, together with the Series 2 Notes (including this Note) and the Collateral Agency Agreement, and all other documents evidencing, securing, governing, guaranteeing and/or pertaining to this Note, collectively, the "***Note Documents***" and each, a "***Note Document***"), pursuant to which the Credit Parties (as defined below) have granted a security interest in certain Collateral (as defined therein).

2.2 Further Assurances. Each of the Company and its subsidiaries (other than GloriFi Receivables Acquisition Company, LLC, a Delaware limited liability company) (collectively, the "***Credit Parties***" and each, a "***Credit Party***") agrees to execute such security agreements, assignments, deeds of trust and other agreements and documents as Agent shall deem appropriate and otherwise require from time to time to more fully create, protect and perfect Agent's lien and security interests in the Collateral or to enable the Agent to exercise and enforce its rights and remedies with respect to such Collateral. Each Credit Party hereby irrevocably authorizes the Agent at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Credit Parties hereunder, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by such Credit Party, or words of similar effect. Each Credit Party agrees to provide to Agent all information required by the Agent pursuant to this Section promptly upon request.

2.3 Limitations on Actions to Perfect, Etc. Notwithstanding anything to the contrary, the Credit Parties shall not be obligated to take any actions to create, perfect or otherwise protect any security interest granted herein in any jurisdiction other than the United States and any state within the United States.



CONFIDENTIAL ABI_Neug_025542

3. Priority. This Note is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured) to banks, commercial finance lenders or other institutions regularly engaged in the business of lending money (the "***Senior Debt***"). The Company hereby agrees, and by accepting this Note, the Holder hereby acknowledges and agrees, that so long as any Senior Debt is outstanding, upon notice from the holders of such Senior Debt (the "***Senior Creditors***") to the Company that an event of default, or any event which the giving of notice or the passage of time or both would constitute an event of default, has occurred under the terms of the Senior Debt (a "***Default Notice***"), the Company will not make, and the Holder will not receive or retain, any payment under this Note. Nothing in this paragraph will preclude or prohibit the Holder from receiving and retaining any payment hereunder unless and until the Holder has received a Default Notice (which will be effective until waived in writing by the Senior Creditors) or from converting this Note or any amounts due hereunder into Equity Securities.

4. Conversion. This Note will be convertible into Equity Securities pursuant to the following terms.

4.1 Definitions.

(a) "***Change of Control***" means:

(i) the closing of the sale, transfer or other disposition, in a single transaction or series of related transactions, of all or substantially all of the Company's assets;

(ii) the consummation of a merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold a majority of the outstanding voting power of the Company or the surviving or acquiring entity immediately following the consummation of such transaction); or

(iii) the closing of the transfer (whether by merger, consolidation or otherwise), in a single transaction or series of related transactions, to a "person" or "group" (within the meaning of Section 13(d) and Section 14(d) of the Exchange Act), of the Company's capital stock if, after such closing, such person or group would become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of securities with more than 50% of the outstanding voting power of the Company (or the surviving or acquiring entity).

For the avoidance of doubt, a transaction will not constitute a "Change of Control" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction. Notwithstanding the foregoing, neither the consummation of a SPAC Transaction nor the sale of Equity Securities in a bona fide financing transaction will constitute a "Change of Control."



CONFIDENTIAL

(b) "***Class A Common Stock***" means the Company's Class A Common Stock, par value $0.0001 per share.

(c) "***Common Stock***" means any class of the Company's common stock, par value $0.0001 per share.

(d) "***Conversion Price***" means:

(i) with respect to a conversion pursuant to Section 4.2 (Next Equity Financing), the lesser of: (A) the product of (x) 100% less the Discount and (y) the lowest per share purchase price of the Equity Securities issued in the Next Equity Financing; and (B) the Optional Conversion Price; and

(ii) with respect to a conversion pursuant to Section 4.3 (Liquidity Event) and Section 4.4 (Optional Conversion), the Optional Conversion Price.

(e) "***Conversion Shares***" (for purposes of determining the type of Equity Securities issuable upon conversion of this Note) means:

(i) with respect to a conversion pursuant to Section 4.2 (Next Equity Financing), shares of the Equity Securities issued in the Next Equity Financing; and

(ii) with respect to a conversion pursuant to Section 4.3 (Liquidity Event) and Section 4.4 (Optional Conversion), shares of Class A Common Stock.

(f) "***Discount***" means 15.0%.

(g) "***Equity Securities***" means (i) Common Stock; (ii) any securities conferring the right to purchase Common Stock; or (iii) any securities directly or indirectly convertible into, or exchangeable for (with or without additional consideration) Common Stock. Notwithstanding the foregoing, the following will not be considered "Equity Securities": (A) any security granted, issued or sold by the Company to any director, officer, employee, consultant or adviser of the Company for the primary purpose of soliciting or retaining their services or pursuant to the Company's equity incentive plan; (B) any additional series convertible promissory notes with the same terms as the Series 2 Notes (including the Series 2 Notes) issued by the Company; (C) any security issued in a PIPE Financing; and (D) any SAFEs issued by the Company.

(h) "***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

(i) As used herein, "***Event of Default***" means the occurrence of any of the following:



CONFIDENTIAL ABI_Neug_025544

(i) The Company fails to pay when due and payable (whether at maturity or otherwise) the full amount of principal or interest on this Note (or any other Series 2 Note) when due, and such failure to pay is not cured within ten (10) days after the occurrence thereof; or

(ii) the occurrence of any event of default specified in any of the other Note Documents; or

(iii) The Company is dissolved, terminated, or ceases to operate its business; or

(iv) The Company makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating the Company bankrupt or insolvent; or any order for relief with respect to the Company is entered under the Federal Bankruptcy Code; or the Company petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of the Company, or of any substantial part of the assets of the Company, or commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against the Company and either (A) the Company by any act indicates its approval thereof, consent thereto or acquiescence therein or (B) such petition, application or proceeding is not dismissed within sixty (60) days; or

(v) The Company fails to comply with Section 17 of this Note.

(j) "***Liquidity Event***" mean a Change of Control, Public Offering or SPAC Transaction.

(k) "***Next Equity Financing***" means the next sale (or series of related sales) by the Company of its Equity Securities after July 30, 2022 following the date of issuance of this Note, in one or more offerings relying on Section 4(a)(2) of the Securities Act or Regulation D thereunder for exemption from the registration requirements of Section 5 of the Securities Act, from which the Company receives aggregate gross proceeds of not less than US$10,000,000.00 (excluding, for the avoidance of doubt, the aggregate principal amount of the Series 2 Notes).

(l) "***Optional Conversion Price***" means $31.78 per share of Class A Common Stock; provided, however, if shares of Common Stock of the Company (or of any parent entity to the Company to the extent shares of Class A Common Stock are exchanged for shares of common stock of such parent entity in connection with a Liquidity Event) are not listed for trading on a "national securities exchange" (as defined in Section 6 of the Securities Exchange Act) on or prior to the first date of issuance of this Note, the Optional Conversion Price shall mean $19.07; provided further, in each case, subject to adjustment pursuant to Section 16.14.

(m) ***"PIPE Financing"*** means any Equity Securities (including any equity securities of the SPAC) raised in a private placement in connection with but after

execution by the Company of an agreement for a SPAC Transaction that closes not later than the closing of such SPAC Transaction.

(n) "***Public Offering***" means the closing of the sale of shares of Common Stock of the Company to the public in a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act resulting in at least $10 million of gross proceeds to the Company. Notwithstanding the foregoing, the consummation of a SPAC Transaction shall not constitute a Public Offering.

(o) "***SAFE***" means any simple agreement for future equity (or other similar agreement) which is issued by the Company for bona fide financing purposes and which may convert into the Company's capital stock in accordance with its terms.

(p) "***Securities Act***" means the Securities Act of 1933, as amended.

(q) "***Securities Exchange Act***" means the Securities Exchange Act of 1934, as amended.

(r) "***SPAC Transaction***" means a business combination of the Company with a publicly listed "special purpose acquisition company" or its subsidiary, whether by merger, consolidation, stock purchase, share exchange, asset sale or otherwise, where immediately following such transaction, the share capital of the SPAC or its successor entity is listed on the Nasdaq Stock Market, the New York Stock Exchange, the London Stock Exchange, London's Alternative Investment Market or another exchange or marketplace approved by the Board of Directors of the Company.

4.2 Next Equity Financing Conversion. Upon the closing of a Next Equity Financing prior to the conversion of this Note pursuant to Section 4.3 or Section 4.4 or repayment of this Note, the outstanding principal balance of this Note will automatically convert into Conversion Shares upon the closing of the Next Equity Financing. The number of Conversion Shares the Company shall issue upon such conversion will equal the quotient (rounded down to the nearest whole share) obtained by dividing (x) the outstanding principal balance of this Note (excluding accrued interest) on a date that is no more than five (5) days prior to the closing of the Next Equity Financing/the date of conversion by (y) the applicable Conversion Price. At least five (5) days prior to the closing of the Next Equity Financing, the Company will notify the Holder in writing of the terms of the Equity Securities that are expected to be issued in such financing. The issuance of Conversion Shares pursuant to the conversion of this Note will otherwise be on, and subject to, the same terms and conditions (other than the applicable Conversion Price in such Equity Financing) applicable to the Equity Securities issued in the Next Equity Financing.

4.3 Liquidity Event Conversion. Upon the consummation of the first Liquidity Event prior to the conversion of this Note pursuant to Section 4.2 or Section 4.4 or the repayment of this Note, immediately prior to the closing of such Liquidity Event, this Note will convert into that number of Conversion Shares equal to the quotient (rounded down to the nearest whole share) obtained by dividing (x) the outstanding principal balance of this Note (excluding accrued interest) on a date that is no more than five (5) days prior to the



CONFIDENTIAL ABI_Neug_025546

DocuSign Envelope ID: 0D412D5D-7695-4475-9299-622809674E74

closing of such Liquidity Event by (y) the applicable Conversion Price. At least five (5) days prior to the closing of the Liquidity Event, the Company will notify the Holder in writing of the terms of the Liquidity Event.

4.4 Optional Conversion. At any time and from time to time on or after the Date of Issuance until the earlier to occur of conversion of this Note pursuant to Section 4.2 or Section 4.3 or the third business day prior the any Prepayment Date, at the written election of the Holder, this Note can be converted into that number of Conversion Shares equal to the quotient (rounded down to the nearest whole share) obtained by dividing (x) the outstanding principal balance of this Note (excluding accrued interest) on the date of such conversion by (y) the applicable Conversion Price.

4.5 Mechanics of Conversion.

(a) Financing Agreements. The Holder acknowledges that the conversion of this Note into Conversion Shares pursuant to Section 4.2 may require the Holder's execution of certain agreements relating to the Conversion Shares and the purchase and sale of Equity Securities in the Next Equity Financing, as well as registration rights, rights of first refusal and co-sale, rights of first offer and voting rights, if any, relating to such securities (collectively, the "***Financing Agreements***"). The Holder agrees to execute all of the Financing Agreements in connection with a Next Equity Financing.

(b) Liquidity Event Agreements. The Holder acknowledges that the conversion of this Note into Conversion Shares pursuant to Section 4.3 may require the Holder's execution of certain agreements relating to the Liquidity Event and/or related Conversion Shares (collectively, the "***Liquidity Event Agreements***"). The Holder agrees to execute all of the Liquidity Event Agreements in connection with a Liquidity Event.

(c) Optional Conversion Election. The Holder shall elect to the conversion of this Note pursuant to Section 4.4 by providing a timely written notice of such election to the Company in compliance with Section 16.5.

(d) Certificates. As promptly as practicable after the conversion of this Note, the Company (at its expense) will issue and deliver a certificate or certificates evidencing the Conversion Shares (if certificated) to the Holder, or if the Conversion Shares are not certificated, will deliver a true and correct copy of the Company's share register reflecting the Conversion Shares held by the Holder. The Company will not be required to issue or deliver the Conversion Shares until the Holder has (i) surrendered this Note to the Company (or provided an instrument of cancellation or affidavit of loss), (ii) delivered executed Financing Agreements or Liquidity Event Agreements, as applicable, and (iii) execution and delivery by the Holder a joinder agreement to the Stockholders Agreement, dated as of August 16, 2021, by and among the Company, Toby R. Neugebauer, Neugebauer Family Enterprises, LLC, and the other parties thereto, as amended and amended and restated (the "***Stockholders Agreement***"), and any spousal consent required thereunder, to the extent that the Holder is not already a party to the Stockholders Agreement. The conversion of this Note pursuant to Section



CONFIDENTIAL

4.2 and Section 4.3 may be made contingent upon the closing of the Next Equity Financing and Liquidity Event, respectively.

4.6 No Interest Upon Conversion or Exchange. For purposes of clarity, no accrued interest will be paid or included for purposes of any conversion pursuant to this Section 4 and such interest will be waived and deemed satisfied in full upon any such conversion.

5. Representations and Warranties of the Company. In connection with the transactions contemplated by this Note, as of the date hereof, the Company hereby represents and warrants to the Holder as follows:

5.1 Due Organization; Qualification and Good Standing. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a material adverse effect on the Company.

5.2 Authorization and Enforceability. Except for the authorization and issuance of the Conversion Shares, all corporate action has been taken on the part of the Company and its officers, directors and stockholders necessary for the authorization, execution and delivery of this Note. Except as may be limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Note valid and enforceable in accordance with its terms.

6. Representations and Warranties of the Holder. In connection with the transactions contemplated by this Note, as of the date hereof and as of the date of any conversion of the Note hereunder, the Holder hereby represents and warrants to the Company as follows:

6.1 Authorization. The Holder has full power and authority (and, if an individual, the capacity) to enter into this Note and to perform all obligations required to be performed by it hereunder. This Note, when executed and delivered by the Holder, will constitute the Holder's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

6.2 Purchase Entirely for Own Account. The Holder acknowledges that this Note is made with the Holder in reliance upon the Holder's representation to the Company, which the Holder hereby confirms by executing this Note, that this Note, the Conversion Shares, and any Common Stock or Class A Common Stock issuable upon conversion of the Conversion Shares (collectively, the "***Securities***") will be acquired for investment for the Holder's own account, not as a nominee or agent (unless otherwise specified on the Holder's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that the Holder has no present intention of selling, granting any participation in, or otherwise distributing the

same. By executing this Note, the Holder further represents that the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities. If other than an individual, the Holder also represents it has not been organized solely for the purpose of acquiring the Securities.

6.3 Disclosure of Information; Non-Reliance. The Holder acknowledges that it has received all the information it considers necessary or appropriate to enable it to make an informed decision concerning an investment in the Securities. The Holder further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities. The Holder confirms that the Company has not given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Securities. In deciding to purchase the Securities, the Holder is not relying on the advice or recommendations of the Company and has made its own independent decision that the investment in the Securities is suitable and appropriate for the Holder. The Holder understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of this investment.

6.4 Investment Experience. The Holder is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.

6.5 Accredited Investor. The Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act. The Holder agrees to furnish any additional information requested by the Company or any of its affiliates to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities.

6.6 Restricted Securities. The Holder understands that the Securities have not been, and will not be, registered under the Securities Act or state securities laws, by reason of specific exemptions from the registration provisions thereof which depend upon, among other things, the bona fide nature of the investment intent and the accuracy of the Holder's representations as expressed herein. The Holder understands that the Securities are "restricted securities" under U.S. federal and applicable state securities laws and that, pursuant to these laws, the Holder must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and registered or qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Holder acknowledges that the Company has no obligation to register or qualify the Securities for resale and further acknowledges that, if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Holder's control, and which the Company is under no obligation, and may not be able, to satisfy.



CONFIDENTIAL ABI_Neug_025549

6.7 No Public Market. The Holder understands that no public market now exists for the Securities and that the Company has made no assurances that a public market will ever exist for the Securities.

6.8 No General Solicitation. The Holder, and its officers, directors, employees, agents, stockholders or partners have not either directly or indirectly, including through a broker or finder solicited offers for or offered or sold the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502 of Regulation D under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act. The Holder acknowledges that neither the Company nor any other person offered to sell the Securities to it by means of any form of general solicitation or advertising within the meaning of Rule 502 of Regulation D under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

6.9 Residence. If the Holder is an individual, then the Holder resides in the state or province identified in the address shown on the Holder's signature page hereto. If the Holder is a partnership, corporation, limited liability company or other entity, then the Holder's principal place of business is located in the state or province identified in the address shown on the Holder's signature page hereto.

6.10 Foreign Investors. If the Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), the Holder hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities, including (a) the legal requirements within its jurisdiction for the purchase of the Securities; (b) any foreign exchange restrictions applicable to such purchase; (c) any governmental or other consents that may need to be obtained; and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, conversion, redemption, sale, or transfer of the Securities. The Holder's subscription and payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction. The Holder acknowledges that the Company has taken no action in foreign jurisdictions with respect to the Securities.

7. Information Rights. For a period beginning on the date hereof, the Company shall deliver to Holder the following:

7.1 as soon as practicable after the end of each fiscal year of the Company, its unaudited (i) balance sheet as of the end of such year, (ii) statements of income and of cash flows for such year, and (iii) statement of stockholders' equity as of the end of such year;

7.2 as soon as practicable after the end of each quarter of each fiscal year of the Company, its unaudited statements of income and cash flows for such fiscal quarter, and an unaudited balance sheet and a statement of stockholders' equity as of the end of such fiscal quarter; and



CONFIDENTIAL ABI_Neug_025550

7.3 such financial information of State of Independence Bank and Animo as is available to the public or that is available to the Company and that can be shared by the Company in compliance with applicable agreements, regulatory requirements and applicable law.

8. Inspection Rights. The Company shall permit Holder, at such Holder's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Holder; provided, however, that the Company shall not be obligated pursuant to this Section 8 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

9. Amendment of the Note. The Company agrees that any amendment of the Series 2 Notes pursuant to Section 16.9 of this Note that would subject Holder to banking regulatory approvals or oversight will require the written consent of holders (other than Neugebauer Family Enterprises, LLC) of at least 60.0% of the aggregate outstanding principal amount of the Series 2 Notes.

10. Confidentiality; Publicity. The Holder shall keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor or make decisions with respect to its investment in the Company) any Confidential Information, unless such Confidential Information (a) is known or becomes known to thepublic in general (other than as a result of a breach of this Section 10 by the Holder), (b) is or has been independently developed or conceived by the Holder without use of the Company's Confidential Information, or (c) is or has been made known or disclosed to such Holder by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that the Holder may disclose Confidential Information (i) to its attorneys, accountants, consultants, and other professionals to the extent reasonably necessary to obtain their services in connection with monitoringits investment in the Company; (ii) to any Affiliate, partner, member, stockholder, or wholly owned subsidiary of the Holder in the ordinary course of business, provided that the Holder informs such Personthat such information is confidential and directs such Person to maintain the confidentiality of such information; or (iii) as may otherwise be required by law, regulation, rule, court order or subpoena, providedthat the Holder promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure. Except as otherwise permitted pursuant to this Note, the Holder shall not make, or permit any of its affiliates or representatives to make, any public announcement (including, without limitation, providing any comments or information to any news, magazine, newspaper,radio, online, or television organization or to any representative of the media) regarding or relating to the Company or its business without the prior written consent of the Company (such consent not to be unreasonably withheld, delayed or conditioned); provided, however, that the Holder and its affiliates may make public announcements required by applicable law or stock exchange regulation; provided, further, that such Holder will provide the Company with a reasonable opportunity to review and comment on the forms of any such public announcements prior to making them. For purposes of the foregoing, "***Confidential Information***" means any information and data of the Company or any of its subsidiaries that is directly or indirectly provided to Holder pursuant to the terms of this Note, the Subscription Agreement of the Holder with the Company or the Stockholders Agreement (as

defined below) or otherwise, anything pertaining to any such entities' intellectual property, patent applications, processes, trade secrets, clients, customers, suppliers, vendors, investors, lenders, sales and marketing information, business and financial plans, information regarding ongoing litigation, pricinginformation, drawings, know-how, technical information, operating techniques, prototypes, financial data, design information, products, product development, government contracting, contract applications, competitive analysis, and any other proprietary or confidential information relating to the business or affairsof the Company or any of its subsidiaries whether in oral or written form, together with all analyses, compilations, forecasts, studies or other documents or records prepared by the Company or any of its subsidiaries or any of their respective agents or representatives based in whole or in part on the foregoing

11. Noteholder Protective Provisions. So long as at least 25% of the original aggregate principal amount of the Series 2 Notes is outstanding, the Company will not amend, modify or waive any provision of the Certificate of Incorporation, as amended, or Bylaws of the Company or the Amended and Restated Stockholders Agreement, dated as of December 3, 2021, by and among the Company and the other parties thereto (as amended, and amended and restated, the "***Stockholders Agreement***"), in a manner that adversely affects the rights of the holders of Class A Common Stock without the written consent of the Requisite Noteholders unless such amendment, modification, or waiver applies to all applicable stockholder in the same fashion. The Company shall give prompt written notice of any amendment, modification, or waiver hereunder to any party that did not consent in writing thereto.

12. Option to Invest in Latino Business. The Company and the Holder agree and acknowledge that the Company is in the process of launching a business division, independent of the Company but operating in tandem through the use of strategic business and operations agreements, focused on the business of the Company but targeting the Latino market (the "***New Latino Venture***"). As a material inducement for the Holder to enter into this Note, the Company hereby agrees to offer the Holder a future opportunity to invest in the New Latino Venture. The terms, conditions, timing and amount of such investment opportunity will be subject to the mutual agreement of the Company and Holder; provided, however, the valuation of the New Latino Venture in connection with such investment shall not exceed $50 million and the Holder's allocation in respect of such investment shall be proportional (in the reasonable discretion of the Company) to the Holder's then current shareholding percentage in the Company.

13. Option to Invest in Empowerment Business. The Company and the Holder agree and acknowledge that the Company is in the process of launching a business division, independent of the Company but operating in tandem through the use of strategic business and operations agreements, focused on the business of the Company but to provide certain goods and services to directly or indirectly empower women (the "***New Empowerment Venture***"). As a material inducement for the Holder to enter into this Note, the Company hereby agrees to offer the Holder a future opportunity to invest in the New Empowerment Venture. The terms, conditions, timing and amount of such investment opportunity will be subject to the mutual agreement of the Company and Holder; provided, however, the valuation of the New Empowerment Venture in connection with such investment shall not exceed $50 million and the Holder's allocation in respect of such investment shall be proportional (in the reasonable discretion of the Company) to the Holder's then current shareholding percentage in the Company.



CONFIDENTIAL

14. Option to Invest in African American Business. The Company and the Holder agree and acknowledge that the Company is in the process of launching a business division, independent of the Company but operating in tandem through the use of strategic business and operations agreements, focused on the business of the Company but targeting the African American market (the "***New African American Venture***"). As a material inducement for the Holder to enter into this Note, the Company hereby agrees to offer the Holder a future opportunity to invest in the New African American Venture. The terms, conditions, timing and amount of such investment opportunity will be subject to the mutual agreement of the Company and Holder; provided, however, the valuation of the New African American Venture in connection with such investment shall not exceed $50 million and the Holder's allocation in respect of such investment shall be proportional (in the reasonable discretion of the Company) to the Holder's then current shareholding percentage in the Company.

15. Events of Default.

15.1 Generally. If any Event of Default has occurred, the Holder of this Note may declare all amounts due under the Note (including without limitation all accrued but unpaid interest thereon and all other amounts due in connection therewith) due and payable and demand immediate payment thereof without further notice or demand.

15.2 Rights and Remedies. Upon approval of the Requisite Noteholders, the Holder of this Note shall also have and may exercise, and may direct (or the Requisite Noteholders may direct) Agent to exercise, any and all other rights or remedies which such Holder may have under any Note Document or contract or agreement at any time and any other rights or remedies which such Holder or Agent may have pursuant to applicable law.

15.3 Waiver. The Company hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time and that the Agent hereof may accept security for this Note or release security for this Note, all without in any way affecting the liability of the Company hereunder.

16. Miscellaneous.

16.1 Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Note will inure to the benefit of, and be binding upon, the respective successors and permitted assigns of the parties hereto. This Note is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Note. Neither this Note nor the rights in this Note are transferable or assignable, by operation of law or otherwise, by either party hereto without the prior written consent of the other; provided, however, that this Note and/or its rights may be assigned without the Company's consent by the Holder to the Holder's estate, heirs, executors, administrators, guardians and/or successors in the event of Holder's death or disability, and provided, further, that the Company may assign this Note in whole, without the consent of the Holder, in connection with a reincorporation to change the Company's domicile.

16.2 Choice of Law. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas.

16.3 Counterparts. This Note may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

16.4 Titles and Subtitles. The titles and subtitles used in this Note are included for convenience only and are not to be considered in construing or interpreting this Note.

16.5 Notices. All notices and other communications given or made pursuant hereto will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by email or confirmed facsimile; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the respective parties at the addresses shown on the signature pages hereto (or to such email address, facsimile number or other address as subsequently modified by written notice given in accordance with this Section 16.5).

16.6 No Finder's Fee. Each party represents that it neither is nor will be obligated to pay any finder's fee, broker's fee, commission, or any other amount in connection with the transactions contemplated by this Note. The Holder agrees to indemnify and to hold the Company harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee or other amounts arising out of the transactions contemplated by this Note (and the costs and expenses of defending against such liability or asserted liability) for which the Holder or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold the Holder harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Note (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

16.7 Expenses. Each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Note.

16.8 Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

16.9 Entire Agreement; Amendments and Waivers. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subject hereof. The Company's agreements with each of the holders of the Series 2 Notes are separate agreements, and the sales of the Series 2 Notes to each of the holders thereof are separate sales. Notwithstanding the foregoing, any term of this Note and the other Series 2 Notes may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively) with the written consent of the Company and the Requisite Noteholders. Any waiver or amendment effected in accordance with this Section 16.9 will be binding upon each holder of a Series 2 Note and each future holder of all such Series 2 Notes.

16.10 Effect of Amendment or Waiver. The Holder acknowledges and agrees that by the operation of Section 16.9 hereof, the Requisite Noteholders will have the right and power to diminish or eliminate all rights of the Holder under this Note.

16.11 Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provisions will be excluded from this Note and the balance of the Note will be interpreted as if such provisions were so excluded and this Note will be enforceable in accordance with its terms.

16.12 Transfer Restrictions.

(a) "Market Stand-Off" Agreement. The Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's first underwritten public offering (the "***IPO***") of its Common Stock under the Securities Act, and ending on the date specified by the Company and the managing underwriter(s) (such period not to exceed one hundred eighty (180) days, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports, and (ii) analyst recommendations and opinions): (A) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock (whether such shares or any such securities are then owned by the Holder or are thereafter acquired); or (B) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities; whether any such transaction described in clause (A) or (B) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Section 16.12(a) will: (x) apply only to the IPO and will not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement; (y) not apply to the transfer of any shares to any trust for the direct or indirect benefit of the Holder or the immediate family of the Holder, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer will not involve a disposition for value; and (z) be applicable to the Holder only if all officers and directors of the Company are subject to the same restrictions and the Company uses

commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than 5% of the outstanding Class A Common Stock. Notwithstanding anything herein to the contrary (including, for the avoidance of doubt, Section 16.1), the underwriters in connection with the IPO are intended third-party beneficiaries of this Section 16.12(a) and will have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with the IPO that are consistent with this Section 16.12(a) or that are necessary to give further effect thereto.

In order to enforce the foregoing covenant, the Company may impose stop transfer instructions with respect to the Holder's registrable securities of the Company (and the Company shares or securities of every other person subject to the foregoing restriction) until the end of such period. The Holder agrees that a legend reading substantially as follows will be placed on all certificates representing all of the Holder's registrable securities of the Company (and the Company shares or securities of every other person subject to the restriction contained in this Section 16.12(a)):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD BEGINNING ON THE EFFECTIVE DATE OF THE COMPANY'S REGISTRATION STATEMENT FILED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE COMPANY'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE SECURITIES.

(b) Further Limitations on Disposition. Without in any way limiting the representations and warranties set forth in this Note and subject to Section 16.1, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until the transferee has agreed in writing for the benefit of the Company to make the representations and warranties set out in Section 6 and the undertaking set out in Section 16.12(a) and (i) there is then in effect a registration statement under the Securities Act covering such proposed disposition, and such disposition is made in connection with such registration statement; or (ii) the Holder has (A) notified the Company of the proposed disposition; (B) furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition; and (C) if requested by the Company, furnished the Company with an opinion of counsel reasonably satisfactory to the Company that such disposition will not require registration under the Securities Act. Subject to Section 16.1, the Holder agrees not to make any disposition of any of the Securities to the Company's competitors, as determined in good faith by the Company.

(c) Legends. The Holder understands and acknowledges that the Securities may bear a standard restricted stock legend.

16.13 Exculpation among Noteholders. The Holder acknowledges that it is not relying upon any person, firm, corporation or stockholder, other than the Company and its officers and directors in their capacities as such, in making its investment or decision to invest in the Company. The Holder agrees that no other holder of the Series 2 Notes, nor the controlling persons, officers, directors, partners, agents, stockholders or employees of any other holder of the Series 2 Notes, will be liable for any action heretofore or hereafter taken or not taken by any of them in connection with the purchase and sale of the Securities.

16.14 Acknowledgment. For the avoidance of doubt, it is acknowledged that the Holder will be entitled to the benefit of all adjustments in the number of shares of the Company's capital stock as a result of any splits, recapitalizations, combinations or other similar transactions affecting the Company's capital stock underlying the Conversion Shares that occur prior to the conversion of this Note.

16.15 Further Assurances. From time to time, the parties will execute and deliver such additional documents and will provide such additional information as may reasonably be required to carry out the terms of this Note and any agreements executed in connection herewith.

16.16 Limitation on Interest. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

16.17 Officers and Directors not Liable. In no event will any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

16.18 Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER REPRESENTS AND WARRANTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

16.19 Usury Laws. It is the intention of the Company and the Holder of this Note to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts

DocuSign Envelope ID: 0D412D5D-7695-4475-9299-622809674E74

having jurisdiction over such matters. If the maturity of this Note is accelerated by reason of an election by the Holder hereof resulting from an Event of Default, voluntary prepayment by the Company or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment.

16.20 Collateral Agency Agreement. The Company and Holder agree and acknowledge that Holder has appointed OnPoint Companies, LLC, a Texas limited liability company, as Collateral Agent pursuant to the terms of that certain Collateral Agency Agreement, dated as of the date hereof, by and among Holder, Agent and the other parties thereto (as amended, amended and restated, modified or otherwise supplemented, the "***Collateral Agency Agreement***"), pursuant to which Agent is authorized and empowered, on behalf of Holder and the holders of the other Series 2 Notes to, upon the occurrence and during the continuation of an Event of Default, exercise rights and remedies with respect to the Collateral pledged to secure the obligations of the Company under the Series 2 Notes pursuant to the Guarantee and Collateral Agreement.

17. Most Favored Nations. As a condition to approving any additional debt for borrowed money in an aggregate principal amount in excess of $10,000,000, including, without limitation, pursuant to any term loan, revolving loan, note, or series of promissory notes, in each case, whether secured, unsecured, convertible, or otherwise by the Company or any of its subsidiaries (each of any of the foregoing, "***Other Debt***"), the Holder may elect to exchange all or any portion of this Note for the debt instrument issued by the Company or such subsidiary in connection with the applicable Other Debt in an aggregate principal amount equal to up to the then-principal outstanding on this Note (or to a lesser amount if the principal amount of the applicable Other Debt is less than the then-principal amount outstanding on this Note), and in the same form, and on the identical terms (unless consented to by Holder in its sole discretion), as the applicable Other Debt (each such election, a "***MFN Exchange Election***" and, such new debt instrument issued to Holder, a "***New Debt Instrument***"). If the Company or any of its subsidiaries intends to incur such Other Debt, it shall (a) notify Holder of the date on which such Other Debt will be incurred (each such date, a "***Other Debt Issuance Date***") and (b) on the date on which it provides notice pursuant to the foregoing clause (a) (each such date of notice, a "***Other Debt Notice Date***"), provide Holder with a definitive term sheet setting forth the economic terms of such proposed Other Debt. No later than ten (10) days after the applicable Other Debt Notice Date (each such date, a "***MFN Exchange Election Date***"), Holder shall notify the Company in writing whether Holder elects a MFN Exchange Election for such Other Debt. If Holder elects not to make an MFN Exchange Election or does not make an MFN Exchange Election by the applicable MFN Exchange Election Date, Holder shall be deemed to have waived its MFN Exchange Election for the applicable Other Debt subject to such MFN Exchange Election. If Holder has elected an MFN Exchange Election for the applicable Other Debt by the MFN Exchange Election Date, Holder shall receive the applicable New Debt Instrument issued by the Company in connection with the applicable Other Debt simultaneously with the closing of the applicable Other Debt, and such applicable Other Debt may not be incurred by the Company prior to the receipt by Holder of such New Debt Instrument. If the Holder elects to exercise its rights to exchange this Note for a New Debt Instrument, the Company and the Holder shall work together in good faith to effect the exchange of Note as provided hereunder.

[SIGNATURE PAGES FOLLOW]



CONFIDENTIAL

DocuSign Envelope ID: 0D412D5D-7695-4475-9299-622809674E74

**COMPANY:**

WITH PURPOSE, INC.

DocuSigned by:
Jin Kang
197C3797B109417...
By______________________________
Name: Jin Kang
Title: Chief Operating Officer

11700 Preston Road, Ste 660-394
Dallas, Texas 75230

DocuSign Envelope ID: 0D412D5D-7695-4475-9299-622809674E74

**Agreed to and accepted:**

If an *individual*:

____________________________

Name:

Address:

Email Address:

If an *entity*:

Animo Bancorp, Inc.

DocuSigned by:

By: William F. Conroy III

C7CBC7C16DDF431...

Name: William F. Conroy III

Title: Chief Executive Officer

Address: 201 S 3rd St 2nd Flr
Ganado, TX 77962-2034 USA

Email Address: Bill.Conroy@Glorifi.com

DocuSign Envelope ID: 851F1D5A-FF8B-48AC-BBDC-70667F191D4A

*Execution Version*

# CONSENT TO ASSIGNMENT

**THIS CONSENT TO ASSIGNMENT** (this "***Consent***"), dated as of September 12, 2022 (the "***Effective Date***"), is entered into by Animo Bancorp, Inc., (the "***Holder***") and With Purpose, Inc., a Delaware corporation doing business as GloriFi, Inc. (the "***Company***") with respect to the Note (as defined below) referenced below. Capitalized terms used, but not defined, in this Consent have the meaning set forth in the Note.

**WHEREAS,** on the date hereof, the Company has issued to the Holder a secured convertible promissory note in principal amount of $5,840,552.00 (collectively, the "***Note***");

**WHEREAS,** on the date hereof, Mr. Toby Neugebauer and/or Mrs. Melissa Neugebauer desire to purchase the Note from the Holder for an amount equal to $5,840,552.00;

**WHEREAS**, Section 16.1 of the Note prohibits certain assignments of the Note by the Holder without the consent of the Company;

**WHEREAS**, the Holder has requested that the Company consent to an assignment of the Note by the Holder to Mr. Toby Neugebauer and/or Mrs. Melissa Neugebauer;

**WHEREAS**, the Company has so agreed, on the terms and conditions set forth herein;

**WHEREAS,** on the date hereof, after giving effect to this Consent, Mr. Toby Neugebauer and/or Mrs. Melissa Neugebauer have purchased the Note from the Holder for an amount equal to $5,840,552.00; and

**NOW**, **THEREFORE**, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holder hereby enter into this Consent.

**SECTION 1 Consent.** The provisions of the Side Letter to the contrary notwithstanding, subject to the satisfaction of the condition to effectiveness set forth in Section 3, the Company hereby irrevocably consents to an assignment of the Note by the Holder to Mr. Toby Neugebauer and/or Mrs. Melissa Neugebauer;

**SECTION 2 Limited Consent**. Except as expressly set forth herein, all the other terms, provisions and conditions of the Note shall remain in full force and effect and this Consent shall not constitute any course of dealing or other basis for altering any obligation of the Company or the Holder.

**SECTION 3 Condition of Effectiveness.** This Consent shall automatically be effective as of the date first set forth above upon the satisfaction (or waiver by the Company) of the following condition:

(a) The Company shall have received a duly executed version of this Consent.

**SECTION 4 Miscellaneous.**

(a) **Successors and Assigns**. This Consent shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Company. Nothing in this Consent, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Consent.

(b) **Governing Law**. This Consent shall be governed by and construed in accordance with the laws of the State of Texas without regard to any such laws which would provide that the laws of another jurisdiction shall govern. The parties to this Consent have participated jointly in the negotiation and drafting of this Consent. In the event an ambiguity or question of intent or interpretation arises, this Consent will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of Consent. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine, or neuter forms and the singular forms of nouns, pronouns, or verbs shall include the plural and vice versa. The captions in this Consent are included for convenience of reference only and in no way define or delineate any of the provisions hereof or otherwise affect their construction or effect.

(c) **Entire Agreement**. This Consent, together with the Note, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, made prior to the Effective Date.

(d) **Amendments and Waivers**. This Consent may be amended, waived or modified from time to time solely by written instrument signed by each of the parties hereto.

(e) **Severability of Provisions.** In case any provision in or obligation hereunder or under the Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby (it being understood that the invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not in and of itself affect the validity, legality or enforceability of such provision in any other jurisdiction). The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid, legal and enforceable provisions the economic effect of which comes as close as reasonably possible to that of the invalid, illegal or unenforceable provisions.

(f) **Effectiveness; Counterparts**. This Consent may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Consent by facsimile or other electronic transmission (including via .pdf) shall be effective as delivery of a manually executed counterpart of this Consent.

*[Balance of Page Intentionally Left Blank; Signature Pages Follow]*



CONFIDENTIAL

DocuSign Envelope ID: 851F1D5A-FF8B-48AC-BBDC-70667F191D4A

IN WITNESS WHEREOF, the parties hereto have duly executed this Consent, as of the date first above written.

**HOLDER:**

ANIMO BANCORP, INC.

DocuSigned by:

By: William F. Conroy III

C7CBC7C18DDF431...

Name: William F. Conroy III

Title: Chief Executive Officer

DocuSign Envelope ID: 851F1D5A-FF8B-48AC-BBDC-70667F191D4A

**COMPANY:**

WITH PURPOSE, INC.

DocuSigned by:

By: ______________________

197C3797B109417...

Name: Jin Kang
Title: Chief Operating Officer

# ASSIGNMENT OF NOTE

**THIS ASSIGNMENT** is entered into effective this 3rd day of October 2022 by and between **Animo Bancorp, Inc.,** a Texas corporation ("Assignor") and **Toby Neugebauer and Melissa Neugebauer,** individuals (collectively "Assignees").

## WITNESSETH

**WHEREAS,** With Purpose, Inc. executed a Secured Convertible Promissory Note originally payable to Animo Bancorp, Inc. ("Animo") in the principal amount of Five Million Eight Hundred Forty Thousand Five Hundred Fifty-Two and 00/100 Dollars ($5,840,552.00)("the **Note**"); and

**WHEREAS,** the current outstanding principal balance and unpaid interest due on the Note is $5,840,552.00; and,

**WHEREAS,** the Note is secured by a Subscription Agreement ("Subscription Agreement"), dated September 8, 2022, by and between With Purpose, Inc. and Animo Bancorp, Inc.; and

**WHEREAS,** Assignee desires to now acquire the Note and Subscription Agreement and Assignor desires to transfer all of its right, title and interest in and to the Note and Subscription Agreement to Assignee.

**NOW THEREFORE,** in consideration of the mutual promises made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Assignment**. For good and valuable consideration of Five Million Eight Hundred Forty Thousand Five Hundred Fifty-Two and 00/100 Dollars ($5,840,552.00), Assignor hereby assigns, transfers and conveys to Assignee any and all of Assignor's right, title and interest in and to the Note and Subscription Agreement, and the right to collect all sums due thereunder. Hereafter, Assignor disclaims any further interest in the Note and Subscription Agreement. In conjunction with the assignment, Assignor represents and warrants that:

   (i) Assignor is the owner and holder of the Note; and

   (ii) Assignor has the right, power and authority to execute this Assignment; and

   (iii) Except as reflected above, the Note has not been amended or modified; and

   (iv) That no act or omission on the part of the Maker of the Note has occurred, which would constitute a default under the Note.

2. **Acceptance.** Assignee hereby accepts the foregoing assignment and transfer and promises to observe and perform all services and obligations required under the Note accruing on or after the Assignment Date or otherwise attributable to the period commencing on said date and continuing thereafter for so long as the Note remains in full force and effect.

3. **Binding Effect.** This Agreement shall be binding upon the parties hereto, their successors and assigns.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first above written.

**ASSIGNOR:**

**ANIMO BANCORP, INC.**

By: William Fleming III
CEO

**ASSIGNEE:**

Toby Neugebauer
**TOBY NEUGEBAUER**

Melissa Neugebauer
**MELISSA NEUGEBAUER**

< I>

STATEMENT ISSUED
02-28-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 4,184,860.49 | 0 | .00 | 7 | 267,745.40 | 3,917,115.09 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 02-07 | 3,150.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 02-07 | 11,262.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 02-14 | 195,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05247 |
| 02-18 | 1,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 02-18 | 16,200.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN DEMYST -SETT- |
| 02-24 | 24,376.30 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 02-28 | 16,756.60 | WIRE TRANSFER | FROST BANK WIRE OUT 03849 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01-31 | 4,184,860.49 | 02-14 | 3,975,447.99 | 02-24 | 3,933,871.69 |
| 02-07 | 4,170,447.99 | 02-18 | 3,958,247.99 | 02-28 | 3,917,115.09 |

CONFIDENTIAL

2 < I> STATEMENT ISSUED 03-31-2022 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 3,917,115.09 | 4 | 201,185.52 | 17 | 428,324.28 | 3,689,976.33 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 03-16 | 191,185.41 | FROST CONNECT TRANSFER | FROM ACCOUNT xxxxx5389 | | |
| 03-21 | 10,000.00 | FROST CONNECT TRANSFER | FROM ACCOUNT xxxxx1812 | | |
| 03-22 | .01 | ELECTRONIC DEPOSIT | PROXIMITY | AMTS:10,1 | ST-R6I5W6J8G3U0 |
| 03-22 | .10 | ELECTRONIC DEPOSIT | PROXIMITY | AMTS:10,1 | ST-C6D1B7F9E3X7 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 03-01 | 700.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-02 | 3,906.20 | ELECTRONIC DEBIT | THE HARTFORD | NTCLBIIVRC | 16494756 |
| 03-04 | 21,650.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | DEMYST | -SETT- |
| 03-07 | 817.11 | ELECTRONIC DEBIT | SPECTRUM VOIP | PURCHASE | 9723120388 |
| 03-10 | 5,603.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-11 | 2,550.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | ARDALYST | -SETT- |
| 03-11 | 83,337.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | ARDALYST | -SETT- |
| 03-15 | 1,609.66 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-15 | 5,440.41 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-15 | 26,233.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-15 | 53,406.60 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-16 | 2,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 02791 |
| 03-24 | 316.63 | ELECTRONIC DEBIT | SPECTRUM VOIP | PURCHASE | 9723120388 |
| 03-28 | 25,500.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 05561 |
| 03-28 | .11 | ELECTRONIC DEBIT | PROXIMITY | AMTS:10,1 | ST-B0M9G5E9G1H4 |
| 03-29 | 250.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |
| 03-29 | 195,003.14 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN | CORP PAY | -SETT- |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 02-28 | 3,917,115.09 | 03-10 | 3,884,438.36 | 03-22 | 3,911,046.21 |
| 03-01 | 3,916,415.09 | 03-11 | 3,798,550.86 | 03-24 | 3,910,729.58 |
| 03-02 | 3,912,508.89 | 03-15 | 3,711,860.69 | 03-28 | 3,885,229.47 |
| 03-04 | 3,890,858.89 | 03-16 | 3,901,046.10 | 03-29 | 3,689,976.33 |
| 03-07 | 3,890,041.78 | 03-21 | 3,911,046.10 | | |

< I> STATEMENT ISSUED
04-29-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

8

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** 980092363

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 3,689,976.33 | 1 | 188,506.25 | 41 | 796,881.91 | 3,081,600.67 |

## DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 04-27 | 188,506.25 | ELECTRONIC RETURN ITEM | RETURN SETTLE RETURN -SETT- |

## CHECKS PAID

| DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 04-15 | # | 100.00 | 04-15 | # | 220.00 | 04-15 | # | 1,600.00 |
| 04-15 | # | 200.00 | 04-15 | # | 400.00 | 04-19 | # | 1,600.00 |
| 04-15 | # | 202.00 | 04-15 | # | 600.00 | | | |

# RECEIVED ELECTRONICALLY AS AN IMAGE OF THE ORIGINAL CHECK

## OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 04-01 | 6,203.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 04-01 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04066 |
| 04-01 | 16,761.60 | WIRE TRANSFER | FROST BANK WIRE OUT 04072 |
| 04-05 | 283.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 2610836 |
| 04-08 | 121,548.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 04-11 | 2,000.00 | ELECTRONIC DEBIT | PROXIMITY Tabbris Pa ST-Z3X8N3P4E9U0 |
| 04-14 | 27,210.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN NETWORKCOM -SETT- |
| 04-14 | 33,490.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN NETWORKCOM -SETT- |
| 04-15 | 5,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04231 |
| 04-15 | 481.39 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63659499338 |
| 04-20 | 5,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 02991 |
| 04-25 | 1,956.25 | ACH ORIGINATION DEBITS | ANIMO BANCORP MERCURY -SETT- |
| 04-25 | 26,650.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP ZETA -SETT- |
| 04-25 | 26,650.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP ZETA -SETT- |
| 04-25 | 30,628.81 | ACH ORIGINATION DEBITS | ANIMO BANCORP SUMMIT INS -SETT- |
| 04-25 | 110,956.25 | ACH ORIGINATION DEBITS | ANIMO BANCORP ALOGENT -SETT- |
| 04-25 | 133,250.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP ZETA -SETT- |
| 04-26 | 625.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 821.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 944.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 1,311.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 1,567.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 1,856.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 2,045.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 03122 |
| 04-26 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 9770622 |
| 04-26 | 316.63 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |

| | | | | |
|---|---|---|---|---|
| 04-27 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BIRMINGHAM -SETT- |
| 04-27 | 92.98 | CHECK PRINTING FEE | HARLAND CLARKE | CHK ORDER 1YEX08760341200 |
| 04-29 | 17,615.95 | ACH ORIGINATION DEBITS | ANIMO BANCORP | 10000 CHAR -SETT- |
| 04-29 | 1,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT 07002 |
| 04-29 | 1,956.25 | WIRE TRANSFER | FROST BANK | WIRE OUT 00649 |
| 04-29 | 186,550.00 | WIRE TRANSFER | FROST BANK | WIRE OUT 00746 |
| 04-29 | 5,000.00 | ELECTRONIC DEBIT | NCR Receivables | LB0422ALLP 0000000USC25348 |

CONFIDENTIAL

< I>

STATEMENT ISSUED
04-29-2022
PAGE 2

ANIMO BANCORP INC

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363__________________(CONTINUED)_________** **980092363**

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 03-31 | 3,689,976.33 | 04-14 | 3,481,479.33 | 04-25 | 3,135,984.63 |
| 04-01 | 3,666,011.31 | 04-15 | 3,472,675.94 | 04-26 | 3,111,313.02 |
| 04-05 | 3,665,727.33 | 04-19 | 3,471,075.94 | 04-27 | 3,293,722.87 |
| 04-08 | 3,544,179.33 | 04-20 | 3,466,075.94 | 04-29 | 3,081,600.67 |
| 04-11 | 3,542,179.33 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
05-31-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

We've raised our interest rates to some of the highest in the industry. Call us 24/7 at (800)513-7678 to learn how your earnings can work for you.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 3,081,600.67 | 1 | 3,000.00 | 29 | 412,870.85 | 2,671,729.82 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 05-03 | 3,000.00 | WIRE TRANSFER | FROST BANK | WIRE IN | 05061 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 05-02 | 30,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | CROWE | -SETT- |
| 05-02 | 2,000.00 | ELECTRONIC DEBIT | PROXIMITY | Tabbris Me | ST-K7U7W5P9T7T3 |
| 05-03 | 50.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | ADAMTEST | -SETT- |
| 05-03 | 14,925.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 05815 |
| 05-04 | 32.48 | ACCESS TO ACH RULES | | | |
| 05-10 | 7,356.64 | WIRE TRANSFER | FROST BANK | WIRE OUT | 02655 |
| 05-12 | 8,060.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | HAYNES B | -SETT- |
| 05-12 | 37,093.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP | HAYNES B | -SETT- |
| 05-13 | 480.63 | ELECTRONIC DEBIT | LOGIX COMMUNICAT | 7138658215 | M63710714215 |
| 05-17 | 283.52 | ANALYSIS CHARGE | ACCOUNT ACTIVITY | FOR PREVIOUS | BILLING PERIOD |
| 05-18 | 60,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | CROWE | -SETT- |
| 05-19 | 132.05 | ACH ORIGINATION DEBITS | ANIMO BANCORP | CATHYLEMIE | -SETT- |
| 05-19 | 177.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | KENNEDY S | -SETT- |
| 05-19 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-19 | 2,347.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP | AMLRIGHT | -SETT- |
| 05-19 | 5,250.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | DHG | -SETT- |
| 05-19 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 05-19 | 31,980.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 05-19 | 137,331.01 | ACH ORIGINATION DEBITS | ANIMO BANCORP | ENDAVA | -SETT- |
| 05-19 | 16,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 05151 |
| 05-23 | 1,032.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-23 | 1,032.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-24 | 68.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-24 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP | PURCHASE | 9723120388 |
| 05-25 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BIRMINGHAM | -SETT- |
| 05-26 | 68.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-26 | 184.98 | ELECTRONIC DEBIT | SPECTRUM | SPECTRUM | 4309367 |
| 05-27 | 20,848.79 | ACH ORIGINATION DEBITS | ANIMO BANCORP | STEARNSOP | -SETT- |
| 05-31 | 18,005.65 | ACH ORIGINATION DEBITS | ANIMO BANCORP | 10000 CHAR | -SETT- |
| 05-31 | 47.03 | ELECTRONIC DEBIT | NCR Receivables | 4-22 ALLP | 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 04-29 | 3,081,600.67 | 05-13 | 2,984,602.42 | 05-24 | 2,716,887.80 |
| 05-02 | 3,049,600.67 | 05-17 | 2,984,318.90 | 05-25 | 2,710,884.38 |

| | | | | | |
|---|---|---|---|---|---|
| 05-03 | 3,037,625.67 | 05-18 | 2,924,318.90 | 05-26 | 2,710,631.29 |
| 05-04 | 3,037,593.19 | 05-19 | 2,719,341.23 | 05-27 | 2,689,782.50 |
| 05-10 | 3,030,236.55 | 05-23 | 2,717,277.23 | 05-31 | 2,671,729.82 |
| 05-12 | 2,985,083.05 | | | | |

STATEMENT ISSUED
< I> 06-30-2022
1 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

We've raised our interest rates to some of the highest in the industry. Call us 24/7 at (800)513-7678 to learn how your earnings can work for you.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,671,729.82 | 0 | .00 | 16 | 279,627.87 | 2,392,101.95 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 06-01 | 10,738.60 | WIRE TRANSFER | FROST BANK WIRE OUT 03104 |
| 06-01 | 204.50 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 06-06 | 62,177.49 | ACH ORIGINATION DEBITS | ANIMO BANCORP SUMMIT FIR -SETT- |
| 06-16 | 72.75 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 06-17 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 06-17 | 12,792.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 06-23 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 06-23 | 30,540.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 06-23 | 97,180.56 | ACH ORIGINATION DEBITS | ANIMO BANCORP ENDAVA -SETT- |
| 06-23 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04507 |
| 06-23 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04508 |
| 06-24 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 06-27 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 3623427 |
| 06-27 | 480.63 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63781549922 |
| 06-29 | 18,556.18 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 06-29 | 23,795.71 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 06-30 | 46.73 | ELECTRONIC DEBIT | NCR Receivables 5-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 05-31 | 2,671,729.82 | 06-17 | 2,585,211.48 | 06-27 | 2,434,500.57 |
| 06-01 | 2,660,786.72 | 06-23 | 2,435,487.50 | 06-29 | 2,392,148.68 |
| 06-06 | 2,598,609.23 | 06-24 | 2,435,166.18 | 06-30 | 2,392,101.95 |
| 06-16 | 2,598,536.48 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
07-29-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

We've raised our interest rates to some of the highest in the industry. Call us 24/7 at (800)513-7678 to learn how your earnings can work for you.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,392,101.95 | 1 | 2,001.36 | 22 | 285,483.36 | 2,108,619.95 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 07-22 | 2,001.36 | WIRE TRANSFER | FROST BANK WIRE IN 04477 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 07-01 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01510 |
| 07-07 | 63,353.45 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 07-13 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 660.92 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 2,677.66 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 2,681.93 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 6,589.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP DHG -SETT- |
| 07-13 | 10,107.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP DHG -SETT- |
| 07-13 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 30,725.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 07-13 | 50,997.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP ENDAVA -SETT- |
| 07-15 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 07-19 | 79.20 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 07-22 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05607 |
| 07-22 | 490.38 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63824920752 |
| 07-25 | 6,949.14 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 07-27 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 07-27 | 28,684.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP VIDEOREVOL -SETT- |
| 07-27 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04912 |
| 07-27 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 7127455 |
| 07-27 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 07-28 | 17,211.66 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 07-29 | 46.43 | ELECTRONIC DEBIT | NCR Receivables 6-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 06-30 | 2,392,101.95 | 07-15 | 2,182,589.62 | 07-27 | 2,125,878.04 |
| 07-01 | 2,384,237.95 | 07-19 | 2,182,510.42 | 07-28 | 2,108,666.38 |
| 07-07 | 2,320,884.50 | 07-22 | 2,169,021.40 | 07-29 | 2,108,619.95 |
| 07-13 | 2,205,252.49 | 07-25 | 2,162,072.26 | | |

CONFIDENTIAL

< I> STATEMENT ISSUED 08-31-2022 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,108,619.95 | 0 | .00 | 27 | 266,117.39 | 1,842,502.56 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 08-01 | 7,864.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 01673 |
| 08-04 | 2.82 | ACH ORIGINATION DEBITS | ANIMO BANCORP | MARQETA | -SETT- |
| 08-04 | 5.43 | ACH ORIGINATION DEBITS | ANIMO BANCORP | MARQETA | -SETT- |
| 08-04 | 22.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-04 | 44.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 08-04 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-04 | 2,705.17 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 08-04 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 08-04 | 29,985.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | NETWORKCOM | -SETT- |
| 08-04 | 37,708.53 | ACH ORIGINATION DEBITS | ANIMO BANCORP | ENDAVA | -SETT- |
| 08-04 | 123,994.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BUCKLEY | -SETT- |
| 08-05 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 | IPFSPMTMAW | 597531 |
| 08-08 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-08 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-16 | 3.57 | ANALYSIS CHARGE | ACCOUNT ACTIVITY | FOR PREVIOUS BILLING PERIOD | |
| 08-22 | 495.36 | ELECTRONIC DEBIT | LOGIX COMMUNICAT | 7138658215 | M63878972990 |
| 08-25 | 6,946.25 | ACH ORIGINATION DEBITS | ANIMO BANCORP | STEARNSOP | -SETT- |
| 08-25 | 15,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 01446 |
| 08-31 | 185.06 | ELECTRONIC DEBIT | NCR Receivables | JS7-22ALLP | 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07-29 | 2,108,619.95 | 08-05 | 1,867,333.02 | 08-22 | 1,864,633.87 |
| 08-01 | 2,100,755.95 | 08-08 | 1,865,132.80 | 08-25 | 1,842,687.62 |
| 08-04 | 1,889,995.89 | 08-16 | 1,865,129.23 | 08-31 | 1,842,502.56 |

CONFIDENTIAL

< I> STATEMENT ISSUED 09-30-2022 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 1,842,502.56 | 0 | .00 | 28 | 239,396.24 | 1,603,106.32 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 09-01 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 09-01 | 16,035.98 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 09-01 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05010 |
| 09-01 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05011 |
| 09-02 | 184.98 | ELECTRONIC DEBIT | Charter Service s 2052646 |
| 09-02 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 09-06 | 204.50 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 09-14 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 09-21 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05642 |
| 09-21 | 1,311.94 | ELECTRONIC DEBIT | AL-DEPT OF REV DIRECT DBT 50998336 |
| 09-22 | 495.36 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63942963876 |
| 09-26 | 12.45 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 09-26 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP BVS -SETT- |
| 09-26 | 2,666.71 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 2,705.17 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 7,875.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP FORVISDHG -SETT- |
| 09-26 | 10,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 09-26 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 16,898.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP BUCKLEY -SETT- |
| 09-26 | 19,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP CROWE -SETT- |
| 09-26 | 20,705.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 09-26 | 22,770.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 09-26 | 40,008.01 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 09-29 | 2,000.00 | ELECTRONIC DEBIT | WOLTERS KLUWER FINANCIAL 7994424 |
| 09-30 | 185.42 | ELECTRONIC DEBIT | NCR Receivables 8-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08-31 | 1,842,502.56 | 09-14 | 1,788,225.49 | 09-26 | 1,605,291.74 |
| 09-01 | 1,811,599.16 | 09-21 | 1,771,913.55 | 09-29 | 1,603,291.74 |
| 09-02 | 1,811,092.86 | 09-22 | 1,771,418.19 | 09-30 | 1,603,106.32 |
| 09-06 | 1,810,888.36 | | | | |

CONFIDENTIAL

< I> STATEMENT ISSUED
10-31-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** 980092363

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 1,603,106.32 | 2 | 5,840,552.00 | 23 | 4,712,665.71 | 2,730,992.61 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 10-03 | 2,920,276.00 | ACCOUNT TRANSFER | FROM ACCOUNT xxxxx0285 |
| 10-03 | 2,920,276.00 | ACCOUNT TRANSFER | FROM ACCOUNT xxxxx0293 |

CHECKS PAID

| DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 10-19 | 1026 # | 1,000.00 | 10-25 | 1027 # | 25.00 | | | |

# RECEIVED ELECTRONICALLY AS AN IMAGE OF THE ORIGINAL CHECK

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 10-03 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 10-03 | 16,741.60 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 10-03 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01408 |
| 10-03 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01409 |
| 10-03 | 537.84 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 10-04 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 9196940 |
| 10-04 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 10-21 | 5,532.08 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 10-21 | 6,815.64 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 10-21 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04025 |
| 10-25 | 59.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 10-25 | 596.16 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 10-25 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP BVS -SETT- |
| 10-25 | 2,704.06 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 10-25 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 10-25 | 23,490.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 10-25 | 40,006.81 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 10-25 | 49,999.98 | ACH ORIGINATION DEBITS | ANIMO BANCORP CATHYLEMIE -SETT- |
| 10-25 | 4,500,000.00 | ELECTRONIC DEBIT | RAYMOND JAMES & BROKERAGE 8193D85000022 |
| 10-26 | 495.36 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M64013440044 |
| 10-31 | 186.80 | ELECTRONIC DEBIT | NCR Receivables 9-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09-30 | 1,603,106.32 | 10-19 | 7,387,663.61 | 10-26 | 2,731,179.41 |
| 10-03 | 7,411,511.46 | 10-21 | 7,360,315.89 | 10-31 | 2,730,992.61 |
| 10-04 | 7,388,663.61 | 10-25 | 2,731,674.77 | | |

CONFIDENTIAL

< I> STATEMENT ISSUED 11-30-2022 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,730,992.61 | 1 | 5,512,246.69 | 15 | 8,107,929.58 | 135,309.72 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 11-28 | 5,512,246.69 | ELECTRONIC DEPOSIT | RAYMOND JAMES & BROKERAGE 8193D85000022 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 11-01 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 11-01 | 18,054.31 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 11-01 | 48,927.59 | ACH ORIGINATION DEBITS | ANIMO BANCORP SUMMIT INS -SETT- |
| 11-01 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01658 |
| 11-01 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01659 |
| 11-02 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 5562553 |
| 11-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 11-02 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 11-03 | 1,000,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01957 |
| 11-10 | 363.41 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 7430326 |
| 11-15 | 1,430.50 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 11-22 | 493.18 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M64063013795 |
| 11-30 | 3,500,025.00 | ACCOUNT TRANSFER | TO ACCOUNT xxxxx0285 |
| 11-30 | 3,500,025.00 | ACCOUNT TRANSFER | TO ACCOUNT xxxxx0293 |
| 11-30 | 465.74 | ELECTRONIC DEBIT | NCR Receivables 10-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 10-31 | 2,730,992.61 | 11-03 | 1,625,865.86 | 11-22 | 1,623,578.77 |
| 11-01 | 2,649,143.29 | 11-10 | 1,625,502.45 | 11-28 | 7,135,825.46 |
| 11-02 | 2,625,865.86 | 11-15 | 1,624,071.95 | 11-30 | 135,309.72 |

CONFIDENTIAL

STATEMENT ISSUED
< I> 12-30-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 135,309.72 | 1 | 659.75 | 2 | 903.48 | 135,065.99 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 12-02 | 659.75 | ELECTRONIC DEPOSIT | RAYMOND JAMES & BROKERAGE 8193D85000022 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 12-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 12-30 | 473.90 | ELECTRONIC DEBIT | NCR Receivables 11-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 11-30 | 135,309.72 | 12-02 | 135,539.89 | 12-30 | 135,065.99 |

< I> STATEMENT ISSUED
01-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 135,065.99 | 0 | .00 | 2 | 961.97 | 134,104.02 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 01-03 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 01-19 | 69.53 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 01-31 | 462.86 | ELECTRONIC DEBIT | NCR Receivables 12-22 ALLP 91034007 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 12-30 | 135,065.99 | 01-19 | 134,566.88 | 01-31 | 134,104.02 |
| 01-03 | 134,636.41 | | | | |

CONFIDENTIAL

ABI_Neug_025587

< I>

STATEMENT ISSUED
02-28-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 134,104.02 | 0 | .00 | 2 | 950.63 | 133,153.39 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 02-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 02-16 | 58.55 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 02-28 | 462.50 | ELECTRONIC DEBIT | NCR Receivables 1-23 ALLP 91034741 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01-31 | 134,104.02 | 02-16 | 133,615.89 | 02-28 | 133,153.39 |
| 02-02 | 133,674.44 | | | | |

CONFIDENTIAL

ABI_Neug_025588

< I>

STATEMENT ISSUED
03-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 133,153.39 | 0 | .00 | 2 | 955.42 | 132,197.97 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 03-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 03-16 | 63.34 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 03-31 | 462.50 | ELECTRONIC DEBIT | NCR Receivables 02-23 ALLP 91035475 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 02-28 | 133,153.39 | 03-16 | 132,660.47 | 03-31 | 132,197.97 |
| 03-02 | 132,723.81 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
04-28-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 132,197.97 | 0 | .00 | 2 | 971.14 | 131,226.83 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 04-03 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 04-18 | 79.06 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 04-28 | 462.50 | ELECTRONIC DEBIT | NCR Receivables 03-23 ALLP 91036219 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 03-31 | 132,197.97 | 04-18 | 131,689.33 | 04-28 | 131,226.83 |
| 04-03 | 131,768.39 | | | | |

< I> STATEMENT ISSUED 05-31-2023 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 131,226.83 | 0 | .00 | 2 | 3,287.51 | 127,939.32 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 05-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 05-16 | 82.93 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 05-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 04-23 ALLP 91036953 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 04-28 | 131,226.83 | 05-16 | 130,714.32 | 05-31 | 127,939.32 |
| 05-02 | 130,797.25 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
06-30-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 127,939.32 | 0 | .00 | 2 | 3,286.50 | 124,652.82 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 06-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 06-16 | 80.34 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 06-30 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 05-23 ALLP 91037685 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 05-31 | 127,939.32 | 06-16 | 127,427.82 | 06-30 | 124,652.82 |
| 06-02 | 127,508.16 | | | | |

CONFIDENTIAL

ABI_Neug_025592

< I> STATEMENT ISSUED
07-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 124,652.82 | 0 | .00 | 2 | 3,291.75 | 121,361.07 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 07-03 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 07-19 | 85.59 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 07-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 06-23 ALLP 91038422 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 06-30 | 124,652.82 | 07-19 | 124,136.07 | 07-31 | 121,361.07 |
| 07-03 | 124,221.66 | | | | |

CONFIDENTIAL

< I> STATEMENT ISSUED 08-31-2023 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 121,361.07 | 0 | .00 | 2 | 3,290.70 | 118,070.37 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 08-01 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 08-16 | 84.54 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 08-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 07-23 ALLP 91039544 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07-31 | 121,361.07 | 08-16 | 120,845.37 | 08-31 | 118,070.37 |
| 08-01 | 120,929.91 | | | | |

CONFIDENTIAL

ABI_Neug_025594

< I>

STATEMENT ISSUED
09-29-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost will never call, email or text you to request account access credentials. If you notice any unusual activity or for additional information, call us 24/7 at (800)513-7678.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 118,070.37 | 0 | .00 | 2 | 3,287.70 | 114,782.67 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 09-01 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 09-19 | 81.54 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 09-29 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 08-23 ALLP 91040424 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08-31 | 118,070.37 | 09-19 | 117,557.67 | 09-29 | 114,782.67 |
| 09-01 | 117,639.21 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
10-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 114,782.67 | 0 | .00 | 2 | 3,293.05 | 111,489.62 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 10-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 10-18 | 86.89 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 10-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 09-23 ALLP 91041331 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09-29 | 114,782.67 | 10-18 | 114,264.62 | 10-31 | 111,489.62 |
| 10-02 | 114,351.51 | | | | |

CONFIDENTIAL

ABI_Neug_025596

STATEMENT ISSUED
< I> 11-30-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Positive Pay verifies checks for payment before they are posted to your account. Learn more about how to prevent fraud by calling (888)481-0336.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 111,489.62 | 0 | .00 | 2 | 3,292.17 | 108,197.45 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 11-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 11-16 | 86.01 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 11-30 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 10-23 ALLP 91042171 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 10-31 | 111,489.62 | 11-16 | 110,972.45 | 11-30 | 108,197.45 |
| 11-02 | 111,058.46 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
12-29-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost will never call, email or text you to request account access credentials. If you notice any unusual activity or for additional information, call us 24/7 at (800) 513-7678.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 108,197.45 | 0 | .00 | 2 | 3,297.31 | 104,900.14 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 12-04 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 12-18 | 91.15 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 12-29 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 11-23 ALLP 91045205 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 11-30 | 108,197.45 | 12-18 | 107,675.14 | 12-29 | 104,900.14 |
| 12-04 | 107,766.29 | | | | |

CONFIDENTIAL

ABI_Neug_025598

STATEMENT ISSUED
< I> 01-31-2024
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost will never call, email or text you to request account access credentials. If you notice any unusual activity or for additional information, call us 24/7 at (800)513-7678.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 104,900.14 | 0 | .00 | 2 | 3,299.50 | 101,600.64 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 01-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 01-18 | 93.34 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 01-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 12-23 ALLP 91045986 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 12-29 | 104,900.14 | 01-18 | 104,375.64 | 01-31 | 101,600.64 |
| 01-02 | 104,468.98 | | | | |

CONFIDENTIAL

< I>

STATEMENT ISSUED
02-29-2024
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost offers a loan for almost every business need. We will work closely to make sure you get the right loan. Call us at (866)376-7889 to learn how we can help your business grow.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 101,600.64 | 0 | .00 | 2 | 3,297.55 | 98,303.09 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 02-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUMVOIPINC WEBPAYMENT |
| 02-16 | 92.97 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 02-29 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 01-24 ALLP 91046719 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01-31 | 101,600.64 | 02-16 | 101,078.09 | 02-29 | 98,303.09 |
| 02-02 | 101,171.06 | | | | |

< I> STATEMENT ISSUED
03-07-2024
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 98,303.09 | 0 | .00 | 4 | 98,303.09 | .00 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 03-01 | 5,600.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 07898 |
| 03-01 | 7,500.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 07288 |
| 03-01 | 85,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 07899 |
| 03-07 | 203.09 | CLOSING DEBIT | | | |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 02-29 | 98,303.09 | 03-01 | 203.09 | 03-07 | .00 |

CONFIDENTIAL

ABI_Neug_025601

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

1

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 5,526,634.66 | 2 | 6,854.59 | 16 | 1,348,628.76 | 4,184,860.49 |

## DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 01-21 | 3,141.47 | ELECTRONIC RETURN ITEM | RETURN SETTLE RETURN -SETT- |
| 01-24 | 3,713.12 | ELECTRONIC RETURN ITEM | RETURN SETTLE RETURN -SETT- |

## CHECKS PAID

| DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 01-21 | # | 2,000.00 | | | | | | |

# RECEIVED ELECTRONICALLY AS AN IMAGE OF THE ORIGINAL CHECK

## OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 01-07 | 50,000.00 | FROST CONNECT TRANSFER | TO ACCOUNT xxxxx5389 |
| 01-07 | 250,000.00 | FROST CONNECT TRANSFER | TO ACCOUNT xxxxx5389 |
| 01-14 | 16,741.60 | WIRE TRANSFER | FROST BANK WIRE OUT 05576 |
| 01-18 | 251,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN MARQETA -SETT- |
| 01-19 | 1,082.55 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN MITEC -SETT- |
| 01-19 | 3,141.47 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN MERCURY -SETT- |
| 01-20 | 3,713.12 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN MERCURY -SETT- |
| 01-24 | 13,461.50 | FROST CONNECT TRANSFER | TO ACCOUNT xxxxx2975 |
| 01-24 | 528,283.42 | FROST CONNECT TRANSFER | TO ACCOUNT xxxxx2975 |
| 01-25 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 00639 |
| 01-25 | 483.51 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63493098082 |
| 01-28 | 6,854.59 | WIRE TRANSFER | FROST BANK WIRE OUT 00409 |
| 01-31 | 200,224.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CAPCO PMT -SETT- |
| 01-31 | 3,901.40 | WIRE TRANSFER | FROST BANK WIRE OUT 03501 |
| 01-31 | 16,741.60 | WIRE TRANSFER | FROST BANK WIRE OUT 03484 |

## DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 12-31 | 5,526,634.66 | 01-19 | 4,954,669.04 | 01-25 | 4,412,582.08 |
| 01-07 | 5,226,634.66 | 01-20 | 4,950,955.92 | 01-28 | 4,405,727.49 |
| 01-14 | 5,209,893.06 | 01-21 | 4,952,097.39 | 01-31 | 4,184,860.49 |
| 01-18 | 4,958,893.06 | 01-24 | 4,414,065.59 | | |

STATEMENT ISSUED
< I> 02-28-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 4,184,860.49 | 0 | .00 | 7 | 267,745.40 | 3,917,115.09 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 02-07 | 3,150.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 02-07 | 11,262.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 02-14 | 195,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05247 |
| 02-18 | 1,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 02-18 | 16,200.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN DEMYST -SETT- |
| 02-24 | 24,376.30 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 02-28 | 16,756.60 | WIRE TRANSFER | FROST BANK WIRE OUT 03849 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01-31 | 4,184,860.49 | 02-14 | 3,975,447.99 | 02-24 | 3,933,871.69 |
| 02-07 | 4,170,447.99 | 02-18 | 3,958,247.99 | 02-28 | 3,917,115.09 |

STATEMENT ISSUED
< I> 03-31-2022
2 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 3,917,115.09 | 4 | 201,185.52 | 17 | 428,324.28 | 3,689,976.33 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 03-16 | 191,185.41 | FROST CONNECT TRANSFER | FROM ACCOUNT xxxxx5389 |
| 03-21 | 10,000.00 | FROST CONNECT TRANSFER | FROM ACCOUNT xxxxx1812 |
| 03-22 | .01 | ELECTRONIC DEPOSIT | PROXIMITY AMTS:10,1 ST-R6I5W6J8G3U0 |
| 03-22 | .10 | ELECTRONIC DEPOSIT | PROXIMITY AMTS:10,1 ST-C6D1B7F9E3X7 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 03-01 | 700.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-02 | 3,906.20 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 03-04 | 21,650.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN DEMYST -SETT- |
| 03-07 | 817.11 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 03-10 | 5,603.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-11 | 2,550.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 03-11 | 83,337.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN ARDALYST -SETT- |
| 03-15 | 1,609.66 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-15 | 5,440.41 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-15 | 26,233.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-15 | 53,406.60 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-16 | 2,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 02791 |
| 03-24 | 316.63 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 03-28 | 25,500.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05561 |
| 03-28 | .11 | ELECTRONIC DEBIT | PROXIMITY AMTS:10,1 ST-B0M9G5E9G1H4 |
| 03-29 | 250.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 03-29 | 195,003.14 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 02-28 | 3,917,115.09 | 03-10 | 3,884,438.36 | 03-22 | 3,911,046.21 |
| 03-01 | 3,916,415.09 | 03-11 | 3,798,550.86 | 03-24 | 3,910,729.58 |
| 03-02 | 3,912,508.89 | 03-15 | 3,711,860.69 | 03-28 | 3,885,229.47 |
| 03-04 | 3,890,858.89 | 03-16 | 3,901,046.10 | 03-29 | 3,689,976.33 |
| 03-07 | 3,890,041.78 | 03-21 | 3,911,046.10 | | |

STATEMENT ISSUED
< I> 04-29-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

8

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 3,689,976.33 | 1 | 188,506.25 | 41 | 796,881.91 | 3,081,600.67 |

## DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 04-27 | 188,506.25 | ELECTRONIC RETURN ITEM | RETURN SETTLE RETURN -SETT- |

## CHECKS PAID

| DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 04-15 | # | 100.00 | 04-15 | # | 220.00 | 04-15 | # | 1,600.00 |
| 04-15 | # | 200.00 | 04-15 | # | 400.00 | 04-19 | # | 1,600.00 |
| 04-15 | # | 202.00 | 04-15 | # | 600.00 | | | |

# RECEIVED ELECTRONICALLY AS AN IMAGE OF THE ORIGINAL CHECK

## OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 04-01 | 6,203.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 04-01 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04066 |
| 04-01 | 16,761.60 | WIRE TRANSFER | FROST BANK WIRE OUT 04072 |
| 04-05 | 283.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 2610836 |
| 04-08 | 121,548.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN CORP PAY -SETT- |
| 04-11 | 2,000.00 | ELECTRONIC DEBIT | PROXIMITY Tabbris Pa ST-Z3X8N3P4E9U0 |
| 04-14 | 27,210.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN NETWORKCOM -SETT- |
| 04-14 | 33,490.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP IN NETWORKCOM -SETT- |
| 04-15 | 5,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04231 |
| 04-15 | 481.39 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63659499338 |
| 04-20 | 5,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 02991 |
| 04-25 | 1,956.25 | ACH ORIGINATION DEBITS | ANIMO BANCORP MERCURY -SETT- |
| 04-25 | 26,650.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP ZETA -SETT- |
| 04-25 | 26,650.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP ZETA -SETT- |
| 04-25 | 30,628.81 | ACH ORIGINATION DEBITS | ANIMO BANCORP SUMMIT INS -SETT- |
| 04-25 | 110,956.25 | ACH ORIGINATION DEBITS | ANIMO BANCORP ALOGENT -SETT- |
| 04-25 | 133,250.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP ZETA -SETT- |
| 04-26 | 625.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 821.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 944.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 1,311.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 1,567.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 1,856.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 2,045.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 04-26 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 03122 |
| 04-26 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 9770622 |
| 04-26 | 316.63 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 04-27 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 04-27 | 92.98 | CHECK PRINTING FEE | HARLAND CLARKE CHK ORDER 1YEX08760341200 |
| 04-29 | 17,615.95 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 04-29 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 07002 |
| 04-29 | 1,956.25 | WIRE TRANSFER | FROST BANK WIRE OUT 00649 |
| 04-29 | 186,550.00 | WIRE TRANSFER | FROST BANK WIRE OUT 00746 |
| 04-29 | 5,000.00 | ELECTRONIC DEBIT | NCR Receivables LB0422ALLP 0000000USC25348 |

ANIMO BANCORP INC

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363____________________(CONTINUED)__________** **980092363**

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 03-31 | 3,689,976.33 | 04-14 | 3,481,479.33 | 04-25 | 3,135,984.63 |
| 04-01 | 3,666,011.31 | 04-15 | 3,472,675.94 | 04-26 | 3,111,313.02 |
| 04-05 | 3,665,727.33 | 04-19 | 3,471,075.94 | 04-27 | 3,293,722.87 |
| 04-08 | 3,544,179.33 | 04-20 | 3,466,075.94 | 04-29 | 3,081,600.67 |
| 04-11 | 3,542,179.33 | | | | |

STATEMENT ISSUED
< I> 05-31-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

We've raised our interest rates to some of the highest in the industry. Call us 24/7 at (800)513-7678 to learn how your earnings can work for you.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 3,081,600.67 | 1 | 3,000.00 | 29 | 412,870.85 | 2,671,729.82 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 05-03 | 3,000.00 | WIRE TRANSFER | FROST BANK | WIRE IN | 05061 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 05-02 | 30,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | CROWE | -SETT- |
| 05-02 | 2,000.00 | ELECTRONIC DEBIT | PROXIMITY | Tabbris Me | ST-K7U7W5P9T7T3 |
| 05-03 | 50.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | ADAMTEST | -SETT- |
| 05-03 | 14,925.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 05815 |
| 05-04 | 32.48 | ACCESS TO ACH RULES | | | |
| 05-10 | 7,356.64 | WIRE TRANSFER | FROST BANK | WIRE OUT | 02655 |
| 05-12 | 8,060.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | HAYNES B | -SETT- |
| 05-12 | 37,093.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP | HAYNES B | -SETT- |
| 05-13 | 480.63 | ELECTRONIC DEBIT | LOGIX COMMUNICAT | 7138658215 | M63710714215 |
| 05-17 | 283.52 | ANALYSIS CHARGE | ACCOUNT ACTIVITY | FOR PREVIOUS BILLING PERIOD | |
| 05-18 | 60,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | CROWE | -SETT- |
| 05-19 | 132.05 | ACH ORIGINATION DEBITS | ANIMO BANCORP | CATHYLEMIE | -SETT- |
| 05-19 | 177.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | KENNEDY S | -SETT- |
| 05-19 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-19 | 2,347.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP | AMLRIGHT | -SETT- |
| 05-19 | 5,250.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | DHG | -SETT- |
| 05-19 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 05-19 | 31,980.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 05-19 | 137,331.01 | ACH ORIGINATION DEBITS | ANIMO BANCORP | ENDAVA | -SETT- |
| 05-19 | 16,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 05151 |
| 05-23 | 1,032.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-23 | 1,032.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-24 | 68.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-24 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP | PURCHASE | 9723120388 |
| 05-25 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BIRMINGHAM | -SETT- |
| 05-26 | 68.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 05-26 | 184.98 | ELECTRONIC DEBIT | SPECTRUM | SPECTRUM | 4309367 |
| 05-27 | 20,848.79 | ACH ORIGINATION DEBITS | ANIMO BANCORP | STEARNSOP | -SETT- |
| 05-31 | 18,005.65 | ACH ORIGINATION DEBITS | ANIMO BANCORP | 10000 CHAR | -SETT- |
| 05-31 | 47.03 | ELECTRONIC DEBIT | NCR Receivables | 4-22 ALLP | 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 04-29 | 3,081,600.67 | 05-13 | 2,984,602.42 | 05-24 | 2,716,887.80 |
| 05-02 | 3,049,600.67 | 05-17 | 2,984,318.90 | 05-25 | 2,710,884.38 |
| 05-03 | 3,037,625.67 | 05-18 | 2,924,318.90 | 05-26 | 2,710,631.29 |
| 05-04 | 3,037,593.19 | 05-19 | 2,719,341.23 | 05-27 | 2,689,782.50 |
| 05-10 | 3,030,236.55 | 05-23 | 2,717,277.23 | 05-31 | 2,671,729.82 |
| 05-12 | 2,985,083.05 | | | | |

STATEMENT ISSUED
< I> 06-30-2022
1 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

We've raised our interest rates to some of the highest in the industry. Call us 24/7 at (800)513-7678 to learn how your earnings can work for you.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,671,729.82 | 0 | .00 | 16 | 279,627.87 | 2,392,101.95 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 06-01 | 10,738.60 | WIRE TRANSFER | FROST BANK WIRE OUT 03104 |
| 06-01 | 204.50 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 06-06 | 62,177.49 | ACH ORIGINATION DEBITS | ANIMO BANCORP SUMMIT FIR -SETT- |
| 06-16 | 72.75 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 06-17 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 06-17 | 12,792.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 06-23 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 06-23 | 30,540.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 06-23 | 97,180.56 | ACH ORIGINATION DEBITS | ANIMO BANCORP ENDAVA -SETT- |
| 06-23 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04507 |
| 06-23 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04508 |
| 06-24 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 06-27 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 3623427 |
| 06-27 | 480.63 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63781549922 |
| 06-29 | 18,556.18 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 06-29 | 23,795.71 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 06-30 | 46.73 | ELECTRONIC DEBIT | NCR Receivables 5-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 05-31 | 2,671,729.82 | 06-17 | 2,585,211.48 | 06-27 | 2,434,500.57 |
| 06-01 | 2,660,786.72 | 06-23 | 2,435,487.50 | 06-29 | 2,392,148.68 |
| 06-06 | 2,598,609.23 | 06-24 | 2,435,166.18 | 06-30 | 2,392,101.95 |
| 06-16 | 2,598,536.48 | | | | |

CONFIDENTIAL 

< I> STATEMENT ISSUED 07-29-2022 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

We've raised our interest rates to some of the highest in the industry. Call us 24/7 at (800)513-7678 to learn how your earnings can work for you.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,392,101.95 | 1 | 2,001.36 | 22 | 285,483.36 | 2,108,619.95 |

## DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 07-22 | 2,001.36 | WIRE TRANSFER | FROST BANK WIRE IN 04477 |

## OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 07-01 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01510 |
| 07-07 | 63,353.45 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 07-13 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 660.92 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 2,677.66 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 2,681.93 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 6,589.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP DHG -SETT- |
| 07-13 | 10,107.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP DHG -SETT- |
| 07-13 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 07-13 | 30,725.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 07-13 | 50,997.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP ENDAVA -SETT- |
| 07-15 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 07-19 | 79.20 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 07-22 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05607 |
| 07-22 | 490.38 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63824920752 |
| 07-25 | 6,949.14 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 07-27 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 07-27 | 28,684.50 | ACH ORIGINATION DEBITS | ANIMO BANCORP VIDEOREVOL -SETT- |
| 07-27 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04912 |
| 07-27 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 7127455 |
| 07-27 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 07-28 | 17,211.66 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 07-29 | 46.43 | ELECTRONIC DEBIT | NCR Receivables 6-22 ALLP 0000000USC25348 |

## DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 06-30 | 2,392,101.95 | 07-15 | 2,182,589.62 | 07-27 | 2,125,878.04 |
| 07-01 | 2,384,237.95 | 07-19 | 2,182,510.42 | 07-28 | 2,108,666.38 |
| 07-07 | 2,320,884.50 | 07-22 | 2,169,021.40 | 07-29 | 2,108,619.95 |
| 07-13 | 2,205,252.49 | 07-25 | 2,162,072.26 | | |

STATEMENT ISSUED
< I> 08-31-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,108,619.95 | 0 | .00 | 27 | 266,117.39 | 1,842,502.56 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION | | |
|---|---|---|---|---|---|
| 08-01 | 7,864.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 01673 |
| 08-04 | 2.82 | ACH ORIGINATION DEBITS | ANIMO BANCORP | MARQETA | -SETT- |
| 08-04 | 5.43 | ACH ORIGINATION DEBITS | ANIMO BANCORP | MARQETA | -SETT- |
| 08-04 | 22.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-04 | 44.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 500.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | WOLTERSKLU | -SETT- |
| 08-04 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 08-04 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-04 | 2,705.17 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 08-04 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | LEXISNEXIS | -SETT- |
| 08-04 | 29,985.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | NETWORKCOM | -SETT- |
| 08-04 | 37,708.53 | ACH ORIGINATION DEBITS | ANIMO BANCORP | ENDAVA | -SETT- |
| 08-04 | 123,994.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BUCKLEY | -SETT- |
| 08-05 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 | IPFSPMTMAW | 597531 |
| 08-08 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-08 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP | BVS | -SETT- |
| 08-16 | 3.57 | ANALYSIS CHARGE | ACCOUNT ACTIVITY | FOR PREVIOUS BILLING PERIOD | |
| 08-22 | 495.36 | ELECTRONIC DEBIT | LOGIX COMMUNICAT | 7138658215 | M63878972990 |
| 08-25 | 6,946.25 | ACH ORIGINATION DEBITS | ANIMO BANCORP | STEARNSOP | -SETT- |
| 08-25 | 15,000.00 | WIRE TRANSFER | FROST BANK | WIRE OUT | 01446 |
| 08-31 | 185.06 | ELECTRONIC DEBIT | NCR Receivables | JS7-22ALLP | 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07-29 | 2,108,619.95 | 08-05 | 1,867,333.02 | 08-22 | 1,864,633.87 |
| 08-01 | 2,100,755.95 | 08-08 | 1,865,132.80 | 08-25 | 1,842,687.62 |
| 08-04 | 1,889,995.89 | 08-16 | 1,865,129.23 | 08-31 | 1,842,502.56 |

STATEMENT ISSUED
< I> 09-30-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit
and debit card payments? Frost Merchant Services can help.
Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 1,842,502.56 | 0 | .00 | 28 | 239,396.24 | 1,603,106.32 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 09-01 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 09-01 | 16,035.98 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 09-01 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05010 |
| 09-01 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05011 |
| 09-02 | 184.98 | ELECTRONIC DEBIT | Charter Service s 2052646 |
| 09-02 | 321.32 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 09-06 | 204.50 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 09-14 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 09-21 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 05642 |
| 09-21 | 1,311.94 | ELECTRONIC DEBIT | AL-DEPT OF REV DIRECT DBT 50998336 |
| 09-22 | 495.36 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M63942963876 |
| 09-26 | 12.45 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 09-26 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 533.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP BVS -SETT- |
| 09-26 | 2,666.71 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 2,705.17 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 7,875.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP FORVISDHG -SETT- |
| 09-26 | 10,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 09-26 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 09-26 | 16,898.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP BUCKLEY -SETT- |
| 09-26 | 19,000.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP CROWE -SETT- |
| 09-26 | 20,705.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 09-26 | 22,770.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 09-26 | 40,008.01 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 09-29 | 2,000.00 | ELECTRONIC DEBIT | WOLTERS KLUWER FINANCIAL 7994424 |
| 09-30 | 185.42 | ELECTRONIC DEBIT | NCR Receivables 8-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08-31 | 1,842,502.56 | 09-14 | 1,788,225.49 | 09-26 | 1,605,291.74 |
| 09-01 | 1,811,599.16 | 09-21 | 1,771,913.55 | 09-29 | 1,603,291.74 |
| 09-02 | 1,811,092.86 | 09-22 | 1,771,418.19 | 09-30 | 1,603,106.32 |
| 09-06 | 1,810,888.36 | | | | |

STATEMENT ISSUED
< I> 10-31-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 1,603,106.32 | 2 | 5,840,552.00 | 23 | 4,712,665.71 | 2,730,992.61 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 10-03 | 2,920,276.00 | ACCOUNT TRANSFER | FROM ACCOUNT xxxxx0285 |
| 10-03 | 2,920,276.00 | ACCOUNT TRANSFER | FROM ACCOUNT xxxxx0293 |

CHECKS PAID

| DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT | DATE | CHECK | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 10-19 | 1026 # | 1,000.00 | 10-25 | 1027 # | 25.00 | | | |

# RECEIVED ELECTRONICALLY AS AN IMAGE OF THE ORIGINAL CHECK

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 10-03 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 10-03 | 16,741.60 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 10-03 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01408 |
| 10-03 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01409 |
| 10-03 | 537.84 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 10-04 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 9196940 |
| 10-04 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 10-21 | 5,532.08 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 10-21 | 6,815.64 | ACH ORIGINATION DEBITS | ANIMO BANCORP STEARNSOP -SETT- |
| 10-21 | 15,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 04025 |
| 10-25 | 59.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP KENNEDY S -SETT- |
| 10-25 | 596.16 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 10-25 | 1,100.11 | ACH ORIGINATION DEBITS | ANIMO BANCORP BVS -SETT- |
| 10-25 | 2,704.06 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 10-25 | 10,660.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP LEXISNEXIS -SETT- |
| 10-25 | 23,490.00 | ACH ORIGINATION DEBITS | ANIMO BANCORP NETWORKCOM -SETT- |
| 10-25 | 40,006.81 | ACH ORIGINATION DEBITS | ANIMO BANCORP MARQETA -SETT- |
| 10-25 | 49,999.98 | ACH ORIGINATION DEBITS | ANIMO BANCORP CATHYLEMIE -SETT- |
| 10-25 | 4,500,000.00 | ELECTRONIC DEBIT | RAYMOND JAMES & BROKERAGE 8193D85000022 |
| 10-26 | 495.36 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M64013440044 |
| 10-31 | 186.80 | ELECTRONIC DEBIT | NCR Receivables 9-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09-30 | 1,603,106.32 | 10-19 | 7,387,663.61 | 10-26 | 2,731,179.41 |
| 10-03 | 7,411,511.46 | 10-21 | 7,360,315.89 | 10-31 | 2,730,992.61 |
| 10-04 | 7,388,663.61 | 10-25 | 2,731,674.77 | | |

STATEMENT ISSUED
< I> 11-30-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 2,730,992.61 | 1 | 5,512,246.69 | 15 | 8,107,929.58 | 135,309.72 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 11-28 | 5,512,246.69 | ELECTRONIC DEPOSIT | RAYMOND JAMES & BROKERAGE 8193D85000022 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 11-01 | 6,003.42 | ACH ORIGINATION DEBITS | ANIMO BANCORP BIRMINGHAM -SETT- |
| 11-01 | 18,054.31 | ACH ORIGINATION DEBITS | ANIMO BANCORP 10000 CHAR -SETT- |
| 11-01 | 48,927.59 | ACH ORIGINATION DEBITS | ANIMO BANCORP SUMMIT INS -SETT- |
| 11-01 | 1,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01658 |
| 11-01 | 7,864.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01659 |
| 11-02 | 184.98 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 5562553 |
| 11-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 11-02 | 22,662.87 | ELECTRONIC DEBIT | IPFS866-412-2431 IPFSPMTMAW 597531 |
| 11-03 | 1,000,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 01957 |
| 11-10 | 363.41 | ELECTRONIC DEBIT | SPECTRUM SPECTRUM 7430326 |
| 11-15 | 1,430.50 | ELECTRONIC DEBIT | THE HARTFORD NTCLBIIVRC 16494756 |
| 11-22 | 493.18 | ELECTRONIC DEBIT | LOGIX COMMUNICAT 7138658215 M64063013795 |
| 11-30 | 3,500,025.00 | ACCOUNT TRANSFER | TO ACCOUNT xxxxx0285 |
| 11-30 | 3,500,025.00 | ACCOUNT TRANSFER | TO ACCOUNT xxxxx0293 |
| 11-30 | 465.74 | ELECTRONIC DEBIT | NCR Receivables 10-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 10-31 | 2,730,992.61 | 11-03 | 1,625,865.86 | 11-22 | 1,623,578.77 |
| 11-01 | 2,649,143.29 | 11-10 | 1,625,502.45 | 11-28 | 7,135,825.46 |
| 11-02 | 2,625,865.86 | 11-15 | 1,624,071.95 | 11-30 | 135,309.72 |

STATEMENT ISSUED
< I> 12-30-2022
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 135,309.72 | 1 | 659.75 | 2 | 903.48 | 135,065.99 |

DEPOSITS/CREDITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 12-02 | 659.75 | ELECTRONIC DEPOSIT | RAYMOND JAMES & BROKERAGE 8193D85000022 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 12-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 12-30 | 473.90 | ELECTRONIC DEBIT | NCR Receivables 11-22 ALLP 0000000USC25348 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 11-30 | 135,309.72 | 12-02 | 135,539.89 | 12-30 | 135,065.99 |

CONFIDENTIAL

STATEMENT ISSUED
< I> 01-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 135,065.99 | 0 | .00 | 2 | 961.97 | 134,104.02 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 01-03 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 01-19 | 69.53 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 01-31 | 462.86 | ELECTRONIC DEBIT | NCR Receivables 12-22 ALLP 91034007 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 12-30 | 135,065.99 | 01-19 | 134,566.88 | 01-31 | 134,104.02 |
| 01-03 | 134,636.41 | | | | |

STATEMENT ISSUED
< I> 02-28-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 134,104.02 | 0 | .00 | 2 | 950.63 | 133,153.39 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 02-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 02-16 | 58.55 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 02-28 | 462.50 | ELECTRONIC DEBIT | NCR Receivables 1-23 ALLP 91034741 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01-31 | 134,104.02 | 02-16 | 133,615.89 | 02-28 | 133,153.39 |
| 02-02 | 133,674.44 | | | | |

STATEMENT ISSUED
< I> 03-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit
and debit card payments? Frost Merchant Services can help.
Contact Customer Service at (800)513-7678 to get started.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 133,153.39 | 0 | .00 | 2 | 955.42 | 132,197.97 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 03-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 03-16 | 63.34 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 03-31 | 462.50 | ELECTRONIC DEBIT | NCR Receivables 02-23 ALLP 91035475 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 02-28 | 133,153.39 | 03-16 | 132,660.47 | 03-31 | 132,197.97 |
| 03-02 | 132,723.81 | | | | |

< I> STATEMENT ISSUED
04-28-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit
and debit card payments? Frost Merchant Services can help.
Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 132,197.97 | 0 | .00 | 2 | 971.14 | 131,226.83 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 04-03 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 04-18 | 79.06 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 04-28 | 462.50 | ELECTRONIC DEBIT | NCR Receivables 03-23 ALLP 91036219 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 03-31 | 132,197.97 | 04-18 | 131,689.33 | 04-28 | 131,226.83 |
| 04-03 | 131,768.39 | | | | |

STATEMENT ISSUED
< I> 05-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 131,226.83 | 0 | .00 | 2 | 3,287.51 | 127,939.32 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 05-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 05-16 | 82.93 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 05-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 04-23 ALLP 91036953 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 04-28 | 131,226.83 | 05-16 | 130,714.32 | 05-31 | 127,939.32 |
| 05-02 | 130,797.25 | | | | |

CONFIDENTIAL Neug-Animo0001639

< I> STATEMENT ISSUED 06-30-2023 PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 127,939.32 | 0 | .00 | 2 | 3,286.50 | 124,652.82 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 06-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 06-16 | 80.34 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 06-30 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 05-23 ALLP 91037685 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 05-31 | 127,939.32 | 06-16 | 127,427.82 | 06-30 | 124,652.82 |
| 06-02 | 127,508.16 | | | | |

STATEMENT ISSUED
< I> 07-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 124,652.82 | 0 | .00 | 2 | 3,291.75 | 121,361.07 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 07-03 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 07-19 | 85.59 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 07-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 06-23 ALLP 91038422 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 06-30 | 124,652.82 | 07-19 | 124,136.07 | 07-31 | 121,361.07 |
| 07-03 | 124,221.66 | | | | |

CONFIDENTIAL Neug-Animo0001641

< I>

STATEMENT ISSUED
08-31-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800) 513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 121,361.07 | 0 | .00 | 2 | 3,290.70 | 118,070.37 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 08-01 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 08-16 | 84.54 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 08-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 07-23 ALLP 91039544 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07-31 | 121,361.07 | 08-16 | 120,845.37 | 08-31 | 118,070.37 |
| 08-01 | 120,929.91 | | | | |

CONFIDENTIAL

Neug-Animo0001642

STATEMENT ISSUED
< I> 09-29-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost will never call, email or text you to request account access credentials. If you notice any unusual activity or for additional information, call us 24/7 at (800)513-7678.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 118,070.37 | 0 | .00 | 2 | 3,287.70 | 114,782.67 |

------------------------------------ OTHER WITHDRAWALS/DEBITS ------------------------------------

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 09-01 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 09-19 | 81.54 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 09-29 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 08-23 ALLP 91040424 |

------------------------------------ DAILY BALANCE ------------------------------------

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08-31 | 118,070.37 | 09-19 | 117,557.67 | 09-29 | 114,782.67 |
| 09-01 | 117,639.21 | | | | |

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 114,782.67 | 0 | .00 | 2 | 3,293.05 | 111,489.62 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 10-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 10-18 | 86.89 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 10-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 09-23 ALLP 91041331 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 09-29 | 114,782.67 | 10-18 | 114,264.62 | 10-31 | 111,489.62 |
| 10-02 | 114,351.51 | | | | |

STATEMENT ISSUED
< I> 11-30-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Positive Pay verifies checks for payment before they are posted to your account. Learn more about how to prevent fraud by calling (888)481-0336.

**ANALYZED_CHECKING : ACCOUNT_NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 111,489.62 | 0 | .00 | 2 | 3,292.17 | 108,197.45 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 11-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 11-16 | 86.01 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 11-30 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 10-23 ALLP 91042171 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 10-31 | 111,489.62 | 11-16 | 110,972.45 | 11-30 | 108,197.45 |
| 11-02 | 111,058.46 | | | | |

< I> STATEMENT ISSUED
12-29-2023
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost will never call, email or text you to request account access credentials. If you notice any unusual activity or for additional information, call us 24/7 at (800) 513-7678.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 108,197.45 | 0 | .00 | 2 | 3,297.31 | 104,900.14 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 12-04 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 12-18 | 91.15 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 12-29 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 11-23 ALLP 91045205 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 11-30 | 108,197.45 | 12-18 | 107,675.14 | 12-29 | 104,900.14 |
| 12-04 | 107,766.29 | | | | |

STATEMENT ISSUED
< I> 01-31-2024
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost will never call, email or text you to request account access credentials. If you notice any unusual activity or for additional information, call us 24/7 at (800)513-7678.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 104,900.14 | 0 | .00 | 2 | 3,299.50 | 101,600.64 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 01-02 | 431.16 | ELECTRONIC DEBIT | SPECTRUM VOIP PURCHASE 9723120388 |
| 01-18 | 93.34 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 01-31 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 12-23 ALLP 91045986 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 12-29 | 104,900.14 | 01-18 | 104,375.64 | 01-31 | 101,600.64 |
| 01-02 | 104,468.98 | | | | |

STATEMENT ISSUED
< I> 02-29-2024
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Frost offers a loan for almost every business need. We will work closely to make sure you get the right loan. Call us at (866)376-7889 to learn how we can help your business grow.

**ANALYZED_CHECKING_:__ACCOUNT_NO.__98_0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 101,600.64 | 0 | .00 | 2 | 3,297.55 | 98,303.09 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 02-02 | 429.58 | ELECTRONIC DEBIT | SPECTRUMVOIPINC WEBPAYMENT |
| 02-16 | 92.97 | ANALYSIS CHARGE | ACCOUNT ACTIVITY FOR PREVIOUS BILLING PERIOD |
| 02-29 | 2,775.00 | ELECTRONIC DEBIT | NCR Receivables 01-24 ALLP 91046719 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01-31 | 101,600.64 | 02-16 | 101,078.09 | 02-29 | 98,303.09 |
| 02-02 | 101,171.06 | | | | |

STATEMENT ISSUED
< I> 03-07-2024
PAGE 1

ANIMO BANCORP INC
10777 STRAIT LN
DALLAS TX 75229

0

Interested in accepting in-store, online or mobile credit and debit card payments? Frost Merchant Services can help. Contact Customer Service at (800)513-7678 to get started.

**ANALYZED CHECKING : ACCOUNT NO. 98 0092363** **980092363**

| BALANCE LAST STATEMENT | NO. | DEPOSITAMOUNT | NO. | ITHDRAWALAMOUNT | BALANCE THIS STATEMENT |
|---|---|---|---|---|---|
| 98,303.09 | 0 | .00 | 4 | 98,303.09 | .00 |

OTHER WITHDRAWALS/DEBITS

| DATE | AMOUNT | TRANSACTION | DESCRIPTION |
|---|---|---|---|
| 03-01 | 5,600.00 | WIRE TRANSFER | FROST BANK WIRE OUT 07898 |
| 03-01 | 7,500.00 | WIRE TRANSFER | FROST BANK WIRE OUT 07288 |
| 03-01 | 85,000.00 | WIRE TRANSFER | FROST BANK WIRE OUT 07899 |
| 03-07 | 203.09 | CLOSING DEBIT | |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 02-29 | 98,303.09 | 03-01 | 203.09 | 03-07 | .00 |

# EXHIBIT F

**Animo Services: Unpaid**

| TOTAL | | 7,560,151 |
|---|---|---|
| Entity to expense | ASL | Animo Services |
| Status | (Multiple Items) | |
| Due Date | (Multiple Items) | |

| Vendor | Total |
|---|---|
| Netrix | 1,322,921 |
| MBO Partners | 880,742 |
| Finxact | 724,018 |
| Reflections (Old Name)- McLaren Strategic Solutions | 721,496 |
| The Software Works | 542,730 |
| Black Knight | 533,000 |
| Aspirent Consulting, LLC | 450,702 |
| The Capital Markets Company (CAPCO) | 396,904 |
| Personetics Technologies Inc | 390,000 |
| Savana | 265,379 |
| OvalEdge LLC | 194,400 |
| GuidePoint Security | 138,795 |
| Predictive Analytics Group | 103,500 |
| EightyTwenty LLC | 90,657 |
| Unison Systems | 76,595 |
| QOMPLX, Inc | 69,862 |
| Wolters Kluwer | 68,685 |
| Demyst | 64,950 |
| AKA Enterprise Solutions, LLC (HSO) | 59,742 |
| Backbase | 58,518 |
| Transmit Security | 54,125 |
| Anexinet | 49,638 |
| Verafin | 46,550 |
| Midwood Partners | 37,998 |
| BPM | 36,804 |
| Mastercard | 29,500 |
| Bassett Capital | 24,538 |
| Plaid | 21,869 |
| Sonarsource | 21,650 |
| Syndeo | 19,500 |
| Appliable | 15,135 |

**Animo Services: Deferred and Disputed**

| TOTAL | | 7,287,116 |
|---|---|---|
| Entity to expense | ASL | Animo Services |
| Status | (Multiple Items) | |
| Due Date | (Multiple Items) | |

| Vendor | Total |
|---|---|
| Unqork | 2,140,503 |
| KPMG | 2,029,824 |
| EastBanc Technologies | 1,712,485 |
| Blend Labs | 611,884 |
| TTEC Financial Services - 1 | 398,010 |
| Kublr | 304,606 |
| Dizzion | 89,804 |
| **Grand Total** | **7,287,116** |

**Animo Services: Unpaid**

| TOTAL | 7,560,151 |
|---|---|

| | | |
|---|---|---|
| Entity to expense | ASL | Animo Services |
| Status | (Multiple Items) | |
| Due Date | (Multiple Items) | |

| Vendor | Total |
|---|---|
| DataBank | 12,735 |
| Alloy (First Mile Group Inc.) | 12,189 |
| User Testing Inc | 10,553 |
| CoNetrix-Tandem | 7,577 |
| Lexis Nexis Risk Solutions | 4,797 |
| Intruder Systems | 736 |
| CT Corporation | 356 |
| Ninjio | 196 |
| Equifax | 108 |
| **Grand Total** | **7,560,151** |

**Animo Services: Deferred and Disputed**

| TOTAL | 7,287,116 |
|---|---|

| | | |
|---|---|---|
| Entity to expense | ASL | Animo Services |
| Status | (Multiple Items) | |
| Due Date | (Multiple Items) | |

| Vendor | Total |
|---|---|

**Animo Services: Unpaid**

| | | |
|---|---|---|
| **TOTAL** | **7,560,151** | |
| Entity to expense | ASL | **Animo Services** |
| Status | (Multiple Items) | |
| Due Date | (Multiple Items) | |
| **Vendor** | **Total** | |

**Animo Services: Deferred and Disputed**

| | | |
|---|---|---|
| **TOTAL** | **7,287,116** | |
| Entity to expense | ASL | **Animo Services** |
| Status | (Multiple Items) | |
| Due Date | (Multiple Items) | |
| **Vendor** | **Total** | |

# EXHIBIT G

**From:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>
**To:** Bryan Joiner <bryan@doradocp.com>
**Subject:** RE: Animo Bancorp New Account
**Date:** Tue, 20 Sep 2022 19:36:56 +0000
**Inline-Images:** image001.png

---

Bryan – I wanted to follow up on this. Can you confirm how Animo Bancorp is held by Toby & Melissa (directly or through a trust) and where I can get the DOB and SS# info for them?

Thanks

**From:** Jonathan Pennington
**Sent:** Monday, September 19, 2022 11:50 AM
**To:** Bryan Joiner <bryan@doradocp.com>
**Subject:** FW: Animo Bancorp New Account

Bryan – I'm working to establish a fixed income trading account at Raymond James for Animo Bancorp so that when it has proceeds from the sale/transfer of the convertible note, those can be invested. Since Animo Bancorp is not yet regulated, Raymond James is asking for me to complete a beneficial owner form outlining who owns the entity. Can you confirm the following:

- Toby and Melissa Neugebauer own Animo Bancorp 50/50 (i.e. Toby and Melissa individually own and not through a trust)?
- For both:
  - Date of birth
  - Residence address if not Strait Lane
  - Social security number

Thanks

**From:** Toni Curles <Toni.Curles@RaymondJames.com>
**Sent:** Monday, September 19, 2022 11:34 AM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>
**Cc:** Peter Klyce <Peter.Klyce@RaymondJames.com>; Philip Klyce <Philip.Klyce@RaymondJames.com>
**Subject:** RE: Animo Bancorp New Account

Hi Jonathan,

Because Animo Bancorp is not regulated yet, we will also need a Beneficial Owner Form along with the audited financial report. I have attached a blank form and a highlighted form for your review.

Please let me know if you have any questions.

Thanks!

**From:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>
**Sent:** Friday, September 16, 2022 1:10 PM
**To:** Toni Curles <Toni.Curles@RaymondJames.com>
**Cc:** Peter Klyce <Peter.Klyce@RaymondJames.com>; Philip Klyce <Philip.Klyce@RaymondJames.com>
**Subject:** RE: Animo Bancorp New Account

Thanks Toni. Nice to meet you.

I will have the information completed and back to you soon. I suspect we will like to utilize RJ as safekeeping as well, just to keep things simple. Animo Bancorp will be registered as a bank holding company with the Federal Reserve, but that designation will be conditional on the approval of Animo Bancorp's merger application of Citizens that's been filed with the FRB, FDIC and Texas Department of Banking. We don't have any insight as to when the merger application will be approved, but once approved, we will provide. Our target date for this approval is weeks away (rather than months).

Thanks again and look for a follow up from me in the near term.

**Jonathan Pennington**
Chief Financial Officer
Animo Services, LLC
205-215-9255
Jonathan.Pennington@glorifi.com
GLORIFI

---

**From:** Toni Curles <Toni.Curles@RaymondJames.com>
**Sent:** Friday, September 16, 2022 11:30 AM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>
**Cc:** Peter Klyce <Peter.Klyce@RaymondJames.com>; Philip Klyce <Philip.Klyce@RaymondJames.com>
**Subject:** Animo Bancorp New Account

Hi Jonathan.

I am Pete and Philip's assistant. All my contact information is below. Please feel free to contact me any time.

I have attached the documents we need to open an account for Animo Bancorp. Citizens uses Raymond James as their safekeeping agent. We do not charge for safekeeping. If you would like to hold your bonds here also, I will have a couple more documents for your signature. Will Animo be registered with the Federal Reserve? If so, can you also send a copy of the acceptance letter.

After you sign the documents, please return them via email to me.

I am available if you have any questions.

Thanks!

*Toni Curles 205-613-6454*
Vice President – Fixed Income Sales

Fixed Income Capital Markets
Raymond James & Associates
T 877.209.5276 // F 205.879.4365
205.874.1826
2900 Highway 280, Suite 100, Birmingham, AL 35223

RAYMOND JAMES

---

Intended for Institutional Customers Only. Prepared for informational purposes only. Not an official confirmation of terms. Based on information generally available to the public from sources believed to be reliable. Changes to assumptions may materially impact returns. Past performances is not indicative of future results. Price/availability is subject to change without notice. This is neither an offer to sell nor a solicitation of an offer to buy a new issue. For further information on a new issue, including a prospectus, please contact your Raymond James salesperson. Raymond James & Associates, Inc. is a wholly-owned subsidiary of Raymond James Financial, Inc.

Any pricing estimates Raymond James & Associates, Inc. supplies at your request (a) represent our view, at the time determined, of the investment value of the securities, (b) may not constitute prices at which the securities could have been purchased or sold in any market, (c) may not take into account the size of a position you have in the security, and (d) may have been derived from matrix pricing that uses data relating to other securities whose prices are more readily ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information for all account openings. **What this means for your organization**: When your organization opens an account, we will ask for your organization's legal name, address, jurisdiction or legal domicile, and Tax ID # or Government ID #, and other information that will allow us to identify you. Depending on certain factors including type of entity and jurisdiction, we may also be required to ask for additional information and documentation regarding your organization or related personnel (e.g., Directors, Beneficial Owners, Authorized Personnel, etc.).

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.
The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.
The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.
The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.

**From:** Jonathan Pennington <Jonathan.Pennington@Animobancorp.onmicrosoft.com>
**To:** Jin Kang <Jin.Kang@glorifi.com>, "Andy Main (Contractor)" <Andy.Main@glorifi.com>, Charlie Hamilton <charlie@caprockpartners.com>, Bill Conroy <Bill.Conroy@animobancorp.com>
**Cc:** Nathan Robinson <Nathan.Robinson@Glorifi.com>, William Izlar <William.Izlar@Glorifi.com>, Gardner Bell <Gardner.Bell@glorifi.com>
**Subject:** FW: Cash Balance and Vendor Summary 11.04.2022
**Date:** Fri, 4 Nov 2022 22:38:28 +0000
**Attachments:** Vendor_Summary_11.4.2022.xlsx
**Inline-Images:** image001.png; image002.png; image003.png; image006.png; image007.png; image008.png; image009.png; image010.png; image011.png; image012.png; image013.png; image014.png; image015.png; image016.png; image017.png; image018.png; image019.png; image020.png; image021.png; image022.png; image023.png; image024.png; image025.png; image026.png; image027.png; image028.png; image029.png; image030.png; image031.png; image032.png; image033.png; image034.png; image035.png; image036.png; image037.png; image004.png; image005.png; image038.png; image039.png

---

No change in cash position since yesterday…

Today's cash status update for **GloriFi**:

- Available cash – currently sits at $20,000.
- Funding – Weekly funding totaled $1.05MM, including $550k received yesterday. No additional funding received today.
- This week's payments – with Monday's funding, Netrix was paid $450k and Metro Tech was paid $50k.
  - Netrix – Based on letter received from Netrix, $1.653MM of payments are due today and tomorrow ($903k tomorrow and $750k on Saturday). Charlie was working to have these dates moved to next week, but I have not heard if this was successful.
  - Payroll – with yesterday's fundings, payroll and tax withholdings are covered and were processed for payment.
    - Benefit payments (health insurance and 401(k) contributions) and employee expense reimbursements of estimated to be $200k are not considered in the available cash and will need to be paid out mid-next week.
  - Other key vendors and outstanding balance noted on "status" tab of the attached.
- Invoices received
  - Total $21.5MM with $19.5MM of that being past due.
  - Separately, Invoices categorized as "Do Not Pay" or "Deferred" total $15.5MM

Status update for **Animo Bancorp**:

- Available cash $1.7MM
  - $5.5MM transferred to Raymond James investment account for deployment into an investment asset ($4.5MM last week and $1.0MM yesterday).
- Invoices received
  - Total $25k of all which is current.

See the attachment for details on the outstanding invoices. 4-week cash burn is anticipated to come out shortly. Let me know if you have any questions. Thanks

**From:** Jenna Register <Jenna.Register@glorifi.com>
**Sent:** Friday, November 4, 2022 4:58 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 11.04.2022

| | |
|---|---|
| **Balance as of 11/4/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 58,109.36 |
| | |
| **Payments Pending:** | |
| Payroll/Benefits for 11/4 pay period | (23,574.46) |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (8,978.55) |
| | |
| **Ending Balance- Buffer** | **20,556.35** |

No change in the buffer from yesterday.

We did not receive any funding today.

Based on the $1 million we are expected to receive, that will leave us around ~$400K to pay to Netrix; however, I think they demanded in their letter is more than this. I am not sure what the conversations with Netrix today entailed. We also will see 401K and the benefits start debiting the accounts next week.

| | |
|---|---|
| **1,000,000.00** | **Expected to receive** |
| **(350,000.00)** | **Payback Charlie and Toby** |
| **(253,000.00)** | **Additional for benefits and 401K** |
| **397,000.00** | |

We received payment request today:

- Slate Group- sent to Cathy, she forwarded the statement of outstanding invoices. All are on our list.
- BPM- Asked for payment by 11/11. We are getting hit with late charges here.
- Dizzion- on the dispute list. Legal has sent them a letter supposedly.
- Eastbanc and Kublr- We received late fee invoices.
- Mentor- automatic system sent email
- Threebridge/Turnberry
- Cincinnati Insurance Company (mailed to office) – GRAC NE, KS, and SD – JP has reached out to Lockton to help us get our hands around these.
- LexisNexis- This is for the $5K invoice from March 2022 that is made out to ASL. We need to discuss this Monday.

The balance of the Bancorp account is $1.6 million. No activity today.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,648,752 |
| 8/5/2022 | 466,679 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 71,067 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,251,722 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 609,056 |
| 9/30/2022 | 1,476,667 |
| 10/7/2022 | 648,331 |
| 10/14/2022 | 385,569 |
| 10/21/2022 | 575,846 |
| 10/28/2022 | 1,659,667 |
| 11/4/2022 | 647,955 |
| 11/11/2022 | 344,575 |
| 11/18/2022 | 191,106 |
| 11/25/2022 | 985,454 |
| 12/2/2022 | 462,018 |
| 12/23/2022 | 50,000 |
| Grand Total | 21,515,076 |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 11/18/2022 | 15,510 |
| 12/2/2022 | 14,905 |
| Grand Total | 780,415 |

**From:** Jenna Register
**Sent:** Thursday, November 3, 2022 7:19 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 11.03.2022

| | |
|---|---|
| **Balance as of 11/3/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 584,534.90 |
| | |
| **Payments Pending:** | |
| Payroll/Benefits for 11/4 pay period | (550,000.00) |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (8,978.55) |
| | |
| **Ending Balance- Buffer** | **20,556.35** |

No change in the buffer from yesterday.

We received $200K in funding today from DRJ Properties LTD. We also received $175K each from Charlie Hamilton and Toby that is to be paid back once we receive the $1 million tomorrow based on my understanding.

Based on the $1 million we are expected to receive in the morning, that will leave us around ~$400K to pay to Netrix tomorrow; however, I think they demanded in their letter is more than this.

| | |
|---|---|
| **1,000,000.00** | **Expected to receive tomorrow (Friday morning)** |
| **(350,000.00)** | **Payback Charlie and Toby** |
| **(253,000.00)** | **Additional for benefits and 401K** |
| **397,000.00** | |

We received payment request today:

- Retarus- Print2Fax mail
- Greenberg Traurig for the Trademarks. Need to pay ~$8K by 11/11
- Robert Gabriel- Said he wanted payment by tomorrow.
- Anexinet – There were several invoices not on our tracker. I added them.

- Global Relay

The balance of the Bancorp account is $1.6 million. We transferred $1 million to the Raymond James account today.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,648,752 |
| 8/5/2022 | 466,679 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 71,067 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,251,722 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 609,056 |
| 9/30/2022 | 1,471,417 |
| 10/7/2022 | 651,129 |
| 10/14/2022 | 385,569 |
| 10/21/2022 | 575,846 |
| 10/28/2022 | 1,659,667 |
| 11/4/2022 | 647,955 |
| 11/11/2022 | 344,575 |
| 11/18/2022 | 191,106 |
| 11/25/2022 | 985,454 |
| 12/2/2022 | 437,265 |
| 12/23/2022 | 50,000 |
| Grand Total | 21,487,870 |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 11/18/2022 | 15,510 |
| 12/2/2022 | 9,905 |
| **Grand Total** | **775,415** |

**From:** Jenna Register
**Sent:** Wednesday, November 2, 2022 5:02 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 11.02.2022

| | |
|---|---|
| **Balance as of 11/2/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 34,534.90 |
| | |
| **Payments Pending:** | |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (8,978.55) |
| | |
| **Ending Balance- Buffer** | **20,556.35** |

No change in the buffer from yesterday.

We did not receive any funding today.

I am not sure what the latest is with Netrix. I think I heard we need to pay them $900K by Friday with some more on Saturday. They sent a letter, but the Accounting mailbox was not copied. **We need to process payroll (~767K) tomorrow by 6:30 at the absolute latest**. This payroll estimate includes the large UHC bill (~$115K) and the expense reports of ~$24K.

We received payment request today:

- Patrick Lara – Kellie Crowe responded
- Demyst
- MBO- standard email
- Netrix- letter

We did get word that some of the app/engineering/design/test teams vendors have pulled until they get paid. I am not sure exactly which vendors these are.

The balance of the Bancorp account is $2.6 million. There was no activity today.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 466,679 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 54,867 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 609,056 |
| 9/30/2022 | 1,462,164 |
| 10/7/2022 | 651,129 |
| 10/14/2022 | 385,569 |
| 10/21/2022 | 574,646 |
| 10/28/2022 | 1,659,667 |
| 11/4/2022 | 647,856 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 189,459 |
| 11/25/2022 | 985,454 |
| 12/2/2022 | 107,765 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **21,116,043** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 11/18/2022 | 1,100 |
| 12/2/2022 | 9,905 |
| **Grand Total** | **761,005** |

**From:** Jenna Register
**Sent:** Tuesday, November 1, 2022 5:07 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 11.01.2022

| | |
|---|---|
| **Balance as of 11/1/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 35,920.71 |
| | |
| **Payments Pending:** | |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (10,364.36) |
| | |
| **Ending Balance- Buffer** | **20,556.35** |

The buffer decreased to $21K due to the $10K payment to Collective Dallas and $15K payment to MBO-Mozz today.

We did not receive any funding today.

I am not sure what the latest is with Netrix or when we need to pay them the remaining $773K. We need to process payroll tomorrow. This payroll estimate includes the large UHC bill (~$115K) and the expense reports of ~$24K.

| | | |
|---|---|---|
| Netrix Payment by Tuesday, 11/1 | 773,716 | |
| Payroll estimate for 11/4 including UHC bill and emp exp reimbursements | 767,000 | Need to submit by Wed, 11/2 |
| | **1,540,716** | |

We received payment request today:

- Syndeo
- Capital Bassett
- Greenberg Traurig
- JJH- Agile4Solutions. These guys are persistent.
- QOMPLX- James asked me about the invoices outstanding for them today.
- Appliable
- Wolters Kluwer
- Inn Reg- We got hit with a late fee on another one of the invoices.

The balance of the Bancorp account is $2.6 million. We paid all rents/internet/insurance today. The only outstanding invoice we have for Bancorp is one we received today that is not due until 11/16.

The Wolters Kluwer invoice that was previously shown on Bancorp lists of payables for deposit disclosures has been moved to be paid from ASL.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 466,679 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 54,867 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 609,056 |
| 9/30/2022 | 1,462,164 |
| 10/7/2022 | 651,129 |
| 10/14/2022 | 385,569 |
| 10/21/2022 | 574,646 |
| 10/28/2022 | 1,659,667 |
| 11/4/2022 | 647,856 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 189,459 |
| 11/25/2022 | 985,454 |
| 12/2/2022 | 103,765 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **21,112,043** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 11/18/2022 | 1,100 |
| **Grand Total** | **751,100** |

**From:** Jenna Register
**Sent:** Monday, October 31, 2022 4:40 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.31.2022

| | |
|---|---|
| **Balance as of 10/31/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 81,730.51 |
| | |
| **Payments Pending:** | |
| November Rent Dallas Office | (10,841.65) |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (20,128.34) |
| | |
| **Ending Balance- Buffer** | **45,760.52** |

The buffer decreased to $46K due to the $2.7K payment to Plaid today and $11K reserve to pay the November Rent for the Dallas office tomorrow. I expect to see more benefits being debited tomorrow or Wednesday.

We received $500K in funding today from Magic Rise Group. We then turned around and paid Netrix $450K and Metro $50K.

Here is what we need to pay Netrix tomorrow, Tuesday 11/1 and payroll by Wednesday evening. This payroll estimate includes the large UHC bill (~$115K) and the expense reports of ~$24K.

| | | |
|---|---|---|
| Netrix Payment by Tuesday, 11/1 | 773,716 | |
| Payroll estimate for 11/4 including UHC bill and emp exp reimbursements | 767,000 | Need to submit by Wed, 11/2 |
| | **1,540,716** | |

We received payment request today:

- Global Relay- We received 2 request from them today. I think William/Nathan are tracking down if we need to keep them current for FINRA app.
- Vouched- Reached out via Larry and JP responded they are considered critical and we will pay as soon as we have sufficient funding.
- Cision
- Gabriel Strategies- Cathy was copied
- Sprout Social- Emailed Cathy to find out if this has been paid or needed to be added to payable listing.
- Bindable- They are suspending our API tokens and website services today. This is related to insurance and email came from Brian Guthrie.

The balance of the Bancorp account is $2.7 million. No activity in Bancorp today. We will pay the remaining invoices for rent/internet/insurance tomorrow. We also need to discuss the Wolters Kluwer (used for disclosures) invoice for Bancorp tomorrow to see which entity should pay that.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 651,129 |
| 10/14/2022 | 385,569 |
| 10/21/2022 | 574,646 |
| 10/28/2022 | 1,674,622 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 189,459 |
| 11/25/2022 | 926,081 |
| 12/2/2022 | 70,725 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **20,994,103** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 10/28/2022 | 21,909 |
| 11/4/2022 | 117,612 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **912,178** |

**From:** Jenna Register
**Sent:** Friday, October 28, 2022 4:36 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.28.2022

| | |
|---|---|
| **Balance as of 10/28/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 85,330.68 |
| | |
| **Payments Pending:** | |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (20,984.45) |
| | |
| **Ending Balance- Buffer** | **59,346.23** |

The buffer increased to $59K due to the $300K contribution received offset by the $250K payment to Netrix today.

We received $300K in funding today from Moriah Investment Partners.

Here is what we need to pay Netrix by Tuesday 11/1 and payroll for next week. This payroll estimate includes the large UHC bill (~$115K) and the expense reports of ~$24K.

| | | |
|---|---|---|
| Netrix Payment by Tuesday, 11/1 | 1,223,716 | |
| ayroll estimate for 11/4 including UHC bill and emp exp reimbursements | 767,000 | Need to submit by Wed, 11/2 |
| | **1,990,716** | |

We also will need to pay ~$11K for rent for the Dallas office on 11/1. We have only received the invoice for the $4K for the CAMs and Utilities but I expect to receive the rent statement anytime since we renewed.

We received payment request today:

- Demyst
- Appliable
- Netrix – Have until 11/1 to fulfil $1.5 million payment
- Vouched- Larry reached out as Vouched reached out to him
- Pinnacle- Insurance
- Perr & Knight- Insurance. They have reached out several times including about the vendor call.
- Leonard Freeman- Cathy is going to respond

The balance of the Bancorp account is $2.7 million. No activity in Bancorp today. We will pay the remaining invoices for rent/internet/insurance on 11/1.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 642,151 |
| 10/14/2022 | 388,313 |
| 10/21/2022 | 1,074,451 |
| 10/28/2022 | 1,674,804 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 188,922 |
| 11/25/2022 | 895,581 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **21,386,094** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 10/28/2022 | 21,909 |
| 11/4/2022 | 68,685 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **863,250** |

**From:** Jenna Register
**Sent:** Thursday, October 27, 2022 5:15 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.27.2022

| | |
|---|---|
| **Balance as of 10/27/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 35,330.68 |
| | |
| **Payments Pending:** | |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (20,984.45) |
| | |
| **Ending Balance- Buffer** | **9,346.23** |

No change in the $9K buffer from yesterday. There were some benefits that hit today that were estimated. 401K was debited for all entities (excluding AMC) today. The 401K has not been debited from AMC for the last 3 pay cycles. We have this included in our estimate.

We did not receive any funding today.

It is my understanding, Jin was able to negotiate with Netrix that we will fulfil our payment of $1,473,716.02 by Tuesday, 11/1 as opposed to today. If we get funding in tomorrow, we may want to go ahead and send a piece of the payment.

Here is what we need to pay Netrix by 11/1 and payroll for next week. This payroll estimates includes the large UHC bill (~$115K) and the expense reports of ~$24K.

| | | |
|---|---|---|
| Netrix Payment by Tuesday, 11/1 | 1,473,716 | |
| Payroll estimate for 11/4 including UHC bill and emp exp reimbursements | 767,000 | Need to submit by Wed, 11/2 |
| | **2,240,716** | |

We received payment request today:

- MBO – AR dept reached out directly. I suggested to reach out to JP or Jin directly as I know this is a critical vendor.
- BPM – requested payment by 11/3
- Netrix – Have until 11/1 to fulfil $1.5 million payment

We did not receive any emails related to the Vendor call a few Fridays today, but still need to communicate to vendors what the plan is.

The balance of the Bancorp account is $2.7 million. No activity in Bancorp today. We will pay the remaining invoices for rent/internet/insurance on 11/1.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 662,104 |
| 10/14/2022 | 388,313 |
| 10/21/2022 | 1,303,113 |
| 10/28/2022 | 1,674,804 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 188,922 |
| 11/25/2022 | 886,381 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **21,625,508** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 10/28/2022 | 21,909 |
| 11/4/2022 | 68,685 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **863,250** |

**From:** Jenna Register
**Sent:** Wednesday, October 26, 2022 5:20 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.26.2022

| | |
|---|---|
| **Balance as of 10/26/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 92,667.10 |
| | |
| **Payments Pending:** | |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (78,320.87) |
| | |
| **Ending Balance- Buffer** | **9,346.23** |

No change in the $9K buffer from yesterday. There were some benefits that hit today that were estimated. I am expecting 401K to be debited tomorrow or Friday.

We did not receive any funding today.

We will need to pay Netrix $1,473,716.02 per the latest agreement by tomorrow, 10/27.

We received payment request today:

- MBO
- Mozz- MBO
- Demyst
- Three Bridge/Turnberry
- Concur- Services suspended if not received by Nov. 9

We did not receive any emails related to the Vendor call a few Fridays today, but still need to communicate to vendors what the plan is.

The balance of the Bancorp account is $2.7 million. No activity in Bancorp today. We will pay the remaining invoices for rent/internet/insurance on 11/1.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 662,104 |
| 10/14/2022 | 388,313 |
| 10/21/2022 | 1,303,113 |
| 10/28/2022 | 1,674,629 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 188,922 |
| 11/25/2022 | 128,939 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **20,867,892** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 10/28/2022 | 21,909 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **794,566** |

**From:** Jenna Register
**Sent:** Tuesday, October 25, 2022 5:04 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.25.2022

| | |
|---|---|
| **Balance as of 10/25/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 96,060.77 |
| **Payments Pending:** | |
| Sweepstakes Reserve | (5,000.00) |
| Payroll/Benefits for 10/21 pay period | (81,714.54) |
| **Ending Balance- Buffer** | **9,346.23** |

There is a $20.4 decrease in the buffer from yesterday due to the $10K payment to Appliable, a $5.3K payment to JAMS for legal, and a $5K reserve for the sweepstakes marketing prize. The buffer is currently ~$9.3K. There were also some benefits that hit today that

were estimated.

We did not receive any funding today.

We will need to pay Netrix $1,473,716.02 per the latest agreement by Thursday, 10/27.

We received payment request today:

- One Inc (Insurance)
- Vouched (They have reached out before. We have not made a payment to them yet.)
- Alloy
- Retarus (Mail 2 Fax)
- Red Point Media

We did not receive any emails related to the Vendor call a few Fridays today, but still need to communicate to vendors what the plan is.

The balance of the Bancorp account is $2.7 million. We transferred $4.5 million to Raymond James yesterday and paid $129K of vendor invoices today. We will pay the remaining invoices for rent/internet/insurance on 11/1.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 162,768 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 131,915 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 662,104 |
| 10/14/2022 | 388,313 |
| 10/21/2022 | 1,303,113 |
| 10/28/2022 | 1,674,389 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 188,922 |
| 11/25/2022 | 107,289 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **20,846,003** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 10/28/2022 | 21,909 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **794,566** |

**From:** Jenna Register
**Sent:** Monday, October 24, 2022 5:00 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen

<Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.24.2022

| | |
|---|---|
| **Balance as of 10/24/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 111,712.52 |
| | |
| **Payments Pending:** | |
| Payroll/Benefits for 10/21 pay period | (81,981.29) |
| | |
| **Ending Balance- Buffer** | **29,731.00** |

No change in the buffer from Friday. The buffer is currently ~$30K. We paid Logix and Spectrum for the Dallas office today for a total of $646.26. There were also some benefits that hit today that were estimated.

We did not receive any funding today.

We will need to pay Netrix $1,473,716.02 per the latest agreement by Thursday, 10/27.

We received payment request today:

- Upfluence
- Global Relay (3rd Notice)
- Intralinks (They last inquired 9/30)
- Plaid (2nd notice)
- JJH Productions- Agile4Solutions
- Austen Paul (Cathy responded to him)
- Inn Reg (added a late fee of $457.50 to invoice 2209)
- Zoom

We did not receive any emails related to the Vendor call a few Fridays today, but still need to communicate to vendors what the plan is.

The balance of the Bancorp account is $7.4 million. We will make several payments this week and next week. We also moved money into a Raymond James account which should be reflected in the balance tomorrow.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for November. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 168,103 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 136,580 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 662,104 |
| 10/14/2022 | 378,699 |
| 10/21/2022 | 1,309,370 |
| 10/28/2022 | 1,603,287 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 344,017 |
| 11/18/2022 | 188,922 |
| 11/25/2022 | 57,600 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **20,731,854** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 9/30/2022 | 59 |
| 10/14/2022 | 1,100 |
| 10/21/2022 | 63,960 |
| 10/28/2022 | 61,916 |
| 11/4/2022 | 23,490 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **923,182** |

**From:** Jenna Register
**Sent:** Friday, October 21, 2022 5:00 PM
**To:** Jonathan Pennington <Jonathan.Pennington@glorifi.com>; Gardner Bell <Gardner.Bell@glorifi.com>; Stu Cohen <Stu.Cohen@glorifi.com>
**Subject:** Cash Balance and Vendor Summary 10.21.2022

| | |
|---|---|
| **Balance as of 10/21/2022 includes WPI, ASL, Securities, MGA, and Mortgage** | 114,730.97 |
| | |
| **Payments Pending:** | |
| Payroll/Benefits for 10/21 pay period | (85,000.00) |
| | |
| **Ending Balance- Buffer** | **29,731.00** |

The buffer is currently $30K. We paid The Software Works $200K, Metro Tech $100K, and T Mobile ~$500 today. The only item we have estimated is payroll/benefit matters (401K etc.)

Next week (by 10/27), we will need to pay Netrix $1,473,716.02 per the latest agreement.

We received payment requests the past several days from:

- The Software Works
- Majesco
- HSO
- MBO
- Syndeo
- iBeta
- Verafin
- QOMPLX
- Inn Reg
- Cision
- Anexinet
- DEC Secure
- Backbase
- Collective Dallas
- Gabriel Strategies
- Personetics
- Oval Edge
- Vouched
- PAG
- Appliable
- Upfluence
- Retarus
- Equifax
- Twilio
- Inn Reg
- JJH Productions- Agile4Solutions
- McLaren Strategies
- Alloy

We continue to receive several emails from Vendors related to the Vendor call a few Fridays ago.

The balance of the Bancorp account is $7.34 million. We paid Landy's consulting payment for October today and the last 2 Stearns invoices. We will have several invoices to pay next week including rent/utilities.

Additionally attached are the outstanding invoices. We are adding daily what we receive for Insurance directly, but we do not have access to the mailbox. Below is a summary of outstanding invoices we have received to date and includes the amounts for rent for September. This does not include those on the Do Not Pay List or Deferred list. We will add back in the Deferred List later.

| WPI, ASL, Brokerage, and MGA | |
|---|---|
| 4/15/2022 | 936,391 |
| 4/22/2022 | 45,301 |
| 4/30/2022 | 254,808 |
| 5/6/2022 | 711,700 |
| 5/13/2022 | 244,387 |
| 5/20/2022 | 805,390 |
| 5/27/2022 | 359,110 |
| 6/3/2022 | 688,062 |
| 6/10/2022 | 804,945 |
| 6/17/2022 | 343,158 |
| 6/24/2022 | 72,715 |
| 7/1/2022 | 457,325 |
| 7/8/2022 | 1,283,990 |
| 7/15/2022 | 200,718 |
| 7/22/2022 | 61,967 |
| 7/29/2022 | 1,642,067 |
| 8/5/2022 | 474,414 |
| 8/12/2022 | 168,103 |
| 8/19/2022 | 57,335 |
| 8/26/2022 | 63,683 |
| 9/2/2022 | 2,245,037 |
| 9/9/2022 | 1,412,279 |
| 9/16/2022 | 136,580 |
| 9/23/2022 | 624,056 |
| 9/30/2022 | 1,461,706 |
| 10/7/2022 | 662,093 |
| 10/14/2022 | 375,714 |
| 10/21/2022 | 1,309,521 |
| 10/28/2022 | 1,603,287 |
| 11/4/2022 | 582,627 |
| 11/11/2022 | 333,408 |
| 11/18/2022 | 179,578 |
| 11/25/2022 | 50,000 |
| 12/23/2022 | 50,000 |
| **Grand Total** | **20,701,455** |

| Bancorp | |
|---|---|
| 5/13/2022 | 750,000 |
| 9/30/2022 | 59 |
| 10/14/2022 | 1,100 |
| 10/21/2022 | 64,456 |
| 10/28/2022 | 192,610 |
| 11/4/2022 | 23,490 |
| 11/11/2022 | 22,657 |
| **Grand Total** | **1,054,371** |

**Jenna Register**
Accounting
GloriFi / Animo
334-798-3870
Jenna.Register@GloriFi.com

GLORIFI

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or

omitted to be taken in reliance on it, is prohibited and may be unlawful.

# EXHIBIT H

# Animo Bancorp, Inc.
## Balance Sheet

| Financial Row | as of 8/31/2022 | Note buy out |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| **Bank** | | |
| 111220 - Due from Frost Bank - | $1,842,502.56 | 5,840,552.00 |
| **Total Bank** | **$1,842,502.56** | 5,840,552.00 |
| **Other Current Asset** | | |
| 111222 - Due from Stearns Ban | $5,000.00 | |
| **Total Other Current Asset** | **$5,000.00** | |
| **Total Current Assets** | **$1,847,502.56** | 5,840,552.00 |
| **Fixed Assets** | | |
| 129701 - Data Processing Softwa | $133,250.00 | |
| **Total Fixed Assets** | **$133,250.00** | |
| **Other Assets** | | |
| 135301 - Prepaid Exp- D&O Insur | $97,501.58 | |
| 135306 - Prepaid Exp- Blanket Bc | $17,866.81 | |
| 135314 - Prepaid Exp- Rent | $24,619.37 | |
| 135318 - Prepaid Exp- IT Softwar | $250,003.15 | |
| 135452 - Operating Lease ROU A | $103,515.72 | |
| 135620 - Miscellaneous Other As | $750,000.00 | |
| 135631 - Due from Animo Service | $301,524.00 | |
| 135632 - Due from With Purpose | $195,000.00 | |
| **Total Other Assets** | **$1,740,030.63** | |
| **Total ASSETS** | **$3,720,783.19** | 5,840,552.00 |
| | | |
| **Liabilities & Equity** | | |
| **Current Liabilities** | | |
| **Accounts Payable** | | |
| 214200 - Accounts Payable-Re | $914,794.91 | |
| **Total Accounts Payable** | **$914,794.91** | |
| **Other Current Liability** | | |
| 219051 - Operating Lease Liabi | $104,400.48 | |
| **Total Other Current Liability** | **$104,400.48** | |
| **Total Current Liabilities** | **$1,019,195.39** | |
| **Equity** | | |
| 352001 - Surplus | $7,000,000.00 | |
| **Total - Equity** | **$7,000,000.00** | |
| Retained Earnings | ($1,301,022.96) | |
| Net Income | ($2,997,389.24) | 5,840,552.00 |
| **Total Equity** | **$2,701,587.80** | 5,840,552.00 |
| **Total Liabilities & Equity** | **$3,720,783.19** | 5,840,552.00 |

| **8/31/22 (adj for note buy out)** |
|---|
| |
| $7,683,054.56 |
| $7,683,054.56 |
| $0.00 |
| $5,000.00 |
| $5,000.00 |
| $7,688,054.56 |
| $0.00 |
| $133,250.00 |
| $133,250.00 |
| $0.00 |
| $97,501.58 |
| $17,866.81 |
| $24,619.37 |
| $250,003.15 |
| $103,515.72 |
| $750,000.00 |
| $301,524.00 |
| $195,000.00 |
| $1,740,030.63 |
| $9,561,335.19 |
| |
| $0.00 |
| $0.00 |
| $914,794.91 |
| $914,794.91 |
| $0.00 |
| $104,400.48 |
| $104,400.48 |
| $1,019,195.39 |
| |
| $7,000,000.00 |
| $7,000,000.00 |
| ($1,301,022.96) |
| $2,843,162.76 |
| $8,542,139.80 |
| $9,561,335.19 |

# EXHIBIT I

THE TEXAS TRIAL GROUP

500 PR-693, Ste. 30
Dorado, PR 00646*

512-680-7947
Ryan@TheTexasTrialGroup.com

Jeff Tillotson
1201 Main St., Suite 1300
Dallas, TX 75202

**Re: Expert Opinion on Value of Animo Bancorp Litigation Assets**

Dear Mr. Tillotson:

**BACKGROUND AND MATERIALS CONSIDERED**

You have asked me to value potential litigation claims for Animo Bancorp, Inc. ("Bancorp") as of November of 2022. I am an attorney practicing nationwide in the area of complex commercial litigation. My current CV will is forthcoming.

I currently represent Toby Neugebauer in various litigation matters related to With Purpose, Inc. and its affiliates. I have agreed to work for Mr. Neugebauer on these matters on a hybrid basis, where I receive a reduced hourly rate and a percentage of any recovery received.

I have an MBA in finance, previously served as the CFO of a multi-million dollar company, and routinely work with expert witnesses in legal matters where company valuations are in disputes. I also regularly value litigation assets in determining whether to take cases on a contingent basis.

Before I take on a case with a contingent component, I perform a rough analysis on the likely value of the case. I will not take on any cases with a contingent component unless I believe I am more likely than not to achieve a successful recovery and that recovery will result in a contingent payment to me in excess of four times my standard hourly rate, which is currently $1,400 per hour, along with four times the standard hourly rates of all attorneys and paralegals working for me on the matter in question.

In this matter, I reviewed the financial projections attached hereto as Exhibits A and B along with supplemental material listed in Exhibit C and items cited within the body of this report. I also consulted with Peter Borel, a principal of Bortel Investment Management, a private equity firm with a specialization in investing in banks. Based on my conversations with Mr. Bortel, banks are currently trading at approximately 8x net income or, alternatively, 1.2x book value of tangible assets.

**SIMILAR LAWSUITS AND RELATED PROCEEDINGS CONSIDERED**

**Similar lawsuits by other parties.** GloriFi's bankruptcy estate and other parties hold claims arising from some of the same events. Two lawsuits asserting such claims, including RICO claims, were filed in May 2024, one in the District of Delaware and one in the Northern District of Georgia.

Bancorp is not a party to either action, and the claims asserted in them belong to others. They are, however, the closest analogues to Bancorp's own unasserted claims: they rest on the

*Ryan Downton is licensed in Texas, not Puerto Rico

same alleged course of conduct, name substantially the same Potential Defendants, and plead the RICO theory on which Bancorp's potential claims principally rest. I have not valued them in this report, and I have taken care not to attribute to Bancorp any loss suffered by GloriFi, its noteholders, or Mr. Neugebauer individually. The only loss I value is Bancorp's own: the bank it contracted to buy.

**The Delaware Action.** *Banzai Advisory Group, LLC, Banzai Capital Partners, LLC, Neugebauer Family Enterprises, LLC, and Toby Neugebauer v. The Founders Fund VII, LP, et al.*, C.A. No. 1:24-cv-00599 (D. Del., filed May 17, 2024) (the "Delaware Action"; "Del. Compl."). The defendants are the three Founders Fund VII partnerships, Keri Findley, Cason Carter, Britt Amos, Jerome T. Fadden, Manuel Rios, Seven Talents, LLC, the J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings LLC, Vivek Ramaswamy Investments LLC, Jackson Investment Group, LLC, GFNCI, LLC, Descante Capital, LLC, and The Lonsdale Family Revocable Trust dated February 15, 2018 — signatories to, or persons alleged to be bound by, GloriFi's Stockholders Agreement. The complaint asserts two counts: (I) breach of, and conspiracy to breach, the Stockholders Agreement, including the confidentiality, non-competition, and non-disparagement covenants in §§ 5.03(c)/5.04(c), 5.04(d), and 5.04(e), brought by Mr. Neugebauer and Neugebauer Family Enterprises against all defendants; and (II) violation of RICO, 18 U.S.C. § 1962(c), brought by Mr. Neugebauer against all defendants (Del. Compl. ¶¶ 199-225). The plaintiffs seek compensatory damages, including the amounts they lent to GloriFi, personal damages to Mr. Neugebauer in excess of $100 million, treble damages under RICO, and fees (*id.* at 82). The complaint expressly disclaims any lost equity value in GloriFi or other damages belonging to the GloriFi bankruptcy estate (*id.* at 2 n.1, 8 n.3).

**The Georgia Action.** *WPI Collateral Management, LLC, Banzai Advisory Group, LLC, Banzai Capital Partners, LLC, Neugebauer Family Enterprises, LLC, and Toby Neugebauer v. Vivek Ramaswamy, et al.*, Case No. 1:24-cv-02148-ELR (N.D. Ga., Atlanta Div., filed May 16, 2024) (the "Georgia Action"; "Ga. Compl."). WPI Collateral Management, LLC sues as collateral agent for GloriFi's Series II Noteholders, which foreclosed on GloriFi's intellectual property (Ga. Compl. ¶¶ 1, 43, 49 & n.2). The defendants include Vivek Ramaswamy, Strive Enterprises, Inc., Strive Asset Management, LLC, Joseph Ricketts, James Nick Ayers, Joseph Lonsdale, Peter Thiel, Jeffrey Sprecher, Richard Jackson, Breanne Harmsen, Jonathan Pennington, Citadel LLC, Zing America, Inc. d/b/a Coign, and the entity defendants named in the Delaware Action. The counts are: (1)-(3) violation of, and conspiracy to violate, the Georgia RICO Act, O.C.G.A. § 16-14-4(a)-(c); (4) misappropriation of trade secrets, O.C.G.A. § 10-1-761 et seq.; (5) federal RICO, 18 U.S.C. § 1962(c); (6) the Lanham Act, 15 U.S.C. § 1125, against Coign and those working with it; (7) conspiracy to breach the Stockholders Agreement; (8) punitive damages, O.C.G.A. § 51-12-5.1; and (9) attorney's fees, O.C.G.A. § 13-6-11 (*id.* ¶¶ 216-299). The plaintiffs seek damages for the diminution in value of GloriFi's intellectual property, the $36,015,552 the Series II Noteholders lent GloriFi, at least $19,493,837.95 lent by the Neugebauer parties, personal damages to Mr. Neugebauer in excess of $100 million, treble and punitive damages, disgorgement of interests in Strive and Coign, and fees (*id.* ¶¶ 262, 293 & at 139-40). The complaint states that the federal RICO count is brought by Mr. Neugebauer in Georgia only against non-signatories to the Stockholders Agreement, because the agreement's venue provision required claims against signatories to be brought in Delaware (*id.* at 122 n.30).

**Relevance to my analysis.** Neither action asserts a claim on behalf of Bancorp, and neither

seeks damages for the loss of the Citizens State Bank acquisition as Bancorp's injury. I do not add any amount sought in either action to Bancorp's assets. Because Bancorp has never asserted its own claims, I have considered the two complaints for three purposes.

*First*, they show that, by May 2024, the same course of conduct on which the Bancorp Claims rest — the alleged campaign directed at GloriFi's auditor, investigators, and the Journal, and the alleged breaches of the Stockholders Agreement covenants — had been pleaded against substantially the same persons as the Potential Defendants (Del. Compl. ¶¶ 208, 220; Ga. Compl. ¶¶ 169, 266). Indeed, the same actions and conduct that allegedly harmed WPI similarly harmed and damaged Bancorp.

*Second*, the Delaware complaint alleges that the bank acquisition was set for final approval by the head of the Texas Department of Banking the week the Journal article was published (Del. Compl. ¶ 215).

*Third*, because the plaintiffs in both actions disclaim GloriFi's own damages and do not seek Bancorp's, there is no overlap between the recoveries sought there and the loss I value here. The GloriFi bankruptcy court later held that the claims asserted in the two actions were primarily derivative of GloriFi's injuries and property of GloriFi's estate, found that filing them willfully violated the automatic stay, and enjoined their prosecution in their current form, noting that the plaintiffs may seek authority to refile non-derivative claims (WPI Doc. 563 at 84-86 & n.26). That holding concerns who owns claims for injury to GloriFi. It does not address Bancorp, a separate company whose injury, the loss of its own acquisition and the forfeiture of its own deposit, is its own.

**Allegations in the similar lawsuits that support the Bancorp Claims.** The Delaware and Georgia complaints contain allegations that, if proved, would support Bancorp's potential claims as well as the plaintiffs' own: (a) the RICO enterprise alleged in Delaware was formed to defame and disparage Mr. Neugebauer, Bancorp's chairman, so that he would give up GloriFi, and its alleged predicate acts include interstate wire transmissions of disproven allegations about him to the Journal and of untrue allegations to Locke Lord, unauthorized downloads of GloriFi data in November 2021 and October 2022, and a false police report used to extort him (Del. Compl. ¶¶ 219-221); (b) the disparagement was directed at the persons on whom GloriFi's financing and Bancorp's acquisition depended, including Crowe, which audited both GloriFi and Bancorp, GloriFi's investment bank, its SPAC partner, and potential investors (id. ¶ 208); (c) after Locke Lord cleared Mr. Neugebauer and Crowe completed its audit in June 2022, the SPAC sponsor reaffirmed the business combination at $1.65 billion (id. ¶ 153); (d) the Citizens State Bank acquisition was set for final approval by the head of the Texas Department of Banking the week the Journal article was published, which the complaint alleges was no accident (*id*. ¶ 215); (e) after the article, the Federal Reserve asked Mr. Neugebauer to withdraw the application for the bank intended to serve GloriFi (*id*. ¶¶ 196-197; Ga. Compl. ¶ 214); and (f) internal GloriFi financial reports were downloaded and sent to the Journal on or about October 2, 2022, and the article cost GloriFi its credit-card lending arrangement with Fortress (Ga. Compl. ¶¶ 169, 179).

These are allegations, not findings, and the Potential Defendants dispute them. I rely on them only to identify the theory and the facts on which Bancorp's potential claims would rest.

## STATEMENT OF KEY FACTS SUPPORTING CLAIM VALUE

This section sets out the facts that, in my opinion, most support the value of the Bancorp Claims. A valuation that recited only one side of the record would not be reliable.

### A. Bancorp, the Bank, and the Status of the Acquisition as of November 2022

Toby and Melissa Neugebauer formed Bancorp on May 27, 2021, and each contributed $3.5 million on October 7, 2021 (Crawford Rpt. ¶ 18). On October 21, 2021, Bancorp agreed to acquire Ganado Bancshares, Inc., the holding company of Citizens State Bank, Ganado, Texas, for the bank's Tier 1 capital plus $2,089,776, an estimated $7.5 million in total. Bancorp paid $930,000 at signing, of which $750,000 was a deposit to be applied to the price at closing and forfeited if the acquisition did not close (Crawford Rpt. ¶ 27).

At September 30, 2022, Citizens State Bank held about $59.6 million of deposits in 2,043 deposit accounts (FDIC Call Report, Sept. 30, 2022, Schedule RC-O, cert. 16934). The price Bancorp agreed to pay therefore equated to about $3,671 per deposit account and about 12.6 cents per dollar of deposits.

The bank was to be the regulated entity through which GloriFi offered banking products. Miles Everson, a former Bancorp director, testified that the plan was for the bank to "serve as the regulated entity for which With Purpose, dba, GloriFi would, in fact, execute banking transactions" (Arb. Tr. Day 5, 131:1-9). Under the business plan the two companies would share revenue under a marketing agreement (management response to Moelis & Company, Dec. 29, 2021.

There is substantial evidence confirming the viability of the With Purpose's customer acquisition strategy for Bancorp, as it obtained 50,000 members in two weeks in the Fall of 2022, with the vast majority of signups coming just before the negative WSJ article. As a result, management assumptions regarding growth of bank accounts and deposits in Bancorp appear conservative.

No regulator approved Bancorp's applications. Mr. Curry testified that the applications were not approved and were "[u]ltimately … withdrawn in late 2022" (Arb. Tr. Day 3, 327:4-11).

By the Fall of 2022, therefore, the acquisition had not been refused on its merits. The decision had been deferred to the last day the merger agreement allowed, GloriFi had announced that it would shut down, and the application process had ended. The loss on which the Bancorp Claims rest had occurred.

### B. Key Facts and Legal Theories from the Ayers Arbitration

I also represent Mr. Neugebauer in the Ayers Arbitration, (JAMS 5310000148). The final hearing took place from August 20-26, 2026. The Ayers Arbitration record bears on each of the four matters on which the value of the Bancorp Claims principally depends: the existence and scope of the covenants, the conduct directed at the auditor and the press, causation, and the scale of the business the bank was acquired to serve. The claimants' theories — that Mr. Neugebauer induced Mr. Ayers's investment by misrepresentation and later defamed and disparaged him — put many of the same events at issue from the other side, so both sides examined them closely. The testimony below is taken from the certified final transcripts.

### *1. The covenants and the options in Bancorp's equity (Potential Claims III-V)*

Section 5.04(d) of GloriFi's Stockholders Agreement binds each stockholder not to make "any defamatory or disparaging remarks, comments, or statements concerning the Company Group or its businesses, or any of its employees, officers," investors, and associated parties; Section 5.04(f) bars any public announcement regarding GloriFi, "including, without limitation, providing any comments or information to any news … organization," without GloriFi's consent (Stockholders Agreement §§ 5.04(d), 5.04(f); *see* Del. Compl. ¶ 208). The Company Group includes affiliates under common control; Bancorp's position would be that it is such an affiliate, under the Neugebauers' common control. The point is contested (¶ 64(h)).

In the arbitration, Claimants' own counsel examined Mr. Neugebauer on the investor non-disparagement covenant Mr. Ayers signed and described the protected "Company Group" as "GloriFi and its subsidiaries such as Animo Bank and the Insurance Company"; Mr. Neugebauer agreed (Arb. Tr. Day 4, 121:12-122:10). Bancorp was an affiliate under common control rather than a GloriFi subsidiary, so the description is not precise, but it reflects that both sides of the arbitration treated the banking entity as within the covenant's protection.

Mr. Ayers testified that GloriFi's investors were focused, from before their investment through the close of the round, on their ability to buy a pro rata share of the bank, because they were "sensitive to creating a lot of value for a mothership but also their money being used to exponentially grow a community bank" that the Neugebauers owned (Arb. Tr. Day 1, 237:5-238:25). Mr. Ayers raised the point as a concern about who would own that value. For valuation purposes the testimony supports two points: the options in Bancorp's equity were consideration the investors cared about, and the investors expected the bank to grow far beyond Ganado's size.

### *2. The auditor, the investigation, and the Journal (Potential Claims I, II, VI, VIII, IX)*

The Locke Lord investigation cleared Mr. Neugebauer. Mr. Curry, who was called by the claimants and said he was disappointed by the investigation, agreed that he understood GloriFi was able to complete its audit once the investigation "did not find a problem" with Mr. Neugebauer (Arb. Tr. Day 3, 356:13-23). Crowe audited GloriFi and Bancorp together, and Crowe issued its opinion on Bancorp's 2021 financial statements on June 30, 2022 (Crawford Rpt. ¶ 33; Animo Bancorp Monthly Financial Package (Oct. 31, 2022) at 5; see Del. Compl. ¶ 153).

Ms. Findley testified that a Journal reporter called her, told her he was working on a story about GloriFi, and that she gave him the names and numbers of people to contact; she also testified that she speaks with the same reporter, on other subjects, every three weeks to a month (Arb. Tr. Day 2, 275:20-277:20; 279:4-21). She denied sending the Journal materials, saying she was "99 plus percent sure" she had not (id. 280:14-21).

In the arbitration, Mr. Ayers denied planting the story and testified that a federal bankruptcy court had concluded the story resulted from Mr. Neugebauer's own disclosures to the reporters (Arb. Tr. Day 1, 112:8-113:6). The opinion I have reviewed does not make that finding. It records Mr. Neugebauer's testimony that he gave the reporter "every text and every email" he possessed, and it states that the "source(s)" behind the Journal investigation is "the subject of veritable dispute" (WPI Doc. 563 at 9 & n.4). The source of the Journal's information therefore remains contested, and I treat it as a risk in Section V.C.

### *3. Chronology and causation*

Mr. Ayers agreed on cross-examination that "right after the launch" the Journal article came out, that Mr. Neugebauer thereafter resigned, and that "by November the company was effectively inactive" (Arb. Tr. Day 3, 182:1-8). He also testified that a negative Journal story "would have been harmful to a business" he had helped capitalize (Arb. Tr. Day 1, 113:18-114:1).

Mr. Neugebauer described how the article affected the business: it stalled consumer sign-ups at the moment of launch and made the interim financing GloriFi needed harder to obtain (Arb. Tr. Day 4, 280:5-19). The GloriFi bankruptcy court recorded testimony from Mr. Neugebauer and GloriFi's former chief marketing officer that disclosing the Journal investigation to potential investors "greatly hampered the Debtor's ability to raise capital" (WPI Doc. 563 at 10). The launch data in Section IV.C show member growth stopping after the article: members held at about 42,000 from October 21 through November 3, 2022.

The same sequence is pleaded in the Delaware and Georgia Actions described in ¶¶ 26A-26B. Those complaints allege that, after the Locke Lord investigation cleared Mr. Neugebauer on June 24, 2022 and Crowe completed its audit on June 30, 2022, the SPAC sponsor reaffirmed the business combination at a $1.65 billion valuation (Del. Compl. ¶ 153); that internal GloriFi financial reports were downloaded and transmitted to the Journal on or around October 2, 2022 (Ga. Compl. ¶ 169); that the article caused the termination of a substantially documented credit-card lending arrangement with Fortress (id. ¶ 179); and that GloriFi announced its shutdown on November 21, 2022 and filed for bankruptcy on February 8, 2023 (id. ¶ 180). The Delaware complaint further alleges that the Citizens State Bank acquisition "was set for final approval by the head of the Texas Department of Banking the week that the Wall Street Journal published" its article (Del. Compl. ¶ 215). These are allegations, not findings, and the defendants dispute them; I cite them because they are consistent with the documentary chronology in ¶¶ 31-32 and Table 4.

### *4. The market's view of the enterprise the bank was built to serve*

Mr. Ayers wrote at the time, and confirmed in the arbitration, that GloriFi's initial investors "got in at a $175 million valuation only two months ago and now that valuation has gone up seven to nine times (according to the Moelis analysis and SPAC term sheets)" (Arb. Tr. Day 3, 173:15-174:7). He agreed that the investment carried "significant upside" and that the business combination with Duty, Honor, Country attached a $1.7 billion valuation (id. 17:8-15; 180:4-13). Mr. Curry described "the billion-plus opportunity of taking the company public" (id. 360:19-24).

## **<u>OPINIONS</u>**

I used Exhibits A and B to create a model for the valuation of the Bancorp litigation asset, which I have attached as Exhibit D. It shows net present value as of 2022 for net income and book value of Bancorp using a 15% discount rate for cost of capital.

The net present value range of net income goes from a "worst case" scenario of $3.2 million based on 2022 projections to a 2024 "best case" scenario of $20.2 million, providing a valuation range from a low of $26.0 million to a high of $161.6 million using the income model. The NPV range of book value ranges from 2022 "worst case" of $20.6 million to 2024 best case of $58.0 million, providing a valuation range of $20.4 million to $69.6 million using the asset model. I applied a weight of 50% to each of the two valuation methods, providing a valuation range of

$23.2 million to $115.6 million.

When valuing litigation I also assign percentages to the possibility the finder of fact will accept or discount management's projections as they contain assumptions about the probability of success of the underlying business. Here, much of that risk is already included in the model because it assigned a weight of 50% to the worst case scenario. Even so, I prefer to be conservative when valuing litigation and applied an additional discount of 30%, reducing the litigation value range to $16.2 million to $80.9 million.

Finally, I applied a discount based on the probability of success in litigation. After reviewing far more material than me, the With Purpose, Inc. Bankruptcy Trustee concluded that all persons involved with GloriFi, both Mr. Neugebauer and the initial investors, face potential culpability in this matter. I chose to further discount the value of the litigation asset by 50% to account for the two differing narratives concerning the failure of With Purpose and resulting failure of Animo Bancorp. This produced a final valuation range for the Bancorp litigation asset of $8.1 million to $40.5 million.

My model is for use in valuing litigation for the purpose of deciding whether or not to accept an engagement. It is designed to be conservative and should not be used as an expert report or damage model or damage limitation in litigation concerning the failure of Bancorp. I reserve the right to adjust my opinions based on information received after the date of this report

Sincerely,

Ryan Downton

# EXHIBIT J

**CAUSE NO. DC-22-17307**

| | | |
|---|---|---|
| **THE CAPITAL MARKETS COMPANY, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **14th JUDICIAL DISTRICT** |
| | § | |
| **ANIMO BANCORP, INC. a/k/a GLORIFI FINANCIAL,** | § | |
| | § | |
| ***Defendant.*** | § | **DALLAS COUNTY, TEXAS** |

**FINAL JUDGMENT**

On December 16, 2022, The Capital Markets Company, LLC ("Plaintiff" or "Capco") filed this instant action against Animo Bancorp, Inc. a/k/a GloriFi Financial ("Defendant" or "Animo") asserting a claim for breach of contract. On May 4, 2023, Capco filed its Traditional Motion for Summary Judgment (the "Motion"). On July 24, 2023, the Court heard arguments of counsel regarding Plaintiff's Motion. That same day, the Court granted Plaintiff's Motion and awarded Capco $396,905.38 in damages, and an additional $37,711.50 in attorneys' fees. In the Order, the Court allowed Capco to return and seek additional attorneys' fees.

As such, on August 23, 2023, Capco filed its Request for and Submission of Reasonable and Necessary Attorneys' Fees and Motion for Entry of Final Judgment. In its Motion for Entry of Final Judgment, Capco seeks a final judgment in the amount of $488,739.41 that includes damages awarded against Animo, Capco's total reasonably and necessary attorneys' fees, and pre-judgment interest from the date Capco's Petition was filed.

The matter of attorneys' fees was submitted to the Court for determination. After considering Capco's Request for and Submission of Attorney's Fees, the Court finds that

$72,098.50 comprises reasonable and necessary attorney's fees for the presentation of Capco's successful breach of contract claim.

The Court hereby RENDERS judgment as follows:

1. The Court orders that Capco recover the following from Animo:

    a. $396,904.38 in damages for Capco's successful breach of contract claim;

    b. $72,098.50 in reasonable and necessary attorney's fees under Tex. Civ. Prac. & Rem. Code Chapter 38 for reasonable and necessary attorney's fees incurred by Capco;

    c. $19,736.53 in pre-judgment interest;

    d. Court costs; and

    e. Post-judgment interest on all of the above at the rate of 8.25% compounded annually from the date this judgment is signed until all amounts are paid in full.

2. The Court further ORDERS that if this judgment is appealed by Animo to an intermediate court of appeal and Animo's appeal fails to modify or reverse this judgment, Capco will additionally recover from Animo the amount of $75,000, representing the anticipated reasonably and necessary fees and expenses that would be incurred by Capco.

3. The Court further ORDERS that if this judgment is appealed by Animo to the Texas Supreme Court and Animo's appeal fails to modify or reverse this judgment, Capco will additionally recover from Animo the amount of $35,000, representing the anticipated reasonably and necessary fees and expenses that would be incurred by Capco.

4. This judgment is intended to be an appealable final judgment that fully and finally disposes of all claims between and among all parties to this proceeding and hereby finally disposes of all claims and all parties to this proceeding.

5. All relief requested by any party to this proceeding not expressly granted in this judgment is hereby denied.

SIGNED on this the 28 day of August 2023.

JUDGE PRESIDING

**FELICIA PITRE**
District Clerk

**NINA MOUNTIQUE**
Chief Deputy

**DALLAS COUNTY DISTRICT CLERK'S OFFICE**

To: ALL ATTORNEYS/PARTIES

Please see the attached order signed and entered in your case.

Regards,

Felicia Pitre

Dallas County District Clerk

**NO. DC-2022-17307**

| | | |
|---|---|---|
| **THE CAPITAL MARKETS COMPANY, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **14th JUDICIAL DISTRICT** |
| | § | |
| **ANIMO BANCORP, INC. a/k/a GLORIFI FINANCIAL,** | § | |
| | § | |
| ***Defendant*.** | § | **DALLAS COUNTY, TEXAS** |

**MOTION FOR NEW TRIAL**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant, ANIMO BANCORP, INC., and asks the Court to grant a new trial in the interest of justice and fairness and would respectfully show the Court as follows:

## I. Introduction

Plaintiff, The Capital Markets Company, LLC, sued Defendant, Animo Bancorp, Inc. for breach of contract and suit on sworn account. In addition to a general denial, Defendant filed verified denials: 1) that the debt asserted by Plaintiff is true and correct; 2) that the amount asserted by Plaintiff is not true and correct; 3) that consideration was not provided to Defendant by Plaintiff; and 4) that Defendant was liable in the capacity sued. (Defendant's *First Amended Verified Answer*).

After a traditional motion for summary judgment hearing, the Court entered an *Order Granting Plaintiff's Traditional Motion for Summary Judgment* in favor of Plaintiff on July 24, 2023. The Dallas County District Clerk issued a *Notice of Final Judgment* on July 25, 2023.

Due to inconsistencies in the *Order Granting Plaintiff's Traditional Motion for Summary Judgment* of July 24, 2023, Defendant filed a *Motion to Correct and/or Reform Judgment* on

August 23, 2023. Thereafter, Plaintiff filed two separate post judgment motions, 1) *Request for and Submission of Reasonable and Necessary Attorneys' Fees* and 2) a *Motion for Entry of Final Judgment*. Plaintiff then filed a *Notice of Hearing* for September 25, 2023, at 10:00am.

On August 28, 2023, the Court, sua sponte, issued a new final judgment that included damages for which evidence was not included nor sought in Plaintiff's Motion for Summary Judgment.

## II. Procedural History

1. On December 16, 2022, Plaintiff, The Capital Markets Company, LLC, filed its *Original Petition for Breach of Contract and Suit on Sworn Account* claiming that it was owed money for goods, wares, merchandise, or services. Plaintiff also made a claim for attorney's fees.

2. On January 23, 2023, Defendant filed its *First Amended Verified Answer*, alleging certain affirmative defenses and making certain verified denials.

3. On May 4, 2023, Plaintiff filed its *Traditional Motion for Summary Judgment* ("Motion") on its claims of Breach of Contract and Suit on Sworn Account alleging there were no genuine issues of material fact.

4. On July 17, 2023, Defendant filed its *Response to Plaintiff's Traditional Motion for Summary Judgment* ("Response") alleging that several fact issues existed.

5. On July 21, 2023, Plaintiff filed its *Plaintiff's Reply to Defendant's Response to Plaintiff's Traditional Motion for Summary Judgment* ("Reply") alleging, among other things, that Animo Services, LLC, ("Animo Services") and With Purpose, Inc. d/b/a Glorifi Inc. ("With Purpose") were "affiliates" of Plaintiff and attaching new summary judgment evidence in the form of Animo Bancorp, Inc.'s Certificate of Formation, "Exhibit 1."

6. On July 24, 2023, the Court heard Plaintiff's *Traditional Motion for Summary Judgment* and granted the same. The Court signed an *Order Granting Plaintiff's Traditional Motion for Summary Judgment* that same day.

7. On July 25, 2023, the Court issued a *Notice of Judgment* giving notice that a final judgment had been entered on July 24, 2023, in the above cause.

8. On August 23, 2023, Defendant filed its *Motion to Correct and/or Reform Judgment*.

9. On August 25, 2023, Plaintiff filed its *Request for and Submission of Reasonable and Necessary Attorney's Fees* and its *Motion for Entry of Final Judgment*.

10. Plaintiff filed its *Notice of Hearing* giving Defendant notice that a hearing had been set on its *Request for and Submission of Reasonable and Necessary Attorney's Fees* at 10:00 AM on Monday, September 25, 2023.

11. On August 28, 2023, the Court signed the proposed final judgment submitted by Plaintiff, which included attorney's fees not included in nor sought in its Motion for Summary Judgment.

## III. <u>Standard of Review</u>

The trial court has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed. TEX. R. CIV. P. 329b(a). If a motion for new trial is timely filed by any party, the trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment until thirty days after all such timely-filed motions are overruled, either by a written and signed order or by operation of law, whichever occurs first. *See* TEX. R. CIV. P. 329b(d)(e).

## IV. Argument

Defendant files this motion pointing out the following errors arising from the August 28, 2023, Final Judgment:

**Point of Error 1: The Court Erred in Awarding Damages of $396,905.38 because the findings could not have included all charges asserted by Plaintiff against Defendant under either a suit on account or breach of contract claim.**

The Court erred in failing to hold Plaintiff to its burden to prove exactly what services it provided to Defendant and what charges it provided to Defendant alone. Tex. R. Civ. P. 185; *Rizk v. Fin. Guardian Ins. Agency, Inc.*, 584 S.W.2d 860, 862 (Tex. 1979); Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (movant for a traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law); *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222-23, (Tex. 1999) (The non-movant need not respond to the motion for summary judgment unless the movant meets its burden of proof).

In awarding all damages asserted by Plaintiff, the Court erred by failing to take Defendant's summary judgment evidence as true as is required. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2007) (A trial court must consider all of the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant, if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not). Specifically, the summary judgment evidence of Defendant conclusively established that even if this Court found a valid contract, there is no dispute that at least certain services and charges were not provided for the benefit of Defendant. In fact, Defendant had no business purpose nor any business necessity during a majority of the time that Plaintiff alleges services were provided and charged. This is demonstrated plainly in Plaintiff's Reply where, instead of pointing out the exact services and

amounts that it believed were attributable to Defendant, it relies solely on an undefined affiliates clause to overcome its inability to prove the necessary element of each specific charge. (Reply pp. 4-5). Incredibly, Plaintiff admitted services were likely provided to others.

**Point of Error 2: The Court Erred in Relying on an Undefined Affiliates Clause and Awarding Damages of $396,905.38 because no affiliates were identified, much less proven in Plaintiff's Motion for Summary Judgment evidence.**

Defendant incorporates and adopts as if taken verbatim the arguments present in Point of Error No. 1. Again, the Court erred in failing to hold Plaintiff to its burden to prove that certain or all services alleged were provided to Defendant or defined affiliates of Defendant. In the present case, Plaintiff was required to overcome the summary judgment evidence produced by Defendant that even if the contract was valid, that the services could not have been and were not provided to Defendant. Taken as true as required, the Court erred in failing to require Plaintiff to demonstrate that the services that could not have been and were not provided to Defendant were provided by a legitimate affiliate for which Plaintiff wholly failed.

**Point of Error 3: The Court erred in finding that all services alleged were subject of a valid contract as Plaintiff failed to prove Defendant received consideration of the alleged services.**

Defendant incorporates and adopts as if taken verbatim the arguments present in Points of Error No. 1 and No. 2. Defendant alleged that no consideration exists for certain services, if not all the services, alleged by Plaintiff. Defendant supported these contentions with competent summary judgment evidence in the form of an affidavit, presentations, and emails. *See* Exhibits A-E of Defendant's Response. Plaintiff argued in reply to Defendant's assertion of lack of consideration that the contract is unambiguous. *See* Reply, pg. 4. However, ambiguity has no bearing on whether or not the consideration of certain services was provided to Defendant or not.

In fact, the Defendant submitted evidence creating a fact issue as to that very point. Specifically, Exhibits C-E of Defendant's Response contain statements and representations made by agents of the parties that obviously create fact issues as to whom the services were provided, issues which Plaintiff simply dismisses or argues don't exist. The emails contained in Exhibits D and E show that the contracting parties were in fact not the actual beneficiaries of the services provided by Plaintiff. Further, Defendant's summary judgment evidence which must be taken as true demonstrates that the nature of Defendant's business was solely as a holding company only and could not and did not utilize the over $3,000,000 worth of services allegedly provided by Plaintiff. Thus, the Court erred in disregarding Defendant's summary judgment evidence because it was required by law to give Defendant the benefit of the doubt in making inferences and resolving doubts.

Further, the Court erred in disregarding Defendant's evidence and following Plaintiff's attempt to negate the fact issues when it argued in its Reply that Defendant was liable for services even if they were provided to just Animo Services, LLC. *See* Reply, pp. 4-5. There can be no dispute, Plaintiff's argument generates by admission yet another fact issue. It knew it did not provide all services to Defendant. It knew it provided services to a separate entity other than Defendant. It claims right by an undefined affiliates clause. Specifically, the fact issue is what does affiliate mean in this context as it is not defined in the Engagement Agreement.

The interpretation of "affiliate" creates ambiguity in the contract and certainly as to the alleged damages which both as a matter of law and fact precludes summary judgment.

Plaintiff then references the Certificate of Formation for Animo Services to show that Defendant was the manager of Animo Services at the time the Engagement Agreement was executed. Yet, at the time the services complained of were performed (all were invoices from May

2022 and later), the manager of Animo Services, LLC, was a completely different entity, With Purpose, Inc. This change was made on February 10, 2022. *See* "Certificate of Amendment," attached hereto as Exhibit 1. Accordingly, Plaintiff's arguments for an award of damages by affiliation fail as a matter of law and clearly mislead the Court to enter an improper judgment.

**Point of Error 4: The Court erred in granting judgment against Plaintiff for attorney's fees as the amounts and types awarded were not supported by legally sufficient evidence.**

The Court erred in granting attorneys' fees that were not proved in Plaintiff's Motion and by failing to hold Plaintiff to its burden to prove the reasonableness and necessity of its attorneys' fees. Importantly, Plaintiff's awarded attorneys' fees were not supported by legally sufficient evidence.

Plaintiff failed to meet its burden to establish that the fees awarded were reasonable and necessary, and genuine issues of material fact exist as to the reasonableness and necessity of such fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 497-498 (Tex. 2019). Specifically, and first, Plaintiff's affidavit failed to set forth any facts to support the reasonableness of the extremely high rates and excessive hours spent on standard issues with, apparently, very little evidentiary material, and was insufficient to constitute sufficient summary judgment evidence. Tex. R. Civ. P. 166a(c); *Eberstein v. Hunter*, 260 S.W.3d 626, 630 (Tex.App.-Dallas 2008, no pet.); *Webb v. Upshaw*, 2016 Tex.App. LEXIS 5398 at *23 (Tex.App.-Amarillo May 20, 2016, no pet.) (mem. op.). Second, the testimony supporting the award of fees on a successful appeal is woefully insufficient. Testimony consisting solely of an attorney's experience, the total amount of fees or an estimate thereof, and the reasonableness of the fees are "generalities" that "are not sufficient to support a fee-shifting award under the lodestar method." *See Rohrmoos*, 578 S.W.3d at 496. Counsel for Plaintiff makes a few simple, conclusory statements without providing

any evidence whatsoever to support the hours or amounts that would create the lodestar figures of $75,000 and $35,000. The Court should grant a new trial on the issue of appellate attorney fees as the award of the same was not supported by legally sufficient evidence.

**Point of Error 5: The Court erred in granting judgment against Plaintiff for attorney's fees that were not requested in the traditional summary judgment motion upon which final judgment was granted and such relief was improper and excessive.**

Plaintiff only sought its segregated fees of $35,974.50 after what Mr. Hess testified to be a complete accounting. (See Motion, p. 13) ("In support of his opinion, Mr. Hess has provided a complete accounting of the attorneys' fees Capco has incurred, which specifically annotate the task performed, the attorney performing the task, the date the task was performed, the amount of time it took to complete the task, as well as the associated attorney's hourly rate."). In their Motion, Plaintiff only sought a judgment for $35,974.50 in attorney fees and did not seek appellate fees. (See Motion p. 13) ("This information constitutes sufficient evidence under Rohrmoos Venture and El Apple I, Ltd. to effectuate a judgment of $35,974.50 in attorneys' fees against Animo as a matter of law."). The Court entered a final judgment awarding these requested fees.

Thereafter, and because the final judgment contained errors on its face, Defendant requested correction or reformation of the final judgment. In response, Plaintiff filed a request alleging it incurred almost $40,000 in additional fees as well as requesting appellate fees. These additional fees were not properly before the Court nor was fair notice provided for same. The additional fees awarded in the second final judgment were excessive relief and improperly granted. Further, Plaintiff included charges for fees that were mistakes of its own making which is improper.

The primary function of pleadings is to notify the opposing party of one's claims and defenses, as well as the relief sought. *See Herrington v. Sandcastle Condo. Ass'n*, 222 S.W.3d 99, 102 (Tex. App.--Houston [14th Dist.] 2006, no pet.). A trial court cannot grant relief to a party in

the absence of pleadings supporting that relief unless the issue has been tried by consent. *See Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983) (citing Tex. R. Civ. P. 301); *Binder v. Joe*, 193 S.W.3d 29, 32 (Tex. App.--Houston [1st Dist.] 2006, no pet.). A request for recovery of attorney's fees is a claim for affirmative relief. *See In re C.A.S.*, 128 S.W.3d 681, 685-86 (Tex. App.--Dallas 2003, no pet.) (citing *Gen. Land Office v. OXY U.S.A.*, Inc., 789 S.W.2d 569, 570 (Tex. 1990). Generally, this kind of excessive relief is reversible error. *See Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).

The additional fees awarded by the Court were not properly before the Court because Plaintiff requested only specific amounts as described above. When Defendant moved the Court to correct or reform its final judgment, Plaintiff took the opportunity to improperly bootstrap additional fees that more than doubled the amount awarded and added appellate fees. Defendant's *Motion to Correct and/or Reform Judgment* was not a motion that reopened the cause so as to allow new evidence or additional requests for relief. The motion was simply invoking the Court's inherent power to modify or correct its own judgments. Further, Defendant was not given an opportunity to contest the additional relief as the proposed order was signed by the Court without a hearing or opportunity to respond. By awarding additional relief in the form of excessive and improper attorney's fees that were not requested in the Motion, the Court has committed error. The Court should grant a new trial on the issue of attorney fees so that justice may be done.

## V. Conclusion & Prayer

The Court should grant a new trial as fact issues remain regarding elements of Plaintiff's claims. The Court should further grant a new trial because the award of attorney fees is not supported by legally sufficient evidence and is both excessive and improper.

WHEREFORE, PREMISES CONSIDERED, and in the interest of justice and fairness, Defendant requests this Court set aside its previous judgment rendered and a retrial of this matter be had.

Respectfully submitted,

FIELD MANNING STONE AYCOCK, P.C.
2112 Indiana Avenue
Lubbock, Texas 79410-1444
T 806/792-0810
F 806/792-9148
jpmanning@lubbocklawfirm.com

*/s/ J. Paul Manning*
J. PAUL MANNING
State Bar No. 24002521
ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

A true and correct copy of the above and foregoing instrument was on this September 27, 2023, served on the attorneys of record via E-filing of Texas, as follows:

**DAVID PARHAM**
**David.parham@akerman.com**
**MICHAEL B. HESS**
**Michael.hess@akerman.com**
**AKERMAN, LLP**
2001 Ross Ave., Ste. 3600
Dallas, TX 75201
Attorney For Plaintiff

/s/ J. Paul Manning
J. PAUL MANNING

# EXHIBIT K

**Order entered March 11, 2024**

**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-23-01195-CV**

**ANIMO BANCORP, INC., Appellant**

**V.**

**THE CAPITAL MARKETS COMPANY, LLC, Appellee**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-22-17307**

**ORDER**

By notice filed March 8, 2024, appellant informs the Court appellant has filed for bankruptcy. Pursuant to Texas Rule of Appellate Procedure 8.2, further action in this cause is automatically suspended. *See* TEX. R. APP. P. 8.2. Accordingly, for administrative purposes, this cause is **ABATED** and treated as a closed case. It may be reinstated on motion by any party showing, in accordance with rule of appellate procedure 8.3, that the appeal is permitted by federal law or the bankruptcy court. *See id.* 8.3.

/s/ BILL PEDERSEN, III
JUSTICE

# EXHIBIT L

FILED
11/22/2023 1:31 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Shelia Bradley DEPUTY

**NO. DC-22-17307**

| | | |
|---|---|---|
| **THE CAPITAL MARKETS COMPANY, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **14th JUDICIAL DISTRICT** |
| | § | |
| **ANIMO BANCORP, INC. a/k/a GLORIFI FINANCIAL,** | § | |
| | § | |
| ***Defendant.*** | § | **DALLAS COUNTY, TEXAS** |

**NOTICE OF APPEAL**

This Notice of Appeal is filed by ANIMO BANCORP, INC, Defendant, a party to this proceeding who seeks to alter the trial court's judgment or other appealable order.

1. The trial court, cause number, and style of this case are as shown in the caption above.

2. The judgment or order appealed from was signed on August 28, 2023.

3. ANIMO BANCORP, INC. desires to appeal from all portions of the judgment.

4. This appeal is being taken to the Fifth Court of Appeals.

Respectfully submitted,

FIELD MANNING STONE & AYCOCK, P.C.
2112 Indiana Avenue
Lubbock, Texas 79410-1444
T 806/792-0810
F 806/792-9148
jpmanning@lubbocklawfirm.com

*/s/ J. Paul Manning*
J. PAUL MANNING
State Bar No. 24002521

**CERTIFICATE OF SERVICE**

A true and correct copy of the above and foregoing instrument was on this November 22, 2023, served on the attorneys of record via E-filing of Texas, as follows:

**DAVID PARHAM**
**David.parham@akerman.com**
**MICHAEL B. HESS**
**Michael.hess@akerman.com**
**AKERMAN, LLP**
2001 Ross Ave., Ste. 3600
Dallas, TX 75201
Attorney For Plaintiff

/s/ J. Paul Manning
J. PAUL MANNING

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

John Moore on behalf of John Moore
Bar No. 24122161
jmoore@lubbocklawfirm.com
Envelope ID: 81912040
Filing Code Description: Notice Of Appeal - CT. Of Appeals
Filing Description: DEFENDANT-DESIGNATION REQUESTED AT TIME OF ACCEPTANCE W/IN 3 DAYS
Status as of 11/27/2023 4:34 PM CST

Associated Case Party: THE CAPITAL MARKETS COMPANY, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Parham | | david.parham@akerman.com | 11/22/2023 1:31:05 PM | SENT |
| Michael Hess | | michael.hess@akerman.com | 11/22/2023 1:31:05 PM | SENT |
| Sydney Sgovio | | sydney.sgovio@akerman.com | 11/22/2023 1:31:05 PM | SENT |

Associated Case Party: ANIMO BANCORP, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Sandra LeeMeeks | | smeeks@lubbocklawfirm.com | 11/22/2023 1:31:05 PM | SENT |
| J. PaulManning | | jpmanning@lubbocklawfirm.com | 11/22/2023 1:31:05 PM | SENT |
| John Moore | | jmoore@lubbocklawfirm.com | 11/22/2023 1:31:05 PM | SENT |
| Bill Crist | | bcrist@lubbocklawfirm.com | 11/22/2023 1:31:05 PM | SENT |

# EXHIBIT M

Chase J. Potter
Texas Bar No. 24088245
Joshua J. Iacuone
Texas Bar No. 24036818
Greg McAllister
Texas Bar No. 24071191
Anna Olin Richardson
Texas Bar No. 24102947
potter@imcplaw.com
josh@imcplaw.com
greg@imcplaw.com
anna@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
214.432.1536

COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR TRUSTEE

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **WITH PURPOSE, INC.,** | § | **Case No. 23-30246-MVL-7** |
| | § | |
| **Debtor.** | § | |

| | | |
|---|---|---|
| | § | |
| **SCOTT M. SEIDEL, TRUSTEE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adv. No. ________________** |
| | § | |
| **WINSTON & STRAWN LLP; and MICHAEL BLANKENSHIP,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**<u>TRUSTEE'S ORIGINAL COMPLAINT</u>**

Scott M. Seidel (the "Trustee" or "Plaintiff"),[1] as the chapter 7 trustee of With Purpose, Inc. (the "Debtor" or "GloriFi" or the "Company"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), files this Original Complaint (the "Complaint") against the following (collectively, "Defendants"): Winston & Strawn LLP ("Winston Strawn" or the "Firm") and Michael Blankenship ("Blankenship"). In support thereof, the Trustee respectfully shows the Court as follows:

## I.
## SUMMARY – WHAT THIS LAWSUIT IS ABOUT

1. This lawsuit is about the substantial role Winston Strawn – one of the largest law firms in the world, boasting almost 1,000 attorneys across its worldwide offices – played in the destruction of the Firm's own client: GloriFi.

2. The Trustee seeks to hold Winston Strawn accountable for the massive financial harm caused by Winston Strawn's malpractice and intentional breaches of its fiduciary duties – specifically, Winston Strawn's remarkable malfeasance resulting in GloriFi going from a valuation of ***$1.7 billion* to *zero*** in a matter of months.

3. The facts of this case make for a John Grisham novel about the dangers in, and destruction caused by, conflicts of interest in BigLaw. Sadly, for GloriFi and its legion of stakeholders and unpaid creditors, this is no fiction novel.

4. Winston Strawn was hired and paid by GloriFi to provide the legal expertise and services needed to guide the Company through the close of a de-SPAC transaction with DHC

[1] Pursuant to the court-approved 9019 Agreement and Joint Prosecution Agreement, GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, the Trustee authorizes and approves the filing of this action.

Acquisition Corp. ("DHC"). That transaction would have resulted in GloriFi going public at an incredible valuation of approximately $1.7 billion.

5. Winston Strawn's client was GloriFi. Winston Strawn owed fiduciary duties to GloriFi. And Winston Strawn was ethically obligated to advocate for and protect GloriFi's interests.

6. But Winston Strawn betrayed its fiduciary duties owed to GloriFi in favor of appeasing and protecting Toby Neugebauer ("Neugebauer") – GloriFi's wealthy founder, CEO, and majority shareholder who, with the active participation and assistance of Winston Strawn, repeatedly engaged in destructive self-dealing and pressure campaigns against GloriFi's interests, outside investors, and independent board members.

7. Winston Strawn knowingly and actively participated in, often orchestrating and/or executing, various schemes designed to benefit the personal interests of Neugebauer to the extreme detriment of GloriFi. Winston Strawn's negligence and intentional bad acts proximately caused GloriFi's (i) existing investors (which included the likes of Peter Thiel, Joe Lonsdale, Ken Griffin, and Vivek Ramaswamy and who Winston Strawn ***knew*** were ready, willing, and able to provide the funding needed to close the de-SPAC transaction) to lose confidence in GloriFi, and (ii) resulting inability to close the de-SPAC transaction and go public at a valuation of $1.7 billion. Thus, Winston Strawn's wrongdoing was a proximate cause in the nearly ***$2 billion in lost enterprise value*** suffered by GloriFi.

8. Winston Strawn's undying allegiance to Neugebauer continued throughout GloriFi's bankruptcy proceeding. Winston Strawn supported the proposed "Neugebauer chapter 11 conversion plan." This plan did not propose the restructuring of any business for GloriFi. Instead, the strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a lawsuit (for

which Winston Strawn helped Neugebauer try to secure creditor support, litigation financing, and media attention) alleging a grand RICO conspiracy against approximately 30 proposed defendants, which include some of the country's most successful and influential business leaders, such as Ken Griffin's Citadel, LLC; Vivek Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson; Nick Ayers; and more (the proposed lawsuit even suggesting that Donald Trump, Jr. was somehow involved in the so-called "conspiracy" and stating "the Trump name was toxic with Wall Street" in 2022).

9. In publicly available marketing materials, Winston Strawn prominently lists Ken Griffin's Citadel as one of Winston Strawn's clients. Publicly available materials show that Winston Strawn also represented Jeff Sprecher's Intercontinental Exchange (ICE). Unbelievably, to appease Neugebauer, Winston Strawn publicly supported Neugebauer's plan to file a fantastical RICO conspiracy lawsuit ***against Winston Strawn's own clients***.[2] Winston Strawn even (i) attempted to help Neugebauer secure litigation financing to pursue the so-called "RICO conspiracy" against Winston Strawn's current and/or former clients and solicit creditor support of the proposed lawsuit, and (ii) spoke to Forbes magazine at Neugebauer's request regarding the accusations.

10. Moreover, in a clear breach of Winston Strawn's duty of confidentiality, Winston Strawn willingly and intentionally provided privileged information that belongs to the Estate – without alerting, much less obtaining approval from, the Trustee – to the lawyer representing Neugebauer to use against the Trustee and the Estate. Winston Strawn made this completely inappropriate disclosure of privileged information after the Trustee's lawyers made a simple, obvious request: that Neugebauer provide evidence supporting the fantastical RICO conspiracy

[2] Or affiliated entities of such clients.

claims, which Winston Strawn signed off on ***against Winston Strawn's own clients***. In response, Neugebauer's lawyer (to whom Winston Strawn wrongfully disclosed privileged information) wrote: "*They can't be serious*."

11. Neugebauer forwarded this e-mail exchange to Blankenship with the message, "*these guys are disgusting*," to which Blankenship responded: "*Yup. Happy to chat*." Winston Strawn's breach of its sacrosanct duty of confidentiality to Winston Strawn's client (GloriFi) is inexcusable and caused the Estate to suffer substantial harm.

12. Why would Winston Strawn go to these lengths? The answer is obvious: it was a cover up. Winston Strawn wanted to cover up the Firm's misdeeds and escape liability. If the Neugebauer chapter 11 conversion plan succeeded, Winston Strawn knew the stunning facts set forth herein (and Winston Strawn's breaches of the fiduciary obligations the Firm owed GloriFi) would be swept under the rug. Specifically, Winston Strawn knew Neugebauer gaining control of the Estate would result in the Firm's wrongdoing never coming to light and this lawsuit – which ***seeks <u>$1.7 billion</u> in lost enterprise value from Winston Strawn*** – never being filed. Moreover, as discussed further below, Winston Strawn choosing Neugebauer over the Firm's actual client (GloriFi) was also a *quid pro quo* for Neugebauer referring Winston Strawn (specifically, Defendant Blankenship) to Neugebauer's wealthy oil and gas tycoon friends in West Texas.

13. Winston Strawn and Blankenship were apparently willing to sell Winston Strawn's other prominent clients – like Ken Griffin and Jeff Sprecher – down the river (specifically by Winston Strawn supporting Neugebauer's plan to file a fantastical RICO conspiracy lawsuit against the Firm's other clients and trying to help Neugebauer secure creditor support, media attention, and litigation financing for the proposed lawsuit and/or accusations therein) in an effort to effectuate the desired "cover up" for Winston Strawn and more business generation and fee

credits for Blankenship. The acts taken by Winston Strawn to assist Neugebauer in harming and destroying Winston Strawn's actual client (GloriFi) are truly astonishing.

14. In this lawsuit, the Trustee asserts the following claims: (1) negligence (legal malpractice) against all Defendants; (2) aiding and abetting Neugebauer in his breaches of fiduciary duty (against all Defendants); and (3) various fraudulent transfer and disallowance claims against Winston Strawn.

## II.
## JURISDICTION AND VENUE

15. On February 8, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

16. The Trustee is the duly appointed chapter 7 trustee of the Estate.

17. The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

18. Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of final orders and judgment.

19. Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.
## THE PARTIES

20. The Trustee is the chapter 7 trustee of the Estate and files this Complaint in such capacity.

21. Defendant Winston & Strawn LLP is a law firm registered as a Delaware limited liability partnership. Since 2011, Winston Strawn has had an office in Houston, Texas, located at

800 Capitol Street, Suite 400, which presently has approximately 60 attorneys. Since 2017, Winston Strawn has had an office in Dallas, Texas, located at 2121 N. Pearl Street, Suite 900, which presently has approximately 95 attorneys. Pursuant to Fed. R. Bank. P. 7004(b), Winston Strawn may be served with process in this Adversary Proceeding by and through its registered agent as follows: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

22. Upon information and belief, Defendant Michael Blankenship is a resident of the State of Texas. Pursuant to Fed. R. Bankr. P. 7004(b), Blankenship may be served with process in this Adversary Proceeding anywhere he may be found, including at his business address: 800 Capitol Street, Suite 2400, Houston, Texas 77002.

## IV.
## THE FACTS

***Winston Strawn was retained by GloriFi and, thus, was supposed to protect GloriFi's interests – that did not happen.***

23. Winston Strawn was retained by GloriFi (***not*** Toby Neugebauer) for the purpose of guiding GloriFi (***not*** Toby Neugebauer) through a de-SPAC transaction that would have taken GloriFi public at a valuation of approximately ***$1.7 billion***. Winston Strawn (either intentionally or negligently) completely lost sight of its mission and the reason the Firm was hired. As evidenced by the facts outlined herein, rather than providing GloriFi the legal expertise needed to capitalize on and close the de-SPAC transaction, Winston Strawn's goal was clear: do Neugebauer's bidding and protect his personal interests irrespective of whether that harmed, or even destroyed, Winston Strawn's actual client – GloriFi.

24. On December 29, 2021, Blankenship (the current managing partner of Winston Strawn's Houston office and current member of Winston Strawn's executive committee) sent an e-mail to the "Winston A-Team":

> *"Winston A-Team, we have been hired to help a new target in a de-SPAC deal. The target is backed by the co-founder of Quantum Energy Partners [Toby Neugebauer], the CEO of NYSE [Jeffrey Sprecher], and founder of PayPal [Peter Thiel]. They are all actively involved. The company is a FinTech company that will rival SoFi, Lemonade and other comparables over the coming years. The company is working with a few SPACs on potential de-SPAC deals. They would like to begin work on an S-4 right away (i.e., Monday)."*

25. Blankenship sent a follow-up e-mail to the same group, expressing excitement regarding the engagement and Winston Strawn's desire to secure future work through Neugebauer:

> *"They chose us over Kirkland. As background, Wachtell does their insurance stuff, Jackson Walker did all corporate stuff and Chapman did employment stuff.* ***They are looking to consolidate to us after the deal is done****. I mentioned our great team and he was quick to make sure it was the A team. I reassured him (Toby) that we are the A-team . . . . The company is called GloriFi (legal name is With Purpose Inc.) . . . ."*

26. The very first paragraph of Winston Strawn's engagement letter with GloriFi, which is dated December 30, 2021, and signed by J. Tyler McGaughey on behalf of Winston Strawn and Toby Neugebauer on behalf of GloriFi, states:

> *"<u>Nature of Engagement</u>: As we discussed, for all matters which you may, from time to time, request our assistance,* ***the firm's client will be GloriFi <u>and not</u> any director, officer or employee*** *of GloriFi.* ***The scope of our engagement will be to represent GloriFi in connection with a de-SPAC transaction****. We have agreed that our present engagement is limited to performance of services related to this matter and other various matters which you may from time to time request our assistance."*

27. Winston Strawn owed GloriFi various fiduciary duties, including but not limited to the duties of loyalty, good faith, prudence, candor, and confidentiality. But scores of e-mails between Winston Strawn lawyers and Neugebauer reveal that Winston Strawn's loyalty lied with Neugebauer, ***not*** GloriFi, and Winston Strawn continually betrayed the fiduciary duties the Firm owed GloriFi in favor of furthering Neugebauer's self-dealing agenda.

28. This conflict of interest severely tainted Winston Strawn's representation of GloriFi – specifically with respect to Winston Strawn's failure to ***ever*** (much less adequately) advise GloriFi that Neugebauer's self-dealing (and other bad acts of which Winston Strawn was acutely

aware) may prevent GloriFi from closing the de-SPAC transaction, which is exactly what happened. Instead, Winston Strawn actively participated and aided/abetted Neugebauer in breaching the fiduciary duties he owed GloriFi.

---

***Winston Strawn orchestrated and executed various schemes designed to benefit Neugebauer and harm GloriFi.***

---

29. Winston Strawn was heavily involved and instrumental in serious wrongdoing that occurred in late March and into April 2022, which was perhaps the most critical time in GloriFi's history and culminated in (i) GloriFi not closing the proposed de-SPAC transaction on the table and going public at a valuation of $1.7 billion, and (ii) GloriFi's ultimate demise. Specifically, as further discussed below, Winston Strawn assisted Neugebauer (in furtherance of his personal interests and to the extreme detriment of GloriFi) in the development and execution of a scheme to (i) remove independent directors who stood in the way of Neugebauer's self-dealing; (ii) stack GloriFi's Board with Neugebauer's long-time friends and business partners, who would rubberstamp whatever Neugebauer wanted; and (iii) amend GloriFi's governing documents to force through Neugebauer's self-interested transactions.

30. Rather than fulfilling the Firm's fiduciary obligations by protecting, and advocating for, the interests of GloriFi (the Firm's client), Winston Strawn sought to please Neugebauer – an alleged billionaire whom Winston Strawn (and, particularly, Blankenship) clearly viewed as a cash cow for current and future billings and perks (*e.g.*, Neugebauer hosting Blankenship and his family at Neugebauer's multi-million-dollar vacation home in Aspen). At every turn, Winston Strawn conceded to, and assisted Neugebauer in, his unrelenting desire to engage in rampant self-dealing and helped Neugebauer run roughshod over GloriFi and its many other stakeholders. The

following is a summary of facts evidencing Winston Strawn's negligence and breaches of its fiduciary duties in late March and April 2022 alone.

***Winston Strawn's malfeasance in March and April 2022.***

31. In late March 2022, GloriFi was on the precipice of (i) completing the de-SPAC transaction for which Winston Strawn was retained to advise the Company, and (ii) going public at a valuation of approximately $1.7 billion. GloriFi had the support of some of the most successful, wealthy, and well-known investors in the country. But GloriFi needed another round of funding to satisfy the financial requirements of the de-SPAC transaction and go public.

32. Rather than fulfilling his fiduciary obligations to GloriFi and doing what was needed to take the Company public (*e.g.*, implementing standard corporate governance expected of a public company operating in a highly regulated industry and considering arms-length funding options to secure the financing needed to complete the de-SPAC, which are basic items Winston Strawn *should* have been advising GloriFi to do), Neugebauer set into motion a self-dealing scheme to improve his economic position (to the detriment of GloriFi's many other stakeholders) and put a stranglehold on his control over the Company. Unfortunately, rather than protecting the best interests of GloriFi (*i.e.,* the Firm's client), Winston Strawn consistently worked to appease Neugebauer (which was a proximate cause of GloriFi's untimely and unnecessary demise).

33. On March 27, 2022, Neugebauer sent an e-mail to Blankenship with copy to Keri Findley (who, along with Nick Ayers and Neugebauer, constituted the three members of GloriFi's Board of Directors at the time) saying:

> *"Ok guys go pray hard and come to house . . . I am going to put in 10mm of super senior convertible note at the 750 valuation if I can get Ken [Griffin] to join . . . reaching out to Ken directly . . . Mike can you make it super senior and secured by animo services [GloriFi subsidiary] stock"*

34. Blankenship immediately circulated Neugebauer's e-mail internally – to Ryan Hunsaker ("Hunsaker") and Ben Smolij ("Smolij") at Winston Strawn:

> *"Ryan, can you please help with the request below? I am going to be traveling and out of office (trying a vacation). I will rope you and Ben into the email.* ***Note, don't they need consent for him to do so?****"*

35. Findley responded to Neugebauer: "*I believe that is at odds w the side letter and we need shareholder approval.*"

36. Hunsaker at Winston Strawn responded to Blankenship:

> *"Yep I'll figure it out – also don't know what super senior is. I'll look at side letters this afternoon re consent but see someone already pointed that out."*

37. Winston Strawn's internal e-mails show the Firm ***knew*** Neugebauer (despite being GloriFi's majority shareholder, CEO, and Chairman of the Company's Board) should not be allowed (much less supported) to simply do whatever he pleased. Instead, Winston Strawn ***knew*** Neugebauer needed to obtain approval from the disinterested/independent Board members (*i.e.*, Ayers and Findley) and consent from the Company's shareholders and the Company's major Series 1 noteholders who held certain side letter rights before Neugebauer could consummate the proposed, self-interested transaction between GloriFi and himself.

38. Winston Strawn and Blankenship hold themselves out to have subject matter expertise in related-party transactions. In fact, Blankenship is one of the editors in Winston Strawn's "Related-Party Transactions Guide – 2024,"[3] which includes a section entitled "Conflict of Interest Management" and advises:

---

[3] https://www.winston.com/a/web/5ZXTuUYKHnT6WxK4uPpCB/pubco_related-party-transactions-guide-2024_oct2024.pdf

> *"Managing conflicts of interest is crucial in maintaining the integrity of related-party transactions. Conflicts of interest can arise when individuals involved in the transaction have personal or financial interests that could influence their decision-making. This can lead to biased decisions that are not in the best interest of the company or its shareholders."*

39. If only Winston Strawn and Blankenship practiced what they preached when presented with the clear conflict of interest resulting from the pressure play Neugebauer initiated against the independent directors and side letter noteholders as part of his incessant efforts to force through his self-dealing. But that was not the case. Instead of complying with their own guidance (in an area the Firm claims to have subject matter expertise), Winston Strawn actively participated and assisted Neugebauer in his self-dealing campaign, which resulted in extreme harm to GloriFi (specifically, the loss of investor confidence and resulting inability to close the de-SPAC transaction at the approximate $1.7 billion valuation, or any valuation, and sending the Company spiraling into chapter 7 bankruptcy). Winston Strawn identified and recognized many of the same red lights about which Winston Strawn warns in the Firm's "Related-Party Transactions Guide" but blew right past them to help Neugebauer.

40. When presented with Neugebauer's related-party transaction, Hunsaker wrote in a Winston Strawn internal e-mail, "*my recollection is you can't do debt senior to series 1 without their consent*," to which Blankenship replied, "*agreed especially super, super* ***secret*** *senior*." Winston Strawn ***knew*** Neugebauer wanted to conceal the "super senior" self-interested note from GloriFi's other stakeholders because it directly conflicted with prior representations made by Neugebauer in securing their investment. Undeterred, and making his intentions abundantly clear, Neugebauer responded, "*it has to be super senior*."

41. As part of his pressure play, Neugebauer instructed Winston Strawn that the Asset Purchase and Assumption Agreement and Marketing Agreement – self-interested transactions that would have resulted in transferring the Company's "tech stack" (the asset Neugebauer repeatedly

represented to GloriFi's investors was worth hundreds of millions of dollars and would serve as the security and downside protection for their investment) to a separate entity wholly owned and/or controlled by Neugebauer and his family – must be sent to the Board because, according to Neugebauer, immediately approving the self-interested transactions was "life or death" for GloriFi. In a telling e-mail from Neugebauer (making clear his self-interested intentions), Neugebauer informed Blankenship, Hunsaker, and others:

> *"I knew this was coming and frankly* ***I want for myself*** *. . . highly confidentially Chris Gaertner [principal of DHC Acquisition Corp. – the de-SPAC partner] has a person he has worked with for 25 years . . . he is a player at 50 [million] . . .* ***I do not want this discussed with anyone that is not on this email*** *. . . But he and I and anyone else is going to want a security interest in tech stack . . . Let's incorporate as I will need to get investor approval in the am . . . as we are down to last 5 mm as projected."*

42. Winston Strawn partner Chris Ferazzi ("Ferazzi") immediately recognized the self-interested nature of Neugebauer's plan and identified various steps Winston Strawn ***should*** have taken:

> *"While probably not a huge deal, you would normally have Toby abstain from voting given that Toby (or his affiliate) is the maker of the note. However, this would require you to obtain board approval in the form of minutes instead of a consent since board consents need to be unanimous. Regardless of whether we ultimately do this by written consent or minutes, while it is obvious the recitals should acknowledge Toby's conflict of interest in the transaction given he or his affiliate is maker of the note and that the disinterested board members determined that the terms of the note are fair and comparable to terms it would agree to with an independent third party."*

43. Instead of following the steps Ferazzi identified, Winston Strawn proceeded to help Neugebauer push through his self-dealing through unrelenting threats and pressure campaigns (*e.g.*, threats of litigation, removal from the Board if the disinterested directors did not approve Neugebauer's self-interested transaction, and that the Company would be forced into bankruptcy if noteholders did not consent).

44. In "negotiating" the terms of Neugebauer's self-dealing note with GloriFi, Winston Strawn was ***supposed*** to be representing the Company's interests. Rather than pushing back in any material way in that "negotiation," Winston Strawn went out of its way to make the terms more favorable to Neugebauer.

45. For example, Hunsaker suggested New York for the choice of law provision in the self-interested note to provide Neugebauer the opportunity to charge Winston Strawn's own client (GloriFi) the highest interest rate possible without violating state usury laws.

46. On March 29, 2022, Hunsaker sent an e-mail to Ferazzi saying "it doesn't matter . . . to me" whether GloriFi would be pledging only the equity in its subsidiaries or granting security in all assets of the subsidiaries with a subsidiary guarantee – whatever Neugebauer wanted.

47. Incredibly, Winston Strawn avoided involving the disinterested directors (Ayers and Findley) on these "negotiations" and, instead, took direction from Neugebauer (*i.e.*, the self-interested director and other party to the transaction – **whom Winston Strawn recognized in writing should have abstained and removed himself from the process**). Winston Strawn's lack of inclusion of Ayers and Findley on these company-critical negotiations, especially given the insider nature of the proposed transactions, is startling and constitutes another breach of the fiduciary obligations the Firm owed GloriFi and the applicable standard of care.

48. During late March 2022, Winston Strawn was preparing to carry out Neugebauer's plan to pressure and force shareholders, Series 1 side letter holders, and disinterested directors into approving Neugebauer's self-dealing. On March 30, Ferazzi identified several issues with the scheme:

> *"My only observation is it is very odd that the stockholders meeting is being held before the board meeting to approve the transaction. As a stockholder, I would want to know that the disinterested directors approved the transaction and have determined it in the best interest of the company. Also, it may be hard for the stockholders to take action if Toby abstains—do the other stockholders represent a majority of the voting shares—or are the Toby affiliated stockholders planning on voting on the proposal. I would normally see in situations like this that the disinterested board approve the transaction and potentially require the transaction be approved by a majority vote of the disinterested stockholders in an effort to provide the transaction and Toby maximum protection. Has Chapman weighed in on this and instructed Toby to abstain from all voting?"*

49. Notwithstanding the issues identified by Ferazzi, Winston Strawn proceeded to oversee a Board meeting wherein Neugebauer made overt threats of litigation against the disinterested directors, said he was going to abstain from voting, proceeded to call the vote, and then voted in favor of his self-dealing. And Winston Strawn did nothing to protect its client's interest. Winston Strawn ***knew*** Neugebauer was using the Firm as a pawn to defraud shareholders and the disinterested directors – and Winston Strawn knowingly and actively participated in same.

50. On March 30, 2022, Findley wrote to Blankenship:

> *"Mike, Toby is under the impression that you and I talked this morning and you told me that the legal analysis of the marketing agreement and asset purchase agreement came in clear of conflicts or issues. Obviously, unless something happened without my knowledge, that call did not happen. Can you please explain to me what you had told him? I'm obviously available anytime."*

51. Blankenship responded to Findley:

> *"Agreed. Clearly a misunderstanding here. That is not what I told him. I told him we were preparing a legal analysis. Didn't mention conflicts on my call."*

52. Perhaps, if Neugebauer's misrepresentations regarding the Firm only happened once, Winston Strawn may have believed Neugebauer was honestly mistaken. But that was not the case. With respect to the very legal analysis Blankenship referenced in his e-mail to Findley (which Neugebauer repeatedly tried to stonewall the disinterested directors from receiving), Ayers sent Blankenship the following e-mail:

> *"Mike – Toby just called and said that you told him today that I was wrong to ask for a memo to the board and that I was making a mountain out of a molehill to ask you all to provide a legal briefing to the board explaining the marketing agreement. Because Toby is on both sides of this transaction we are trying to protect both he and the company from conflicts of interest. If it is Winston's opinion that the board should consider this matter without legal guidance please let me know. If I have bad information also please advise so we can address this issue . . . . I have copied Keri Findley and not copied Toby as he has recused himself from this matter – though he continues to call us and demand we approve it."*

53. Blankenship responded to Ayers:

> *"For the record, I did not communicate or state that to Toby. I simply responded to him that we were providing you guidance without making a determination as to what you all should do with respect to the information. You certainly should have legal guidance and we often support board members by educating them on various legal matters. I agree with the steps here and that you all should be fully informed and take the time to be so informed. We certainly will do that on our end and I expect the company would provide you with market information about the transaction. I am happy to discuss tomorrow."*

54. In addition to the disinterested directors, Winston Strawn ***knew*** Neugebauer was making various misrepresentations to shareholders in connection with Neugebauer's efforts to force through his self-dealing. For example, on March 30, 2022, law firm Chapman Cutler stated to Ferazzi:

> *"Chris [Ferazzi] – unless Toby chimes in otherwise, I am told that the warrants are only nixed if the company prepays the note in the first 30 days. If the note is still outstanding after 30 days, then the warrants are required."*

55. In response, Ferrazzi sent the following internal e-mail to Blankenship, Hunsaker, and other Winston Strawn lawyers: "*Guys, is that how you understood Toby's discussion during the shareholder call??*" Hunsaker responded: "*Not at all, he said they were not included at all and it was dropped.*" But Winston Strawn was unfazed by Neugebauer's misrepresentations (made for the purpose of trying to push through his self-interested note) to shareholders and continued actively participating and aiding and abetting Neugebauer in his self-dealing (undeterred by whether Neugebauer's knowing misrepresentations may rise to the level of securities fraud).

56. Specifically, Winston Strawn began sending out consents designed to approve Neugebauer's self-dealing. After Winston Strawn did Neugebauer's bidding and sent out the consents, Ayers sent Blankenship the following (after receiving the consent via DocuSign from Winston Strawn):

> *"FYI…Did you all [Winston Strawn] approve how this DocuSign waiver was marketed in this presentation? The presentation makes it sound like 30mm into the DHC deal which shareholders were briefed on Sunday night and Toby told them he was putting in the first 10mm…But the DocuSign is not that term sheet—it is Toby's which two of our investors have strongly opposed through Keri Findley and threatened legal action….Are our conversations privileged….Are they private? How do we report suspected fraud, threats, and harassment when the HR director who was cataloging them was threatened and fired….What are my obligations as a board member when the CEO and majority shareholder are lying to and misleading the board while threatening and disparaging them if we do not do what he wants."*

57. After receiving such a concerning e-mail, Winston Strawn (*i.e.*, Company counsel) should have taken that e-mail very seriously and initiated immediate steps to make certain the process involving Neugebauer's self-interested transaction (the very topic on which Winston Strawn and Blankenship authored the Firm's "Related-Party Transactions Guide") was handled appropriately to ensure shareholders and noteholders were not being defrauded. But Winston Strawn took a much different approach.

58. Incredibly, Winston Strawn proceeded to help Neugebauer (i) remove Ayers and Findley from the Board (thus removing any roadblocks to Neugebauer engaging in unfettered self-dealing), and (ii) stack the Board with Neugebauer's long-time friends and business partners who would rubberstamp whatever Neugebauer desired. In sum, to aid and abet Neugebauer in his self-dealing, Winston Strawn was intentionally violating its client's best interest: helping the Company go public through the proposed de-SPAC transaction, which is what Winston Strawn was retained and paid by GloriFi to do – ***not*** look out for Neugebauer's self-interests.

59. Before Winston Strawn helped Neugebauer remove Findley from the Board, she expressed serious concerns (and copied Winston Strawn):

> *"Toby, you have a term sheet from DHC that you won't show me. You said you would put in the first 10mm of the capital for DHCs termsheet on the call with ALL your investors Sunday. Put in the 10mm you said you would and let DHC come w the rest over the next 30 days. This is the only option you have and you promised your investors you would do it. I can't understand what is going on here."*

60. In response to Neugebauer's threat to put the Company into bankruptcy if his self-interested transaction was not immediately approved (a threat Neugebauer made on multiple occasions and often copying Winston Strawn on same), Findley wrote (again copying Blankenship on her concerns):

> *"Toby, if you file the [convertible note] holders get the tech stack from my understanding of the docs. You will not keep anything. Again, you have a term sheet from DHC that you won't show me. You said you would put in the first 10mm of the capital for DHCs term sheet on the call with ALL of your investors Sunday. Put in the 10mm you said you would and let DHC come w the rest over the next 30 days. This is the only option you have and you promised your investors you would do it."*

61. While Winston Strawn's client was in a crisis (and at risk of losing investor support and the opportunity to complete the de-SPAC transaction at the $1.7 billion valuation, which is exactly what ultimately happened) due, in large part, to the majority shareholder's incessant self-dealing (which Winston Strawn actively participated in and aided/abetted), Winston Strawn joked and laughed about a decisively not "humorous" situation. For example, Winston Strawn partner Jordan Klein wrote to Hunsaker:

> *"How do I get off of this ride 😂"*

62. Unfortunately, for GloriFi, the rollercoaster "ride" was headed off the rails and into chapter 7 bankruptcy due, in large part, to Winston Strawn's conflicted/negligent representation and multiple breaches of the fiduciary duties Winston Strawn owed GloriFi.

63. On March 31, 2022, Winston Strawn again recognized, in writing, the need to disclose and handle Neugebauer's various conflicts in the self-interested transaction. Specifically, Ferazzi wrote to Blakenship, Hunsaker, and various others at the Firm:

> *"In light of the situation, we need to take a fresh look at these and certainly disclose the conflicts as it relates to Toby with respect to the APA and marketing agreement similar to the credit facility. I would also like to disclose his conflicts more specifically, including his role as a director (or equivalent position, e.g., manager of an LLC), whether he or his affiliates/relatives (e.g., wife or kids) control the board, any officer position in which he and his relatives serve in the counterparty, and that he or his affiliates/relatives are controlling equity owners of the counterparty."*

64. Instead, Winston Strawn focused on aiding and abetting Neugebauer to remove the disinterested directors. Winston Strawn did so even though Neugebauer forwarded an e-mail from another law firm to the entire Company, advising:

> *"Toby – I haven't had a chance to circle up with Michael yet, but my strong view is that having the stockholders (without you) remove/replace board members in order to approve the note is highly likely to lead to a lawsuit."*

65. In response, Blankenship simply wrote to Ferazzi and Smolij:

> *"Mess."*

66. It certainly was a mess, and one largely caused by Winston Strawn's (i) unwillingness to protect GloriFi's interests, and (ii) unwavering commitment to further Neugebauer's self-dealing and personal self-interests. Winston Strawn did nothing to fix this "mess." Winston Strawn instead added fuel to the fire by intentionally fanning the flames of the conflict.

67. After Neugebauer made clear to Winston Strawn that his plan was to remove Findley from the Board to push through his self-dealing, Ferazzi wrote internally:

> *"I assume we do not do anything with this information, but lay low."*

68. While doing nothing as Company counsel wasn't the answer, doing nothing may have been better than what Winston Strawn did.

69. Winston Strawn jumped right into the middle of the conflict, attempting to protect and further the interests of Neugebauer (to the detriment of GloriFi), of course. Winston Strawn helped Neugebauer respond to counsel retained by Ayers and counsel retained by various noteholders when Neugebauer (with Winston Strawn's active participation) initiated step 2 of the scheme to stack the Board and defraud the noteholders – *i.e.*, removing Ayers (just like Neugebauer and Winston Strawn did days prior with respect to Findley).

70. In deciding how to respond to counsel for the noteholders, Blankenship sought counsel from Winston Strawn partner Matthew DiRisio ("DiRisio") who advised:

> *"Mike, one other thought: you may also want to clarify that we're company counsel (not "board counsel"). It may often be a distinction without a practical difference but it can be important for independence/privilege purposes."*

71. This certainly would have been an important disclosure to make. DiRisio's concern shows Winston Strawn was scrambling to justify its past failures to put GloriFi's interests ahead of Neugebauer's interest. But it was too little and far too late. Winston Strawn's conflicted representation (caused by disregarding – or intentionally betraying – who Winston Strawn was and/or was not representing) had already caused GloriFi to suffer severe harm (through the loss of investor confidence resulting in GloriFi's inability to secure the funding needed to close the de-SPAC transaction). In fact, DiRisio later recognized: *"We need to clarify who the firm represents and where the lines are drawn in terms of taking instruction, becoming adverse, etc."*

72. But it was clear where Winston Strawn drew the line. Winston Strawn would protect Neugebauer's self-interests at all costs, and irrespective of whether those self-interests were adverse to GloriFi. DiRisio even recognized Winston Strawn's responses to counsel for Ayers and counsel for the noteholders would likely "*be part of the litigation record*" and advised against

Blankenship's incredible statement that Winston Strawn needed to initiate a "***bulldog attack***" on behalf of Neugebauer against Ayers and the Company's noteholders.

73. Winston Strawn partner Jeffrey Steinfeld ("Steinfeld") chimed in saying:

> *"We should also consider that Nick, up until at least the 5th was a director of the company, and had a fiduciary duty in evaluating various alternatives. In that role he will likely be seen as exercising those duties to the extent he was questioning or asking for information on the SPAC transaction . . . . I don't see much in the [sic] his letters that would be evidence of interference."*

74. DiRisio provided further guidance against Blankenship's proposed "bulldog attack":

> *"I would strongly counsel against an aggressive response here (from any party) unless there are facts about Nick I don't know . . . . Otherwise, on this record, anything but a measured, factual, non-defensive response **will lead with our chin**."*
>
> *[. . .]*
>
> *"More importantly, if Toby's counsel wants to send a letter like that, it's ultimately up to him – I don't think it will help Toby in a fiduciary duty case (I think it will likely hurt his defense), but that shouldn't be our call. Regardless, the <u>**company**</u> shouldn't be seen as attacking a director who's raising concerns about a major transaction . . . ."*

75. Steinfeld further stated that Blankenship's proposed approach would not be productive "***other than potentially <u>appeasing</u> <u>Toby</u>.***" Incredibly, Blankenship and Winston Strawn ignored the foregoing and implemented the "bulldog attack" approach to "appease" Neugebauer, and – as DiRisio said – led with Winston Strawn's chin.

76. On April 8, Steinfeld stated that Winston Strawn does not want "*to look like we are doing the bidding of the controller.*" But it was impossible to create the façade Steinfeld wanted (in an effort to shield Winston Strawn from liability), because "doing the bidding" of Neugebauer is exactly what Winston Strawn intentionally did throughout the entirety of the conflicted representation. And it was a proximate cause in GloriFi – once valued at approximately <u>***$1.7 billion***</u> – currently languishing in chapter 7 bankruptcy.

77. Around that very same time, Winston Strawn was receiving letters from Kirkland & Ellis on behalf of various Series 1 investors raising concerns related to the self-dealing schemes and actions of Neugebauer (*i.e.*, the very schemes in which Winston Strawn was actively participating and aiding and abetting Neugebauer in carrying out). Specifically, on April 12, Kirkland & Ellis stated:

> *"The Offer caps several weeks in which the CEO, director and controlling shareholder [Neugebauer] and the directors he recently appointed [Hamilton and Norwood] have demonstrated an unwillingness to conduct Company business in a manner consistent with contractual obligations, Delaware law, Federal and state securities law, and other applicable laws. Each Client reserves all rights with respect to these directors.*
>
> *Self-interested, impudent and imprudent governance not only undermines the Company's ability to finance the Company's business plan, but also undermines the investment thesis behind the Company's creation.* ***The Company has a governance crises which is causing a financing crises****. For example, investors were excited to participate in the third-party arm's length financing proposal touted by the CEO [Neugebauer] on March 27th, but then a series of self-interested transactions have been offered instead.*
>
> *The Board has two choices: either (1) obtain the controlling shareholder's consent to establish and abide by a market-based and ethical governance structure in which he does not retain unilateral power to direct the Company (thereby opening the door to financing from third-parties and from existing investors), or (2) "approve" bad-faith, unlawful self-interested transactions in which the existing controlling shareholder funds and directs the Company according to whim (thereby cutting off access to financing from third parties and existing investors), risking personal liability for each Board member from the damages that accumulate."*

78. Thus, Winston Strawn ***knew*** existing investors were ready, willing, and able to provide the funding needed to close the de-SPAC transaction, which Winston Strawn was retained to help GloriFi close so long as GloriFi: established and abided by a market-based and ethical governance structure in which Neugebauer did not retain unilateral power to direct GloriFi (*i.e.*, the exact things Winston Strawn *should* have been advising GloriFi to implement in preparation for closing the de-SPAC and going public). But Winston Strawn chose "Option 2." Now, Winston

Strawn faces, and must be held accountable for, the liability for substantial damages that resulted, and **about which Winston Strawn was expressly warned**.

***Winston Strawn's post-April 2022 malfeasance.***

79. Winston Strawn's malfeasance was not restricted to late March and April 2022. For example, beginning around September of 2022 (when the writing was on the wall for GloriFi's eventual failure), Winston Strawn, as counsel to GloriFi, was responsible for the preparation and circulation of GloriFi's *Secured Convertible Promissory Notes* (the "Series 2 Notes"), which were targeted for closing by September 30, 2022. However, the Series 2 Notes suffered from a major deficiency – namely that the majority of the Series 2 Notes (note numbers CN2-1 through CN2-20), which indicate a date of issuance prior to October of 2022, were backdated from the date of execution. But the Series 2 Notes do not reflect they were backdated (which appears to have been intentional). The sole exception to the backdating is note number CN2-18 dated September 8, which was executed for the benefit of Animo Bancorp, a company wholly owned by Neugebauer and his wife and which provided no capital to GloriFi in exchange for the note. All of the Series 2 Notes were tied to the *Guarantee and Collateral Agreement* (the "GCA") and *Collateral Agency Agreement* (the "CAA"), which securitized the Series 2 Notes with GloriFi's assets and granted authority to a collateral agent to protect that security interest. Winston Strawn also assisted in drafting and circulating for signature both the GCA and CAA.

80. All the Series 2 Notes numbered CN2-1 through CN2-17 and CN2-19 through CN2-20 reflect an issuance date ***prior*** to the day each note was individually signed. Rather, the Series 2 Notes were not actually signed until October of 2022. Moreover, the GCA and CAA are each dated September 30, 2022, but the GCA and CAA were not fully executed until, at the earliest,

October 13. To make matters worse, much of the funding for the Series 2 Notes came from insiders of GloriFi. This intentional backdating evidences Neugebauer's (and other insiders) scramble attempt to securitize the remaining assets as the ship was sinking to the benefit of such insiders and control persons, to which Winston Strawn not only offered no push back, but were the legal architects in carrying out the scheme.

81. These actions by Winston Strawn were designed to benefit Neugebauer and other insiders – ***not GloriFi***. In fact, Winston Strawn's actions with respect to the Series 2 Notes caused GloriFi to suffer significant financial harm – which includes, at minimum, the substantial legal fees incurred by the Estate in relation to the adversary proceeding involving the Series 2 Notes that the Estate would not have incurred but for Winston Strawn's actions – as its own counsel assisted Neugebauer in another self-dealing ploy to elevate Neugebauer's economic position above those of other creditors when Winston Strawn ***knew*** GloriFi was headed to bankruptcy.

***Winston Strawn assists Neugebauer in "abusing the bankruptcy process" and publicly supports the pursuit of a fanciful RICO conspiracy lawsuit against Winston Strawn's own clients.***

82. Winston Strawn's undying allegiance to Neugebauer even continued throughout GloriFi's bankruptcy proceeding. Winston Strawn signed the Restructuring Support Agreement ("RSA") in support of the Motion to Convert the GloriFi bankruptcy proceeding to chapter 11; that filing was at Neugebauer's direction over 17 months into the case. Blankenship signed the RSA on behalf of Winston Strawn.

83. Blankenship appears to have signed the RSA in July 2024 while vacationing at Neugebauer's multi-million-dollar home in Aspen. What is even more troubling, though, is that Winston Strawn either participated in, or knowingly allowed, Neugebauer's use of the Firm as

Neugebauer's pawn (i) to solicit creditor support for the "Neugebauer chapter 11 conversion plan," and (ii) did so through various misrepresentations to creditors.[4]

84. These very schemes and tactics, and others it appears Winston Strawn supported and/or assisted Neugebauer in employing, were found by the Bankruptcy Court, in an opinion in the GloriFi bankruptcy proceeding, to constitute an "abuse" of the bankruptcy process. Moreover, the Bankruptcy Court found that "there are a multitude of conflicts of interests that exist in this case, which the Court finds very concerning."

85. By signing the RSA, Winston Strawn affirmed, in a public filing made in the Bankruptcy Court, that Winston Strawn supported the proposed "Neugebauer chapter 11 conversion plan." But the plan did not propose the restructuring of any business for GloriFi. Instead, the strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a fantastical lawsuit alleging a RICO conspiracy against approximately 30 proposed defendants, which include some of the most successful and influential business leaders in the country – *e.g.*, Ken Griffin and his company Citadel, LLC; Vivek Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson; Nick Ayers; Keri Findley; and more.

86. In other words, Winston Strawn publicly supported the filing of RICO conspiracy claims against at least one of the Firm's own clients, Citadel, LLC, and the principal of one of the Firm's other clients (Jeff Sprecher of ICE).[5]

---

[4] During his deposition in the GloriFi bankruptcy proceeding, Blankenship indicated that numerous statements Neugebauer made to creditors, in relation to Winston Strawn and in an effort to solicit support for the "Neugebauer chapter 11 conversion plan" from such creditors, were untrue. But it appears neither Blankenship nor Winston Strawn made any effort to correct the false statements made by Neugebauer in soliciting creditor support.

[5] Winston Strawn's publicly available marketing materials prominently lists Citadel as one of the Firm's "Representative Clients."

87. It gets worse. Neugebauer testified that ***Winston Strawn helped Neugebauer in his efforts to prepare the proposed RICO conspiracy complaint against Winston Strawn's client (Citadel) and others.*** Specifically, Neugebauer testified (and Blankenship confirmed) that Blankenship reviewed, at least portions, of the draft RICO conspiracy complaint (*i.e.*, the managing partner of Winston Strawn's Houston office and current member of the Firm's Executive Committee willingly provided assistance to Neugebauer in his preparation of the fantastical RICO conspiracy lawsuit). Moreover, based on prior testimony, it appears Blankenship – on behalf of Winston Strawn – (i) attempted to help Neugebauer secure litigation financing to pursue the fantastical RICO claims against Winston Strawn's current and/or former clients, and (ii) spoke to Forbes magazine at Neugebauer's request regarding the accusations. The actions Winston Strawn took behind the scenes in the GloriFi bankruptcy proceeding – to further Neugebauer's self-interests to the extreme detriment of the Debtor (which, unfortunately, is per Winston Strawn's norm in connection with this badly conflicted representation) – is hard to fathom.

88. Winston Strawn willingly and intentionally provided privileged information that belongs to the Estate – without even alerting, much less obtaining approval from, the Trustee – to the lawyer representing Neugebauer to use against the Trustee and the Estate. Winston Strawn made this completely inappropriate disclosure of privileged information after the Trustee's lawyers had the "audacity" to request that Neugebauer provide evidence supporting the fantastical RICO conspiracy claims Winston Strawn signed off on ***against Winston Strawn's own clients*** – to which Neugebauer's lawyer (to whom Winston Strawn wrongfully disclosed privileged information) responded: "*They can't be serious*."

89. Neugebauer forwarded this e-mail exchange to Blankenship with the message, "*these guys are disgusting*," to which Blankenship responded: "*Yup. Happy to chat*." Winston

Strawn's breach of its sacrosanct duty of confidentiality to Winston Strawn's client (GloriFi) is inexcusable and caused the Estate to suffer substantial harm.

90. The motivation for Winston Strawn's bizarre involvement in Neugebauer's wrongful solicitation of creditors is revealed by Neugebauer's *quid pro quo* e-mail on July 17, 2024, to his wealthy business associates in West Texas:

> *"For no personal gain…….probably to the dismay of his New York and DC partners he [Blankenship] stood by us courageously sharing the truth of GloriFi to key stakeholders. The chapter 11 filing that we made last Wednesday would not have had a fraction of the impact to other unsecured creditors and more importantly the Judge if Mike [Blankenship] had not signed on to our reorganization plan and staunchly supported it."*
>
> *[. . .]*
>
> *"We all know lawyers…….and we all know firms……but the next time you need the resources of a larger firm or the experience of one of the top lawyers in the country I ask you to strongly consider Mike and Winston."*

91. It appears Winston Strawn was willing to actively participate in and aid/abet Neugebauer in his wrongful solicitation of creditors and brazen abuse of the bankruptcy process so long as it increased Winston Strawn's current and future bottom line.

***Winston Strawn caused GloriFi to suffer massive economic damages.***

92. In sum, rather than exercising fiduciary and ethical obligations Winston Strawn owed GloriFi, the Firm intentionally took actions designed to harm GloriFi and benefit Neugebauer and his family members/separate entities. Winston Strawn's actions (and deliberate inactions) were a proximate cause in GloriFi suffering ***enormous*** financial harm.

93. GloriFi was on the verge of closing the de-SPAC transaction with DHC and going public at a valuation of approximately ***$1.7 billion***. As of the date of this filing, Winston Strawn's own website still states that the proposed de-SPAC transaction would have provided

"approximately US$279M to GloriFi's balance sheet from DHC's trust after expenses . . ." and "[t]he transaction values the combined company . . . at a pro forma enterprise value of approximately US$1.7B at a price of US$10.00 per share . . . ."[6] As stated at the beginning of this section, the very reason Winston Strawn was hired and paid by GloriFi was to provide the legal advice and services GloriFi needed to close the de-SPAC transaction with DHC and go public at such an enormous valuation.

94. But for Winston Strawn's (i) negligence, including and not limited to the Firm's failure to adequately warn and advise the Company that engaging in the self-dealing schemes and other wrongful acts the Firm assisted Neugebauer in carrying out would likely result in killing the very de-SPAC transaction Winston Strawn was hired to navigate the Company through, and (ii) active participation in assisting, and developing and/or executing on the game plan for, Neugebauer in his unrelenting and sustained self-dealing and fraud to the Company's extreme detriment, GloriFi would have been able to close the de-SPAC transaction.

95. Specifically, Winston Strawn's misdeeds and collusion with Neugebauer, as outlined herein, was a proximate cause of the existing investors (and potential investors) losing confidence in GloriFi and the Company's resulting inability to raise the funding needed to close the de-SPAC transaction. The Company now sits in chapter 7 bankruptcy due, in large part, to Winston Strawn's conflicted representation, malpractice, breach of the Firm's fiduciary and ethical obligations, and active participation in Neugebauer's schemes and breaches of duty. Winston Strawn must be held accountable for its significant role in GloriFi's destruction and the massive reduction in GloriFi's enterprise value from $1.7 billion to zero.

---

6 GloriFi Announces Business Combination with DHC Acquisition Corp. (68243300) | Winston & Strawn

## V.
## CAUSES OF ACTION

**COUNT 1: NEGLIGENCE (LEGAL MALPRACTICE) – AGAINST ALL DEFENDANTS**

96. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

97. As GloriFi's attorneys and law firm, Defendants owed GloriFi the duty to act with reasonable care. Specifically, in Defendants' representation of GloriFi, Defendants were required to exercise the standard of care that would be exercised by a reasonably prudent attorney under the same or similar circumstances. For the reasons set forth herein, Defendants fell well below that standard and, thus, breached their duty of care to GloriFi.

98. GloriFi suffered significant actual and consequential damages as a result of Defendants' negligence and breaches of their duty of care. The Trustee seeks all recoverable damages from Defendants resulting from their negligence, including, but not limited to, the entire loss of GloriFi's enterprise value.

**COUNT 2: AIDING AND ABETTING / KNOWING PARTICIPATION IN NEUGEBAUER'S BREACH OF FIDUCIARY DUTY TO THE DEBTOR – AGAINST ALL DEFENDANTS**

99. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

100. At all relevant times, Neugebauer, who operated as an officer, director, and controlling shareholder of the Debtor, was a fiduciary to the Debtor. As such, Neugebauer owed the Debtor fiduciary duties, including the duties of loyalty and care. Given their representation of the Debtor, Defendants were fully aware of Neugebauer's fiduciary role and fiduciary duties owed to the Debtor.

101. Neugebauer's breaches of fiduciary duty directly and proximately caused the Debtor injury by, among other things: leading investors to lose confidence in GloriFi, the Company not being able to close the de-SPAC transaction and go public at a valuation of approximately $1.7 billion (which would have resulted in approximately $279 million to GloriFi's balance sheet after closing), and – ultimately – landing GloriFi in chapter 7 bankruptcy only months later.

102. Defendants knew Neugebauer was breaching his fiduciary duties to the Debtor and intended to (and did) substantially encourage, assist, and participate with Neugebauer in his actions as outlined herein.

103. Defendants knew they were participating in a breach of Neugebauer's fiduciary duties to the Debtor (or, at a minimum, Defendants recklessly aided, abetted, or participated in same). Defendants had extensive knowledge of Neugebauer's actions, and Defendants willingly participated in assisting Neugebauer's efforts in furthering his unlawful schemes.

104. At all relevant times, Defendants, in order to aid Neugebauer, acted in conflict with (or in disregard of) their duties to the Debtor to ignore clear conflicts of interest and prioritize Neugebauer's interests over the Debtor's, allowing Neugebauer to engage in self-dealing transactions and disregard normal corporate governance, all to cloak Neugebauer's scheme with the appearance of legitimacy.

105. Defendants' assistance to Neugebauer was essential to and a substantial factor in Neugebauer's self-dealing and other bad acts, which caused catastrophic harm to the Debtor and the ultimate demise of GloriFi.

106. Defendants did not take adequate steps to protect the Debtor and mitigate its harm. Instead of representing the Debtor's interests (*i.e.*, their own client), Defendants took actions to effectuate Neugebauer's interests. Defendants, through action and omission, aided and abetted

Neugebauer to implement a scheme to remove all independence and oversight from GloriFi's Board, engage in self-dealing transactions to the detriment of GloriFi's other stakeholders, and kill the potential de-SPAC merger between GloriFi and DHC (the very transaction Defendants were retained and paid by GloriFi to help the Company close).

107. As a result, Defendants knew or should have known that their aiding, abetting, or participation in Neugebauer's breaches of fiduciary duty would result in harm to the Debtor.

108. The Trustee seeks all recoverable damages from Defendants resulting from their aiding, abetting, participation, and encouragement of Neugebauer in his breaches of fiduciary duty, including, but not limited to, the entire loss of GloriFi's enterprise value.

**COUNT 3: AVOIDANCE OF TRANSFER – FRAUDULENT TRANSFER (11 U.S.C. § 548) – AGAINST WINSTON & STRAWN**

109. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

110. GloriFi filed its voluntary petition for relief under chapter 7 of the Bankruptcy Code on February 8, 2023 (the "Petition Date").

111. During the one-year period prior to the Petition Date, that is between February 8, 2022 and February 8, 2023, GloriFi made transfer(s) of an interest of GloriFi's property to or for the benefit of Winston Strawn through payments totaling not less than $790,890.00 (collectively, the "Transfers") in relation to the Firm's conflicted and improper representation of GloriFi (for which GloriFi obviously did not receive reasonable equivalent value from Winston Strawn for the reasons outlined herein).

112. During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to Winston Strawn during the relevant clawback period. It is the Trustee's intention to avoid and recover all transfers made by GloriFi which are voidable

pursuant to the Trustee's rights under the Bankruptcy Code and applicable law. The Trustee expressly reserves his right to amend this Complaint to include further information regarding Winston Strawn, the Transfers, and/or additional transfers that may become known to the Trustee at any time during this proceeding, through formal discovery or otherwise.

113. GloriFi's funds constituting the Transfers were made in relation to Winston Strawn's improper and conflicted representation of GloriFi. Accordingly, the Trustee asserts that the Transfers are fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

**<u>COUNT 4:</u>** **AVOIDANCE OF TRANSFER – FRAUDULENT TRANSFER (TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*) – AGAINST WINSTON & STRAWN**[7]

114. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

115. Pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a pre-petition transfer by GloriFi that an unsecured creditor could avoid.

116. In the alternative to the Trustee's fraudulent transfer claim under Section 548 of the Bankruptcy Code, the Trustee also pleads that the Transfers were fraudulent transfers under TUFTA because:

a. GloriFi did not receive reasonably equivalent value in exchange for the Transfers; and

b. GloriFi was insolvent at that time, or GloriFi became insolvent as a result of the transfer or obligation;

---

[7] The Texas Uniform Fraudulent Transfer Act is referred to herein as "TUFTA."

c. GloriFi was engaged or was about to engage in a business or a transaction for which the remaining assets of GloriFi were unreasonably small in relation to the business or transaction; or

d. GloriFi intended to incur, or believed or reasonably should have believed that GloriFi would incur, debts beyond GloriFi's ability to pay as they became due.

117. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to his reasonable costs and attorney's fees in avoiding and recovering the Transfers.

**<u>COUNT 5:</u> RECOVERY OF VOIDABLE TRANSFER (11 U.S.C. § 550) – AGAINST WINSTON & STRAWN**

118. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

119. Winston Strawn was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the Transfers were made for Winston Strawn's benefit.

120. Pursuant to Section 550 of the Bankruptcy Code, the Trustee is entitled to recover the Transfers, in the total amount of $790,890.00, and hereby seeks a monetary judgment against Winston Strawn in at least that amount with respect to the claims being asserted herein in relation to the Transfers.

**<u>COUNT 6:</u> DISALLOWANCE OF CLAIM (11 U.S.C. § 502) – AGAINST WINSTON & STRAWN**

121. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

122. Winston Strawn is the transferee of the Transfers, which are avoidable as stated herein. As such, the Transfers are recoverable pursuant to Section 550 of the Bankruptcy Code.

123. Winston Strawn has not paid back any portion of the Transfers.

124. Accordingly, pursuant to Section 502(d) of the Bankruptcy Code, any Claim,[8] if any, Winston Strawn and/or its assignees may have against GloriFi or the Estate must be disallowed.

125. Moreover, pursuant to Section 502(j) of the Bankruptcy Code, any Claim, if any, Winston Strawn and/or its assignees may have against GloriFi or the Estate which may have been previously allowed in the Bankruptcy Case, must be reconsidered and disallowed.

126. The Trustee hereby requests that the Bankruptcy Court disallow all Claims, if any, of Winston Strawn.

## VI.
## ATTORNEY'S FEES AND EXEMPLARY DAMAGES

127. The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

128. The Trustee seeks an award of exemplary damages in this case because, for the reasons set forth herein, Defendants acted with malice (*i.e.*, the specific intent to cause substantial injury or harm to GloriFi), an extreme degree of risk and a conscious indifference to the rights of GloriFi, and/or in a fraudulent manner, Defendants committed gross negligence, and Defendants committed other acts (as outlined herein) and in a manner that justifies the imposition of exemplary damages under applicable law.

129. The Trustee further seeks an award of the reasonable and necessary attorney's fees and costs incurred in pursuing this action. An award of attorney's fees is appropriate and just in this action under Section 24.013 of TUFTA and any other applicable statutes and/or contract provisions.

[8] As that term is defined in Section 101(5) of the Bankruptcy Code.

## VII.
## Conditions Precedent

130. All conditions precedent to maintaining this action have occurred and been satisfied or have been excused and/or waived.

## VIII.
## Conclusion

Based on the foregoing, the Trustee respectfully requests the following relief from the Court:

a) Judgment against Defendants for all actual damages, including the full amount of GloriFi's lost enterprise value (*i.e.*, approximately $1.7 billion), and any applicable special or other damages (including disgorgement);

b) Judgment against Defendants for exemplary damages;

c) Avoidance of the Transfers, upon the law and the facts, as fraudulent transfers;

d) Recovery of the Transfers by way of a monetary judgment against Winston Strawn;

e) Disallowance of all Claims, if any, of Winston Strawn filed in this bankruptcy proceeding;

f) Judgment against Defendants for pre- and post-judgment interest at the maximum rate permitted by law;

g) Judgment against Defendants for costs of suit and reasonable and necessary attorney's fees; and

h) Such other and further relief to which the Trustee is entitled.

Respectfully submitted,

*/s/ Chase J. Potter*

**CHASE J. POTTER**
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

**JOSHUA J. IACUONE**
Texas Bar No. 24036818
E-Mail: josh@imcplaw.com

**GREG MCALLISTER**
Texas State Bar No. 24071191
E-Mail: greg@imcplaw.com

**ANNA OLIN RICHARDSON**
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone: (214) 432-1536

**COUNSEL FOR THE AGENT AND SPECIAL COUNSEL FOR TRUSTEE**

B1040 (FORM 1040) (12/24)

| **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER** (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>Scott M. Seidel, Trustee | **DEFENDANTS**<br>Winston & Strawn LLP;<br>and Michael Blankenship |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Iacuone McAllister Potter PLLC<br>4925 Greenville Ave, Ste 1112<br>Dallas, TX 75206 214-432-1536 | **ATTORNEYS** (If Known)<br>Gibbs & Bruns LLP<br>1100 Louisiana, Suite 5300<br>Houston, TX 77002 |
| **PARTY** (Check One Box Only)<br>□ Debtor □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor ☑ Other<br>☑ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor ☑ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1: Negligence (Legal Malpractice); Count 2: Aiding and Abetting; Count 3: Avoidance of Transfer -- Fraudulent Transfer (11 U.S.C. Section 548); Count 4: Avoidance of Transfer -- Fraudulent Transfer (Tex. Bus. & Com. Code Sections 24.001, et seq.); Count 5: Recovery of Voidable Transfer (11 U.S.C. Section 550); Count 6: Disallowance of Claim (11 U.S.C. Section 502)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☑ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☑ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
| □ Check if a jury trial is demanded in complaint | Demand $ At least $ Lost enterprise value (over $1 billion) |

Other Relief Sought

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>With Purpose, Inc. | BANKRUPTCY CASE NO.<br>Case No. 23-30246-mvl-7 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas Division | NAME OF JUDGE<br>Hon. Michelle V. Larson |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br> | | |
| DATE<br>September 17, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Chase J. Potter | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.